1   ROB BONTA
    Attorney General of California
2   R. MATTHEW WISE
    SETH E. GOLDSTEIN
3   Supervising Deputy Attorneys General
    ROBERT WILLIAM SETRAKIAN (SBN 335045)
4   ANNE P. BELLOWS (SBN 293722)
    LISA C. EHRLICH (SBN 270842)
5   MICHAEL S. COHEN (SBN 339846)
    KEVIN L. QUADE (SBN 285197)
6   WILLIAM BELLAMY (SBN 347029)
    MALCOLM A. BRUDIGAM (SBN 323707)
7   Deputy Attorneys General
      1300 I Street, Suite 125
8     Sacramento, CA 95814
      Telephone: (916) 210-7873
9     Fax: (916) 454-8171
      E-mail: Malcolm.Brudigam@doj.ca.gov
10  Attorneys for Defendants Shirley Weber, in her
    official capacity as the California Secretary of
11  State, and the State of California

12                IN THE UNITED STATES DISTRICT COURT

13              FOR THE CENTRAL DISTRICT OF CALIFORNIA

14

15

16

17  **UNITED STATES OF AMERICA,**           Case No. 2:25-cv-09149-DOC-ADS

18                          Plaintiff,       **DECLARATION OF MALCOLM
                                             A. BRUDIGAM IN SUPPORT OF**
19            **v.**                         **DEFENDANTS' MOTION TO
                                             DISMISS**
20  **SHIRLEY WEBER, in her official
    capacity as Secretary of State of the**  Date:       Monday, Dec. 8, 2025
21  **State of California, and the STATE**   Time:       8:30 a.m.
    **OF CALIFORNIA,**                       Courtroom:  10A
22                                           Judge:      Hon. David O. Carter
                            Defendants.      Trial Date: None set.
23                                           Action Filed: Sept. 25, 2025

24

25

26

27

28

**DECLARATION OF MALCOLM A. BRUDIGAM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

Malcolm A. Brudigam hereby declares as follows:

1.     I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration. The evidence set out in this Declaration is based on my personal knowledge.

2.     I am a Deputy Attorney General employed at the California Department of Justice, Office of the Attorney General and am counsel of record in this case. I submit this Declaration in support of Defendants Secretary of State Shirley Weber's and State of California's (together, "California") Motion to Dismiss.

3.     Pursuant to Local Rule 7-3, I hereby certify that on October 31, 2025, I, counsel for California, the moving parties, conferred with opposing counsel in a good faith effort to resolve the issues raised by this motion. The parties were unable to resolve the issues raised in this motion, which the United States opposes, because the parties fundamentally differed in their legal interpretation of the statutes raised in this Motion and the Complaint. California takes the position that it has either complied with the federal statutes invoked in the complaint, or that those federal statutes do not apply at all, and that it is prohibited from disclosing voter information protected under California law. The United States' position is that California's laws are preempted, and that California has not complied with federal law, which requires more disclosure than California has provided thus far.

4.     Attached hereto as **Exhibit 1** is a true and correct copy of the July 10, 2025 letter from the U.S. Department of Justice to the Secretary of State.

5.     Attached hereto as **Exhibit 2** is a true and correct copy of the July 22, 2025 letter from the Secretary of State to the U.S. Department of Justice.

6.     Attached hereto as **Exhibit 3** is a true and correct copy of the July 29, 2025 letter from the U.S. Department of Justice to the Secretary of State.

*///*

7.     Attached hereto as **Exhibit 4** is a true and correct copy of the August 8, 2025 letter from the Secretary of State to the U.S. Department of Justice.

8.     Attached hereto as **Exhibit 5** is a true and correct copy the August 13, 2025 letter from the U.S. Department of Justice to the Secretary of State.

9.     Attached hereto as **Exhibit 6** is a true and correct copy of the August 21, 2025 letter from the Secretary of State to the U.S. Department of Justice.

10.    Attached hereto as **Exhibit 7** is a true and correct copy of the August 29, 2025 letter from the Secretary of State to the U.S. Department of Justice.

11.    Attached hereto as **Exhibit 8** is a true and correct copy of the September 12, 2025 letter from the Secretary of State to the U.S. Department of Justice.

12.    Attached hereto as **Exhibit 9** is a true and correct copy of President Dwight D. Eisenhower's "Statement by the President Upon Signing the Civil Rights Act of 1960" obtained online through the American Presidency Project, https://www.presidency.ucsb.edu/node/234270.

13.    Attached hereto as **Exhibit 10** is a true and correct copy of Report No. 1205 on H.R. 8601 (Civil Rights Act of 1960) from the U.S. Senate (86th Congress), Judiciary Committee, dated March 29, 1960.

14.    Attached hereto as **Exhibit 11** is a true and correct copy of Report No. 956 on H.R. 8601 (Civil Rights Act of 1960) from the U.S. House of Representatives (86th Congress), Judiciary Committee, dated August 20, 1959.

15.    Attached hereto as **Exhibit 12** is a true and correct copy of the Message to Congress from the President of the United States Transmitting Recommendations Pertaining to Civil Rights dated February 5, 1959.

16.    Attached hereto as **Exhibit 13** is a true and correct copy of an excerpt (pp. 3682–3692) of the Congressional Record from February 27, 1960 in the U.S. Senate.

///

///

2

17.    Attached hereto as **Exhibit 14** is a true and correct copy of an excerpt (pp. 5191–5194, 5208–5209) of the Congressional Record from March 10, 1960 in the U.S. House of Representatives.

18.    Attached hereto as **Exhibit 15** is a true and correct copy of the Civil Rights Act of 1957, Public Law No. 85-315 (Sept. 9, 1957).

19.    Attached hereto as **Exhibit 16** is a true and correct copy of California's voter registration form.

20.    Attached hereto as **Exhibit 17** are true and correct copies of the letters sent by the U.S. Department of Justice requesting a current electronic copy of the computerized statewide voter registration list from: Alaska, Arizona, Delaware, Georgia, Hawaii, Idaho, Illinois, Kansas, Louisiana, Maryland, Maine, Michigan, Minnesota, Missouri, Nebraska, New Hampshire, Nevada, New York, Ohio, Oregon, Pennsylvania, South Carolina, Texas, Utah, Virginia, Vermont, Washington, Wisconsin, West Virginia, and Wyoming.

I declare under penalty of perjury that the foregoing is true and correct. Executed on November 7, 2025 in Sacramento, California.

/s/ Malcolm A. Brudigam

Malcolm A. Brudigam

# EXHIBIT 1

**U.S. Department of Justice**

Civil Rights Division

*Voting Section*
*950 Pennsylvania Ave, NW – 4CON*
*Washington, DC  20530*

July 10, 2025

<u>Via Mail and Email</u>

The Honorable Shirley Weber
Secretary of State
1500 11th Street
Sacramento, CA 95814
secretary.weber@sos.ca.gov

Dear Secretary of State Weber:

We write to you as the chief election official for the State of California to request information regarding the state's procedures for complying with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq*.

Please provide a list of the election officials who are responsible for implementing California's general program of voter registration list maintenance from November 2022 through receipt of this letter, including those responsible officials not employed by your office (such as local election officials) who are also involved in that effort. Please also provide a description of the steps that you have taken, and when those steps were taken, to ensure that the state's list maintenance program has been properly carried out in full compliance with the NVRA. Please include both the actions taken by California officials as well as county officials.

The NVRA requires each state and the District of Columbia to make available for inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). Section 11 of the NVRA authorizes the Attorney General to bring NVRA enforcement actions. *See* 52 U.S.C. § 20510.

Pursuant to Section 20507(i) of the NVRA, the Attorney General requests that you produce for inspection the following records:

The current electronic copy of California's computerized statewide voter registration list ("statewide voter registration list") as required by Section 303(a) of the Help America Vote Act. Please include all fields contained within the list. Please produce each list in a .xls, .csv, or delimited-text file format.  Please specify what delimiter is used, if applicable, or provide a file layout along with a database user manual, coding list, or other materials that define or explain how a voter record is coded into the statewide voter registration list and reported in the electronic copy of the statewide voter registration list.

Additionally, please provide the following information in electronic form. The time period for these requests is close of registration for the November 2022 general election through the close of registration for the November 2024 general election, the same time period as the most recent report from the Election Assistance Commission's Election Administration and Voting Survey ("EAVS"). If you are unable to provide the data, please explain why the data is not available.

1. In the EAVS data for Question A3d, California had 2,178,551 voters (15.6 percent) with duplicate registrations. However, seven counties failed to provide data regarding duplicate registrations. Please provide a list of all duplicate registration records in Imperial, Los Angeles, Napa, Nevada, San Bernardino, Siskiyou, and Stanislaus counties.

2. No data was listed in the EAVS survey for Question A12h for California regarding duplicate registrants who were removed from the statewide voter registration database. Please provide a list of all duplicate registrants who were removed from the statewide voter registration list including the date(s) of removal. If they were merged or linked with another record, please provide that information. Please explain California's process for determining duplicates and what happens to the duplicate registrations.

3. In the EAVS data for Question QA12c, California had 378,349 voters (11.9 percent) removed because of death, which was well below the national average. Please provide a list of all registrations that were cancelled because of death. Please explain California's process for determining who is deceased and removing them from the voter roll and when that occurs.

4. Confirmation Notice data was missing in the EAVS survey for Questions A10a through A10f for several counties in California. Please provide the data for each county in California for Questions A10a through A10f.

5. The 2022 EAVS report contained 4,984,314 inactive voters, while the 2024 report contained 2,883,995. Please explain the reason for the change in the number of inactive registrations for these years.

6. A list of all registrations, including date of birth, driver's license number, and last four digits of Social Security Number, that were cancelled due to non-citizenship of the registrant.

Please provide this information within 14 days of the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS).

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov. We look forward to your assistance in advance.

Sincerely,

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division

Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division

Cc:     Jana Lean
        Chief of Elections
        1500 11th Street, 5th Floor
        Sacramento, CA 95814
        jana.lean@sos.ca.gov

EXHIBIT 2

**SHIRLEY N. WEBER, Ph.D.** | SECRETARY OF STATE | STATE OF CALIFORNIA
LEGAL AFFAIRS OFFICE
1500 11th Street | Sacramento, CA 95814 | 916.695.1242 | www.sos.ca.gov

July 22, 2025

<u>Via Mail and Email</u>

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division
United States Department of Justice
950 Pennsylvania Ave. NW -4CON
Washington, DC 20530

Maureen S. Riordan
Acting Chief, Voting Section
Civil Rights Division
United States Department of Justice
950 Pennsylvania Ave. NW -4CON
Washington, DC 20530
maureen.riordan2@usdoj.gov

Dear Michael Gates and Maureen Riordan,

We are in receipt of your letter dated July 10, 2025, wherein you requested information regarding California's procedures for complying with the statewide voter registration list maintenance provisions of the National Voter Registration Act.

Additionally, you requested additional information and posed six questions related to California responses to the Election Assistance Commission's Election Administration and Voting Survey (EAVS) report.

We are currently identifying information related to your request. We have determined we will require 90 days to provide a response, but will make every effort to respond sooner, if possible.

If you have any questions, please feel free to contact our office's Legal Affairs Division at legalsupport@sos.ca.gov.

Thank you for your understanding.

Respectfully,

<u>/s/ Shirley N. Weber</u>

Shirley N. Weber, Ph.D.
California Secretary of State

# EXHIBIT 3

**U.S. Department of Justice**

Civil Rights Division

*Voting Section - NWB*
*950 Pennsylvania Ave, NW*
*Washington, DC 20530*

July 29, 2025

<u>Via Mail and Email</u>
The Honorable Shirley N. Weber
c/o Legal Affairs Office
Office of the Secretary of State
State of California
1500 11th Street
Sacramento, CA 95814
Secretary.weber@sos.ca.gov
legalsupport@sos.ca.gov

Dear Secretary Weber,

Please allow this letter to reply to your correspondence dated July 22, 2025, responding to the U.S. Department of Justice's July 10, 2025 letter, calling for a series of information and records disclosures pursuant to the NVRA.

The request for another 90 days to respond to the Justice Department with information that should already be readily available to the Secretary of State is not acceptable. For example, Question 5 regarding the EAVS Report, should be answerable now. Moreover, process questions such as in Question 2, "Please explain California's process for determining duplicates and what happens to the duplicate registrations," are also answerable now. Accordingly, please provide those responses by August 8, 2025.

Similarly, the electronic copy of the statewide voter registration list is readily available to you. Accordingly, we request an unredacted statewide voter registration list by August 8, 2025 as well. As you know, Section 8(i) of the NVRA requires states to make available "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i).

We recognize, however, that other responses may take more time.  As such, we are willing to give the Secretary of State until Friday, August 29, 2025, to respond to the other requests.  If you have any questions, please contact Tim Mellett, Deputy Chief, Voting Section, at 202-307-6262 or timothy.f.mellett@usdoj.gov.

Sincerely,

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division


Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division


cc:     Jana Lean
        Chief of Elections
        1500 11th Street, 5th Floor
        Sacramento, CA 95814
        jana.lean@sos.ca.gov

EXHIBIT 4

**SHIRLEY N. WEBER, Ph.D.** | SECRETARY OF STATE | STATE OF CALIFORNIA
LEGAL AFFAIRS OFFICE
1500 11th Street | Sacramento, CA 95814 | 916.695-1242 | www.sos.ca.gov

August 8, 2025

<u>Via Mail and Email</u>

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division
United States Department of Justice
950 Pennsylvania Ave. NW-4CON
Washington, DC 20530

Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division
United States Department of Justice
950 Pennsylvania Ave. NW-4CON
Washington, DC 20530
maureen.riordan2@usdoj.gov

Dear Mr. Gates and Ms. Riordan:

I write in response to the U.S. Department of Justice's ("DOJ") July 29, 2025, letter stating that 90 days is not an acceptable amount of time to respond to a series of information and record requests made by DOJ on July 10, 2025. Although we are not required by law to respond by a certain deadline, below is a response to your request for "an unredacted statewide voter registration list by August 8, 2025," as well as records responsive to questions two and five that you highlighted in your July 29 letter.

**<u>California's Voter Registration Database</u>**

We are unable to comply with your request for an electronic copy of an entirely "unredacted statewide voter registration list." First, California law prohibits making available for public inspection or disclosing electronically an entirely "unredacted" voter file. Second, the NVRA has never been interpreted to require total and unqualified access to all information contained in a voter registration record. *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024) ("[N]othing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the Voter File." (collecting cases)). And finally, there is no need to collect sensitive personally identifiable information of California voters to evaluate whether California is "conduct[ing] a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of" death and change in residence. 52 U.S.C. § 20507(a)(4).

Nonetheless, and as required under section 8(i), my office has made available for DOJ's inspection a copy of California's voter registration database at my office located at 1500 11th Street, Sacramento, California 95814. 52 U.S.C. § 20507(i)(1) (requiring States to make the records "available for public inspection and, where available, photocopying at a reasonable cost"); *Greater Birmingham Ministries v. Sec'y of State for Alabama* 105 F.4th 1324, 1333 (11th Cir. 2024) ("'[P]ublic inspection' as used in the National Voter Registration Act does not include electronic disclosure."). DOJ may inspect a copy of our redacted voter registration database during regular business hours by making an appointment with my office. Public inspection satisfies our legal obligations under the NVRA and ensures that this office complies with legal protections for voter registration data under California law. These protections include prohibitions on transferring the data, along with detailed data security and storage requirements. Cal. Code Regs. tit. 2, §§ 19005, 19008(a)(8), 19012, 19013.

Please know that in accordance with California law, the following information has been redacted from all records made available for DOJ's public inspection: voters' driver's license numbers, California identification card numbers, social security numbers, other unique identifier numbers used by the State of California for purposes of voter identification, and voter signatures. Cal. Elec. Code § 2194(b)(1)–(2); *see also* Cal. Gov. Code § 7924.000(b).

Finally, to the extent that DOJ intends to make copies of any records made available for public inspection, we would require that DOJ enter into a Memorandum of Understanding with my office to ensure that the handling of our registered voters' sensitive information meets the data protection standards of California law. In addition, my office requests that you inform us whether DOJ believes data collected from California's voter registration database is subject to the Privacy Act of 1974, along with the legal explanation for your position. Please also provide a citation within the Federal Register to the system of records under which DOJ intends to collect and maintain the records it has requested from California. And please describe how DOJ plans to store, maintain, and use the requested voter registration information.

## California List Maintenance Processes – Response to Questions 2 and 5

DOJ's July 10, 2025, letter asked the following two questions:

> 2. No data was listed in the EAVS survey for Question A12h for California regarding duplicate registrants who were removed from the statewide voter registration database. Please provide a list of all duplicate registrants who were removed from the statewide voter registration list including the date(s) of removal. If they were merged or linked with another record, please provide that information. Please explain California's process for determining duplicates and what happens to the duplicate registrations.

> 5. The 2022 EAVS report contained 4,984,314 inactive voters, while the 2024 report contained 2,883,995. Please explain the reason for the change in the number of inactive registrations for these years.

While both questions request a narrative response, we are aware of no legal obligation to provide one. Rather, because California strives to have some of the most transparent election processes in

the country, the answer to your questions can be found in the following publicly available documents, which are available online.

In response to question two, please see the following documents:

1. [U.S. Election Administration Commission's (EAC) 2024 Election Administration Policy Survey](#), See page 154.

   https://www.eac.gov/sites/default/files/2025-07/2024_EAVS_Report_508.pdf

2. [Guidance: EMS Messages](#), See page 6, Section 2.2.

   https://elections.cdn.sos.ca.gov/votecal/guidance/ems-message.pdf

3. [California 2022-2024 Election Administration and Voting Survey to EAC](#).

   https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Felections.cdn.sos.ca.gov%2Fnvra%2Freports%2Fbiennial%2Feavs-2024.xlsm&wdOrigin=BROWSELINK

In response to question five, please see the following documents:

1. [California's NVRA Manual, Ch. 4 entitled "Voter Registration Applications and Voter List Maintenance"](#), See Ch 4., page 20.

   https://elections.cdn.sos.ca.gov/nvra/nvra-manual/chap-4.pdf

2. [Legislative History of AB-504 (Berman), California Statutes of 2019, Ch. 262 § 6](#).

   https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201920200AB504

3. [Cal. Elec. Code, §§ 2222 through 2226](#).

   https://leginfo.legislature.ca.gov/faces/codes_displayText.xhtml?lawCode=ELEC&division=2.&title=&part=&chapter=3.&article=2

4. *[Husted v. A. Philip Randolph Inst. 584 U.S. 756 (2018).](#)*

   https://www.supremecourt.gov/opinions/17pdf/16-980_f2q3.pdf

The remaining four questions require compiling records from up to twelve different counties, which will require more time. As such, I cannot agree to your arbitrary deadline of August 29 to answer the remaining requests. Please accept my assurances that my office is looking into your questions and will inform you when the documents are available for inspection at my office.

Finally, I want to remind DOJ that the United States Constitution is clear about where the power to regulate elections is allocated in this country: as sovereigns closest to the people, the States have primary responsibility. Nowhere does the Constitution provide the President or the Executive Branch with *any* independent power to control or otherwise conscript States to carry out non-statutory policy priorities of the President. To the extent DOJ is utilizing the NVRA in a

manner not permitted to advance the President's policy objectives, my office is not obligated to follow along. To the contrary, my obligation is to support and defend the Constitution of the United States and the Constitution of the State of California, ensure election laws are being enforced, and protect California voters from unnecessary and illegitimate intrusions on their privacy.

Please do not hesitate to contact my office regarding when you plan to visit Sacramento to review the voter registration information.

Respectfully,

/s/ Shirley N. Weber

Dr. Shirley N. Weber
California Secretary of State

# EXHIBIT 5



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

August 13, 2025

<u>Via Mail and Email</u>

The Honorable Shirley N. Weber
c/o Legal Affairs Office
Office of the Secretary of State
State of California
1500 11th Street
Sacramento, CA 95814
Secretary.weber@sos.ca.gov
legalsupport@sos.ca.gov

Re:    **California Voter Registration List and Other Disclosures**

Secretary Weber:

This letter responds to your letter of August 8, 2025.  This communication is limited to our request for the State of California's voter registration list ("VRL") and associated voter registration records and does not include the Justice Department's response to your partial answers to the inquiries about California's VRL maintenance processes.  That response will come later.

Our July 10, 2025, letter requested California's VRL to assess the State's compliance with the statewide VRL maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501, *et seq.*  Our request is pursuant to the Attorney General's authority under Section 11 of the NVRA to bring enforcement actions. *See* 52 U.S.C. § 20501(a).

The Help America Vote Act ("HAVA"), 52 U.S.C. § 20501, *et seq.*, also provides authority for the Justice Department to seek the State's VRL via Section 401, which makes the Attorney General solely responsible for actions to enforce HAVA's computerized statewide Voter Registration List requirements.  *See* 52 U.S.C. § 21111; *see also Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 (2008) (*per curiam*) (finding there is no private right of action to enforce those requirements in HAVA).

In addition to those authorities, the Attorney General is also empowered by Congress to request records pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), codified at 52 U.S.C.

§ 20701, *et seq*. Section 301 of the CRA requires state and local officials to retain and preserve records related to voter registration and other acts requisite to voting for any federal office for a period of 22 months after any federal general, special or primary election. *See* 52 U.S.C. § 20701.

Section 303 of the CRA provides, in pertinent part, "Any record or paper required by section 20701 to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative…." 52 U.S.C. § 20703.

As the plain language of the statute makes clear, California cannot limit the Justice Department's access to mere inspection of the requested voter registration records; the Justice Department is entitled to a full and complete copy of those records in the form in which California maintains them, including in electronic form pursuant to HAVA.

As required by Section 303 of the CRA, our letter dated July 10, 2025, provided you with "a statement of the basis and the purpose therefore," *id.*, namely, to assist in our determination of whether California's list maintenance program complies with the NVRA. At your request, we have reaffirmed that statement in this correspondence.

When providing the electronic copy of the statewide VRL, California must ensure that it contains *all fields*, which includes the registrant's full name, date of birth, residential address, his or her state driver's license number, or the last four digits of the registrant's social security number as required under the Help America Vote Act ("HAVA")[1] to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A)(i).

In addition to the full electronic VRL, we also request by this letter a copy of all original and completed voter registration applications submitted to the State of California from December 1, 2023, through July 1, 2025. To be clear, that means copies of all voter registration applications completed and submitted by prospective voters during that time period. When providing a copy of the requested completed registration applications, California must ensure that they are provided in unredacted format.

Your letter dated August 8, 2025, also indicated concern regarding federal privacy protections of the VRL and other requested information by the Justice Department. Section 304 of the CRA provides the answer:

Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney

---

[1] In charging the Attorney General with enforcement of the voter registration list requirements in the HAVA and in the NVRA, Congress plainly intended that Justice Department be able to conduct an independent review of each state's list. Any statewide prohibitions are clearly preempted by federal law.

General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

52 U.S.C. § 20704. As you noted, other federal laws may be applicable, including the Privacy Act. California's privacy laws, to the extent they are inconsistent with federal law, are preempted.

HAVA specifies that the "last 4 digits of a social security number . . . shall not be considered a social security number for purposes of section 7 of the Privacy Act of 1974" (5 U.S.C. § 522(a) note); 52 U.S.C. § 21083(c)).  In addition, any prohibition of disclosure of a motor vehicle record contained in the Driver's License Protection Act, codified at 18 U.S.C. § 2721(b)(1), is exempted when the disclosure is for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority as the Justice Department is now doing.

To that end, provide the requested electronic Voter Registration List[2] to the Justice Department within seven days or by August 21, 2025, and provide all original and completed voter registration applications submitted to the State of California from December 1, 2023, through July 1, 2025, to the Justice Department by September 12, 2025.

California's VRL and the requested original and completed voter registration applications may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing ("JEFS").  Please be advised that failure by California to provide its statewide VRL may result in legal action. Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov.

Regards,

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division


cc:     Jana Lean
        Chief of Elections
        1500 11th Street, 5th Floor
        Sacramento, CA 95814
        jana.lean@sos.ca.gov

---

[2] Containing *all fields*, which includes either the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required by HAVA.

EXHIBIT 6

**SHIRLEY N. WEBER, Ph.D.** | SECRETARY OF STATE | STATE OF CALIFORNIA

LEGAL AFFAIRS OFFICE
1500 11th Street | Sacramento, CA 95814 | 916.695.1242 | www.sos.ca.gov

August 21, 2025

<u>Via Mail and Email</u>

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division
United States Department of Justice
950 Pennsylvania Ave. NW-4CON
Washington, DC 20530
Michael.Gates2@usdoj.gov
Maureen.Riordan2@usdoj.gov

Dear Ms. Dhillon:

I write in response to your August 13, 2025 letter regarding the U.S. Department of Justice's (DOJ) request for a copy of California's voter registration list and associated voter registration records.

DOJ's July 10 and July 29 letters both invoked the National Voter Registration Act's (NVRA) public inspection provision, 52 U.S.C. § 20507(i), in requesting that California provide a copy of its voter registration list. On August 8, I informed your office that we have made available for public inspection a copy of California's voter registration list at my office in Sacramento, with appropriate redactions of social security numbers, driver's license numbers, and similar protected personal identifying information as required under California law and allowed under the NVRA. Despite our invitation, you have not yet made an appointment for the inspection.

My office remains willing and available to facilitate your inspection of the redacted voter file; however, your letter fails to establish a sound legal basis to demand anything more.

> **1. DOJ Has Not Established Legal Authority to Request the Unredacted Voter File Containing Sensitive Personal Identifying Information of Millions of Californians.**

Your August 13 letter—for the first time—references the Help America Vote Act (HAVA) and the Civil Rights Act of 1960 (CRA). But neither statute supports your office's sweeping request. HAVA gives the Attorney General authority to enforce the "uniform and nondiscriminatory election technology and administration requirements" set out in that Act. 52 U.S.C. § 21111. California carefully complies with every HAVA requirement and stands ready to demonstrate

this compliance through its documented policies and practices, should your office so request. Notably, your letter gives no basis for suspecting any shortcoming or failure in California's HAVA compliance, nor suggests that DOJ is actually investigating any alleged HAVA violation.

The CRA also does not authorize your office's sweeping request for all California voters' sensitive, personal identifying information linked to their voter registration. As you note, to validly request election records under the CRA, your office must provide "a statement of the basis and the purpose" of the request. 52 U.S.C. § 20703. Your August 13 letter asserts that the purpose of DOJ's request for the unredacted voter file is "to assist in [DOJ's] determination of whether California's list maintenance program complies with the NVRA." But demonstrating compliance with the NVRA's list maintenance requirements does not require production of sensitive and confidential records of millions of Californians. And your communications with my office articulate no basis for even suspecting a violation of the NVRA, much less a reason why DOJ needs access to confidential voter data to evaluate our list maintenance program.

As you know, the NVRA does not give DOJ general supervisory power over the accuracy of each record in the voter file. Rather, Congress deliberately left the primary responsibility to manage voter lists in the hands of the States, subject to protections against unjustified voter purges and the requirement that States "conduct a general program" to remove voters who become ineligible due to death or change in residence. 52 U.S.C. § 20507(a)(4). To satisfy the NVRA's list maintenance obligations, a State must simply "establish a program that makes a rational and sensible attempt to remove" registrants who have died or moved. *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 625 (6th Cir. 2025) (rejecting the argument that the adequacy of a list maintenance program should be judged by statistical indicia).

Because the protected, sensitive data of millions of California voters is not facially germane to an investigation of the State's list maintenance practices, and your office has not provided any other basis or purpose for requesting this confidential data, the CRA does not require its production. *See* 52 U.S.C. § 20703.

DOJ's request to California also does not come in a vacuum. Our sister States have informed us, along with reporting by media outlets, that DOJ is seeking voter registration lists from all 50 States. I understand that many States received letters nearly identical to the August 13 letter sent to my office, each demanding substantially identical data. This nationwide effort undermines DOJ's claim that its data request is necessary for an investigation of *California's* NVRA compliance. Thus, it appears that your requests are not part of any good faith investigation into California's—or any State's—compliance with the NVRA, but rather some undisclosed purpose.

**2. California Law Protecting Voters' Sensitive Identifying Information is Not Preempted in these Circumstances.**

As I informed your office in my August 8, 2025 letter, the Secretary of State is required under California law to redact certain information from the copy of the voter registration list which has

been made available for inspection, including social security numbers, driver's license numbers, and contact information of confidential voters like victims of domestic violence. Cal. Elec. Code § 2194; Cal. Gov. Code § 7924.000(b); Cal. Elec. Code §§ 2166, 2166.5, 2166.7, 2166.8; *see also* Cal. Const. art. I, § 1.

These legal protections are not preempted by the NVRA, which does not require the disclosure of sensitive personal identifying information. *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024) (collecting cases). Nor are they preempted by HAVA, which does not contain any inspection provision and thus does not obligate California to make any records available to DOJ. *See* 52 U.S.C. § 21111. Finally, these legal protections are not displaced by DOJ's mere citation to the CRA, particularly when DOJ has not stated a valid purpose and basis for accessing this sensitive and confidential personal data. *See* 52 U.S.C. § 20703.

### 3. DOJ Has Not Demonstrated that Its Data Request Complies with the Privacy Act.

Finally, from DOJ's correspondence, we understand that DOJ is creating a system of records of California voters (and, apparently, all voters nationwide), which is subject to the Privacy Act of 1974. As I requested in my August 8 letter—but so far have received no response—please explain in detail how DOJ's request complies with the Privacy Act. Specifically, please explain:

1) DOJ's purpose for creating this system of records, including a citation to the notice published in the Federal Register, as required under 5 U.S.C. § 552a(e)(4);
2) Any currently planned or foreseen transfer of the records outside of DOJ's Voting Rights Section and your basis for believing that such a transfer complies with the Privacy Act;
3) How California's voter registration list is necessary and relevant to the reason DOJ is compiling this system of records;
4) How the system of records DOJ is establishing complies with the prohibition in 5 U.S.C. § 552a(e)(7) on maintaining records "describing how any individual exercises rights guaranteed by the First Amendment," considering that voter registration lists include party affiliation and voter participation history, *see id.*; and
5) What, if any, measures DOJ is taking to ensure the new system of records will be maintained with "such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination." 5 U.S.C. § 552a(e)(5).

Before my office allows DOJ to make a copy of any part of the voter registration list, we must confirm that DOJ's collection of this data is permitted under the Privacy Act. Additionally, as I informed your office in my August 8 letter, prior to DOJ making copies of any voter file records, we require that DOJ enter into a Memorandum of Understanding with my office to ensure that

the handling of the data meets the standards of California law, the Privacy Act, and any other applicable protections.[1]

Please do not hesitate to contact my office regarding when you plan to visit Sacramento to review the voter registration information.

Respectfully,

/s/ Shirley N. Weber

Shirley N. Weber, Ph.D.
California Secretary of State

---

[1] There is no legal basis for your claim that DOJ is entitled to receive the records in electronic form.  The NVRA and the CRA require States to allow inspection and copying of the records, but no more than that.  52 U.S.C. § 20507(i)(1) (requiring States to make covered records "available for public inspection and, where available, photocopying at a reasonable cost"); *id.* § 20703 (requiring the records custodian to make covered records "available for inspection, reproduction, and copying at the principal office of such custodian").  Permitting your inspection satisfies our legal obligations under these statutes and ensures that my office complies with legal protections for voter registration data under California and federal law.

# EXHIBIT 7

**SHIRLEY N. WEBER, Ph.D.** | SECRETARY OF STATE | STATE OF CALIFORNIA
LEGAL AFFAIRS OFFICE
1500 11th Street | Sacramento, CA 95814 | 916.695-1242 | www.sos.ca.gov

August 29, 2025

<u>Via Mail and Email</u>

Harmeet K. Dhillon, Assistant Attorney General
Michael E. Gates, Deputy Assistant Attorney General
Maureen S. Riordan, Acting Chief, Voting Section
Civil Rights Division
United States Department of Justice
950 Pennsylvania Ave. NW-4CON
Washington, DC 20530
Michael.Gates2@usdoj.gov
Maureen.Riordan2@usdoj.gov

Ms. Dhillon, Mr. Gates, and Ms. Riordan:

We write in response to your letters dated July 10 and 29, 2025, wherein you requested information regarding California's procedures for complying with the statewide voter registration list maintenance provisions of the National Voter Registration Act. Additionally, you requested other county-specific information and posed six questions related to California's responses to the Election Assistance Commission's Election Administration and Voting Survey (EAVS) report. On August 8, 2025, we responded to two of those six questions.

In your July 29 letter, the Department of Justice (DOJ) requested that my office provide responses to the remaining requests in the July 10 letter by August 29, 2025. Since then, DOJ sent a subsequent letter on August 13, 2025, requesting additional voluminous documents and unredacted sensitive data.

In this letter, my office is providing a response to the following request from DOJ's July 10 letter: "Please provide a list of the election officials who are responsible for implementing California's general program of voter registration list maintenance from November 2022 through receipt of this letter, including those responsible officials not employed by your office (such as local election officials) who are also involved in that effort." Attached to this letter is a current list of all county elections officials with their contact information. Secretary of State employees may be reached through my Legal Affairs Office at: legalsupport@sos.ca.gov.

As to the remaining information requests from DOJ's original July 10 letter, I am writing to inform you that we anticipate providing a response by September 12, 2025. This will provide my

office with the necessary time to communicate with local elections officials regarding the
county-specific information requested.  To the extent my office can provide rolling responses
sooner than September 12, we will do so.

Respectfully,

/s/ Shirley N. Weber

Shirley N. Weber, Ph.D.
California Secretary of State

**<u>Alameda</u>**
Tim Dupuis, Registrar of Voters
1225 Fallon Street, Room G-1
Oakland, CA 94612
(510) 272-6933
(510) 272-6982 Fax
Hours: 8:30 a.m. - 5:00 p.m.
https://www.acvote.org

**<u>Alpine</u>**
Teola L. Tremayne, County Clerk
99 Water Street
Markleeville, CA 96120
Mailing Address:
P.O. Box 158
Markleeville, CA 96120
(530) 694-2281
(530) 694-2491 Fax
Hours: 8:30 a.m. - 12:00 p.m. / 1:00 p.m. - 5:00 p.m.
https://www.alpinecountyca.gov
E-Mail: ttremayne@alpinecountyca.gov

**<u>Amador</u>**
Kimberly L. Grady, County Clerk
810 Court Street
Jackson, CA 95642-2132
(209) 223-6465
(209) 223-6467 Fax
Hours: 8:00 a.m. - 5:00 p.m.
https://www.amadorgov.org/government/elections
E-Mail: Elections@amadorgov.org

**<u>Butte</u>**
Keaton Denlay, County Clerk-Recorder/Registrar of Voters
155 Nelson Ave
Oroville, CA 95965-3411
(530) 552-3400, option 1
(800) 894-7761 (Domestic)
(530) 538-6853 Fax
Hours: 8:00 a.m. - 5:00 p.m.
https://buttevotes.net/35/Elections
E-Mail: elections@buttecounty.net

**<u>Calaveras</u>**
Rebecca Turner, County Clerk/Recorder
Elections Department
891 Mountain Ranch Road
San Andreas, CA 95249
(209) 754-6376
(209) 754-6733 Fax
Hours: 8:00 a.m. - 4:00 p.m.
http://elections.calaverasgov.us
E-Mail: electionsweb@co.calaveras.ca.us

**<u>Colusa</u>**
Cristy Jayne Edwards, County Clerk/Recorder/Registrar of Voters
546 Jay Street, Suite 200
Colusa, CA 95932
(530) 458-0500
(530) 458-0512 Fax
Hours: 8:30 a.m. - 4:00 p.m.
http://www.countyofcolusa.org
E-Mail: clerkinfo@countyofcolusa.org

**<u>Contra Costa</u>**
Kristin Braun Connelly, County Clerk, Recorder and Registrar of Voters
555 Escobar Street
Mailing Address:
P.O. Box 271
Martinez, CA 94553
(925) 335-7800
(925) 335-7838 Fax
Hours: 8:00 a.m. - 5:00 p.m.
https://www.contracostavote.gov/
E-Mail: voter.services@vote.cccounty.us

**<u>Del Norte</u>**
Alissia Northrup, County Clerk-Recorder
981 H Street, Room 160
Crescent City, CA 95531
(707) 464-7216
(707) 465-0321 Fax
Hours: 8:00 a.m. - 5:00 p.m.
https://www.co.del-norte.ca.us/departments/Elections
E-Mail: anorthrup@co.del-norte.ca.us

**El Dorado**
Linda Webster, Registrar of Voters
3883 Ponderosa Road
Shingle Springs, CA 95682
Mailing Address:
P.O. Box 678001
Placerville, CA 95667
(530) 621-7480
(530) 677-1014 Fax
Hours: 8:00 a.m. - 5:00 p.m.
https://www.eldoradocounty.ca.gov/County-Government/Elections
E-Mail: elections@edcgov.us

**Fresno**
James Kus, County Clerk/Registrar of Voters
2221 Kern Street
Fresno, CA 93721
(559) 600-8683
(559) 488-3279 Fax
Hours: 8:30 a.m. - 5:00 p.m.
https://www.fresnocountyca.gov/Departments/County-ClerkRegistrar-of-Voters
E-Mail: clerk-elections@fresnocountyca.gov

**Glenn**
Sendy Perez, County Assessor/Clerk-Recorder/Elections
516 W. Sycamore Street, 2nd Floor
Willows, CA 95988
(530) 934-6414
(530) 934-6571 Fax
Hours: 8:00 a.m. - 5:00 p.m.
https://www.countyofglenn.net/dept/elections/welcome
E-Mail: elections@countyofglenn.net

**Humboldt**
Juan Pablo Cervantes, County Clerk, Recorder and Registrar of Voters
2426 6th Street
Eureka, CA 95501
(707) 445-7481
(707) 445-7204 Fax
Hours: 8:30 a.m. - 12:00 p.m. / 1:00 p.m. - 5:00 p.m.
https://humboldtgov.org/890/Elections-Voter-Registration
E-Mail: humboldt_elections@co.humboldt.ca.us

**Imperial**
Linsey J. Dale, Registrar of Voters
940 W. Main Street, Suite 206
El Centro, CA 92243
(442) 265-1060
(442) 265-1062 Fax
Hours: 8:00 a.m. - 5:00 p.m.
https://elections.imperialcounty.org/
E-Mail: linseydale@co.imperial.ca.us

**Inyo**
Danielle Sexton, Clerk/Recorder & Registrar of Voters
168 N. Edwards Street
Independence, CA 93526
Mailing Address:
P.O. Drawer F
Independence, CA 93526
(760) 878-0224
(760) 878-1805 Fax
Hours: 8:00 a.m. - 12:00 p.m. / 1:00 p.m. - 5:00 p.m.
https://elections.inyocounty.us
E-Mail: dsexton@inyocounty.us

**Kern**
Aimee X. Espinoza, Auditor-Controller/County Clerk/Registrar of Voters
1115 Truxtun Avenue, First Floor
Bakersfield, CA 93301
(661) 868-3590
(800) 452-8683
(661) 868-3768 Fax
Hours: 8:00 a.m. - 5:00 p.m.
https://www.kernvote.com
E-Mail: elections@kerncounty.com

**Kings**
Lupe Villa, Registrar of Voters
1400 W. Lacey Blvd. Bldg. #7
Hanford, CA 93230
(559) 852-4401
(559) 585-8453 Fax
Hours: 8:00 a.m. - 5:00 p.m.
https://www.countyofkings.com/departments/administration/elections
E-Mail: Elections@Countyofkings.com

**Lake**
Maria Valadez, Registrar of Voters
325 N. Forbes Street
Lakeport, CA 95453
(707) 263-2372
(707) 263-2742 Fax
Hours: Monday - Friday: 8:00 a.m. - 5:00 p.m.
https://www.lakecountyca.gov/818/Registrar-of-Voters
E-Mail: elections@lakecountyca.gov

**Lassen**
Julie Bustamante, County Clerk-Recorder
220 S. Lassen Street, Suite 5
Susanville, CA 96130
(530) 251-8217
(530) 257-3480 Fax
Hours: 9:00 a.m. - 12:00 p.m. / 1:00 p.m. - 4:00 p.m.
http://www.lassencounty.org/dept/county-clerk-recorder/elections/
E-Mail: lcclerk@co.lassen.ca.us

**Los Angeles**
Dean Logan, Registrar - Recorder/County Clerk
12400 Imperial Hwy.
Norwalk, CA 90650
Mailing Address:
P.O. Box 1024
Norwalk, CA 90651-1024
(800) 815-2666
(562) 929-4790 Fax
Hours: 8:00 a.m. - 5:00 p.m.
https://www.lavote.gov/home/voting-elections
E-Mail: voterinfo@rrcc.lacounty.gov

**Madera**
Rebecca Martinez, Clerk/Recorder/ROV
Elections Division
200 W. 4th Street
Madera, CA 93637
(559) 675-7720
(559) 675-7870 Fax
Hours: 8:00 a.m. - 5:00 p.m.
https://votemadera.com
E-Mail: electionsinfo@maderacounty.com

**<u>Marin</u>**
Natalie Adona, Registrar of Voters
3501 Civic Center Drive, Room 121
San Rafael, CA 94903
Mailing Address:
P.O. Box E
San Rafael, CA 94913-3904
(415) 473-6456
(415) 473-6447 Fax
Hours: 8:00 a.m. - 4:30 p.m.
https://www.marincounty.gov/departments/elections
E-Mail: elections@marincounty.gov

**<u>Mariposa</u>**
Courtney Progner Morrow, Registrar of Voters
Hall of Records
4982 10th Street
Mariposa, CA 95338
Mailing Address:
P.O. Box 247
Mariposa, CA 95338
(209) 966-2007
(209) 966-6496 Fax
Hours: 8:00 a.m. - 5:00 p.m.
http://www.mariposacounty.org/87/Elections
E-Mail: cmorrow@mariposacounty.org

**<u>Mendocino</u>**
Katrina Bartolomie, Assessor-County Clerk-Recorder
Elections Department
501 Low Gap Road, Room 1020
Ukiah, CA 95482
(707) 234-6819
(707) 463-6597 Fax
Hours: 8:00 a.m. - 5:00 p.m.
https://www.mendocinocounty.org/government/assessor-county-clerk-recorder-
elections/elections
E-Mail: acr@co.mendocino.ca.us

**<u>Merced</u>**
Melvin E. Levey, Registrar of Voters
2222 M Street
Merced, CA 95340
(209) 385-7541
(209) 385-7387 Fax
Hours: 8:00 a.m. - 5:00 p.m.
https://www.countyofmerced.com/3878/Elections
E-Mail: mcvotes@mendocinocounty.gov

**<u>Modoc</u>**
Stephanie Wellemeyer, County Auditor/Clerk/Recorder
108 E. Modoc Street
Alturas, CA 96101
(530) 233-6200
(530) 233-6666 Fax
Hours: 8:30 a.m. - 12:00 p.m. / 1:00 p.m. - 5:00 p.m.
http://www.co.modoc.ca.us/departments/elections
E-Mail: clerkelections@co.modoc.ca.us

**<u>Mono</u>**
Queenie Barnard, Clerk – Recorder – Registrar
(Library Building)
74 N. School Street, Annex I
Bridgeport, CA 93517
Mailing Address:
P.O. Box 237
Bridgeport, CA 93517
(760) 932-5500
(760) 932-5531 Fax
Hours: 8:00 a.m. - 5:00 p.m.
https://monocounty.ca.gov/elections
E-Mail: elections@mono.ca.gov

**<u>Monterev</u>**
Gina Martinez, Registrar of Voters
1441 Schilling Place - North Building
Salinas, CA 93901
Mailing Address:
P.O. Box 4400
Salinas, CA 93912
(831) 796-1499
(831) 755-5485 Fax
Hours: 8:00 a.m. - 5:00 p.m.
https://www.montereycountyelections.us
E-Mail: elections@co.monterey.ca.us

**<u>Napa</u>**
John Tuteur, Assessor-Recorder-County Clerk
Napa County Registrar of Voters
1127 First St. Ste. E
Napa, CA 94559
(707) 253-4321
(707) 253-4390 Fax
Hours: 8:00 a.m. - 5:00 p.m.
https://www.countyofnapa.org/396/Elections
E-Mail: elections@countyofnapa.org

**<u>Nevada</u>**
Corey O'Hayre, Acting Clerk-Recorder, Registrar of Voters
950 Maidu Avenue, Suite 210
Nevada City, CA 95959
(530) 265-1298
(530) 265-9829 Fax
Hours: 8:00 a.m. - 5:00 p.m.
https://www.nevadacountyca.gov/3446/Elections
E-Mail: elections.mail@nevadacountyca.gov

**Orange**
Bob Page, Registrar of Voters
1300 South Grand Avenue, Bldg. C
Santa Ana, CA 92705
Mailing Address:
P.O. Box 11298
Santa Ana, CA 92711
(714) 567-7600
(714) 567-7556 Fax
Hours: 8:00 a.m. - 5:00 p.m.
ocvote.gov
E-Mail: ocvoter@ocgov.com

**Placer**
Ryan Ronco, County Clerk-Recorder-Registrar
3715 Atherton Road Suite #2
Rocklin, CA 95765
(530) 886-5650
(800) 824-8683
(530) 886-5688 Fax
Hours: 8:00 a.m. - 5:00 p.m.
http://www.placercountyelections.gov
E-Mail: election@placer.ca.gov

**Plumas**
Marcy DeMartile, County Clerk-Recorder-Registrar of Voters
520 Main Street, Room 102, Courthouse
Quincy, CA 95971
(530) 283-6256
(530) 283-6155 Fax
Hours: 8:00 a.m. - 5:00 p.m.
http://www.countyofplumas.com/142/Elections-Division-Home
E-Mail: elections@countyofplumas.com

**Riverside**
Art Tinoco, Registrar of Voters
2724 Gateway Drive
Riverside, CA 92507-0918
(951) 486-7200
(951) 486-7272 Fax
Hours: 8:00 a.m. - 5:00 p.m.
https://www.voteinfo.net
E-Mail: rovweb@rivco.org

**<u>Sacramento</u>**
Hang Nguyen, Registrar of Voters
7000 65th Street, Suite A
Sacramento, CA 95823
(916) 875-6451
(916) 875-6516 Fax
Hours: 8:00 a.m. - 5:00 p.m.
https://elections.saccounty.gov/Pages/default.aspx
E-Mail: voterinfo@saccounty.gov

**<u>San Benito</u>**
Francisco Diaz, County Clerk-Auditor-Recorder
1601 Lana Way
Hollister, CA 95023
Mailing Address:
PO Box 1150
Hollister, CA 95024
(831) 636-4016
(831) 636-2939 Fax
Hours: 8:00 a.m. - 5:00 p.m.
https://www.sanbenitocounty-ca-cre.gov/
E-Mail: sbcvote@sanbenitocountyca.gov

**<u>San Bernardino</u>**
Joani Finwall, Registrar of Voters
777 E. Rialto Avenue
San Bernardino, CA 92415-0770
(909) 387-8300
(909) 387-2022 Fax
Hours: 8:00 a.m. - 5:00 p.m.
https://elections.sbcounty.gov/
E-Mail: communications@rov.sbcounty.gov

**San Diego**

Cynthia Paes, Registrar of Voters

5600 Overland Avenue

San Diego, CA 92123

Mailing Address:

P.O. Box 85656

San Diego, CA 92186-5656

(858) 565-5800

(800) 696-0136

(858) 505-7294 Fax

Hours: 8:00 a.m. - 5:00 p.m.

https://www.sdvote.com

E-Mail: rovmail@sdcounty.ca.gov

**San Francisco**

John Arntz, Director of Elections

1 Dr. Carlton B Goodlett Place

City Hall, Room 48

San Francisco, CA 94102-4635

(415) 554-4375

(415) 554-7344 Fax

Hours: 8:00 a.m. - 5:00 p.m.

https://sf.gov/departments/department-elections

E-Mail: sfvote@sfgov.org

**San Joaquin**

Olivia Hale, Registrar of Voters

44 N. San Joaquin Street, Third Floor, Suite 350

Stockton, CA 95202

Mailing Address:

P.O. Box 810

Stockton, CA 95201

(209) 468-8683

(209) 468-2889 Fax

Hours: 8:00 a.m. - 5:00 p.m.

https://www.sjgov.org/department/rov/

E-Mail: vbm@sjgov.org

**San Luis Obispo**
Elaina Cano, Clerk-Recorder-Registrar
1055 Monterey Street, Suite D-120
San Luis Obispo, CA 93408
(805) 781-5228
(805) 781-1111 Fax
Hours: 8:00 a.m. - 5:00 p.m.
https://www.slocounty.ca.gov/Departments/Clerk-Recorder
E-Mail: elections@co.slo.ca.us

**San Mateo**
Mark Church, Chief Elections Officer & Assessor-County Clerk-Recorder
Registration-Elections Division
40 Tower Road
San Mateo, CA 94402
(650) 312-5222
(650) 312-5348 Fax
Hours: 8:00 a.m. - 5:00 p.m.
https://smcacre.gov/elections
E-Mail: registrar@smcacre.gov

**Santa Barbara**
Joseph E. Holland, Clerk/Recorder/Assessor and Registrar of Voters
4440-A Calle Real
Santa Barbara, CA 93110
Mailing Address:
P.O. Box 61510
Santa Barbara, CA 93160-1510
(805) 568-2200
(800) 722-8683
(805) 568-2209 Fax
Hours: 8:00 a.m. - 5:00 p.m.
https://www.countyofsb.org/164/Elections
E-Mail: electionssupport@co.santa-barbara.ca.us

**<u>Santa Clara</u>**
Matt Moreles, ROV
1555 Berger Drive, Bldg. 2
San Jose, CA 95112
Mailing Address:
P.O. Box 611360
San Jose, CA 95161-1360
(408) 299-8683
(866) 430-8683
(408) 998-7314 Fax
Hours: 8:00 a.m. - 5:00 p.m.
https://vote.santaclaracounty.gov/home
E-Mail: registrar@rov.sccgov.org

**<u>Santa Cruz</u>**
Tricia Webber, County Clerk
701 Ocean Street, Room 310
Santa Cruz, CA 95060
(831) 454-2060
(831) 454-2445 Fax
Hours: 8:00 a.m. - 5:00 p.m.
https://votescount.santacruzcountyca.gov/
E-Mail: tricia.webber@santacruzcountyca.gov

**<u>Shasta</u>**
Clint Curtis, Clerk & Registrar of Voters
1643 Market Street
Redding, CA 96001
Mailing Address:
P.O. Box 990880
Redding, CA 96099-0880
(530) 225-5730
(530) 225-5454 Fax
Hours: 8:00 a.m. - 5:00 p.m.
https://elections.shastacounty.gov/
E-Mail: countyclerk@co.shasta.ca.us

**Sierra**
Heather Foster, County Clerk-Recorder
100 Courthouse Square, Room 11
P.O. Drawer D
Downieville, CA 95936-0398
(530) 289-3295
(530) 289-2830 Fax
Hours: 9:00 a.m. - 12:00 p.m. / 1:00 p.m. - 4:00 p.m.
https://www.sierracounty.ca.gov/214/Elections
E-Mail: hfoster@sierracounty.ca.gov

**Siskiyou**
Laura Bynum, County Clerk
311 Fourth Street, Room 201
Yreka, CA 96097
(530) 842-8084
(530) 841-4110 Fax
Hours: 9:00 a.m. - 12:00 p.m. / 1:00 p.m. - 4:00 p.m.
https://www.co.siskiyou.ca.us/elections
E-Mail: laura@sisqvotes.org

**Solano**
Timothy Flanagan, Registrar of Voters
675 Texas Street, Suite 2600
Fairfield, CA 94533
(707) 784-6675
(888) 933-8683
(707) 784-6678 Fax
Hours: 8:00 a.m. - 5:00 p.m.
http://www.solanocounty.com/depts/rov/default.asp
E-Mail: elections@solanocounty.com

**<u>Sonoma</u>**
Evelyn Mendez, Registrar of Voters
435 Fiscal Drive
Santa Rosa, CA 95403
Mailing Address:
P.O. Box 11485
Santa Rosa, CA 95406-1485
(707) 565-6800
(800) 750-8683
(707) 565-6843 Fax
Hours: 8:00 a.m. - 5:00 p.m.
https://sonomacounty.ca.gov/administrative-support-and-fiscal-services/clerk-recorder-assessor-registrar-of-voters/registrar-of-voters
E-Mail: rov-info@sonomacounty.gov

**<u>Stanislaus</u>**
Donna Linder, County Clerk-Recorder
1021 I Street, Suite 101
Modesto, CA 95354-2331
(209) 525-5200
(209) 525-5802 Fax
Hours: 8:00 a.m. - 4:00 p.m.
http://stanvote.gov
E-Mail: stanvote@stancounty.com

**<u>Sutter</u>**
Donna M. Johnston, County Clerk-Recorder
1435 Veterans Memorial Circle
Yuba City, CA 95993
(530) 822-7122
(530) 822-7587 Fax
Hours: 8:00 a.m. - 5:00 p.m.
https://www.suttercounty.org/doc/government/depts/cr/elections/cr_elections_home

**Tehama**
Sean Houghtby, Registrar of Voters
633 Washington Street, Room 17
Red Bluff, CA 96080
Mailing Address:
P.O. Box 250
Red Bluff, CA 96080-0250
(530) 527-8190
(530) 527-1140 Fax
Hours: 8:00 a.m. - 5:00 p.m.
https://www.co.tehama.ca.us/government/departments/elections/
E-Mail: elections@tehama.gov

**Trinity**
Shanna White, Registrar of Voters
11 Court Street
Weaverville, CA 96093
Mailing Address:
P.O. Box 1215
Weaverville, CA 96093-1215
(530) 623-1220
(530) 623-8398 Fax
Hours: 9:00 a.m. - 1:00 p.m, 2:00 p.m. - 4:00 p.m.
https://www.trinitycounty.org/214/Elections
E-Mail: elections@trinitycounty.org

**Tulare**
Michelle Baldwin, Registrar of Voters
5300 West Tulare Avenue, Suite 105
Visalia, CA 93277
(559) 839-2100
(559) 615-3019 Fax
Hours: M-Th 7:30 a.m. - 5:30 p.m., F 8:00 a.m. - 12:00 p.m.
https://tularecoelections.org/elections
E-Mail: absentee@co.tulare.ca.us

**Tuolumne**
Donny McNair, Clerk & Auditor-Controller
Elections Department
2 S. Green Street
Sonora, CA 95370-4618
(209) 533-5570
(209) 694-8931 Fax
Hours: 8:00 a.m. - 5:00 p.m.
https://www.tuolumnecounty.ca.gov/194/Election-Information
E-Mail: clerk@tuolumnecounty.ca.gov

**Ventura**
Michelle Ascencion, County Clerk-Recorder-Registrar of Voters
800 S. Victoria Avenue
Hall of Administration, Lower Plaza
Ventura, CA 93009-1200
(805) 654-2664
(805) 648-9200 Fax
Hours: 8:00 a.m. - 5:00 p.m.
https://clerkrecorder.venturacounty.gov/elections/elections/
E-Mail: elections@venturacounty.gov

**Yolo**
Jesse Salinas, Yolo County Assessor/Clerk-Recorder/Registrar of Voters
625 Court Street, Room B-05
Woodland, CA 95695
Mailing Address:
P.O. Box 1820
Woodland, CA 95776-1820
(530) 666-8133
(916) 375-6490
(530) 666-8123 Fax
Hours: 8:00 a.m. - 5:00 p.m.
https://elections.yolocounty.gov/
E-Mail: elections@yolocounty.gov

**<u>Yuba</u>**
Donna Hillegass, County Clerk-Recorder-Registrar of Voters
915 8th Street, Suite 107
Marysville, CA 95901-5273
(530) 749-7855
(530) 749-7854 Fax
Hours: 8:00 a.m. - 5:00 p.m.
https://www.yuba.org/departments/elections/index.php
E-Mail: elections@co.yuba.ca.us

# EXHIBIT 8

**SHIRLEY N. WEBER, Ph.D.** | SECRETARY OF STATE | STATE OF CALIFORNIA

LEGAL AFFAIRS OFFICE
1500 11th Street | Sacramento, CA 95814 | 916.695-1242 | www.sos.ca.gov

September 12, 2025

<u>Via Mail and Email</u>

Harmeet K. Dhillon, Assistant Attorney General
Michael E. Gates, Deputy Assistant Attorney General
Maureen S. Riordan, Acting Chief, Voting Section
Civil Rights Division
United States Department of Justice
950 Pennsylvania Ave. NW-4CON
Washington, DC 20530
Michael.Gates2@usdoj.gov
Maureen.Riordan2@usdoj.gov

Dear Ms. Dhillon, Mr. Gates, and Ms. Riordan:

This letter responds to the outstanding requests from your letters dated July 10 and August 13, 2025.  It also supplements the response I provided in my August 8, 2025, letter.

Your July 10 letter requested that I provide "a description of the steps that you have taken, and when those steps were taken, to ensure that the state's list maintenance program has been properly carried out in full compliance with the NVRA," including "both the actions taken by California officials as well as county officials."  The letter also requested "a list of the election officials who are responsible for implementing California's general program of voter registration list maintenance from November 2022 through receipt of this letter" and posed six questions, five of which concerned the U.S. Election Assistance Commission's 2024 Election Administration and Voting Survey (EAVS).  On August 8, I responded to questions two and five by producing documents responsive to those questions.  On August 29, I responded to your request for "a list of the election officials who are responsible for implementing California's general program of voter registration list maintenance from November 2022 through receipt of this letter."

On August 13, I received another letter from your office requesting, among other things, that I "provide all original and completed voter registration applications submitted to the State of California from December 1, 2023, through July 1, 2025."

Below are my responses to the U.S. Department of Justice's (DOJ) outstanding request.

## I.    <u>California's List Maintenance Program</u>

California has established a comprehensive list maintenance program that draws from multiple sources of data to identify voter registrations that may need updating or canceling while protecting eligible voters' access to the ballot.  This list maintenance complies with every requirement of the NVRA.

Under California's system for administering elections, each county has primary responsibility for carrying out its list maintenance practices in accordance with California and federal law.  California law requires counties to engage in numerous list maintenance activities, as detailed below.  My office has also issued detailed written guidance and conducted in-person and webinar trainings for county elections officials on various list maintenance subjects, including six trainings since 2022.[1]  Together, these California laws and the related guidance and training offered by my office constitute a general program that makes a reasonable effort to maintain accurate lists of eligible voters, and thus comports fully with Section 8(a)(4) of the NVRA.

As you know, the NVRA does not mandate that a State follow any particular method of identifying ineligible voters when it conducts its general program to make a reasonable effort to remove the names of ineligible voters from its rolls.  In California, elections officials must follow the procedures for confirming registrants' addresses set forth in sections 2220 through 2226 of the Elections Code.  These procedures are described in detail in Chapter 4 of California's NVRA Manual, entitled "Voter Registration Applications and Voter List Maintenance," which was linked in my August 8 letter, and again here: https://elections.cdn.sos.ca.gov/nvra/nvra-manual/chap-4.pdf.  These procedures include:

- Sending voter notification cards to notify voters that they are registered and confirm the voters' address and information (Cal. Elec. Code §§ 2155, 2155.3);
- Confirming voters' residence prior to elections with pre-election residency confirmation postcards (Cal. Elec. Code § 2220) or an alternative procedure, such as:
    - the use of national change-of-address data from the U.S. Postal Service (Cal. Elec. Code § 2222);
    - the mailing of county voter information guides with address correction requests (Cal. Elec. Code § 2223); or
    - obtaining change-of-address data from a consumer credit reporting agency (Cal. Elec. Code § 2227);
- Sending address confirmation notices in response to information indicating that a registrant has moved (Cal. Elec. Code §§ 2155, 2225, 2226);

---

[1] Here is a limited sample of the materials my office generates as guidance and training materials: (1) VoteCal Guidance Documents (https://www.sos.ca.gov/elections/voter-registration/votecal-project/votecal-guidance-documents); (2) Training Resources for County Elections Officials (https://www.sos.ca.gov/elections/voter-registration/votecal-project/votecal-guidance-documents); and (3) General Publications and Resources (https://www.sos.ca.gov/elections/publications-and-resources).

- Intra- or inter-county transfer of voter registrations, when appropriate (Cal. Elec. Code § 2155);
- Placing voter registration records on inactive status, when appropriate (Cal. Elec. Code §§ 2221, 2225); and
- Canceling voter registrations when all requirements of Section 8(d) of the NVRA (52 U.S.C. § 20507(d)(2)) have been satisfied (Cal. Elec. Code §§ 2225, 2226).

As required by California law, county elections officials check new and updated registrations against a number of data points to determine their accuracy. This process includes steps to reconcile voter-to-voter duplicates, as discussed more fully in response to question two below. Voter registration records are also reviewed and updated regularly based on data from the California Department of Corrections and Rehabilitation (CDCR), California Department of Public Health (CDPH), Department of Motor Vehicles (DMV), and Employment Development Department (EDD). The process for canceling voter registrations due to death is also further discussed below in response to question three.

With respect to changes of address, my office provides the full voter registration database to the EDD on a monthly basis to compare against its National Change of Address (NCOA) database. EDD is the sole licensed provider of the NCOA database for the State. In return, EDD marks the voters that may have moved and provides this data to my office, which is processed into VoteCal, the federally mandated and compliant statewide voter registration database. Notices of potential address changes are then sent to county election officials for final determination. My office also receives daily change of address notifications from the DMV from registrants who update their address records with DMV about changes of address made at DMV. VoteCal identifies potential changes of address and automatically sends notices to county election officials for final determination.

In its recent correspondence, your office has cited its authority to enforce the NVRA in connection with its document and data requests. However, your office has not identified any aspect of California's list maintenance program that fails to comply with the NVRA, nor is there any basis for such an allegation. California's robust list maintenance program fully complies with the requirements of federal law.

## II.    <u>Response to Specific Inquires</u>

This section responds to the six questions raised in your July 10 letter, including supplementing the responses I provided in response to questions two and five in my August 8 letter.

### a.    *Question 1 – EAVS Question A3d*

Question one from your July 10 letter states:

> In the EAVS data for Question A3d, California had 2,178,551 voters (15.6 percent) with duplicate registrations. However, seven counties failed to provide

data regarding duplicate registrations. Please provide a list of all duplicate registration records in Imperial, Los Angeles, Napa, Nevada, San Bernardino, Siskiyou, and Stanislaus counties.

As an initial matter, Napa responded to EAVS Question A3d with 9,760. The remaining six counties responded with "data not available."

As the EAC makes clear in their guidance on completing the survey, "[i]f your state or jurisdiction does not track data for an item, then you may select 'Data not available' as your response. There are instructions throughout the survey that provide helpful advice and examples for when to use the 'Does not apply' and 'Data not available' responses." *Guide to Using the Data Collection Templates*, 2024 Election Administration and Voting Survey (Nov. 5, 2024), available at https://eavsportal.com/Downloads/2024/2024%20EAVS%20Data%20Template%20User%20Guide.pdf. Accordingly, I understand that these six counties did not provide data in response to these questions because they did not track that information during the EAVS reporting period.

> b. *Question 2 – EAVS Question A12h*

Question two from your July 10 letter stated:

> *No data was listed in the EAVS survey for Question A12h for California regarding duplicate registrants who were removed from the statewide voter registration database. Please provide a list of all duplicate registrants who were removed from the statewide voter registration list including the date(s) of removal. If they were merged or linked with another record, please provide that information. Please explain California's process for determining duplicates and what happens to the duplicate registrations.*

In my August 8 letter, my office produced various documents that were responsive to your question regarding duplicates. As those documents reflect, California has no list of duplicate registrants that were removed because all duplicates were merged. California provided this information in response to Question 21 of the EAC's 2024 Election Administration Policy Survey. This practice of merging duplicates is consistent with almost three quarters of the Nation's states, as found in the 2024 EAVS Comprehensive Report (EAVS Report). EAVS Report, at 154 ("In response to a 2024 Policy Survey item that covered this topic, 73.2% of states reported merging records when a duplicate is found in their system.").

The merging process occurs as follows: VoteCal, California's federally compliant statewide voter registration database, automatically runs voter-to-voter duplicate checks on new registrations and updates to existing voter registrations. If a potential match (for example, the same registrant, registered twice with different addresses) is determined, VoteCal notifies relevant county elections officials for a potential match final determination. If the county elections official determines that the records are a match based upon a variety of data points, the

records are merged, and the most recent information is applied to the voter's record.  These steps
are outlined in Section 2.2 in the Guidance: EMS Messages linked in my August 8 letter.

c.    *Question 3 – EAVS Question QA12c*

Question three from your July 10 letter stated:

> In the EAVS data for Question QA12c, California had 378,349 voters (11.9
> percent) removed because of death, which was well below the national average.
> Please provide a list of all registrations that were canceled because of death.
> Please explain California's process for determining who is deceased and
> removing them from the voter roll and when that occurs.

As required by California law, county elections official must cancel a voter's registration record
upon their death.  Cal. Elec. Code §§ 2201(a)(5), 2205.  This requirement is implemented
through our VoteCal database.  My office receives a weekly data file from CDPH, which is
processed through VoteCal and generates "Potential Deceased Match" messages.  These
messages are then automatically sent to the county's Election Management System (EMS) where
the potential deceased voter's record resides.

Upon receipt of the "Potential Deceased Match" message, the county must review the voter
record and the associated deceased record and compare date of birth, name, and any other
information included to help verify a match.  If the county verifies the match, a new EMS
message, "Deceased to Voter Pre-Cancellation," is sent to the county to start the pre-cancellation
process.  This process requires county elections officials to notify the possibly deceased
individuals 15 to 30 days before canceling their registration.  That action triggers VoteCal to
send another message to the EMS, "Deceased Voter Cancellation."  If no response is received
within 15 days of sending the pre-cancellation notice, the county must respond to the "Deceased
Voter Cancellation" message on or after the 16th day of the pre-cancellation period and confirm
the cancellation.

In regard to your request for a list of all registrations that were canceled due to death, my office
can make this list available for public inspection, consistent with Section 8(i) of the NVRA, at
my office during regular business hours whenever DOJ makes an appointment.

d.    *Question 4 – EAVS Questions A10a-A10f*

Question four from your July 10 letter stated: "Confirmation Notice data was missing in the
EAVS survey for Questions A10a through A10f for several counties in California.  Please
provide the data for each county in California for Questions A10a through A10f."

Twelve counties answered "data not available" or "valid skip" in response to A10a through
A10f.  These questions concern specific data related to confirmation notices mailed to registered
voters, such as whether a notice was returned along with the specific reason it was returned.

As the EAC makes clear in their guidance on completing the survey, "[i]f your state or jurisdiction does not track data for an item, then you may select 'Data not available' as your response. There are instructions throughout the survey that provide helpful advice and examples for when to use the 'Does not apply' and 'Data not available' responses." *Guide to Using the Data Collection Templates*, 2024 Election Administration and Voting Survey (Nov. 5, 2024), available at https://eavsportal.com/Downloads/2024/2024%20EAVS%20Data%20Template%20User%20Guide.pdf. Accordingly, I understand that these 12 counties did not provide data in response to these questions because they did not track that information during the EAVS reporting period.

e.  *Question 5 – EAVS Report Change In Inactive Voters*

Question five from your July 10 letter stated that "[t]he 2022 EAVS report contained 4,984,314 inactive voters, while the 2024 report contained 2,883,995. Please explain the reason for the change in the number of inactive registrations for these years."

In my August 8 letter, my office produced various documents that were responsive to your question regarding the change in the number of inactive registrations between the 2022 EAVS report and the 2024 EAVS report.

A change in the number of inactive voters may have various causes, including increased participation in elections resulting in voters being removed from the inactive list, reregistration by voters with updated address information, or the cancellation of previously-inactive registrations. Additionally, another possible explanation is that the decrease in the number of inactive voters between 2022 and 2024 resulted from amendments to state law made to conform to the United States Supreme Court's 2018 decision regarding the cancellation of voter registrations under the NVRA, *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756 (2018).

As you know, the NVRA prohibits canceling a voter's registration for failing to vote but allows removal if a registrant has changed residences, albeit only after a qualifying notice has been sent and certain conditions are thereafter satisfied. 52 U.S.C. § 20507(b)(2), (d)(1)(B). A qualifying notice can be sent in response to information indicating that the registrant has moved out of state or has moved and left no forwarding address. Cal. Elec. Code §§ 2221(a)(1), 2225(c). In addition, the voter registration status for these registrants is updated to inactive. Cal. Elec. Code §§ 2221(a)(1), 2225(f). At that point, if an inactive registrant fails to return the address confirmation notice, does not offer or appear to vote in any election within the next two federal general election cycles following the mailing of that notice, and does not notify a county elections official of continued residency within California, the county elections official must cancel the voter's registration record. Elec. Code §§ 2225(c), 2226(b); 52 U.S.C. §§ 21083(a)(4)(A), 20507(a)(4), (d)(3); *Husted*, 584 U.S. at 767. These procedures, codified in Elections Code sections 2222 through 2226, are described in greater detail in the previously

mentioned Chapter 4 of California's NVRA Manual, entitled "Voter Registration Applications and Voter List Maintenance."

Previously, Elections Code section 2226 was permissive, allowing—but not requiring—removal once section 8(d)(1)(B) requirements had been met. This reflects the California Legislature's prior understanding that such removals were permitted, but not mandatory, under the NVRA. In *Husted*, the Supreme Court clarified that cancellation is mandatory under federal law. 584 U.S. at 767. As of January 1, 2020, Elections Code section 2226, as amended, requires the cancellation of registrations once all section 8(d)(1)(B) prerequisites have been satisfied. Cal Stats. 2019, ch. 262, § 6. Thus, the difference in inactive voters between the 2022 and 2024 EAVS may reflect an increase in removal of inactive voters pursuant to changes in state law to comply with the United States Supreme Court's *Husted* decision.

>    f.   *Question 6 – Non-Citizenship Cancellations*

Question six from your July 10 letter requested "[a] list of all registrations, including date of birth, driver's license number, and last four digits of Social Security Number, that were canceled due to non-citizenship of the registrant."

Under California law, local elections officials shall cancel a voter's registration "[u]pon proof that the person is otherwise ineligible to vote." Cal. Elec. Code § 2201(a)(8). VoteCal does not track whether a cancellation of a registrant's record by county elections officials was specifically due to their finding that the registrant was not a citizen. Accordingly, my office has no responsive records to this request.

## III.   DOJ Has Not Established Its Legal Authority to Request All Original and Completed Voter Registration Applications

In your August 13 letter, you requested that I "provide all original and completed voter registration applications submitted to the State of California from December 1, 2023, through July 1, 2025, to the Justice Department by September 12, 2025." Your letter does not identify any authority for this sweeping request. To the extent you are relying on the Civil Rights Act of 1960 (CRA), that statute fails to support this request.

To make a valid request, the CRA requires that the Attorney General provide "a statement of the basis and the purpose" of the demand. 52 U.S.C. § 20703. The only asserted *purpose* in your August 13 letter is "to assist in [DOJ's] determination of whether California's list maintenance program complies with the NVRA." But evaluating California's compliance with the NVRA's requirement that each State conduct a general program that makes a reasonable effort at removing ineligible voters due to a change in address or death is far afield from the CRA's aim. The CRA was enacted to facilitate civil rights investigations related to the denial of the right to vote, but you readily admit that you are not seeking voter registration applications for this reason. You have also failed to state any *basis* for your demand. And you have not identified any suspected violation of the NVRA or HAVA, much less one to which the requested voter

registration applications would be relevant.  No legitimate purpose is apparent for this burdensome and voluminous request.  Accordingly, your purported reliance on the CRA does not establish the legal authority to demand the requested voter registration records, and my office will not be making them available for your inspection.

Your request for further documents containing sensitive information of Californians suggests that your aim is to create a system of records of California voters, which is subject to the Privacy Act of 1974.  I note that your office still has not answered the questions that I posed in my August 21 letter to ensure that DOJ is following federal law and that the data of California voters receives the full protections entitled by law.

In addition, it appears that your request for voter registration applications (and for the California voter file) is governed by the e-Government Act of 2002, which requires the DOJ to complete a privacy impact assessment prior to collecting this type of information about individuals.  *See* Pub. L. 107-347, 116 Stat. 2899, § 208.  If you contend that your request complies with this Act, please explain the basis for that position.

As California's Chief Elections Officer, I am committed to complying with both state and federal law to ensure that eligible voters' rights to register and vote are protected.  Hopefully, the thorough explanation of our list maintenance practices and detailed responses to your questions provided in this letter assuage any concerns your office may have about California's list maintenance program.

Respectfully,

/s/ Shirley N. Weber

Shirley N. Weber, Ph.D.
California Secretary of State

# EXHIBIT 9

# The American Presidency Project (https://www.presidency.ucsb.edu/)



## DWIGHT D. EISENHOWER (/PEOPLE/PRESIDENT/DWIGHT-D-EISENHOWER)

## Statement by the President Upon Signing the Civil Rights Act of 1960

May 06, 1960

I have today signed into law the Civil Rights Act of 1960. It is only the second civil rights measure to pass the Congress in 85 years. As was the case with the Act of 1957, recommendations of this Administration underlie the features of the Civil Rights Act of 1960.

The new Act is concerned with a range of civil rights problems. One title makes it a crime to obstruct rights or duties under Federal court orders by force or threat of force. That provision will be an important deterrent to such obstruction which interferes with the execution of Federal court orders, including those involving school desegregation. Provision is also made to assure free public education to all children of Armed Forces personnel in the United States where local public school facilities are unavailable. By authorizing the FBI to investigate certain bombings or attempted bombings of schools, churches and other structures, the Act will deter such heinous acts of lawlessness.

The new Act also deals significantly with that key constitutional right of every American, the right to vote without discrimination on account of race or color. One provision, which requires the retention of voting

records, will be of invaluable aid in the successful enforcement of existing voting rights statutes. Another provision authorizes the use by federal courts of voting referees. It holds great promise of making the Fifteenth Amendment of the Constitution fully meaningful.

While I regret that Congress saw fit to eliminate two of my recommendations, I believe the Act is an historic step forward in the field of civil rights. With continuing help from all responsible persons, the new law will play an important role in the days ahead in attaining our goal of equality under law in all areas of our country for all Americans.

---

*Note: The Civil Rights Act of 1960 is Public Law 86-449 (74 Stat. 86).*

---

Dwight D. Eisenhower, Statement by the President Upon Signing the Civil Rights Act of 1960 Online by Gerhard Peters and John T. Woolley, The American Presidency Project https://www.presidency.ucsb.edu/node/234270

EXHIBIT 10

# Calendar No. 1241

| 86TH CONGRESS<br>*2d Session* | } | SENATE | { | REPORT<br>No. 1205 |

---

## CIVIL RIGHTS ACT OF 1960

---

MARCH 29, 1960.—Ordered to be printed

Filed under authority of the order of the Senate of March, 29, 1960

---

Mr. HENNINGS, from the Committee on the Judiciary, submitted the following

# REPORT

[To accompany H.R. 8601]

The Committee on the Judiciary, to which was referred the bill (H.R. 8601) to enforce constitutional rights, and for other purposes, having considered the same, reports the bill in conformity with instruction of the Senate, with amendments.

### STATEMENT

By order of the Senate, agreed to March 24, 1960, H.R. 8601, to enforce constitutional rights, and for other purposes, was referred to the Committee on the Judiciary, with instruction to report back to the Senate not later than midnight Tuesday, March 29, 1960.

The committee met in executive session on March 28 and 29, 1960, during which time testimony was received from the Attorney General of the United States, William P. Rogers; the Deputy Attorney General, Lawrence E. Walsh, and the special deputy attorney general of the State of Georgia, Charles J. Bloch.

The committee considered numerous amendments. The amendments agreed to by the committee are set forth in the bill as reported to the Senate.

O

# Calendar No. 1241

| 86TH CONGRESS<br>*2d Session* | SENATE | Rept. 1205<br>Part 2 |
|---|---|---|

## CIVIL RIGHTS ACT OF 1960

APRIL 1, 1960.—Ordered to be printed

Mr. HART, (on behalf of himself, Mr. HENNINGS and Mr. DODD) from the Committee on the Judiciary, submitted the following

## SEPARATE VIEWS

[To accompany H.R. 8601]

### SUMMARY

During the Judiciary Committee's consideration of H.R. 8601, we urged and supported the addition of a new title to the bill proposing the establishment of a Federal enrollment officer procedure to insure that voting rights of American citizens shall not be denied because of race or color.

Such a plan as we urged in the committee, and which received the support of six members of the committee, would not replace the present title of the bill proposing a system of voting referees. Rather it would be an alternative procedure in no way in conflict with the voting referee proposal.

It is now abundantly clear to us, in reviewing the debates in the House of Representatives, the various drafts of the voting referee proposal, amendments which have been adopted, and the testimony of the Attorney General and the Deputy Attorney General before our committee, that there are endless pitfalls and shortcomings inherent in relying solely on the judicial approach involved in the voting referee procedure. The basic difficulty with this referee proposal as the only available procedure is that it will place in the Federal court system registration and election functions and responsibilities which are not properly judicial. And this will be done in the face of already over-burdened Federal courts in many of the areas most likely to be affected.

We believe that the Congress should provide the additional methods for solving the problem of racial disfranchisement contained in the enrollment officer plan. These are: (1) discretionary action by the President in appointing enrollment officers upon notification of a successful suit under section 131(c) of the Civil Rights Act of 1957; or (2) similar action upon a finding based on complaints filed with the Civil Rights Commission. Such additions to the present bill would offer to the Attorney General and to the President alternatives.

2            CIVIL RIGHTS ACT OF 1960

They could proceed under whichever system—the court referee approach or the Federal enrollment officer approach—that seemed most effective and least disruptive of the local and State operations of registration and voting laws.

Congress, when it passed the voting provisions of the Civil Rights Act of 1957, believed they would be effective tools in fulfilling the Federal Government's responsibilities under the 14th and 15th amendments to the Constitution. Under those amendments, the Congress clearly has the powers to *enforce* the guarantees set forth in them. To date, this assumption with respect to the 1957 act has proved wrong. Now, for the second time in less than 3 years, this problem of assuring full rights of suffrage to all Americans is again before the Congress. Let us provide sufficient mechanisms and alternatives to overcome systematic disfranchisement. For 8 weeks Congress has debated; the Nation is aware of the issues. To fail to provide effective legislation now might well prove worse for our Nation than the possibility that there had been no debate and no legislation at all.

It seems to us that there is very great logic in an alternative approach such as we recommend to our colleagues. The referee approach carries with it punitive threats, from possible criminal and/or contempt proceedings, for every local and State official connected with the voting and registration processes in the affected area. Such threats are not inherent in the efficient operations of the enrollment officer plan. Unless there is a clear showing of potential threat to and obstruction of the right of enrolled voters to vote, few if any local election officials will be involved in litigation under this procedure. If such threats were forthcoming once the system is in operation, the Attorney General would then immediately invoke the equity powers of the Federal court to protect and insure the enforcement of the act.

For 90 years, the judicial approach has not been effective. We have very serious doubts that the referee approach will add more than a very few Americans to the voting lists. Addition now of the enrollment title will mean that an alternative method will be available—a method recommended by the Civil Rights Commission, created by Congress for this purpose.

SEPARATE VIEWS

We urged that the committee include the enrollment officer plan in the bill as well as the voting referee plan for the following reasons:

(1) The Congress has invested much time and money this year in its consideration of civil rights legislation. We have doubts as to the validity and effectiveness of the voting referee plan provided in H.R. 8601, and we think it a mistake to rely solely on this plan in the legislative efforts to protect and implement the constitutional voting rights of many hundred thousands of our fellow citizens now deprived of these rights because of their race or color. We do not want to rely solely on one method, especially when we are not sure of the strength of that basket. There is no need to rely on the one procedure when we can adopt two without any basic conflict between them. Insofar as they are each effective the two systems can supplement and strengthen each other.

(2) We have doubts as to the constitutionality of the referee plan. Under article III of the Constitution, Congress cannot impose on a court an obligation to make findings or decisions which are not necessary to decide the *case* or *controversy* which is properly before it.

Under the revised referee plan as contained in H.R. 8601 the court would, upon request of the Attorney General in cases brought to enforce voting rights guaranteed by the 15th amendment, be *obligated* to make a supplemental finding as to whether the voting deprivations are pursuant to a pattern or practice. If the court finds affirmatively on the question of pattern or practice, under the bill the court may appoint "voting referees" to aid it in determining whether Negro applicants are qualified to vote and thus initiate the voting referee procedure. We doubt whether article III permits Congress to compel the courts to make supplemental findings such as that of existence of a pattern or practice. In the case before it the court would have made particular findings of deprivation of voting rights. It would have entered an order against the State registration officials who were parties defendant in the case. The supplemental findings that "a pattern or practice of discrimination" exists would not be needed to support the original findings that particular persons had been deprived of their voting rights.

(3) Our other principal objection to the referee plan is that it is likely to be ineffective. We believe that not very many Negroes will become registered or qualified to vote as a result of the referee plan. We believe it will not be effective in achieving the broad objective of providing a procedure by which qualified citizens heretofore disfranchised because of their race can vote if they so choose. In the first place under the referee plan no qualified Negroes heretofore denied a vote may even take the first step down the long road to the voting booth unless and until the Attorney General initiates a lawsuit in the U.S. district court for that registration area. But let us assume that the case is brought, the original order entered, the supplemental finding made, and the referee appointed. The bill then requires those Negroes who are ambitious for the suffrage and courageous enough to attempt to get a qualifying certificate and order from the court protecting their right to vote, first to attempt to be registered and turned down by the local State registrars. This is the very area in which the court has found a pattern or practice of discrimination against the Negroes. Only after this humiliating experience may they apply to the court-appointed referee for a voting certificate with any hope of success. This was bad enough but a further hurdle was added by a committee amendment. The Negro applicants must face a public trial of their voting qualifications. The local or State registration officials who had previously rejected their request to be qualified as a voter, or the lawyers of such officials, are to be present at the trial and possibly too the most hostile elements of the white community. One has only to read the report of the Commission on Civil Rights which describes at some length the various techniques used by local and State registrars and others to prevent Negroes from becoming registered voters to realize what a formidable obstacle to Negroes the requirement of the referee proposal will be.

**4**                                    CIVIL RIGHTS ACT OF 1960

There is one further serious objection to the referee plan as contained in H.R. 8601.   It provides as follows:

> Notwithstanding any inconsistent provision of State law or the action of any State officer or court, an applicant so declared qualified to vote shall be permitted to vote in any such election.   The Attorney General shall cause to be transmitted certified copies of such order to the appropriate election officers.   *The refusal by any such officer with notice of such order to permit any person so declared qualified to vote to vote at an appropriate election shall constitute contempt of court.*

This provision means that State election officials can only at the peril of being held in contempt of court, challenge the right to vote of a Negro who has been "declared qualified to vote" by a Federal court order.   This language appears absolute and makes no provision for exceptions and contingencies.   It makes no exception for the case of a person who, after being found qualified to vote by the court, moves away from the election district or area, or fails to pay his poll tax or, for some other reason occurring since the court's order, would not be qualified under State law.   The State election officials faced with a court order, would permit such a person to vote, and might well be in violation of State law.   Perhaps the State election officials could let the Negro voter, protected by a court order, vote under a challenge but the language of the bill makes no explicit provision for such a contingency.

Our enrollment officer amendment, on the other hand, especially provides that State election officials and other appropriate and interested persons may challenge any prospective voter registered by the Federal enrollment officer, subject to later determination by the appropriate Federal court in an action brought by those making the challenge.   In this wise the enrollment officer procedure protects the valid interest of the State and of individual citizens to prevent unqualified persons from voting, and at the same time allows all Negro applicants who are certified to cast their ballots.

For these reasons we think the Congress should not rely solely on the "referee plan" to implement the right to vote of qualified Negroes presently disfranchised because of their race or color.

Briefly, for the following reasons we think the enrollment officer procedure should be added to the bill to insure, insofar as we can, an effective piece of legislation:

The enrollment officer plan avoids the constitutional problem that arises when the Congress attempts by legislation to compel the courts to make supplemental findings that voting deprivations are pursuant to a "pattern or practice."   It does this by providing that whenever in an action brought by the Attorney General a court finds that a State official, acting under color of law, has deprived Negroes of the right to vote because of their race or color, the Attorney General is to notify the President of this fact.   In his discretion the President then may appoint an enrollment officer.   The court is not required to make a finding that the deprivation of voting rights is done pursuant to a pattern or practice as would be the case under the court referee proposal.

The Attorney General may bring few actions to enforce voting rights.   Since 1957 he has, in fact, brought only four cases of this type.

CIVIL RIGHTS ACT OF 1960                     **5**

For this reason, in the enrollment officer plan a second basis is provided for the Presidential appointment of enrollment officers. If the Commission on Civil Rights, acting under its present authority, makes a similar finding of racial voting disfranchisement, it is to notify the President of this fact. The President may then in his discretion use these findings as a basis for appointing enrollment officers for the area where the voting deprivations occur.

Once the enrollment officer for a given area is appointed it becomes his responsibility to determine whether, under the State law, applicants who appear before him are properly qualified. There is no court procedure and no State or local officials are made defendants of a lawsuit (other than the original suit and none at all if the President acts on the basis of a finding by the Civil Rights Commission rather than a finding by a judge). The enrollment officer carries out his function. He is on the other side of the street from the State or local registrar and in no way interferes with State officials. He merely registers Negroes qualified to vote under State law. The State officials on the other hand are given the right to challenge the prospective Negro voter—but at the right time—on election day at the polls. The ballots are cast and counted and those challenged are impounded for later court decision. This procedure would be direct, simple, and effective.

Attorney General William P. Rogers and others have stated flatly that the enrollment officer plan would be ineffective because it would not insure that the voter, registered under it, would actually be permitted to vote.

The Attorney General has argued that under this procedure the prospective voter would end up with nothing but the certificate of the enrollment officer which would be worthless because the State or local election officials would refuse to honor it. We do not agree.

In taking this position, the Attorney General is overlooking the extent of the powers he now has under existing law and of those which would in addition be given him under the enrollment officer procedure. Our amendment provides that the Federal district courts would be authorized to enforce the provisions contained in our amendment, including the provision giving enrolled voters the right to vote, subject, of course, to proper challenge at the polls. To enforce the act, the courts would be empowered to issue on request of the Attorney General "permanent and temporary injunctions or *other orders*." In the first place, if the local U.S. attorney has information substantiating his probable belief that State officials or others intend to interfere with a Negro voter's rights on election day, he can properly ask for an injunction restraining the suspected persons from any contemplated interference.

If the Attorney General has information that local election officials are preventing or are about to prevent enrolled voters from voting, under section (b) of rule 65 of the Federal Rules of Civil Procedure he could request the issuance immediately of a temporary restraining order compelling local officials to refrain from interfering, on pain of otherwise being held in contempt of court. On the basis of specific facts shown by a verified complaint or affidavit by the U.S. attorney that immediate and irreparable injury, loss, or damage (defeat of the constitutional guarantees and of the directive to Congress to implement them contained in the 15th amendment) would otherwise result,

**6**                    CIVIL RIGHTS ACT OF 1960

rule 65 provides that a Federal judge may grant the temporary restraining order mentioned above. This temporary restraining order can be granted on the basis of a very brief ex parte hearing without notice to the State officials or others who may be restrained by such order. While an extraordinary remedy, this type of order can be secured within a matter of minutes on a proper showing. For instance, if the polls on election day are opened at 6 o'clock and if by 6:30 Negroes are being denied the right to vote, by 8 o'clock the U.S. marshal should have been able to serve the temporary restraining order compelling the State election officials to honor the enrollment certificate.

All the Attorney General has to do is carry out his oath of office with appropriate zeal, industry, and ingenuity. He can plan ahead for possible violations, alert his attorneys and the local FBI offices, shore up weak spots in his organization and notify both Federal judges and State officials that he will protect the rights of registered voters with all the resources and vigor of which the Department of Justice is capable. If this be done, the certificate given a qualified Negro voter will not be worthless but, on the contrary, will be honored. We ask the Congress to provide the necessary machinery for the task.

SCHOOL DESEGREGATION

We believe that this year's civil rights bill should be amended to include provisions intended to help ease the school desegregation crisis. This is a glaring weakness in the bill before the Senate. According to the Southern Education Reporting Service (see chart I), by May 1959, 5 years after the Supreme Court decision, some 797 of the 2,907 school districts having both races in the 17 Southern States and the District of Columbia had been desegregated. Further analysis of this situation reveals that six States, Alabama, Florida, Georgia, Louisiana, Mississippi, and South Carolina, have completely segregated public schools; five States, Arkansas, Delaware, North Carolina, Tennessee, and Virginia, have permitted beginning or "token" desegregation at the local level; and six States and the District have undertaken comprehensive efforts to comply with the Supreme Court decision. Each of these situations present different problems. Each requires a somewhat different solution. In addition, there is evidence that school district gerrymandering and other devices have resulted in segregated school areas in some northern and western communities. All of these conditions require action by the Congress.

In 1957, Congress had before it a proposal to authorize the Attorney General to initiate injunctive relief suits on behalf of citizens complaining that they were being denied equal protection of the law. It approved authority of this kind for the voting field. It is still urgently needed in other fields to give support to those seeking their constitutional rights but who cannot afford the lengthy and costly procedures involved in Federal court cases. Illustrative of this burden is the total time taken in the *Aaron* v. *Cooper* case in Little Rock, Ark. From the filing of the first petition to the time set for full compliance with the court order 9 years elapsed. Experience with such cases in Virginia has been comparable. This is an intolerable differential for citizens supposedly guaranteed equal rights under the Constitution. The authority contained in the so-called title III or part III

which was not included in the 1957 act is essential to any new civil rights bill. It is the same type of authority already given the Attorney General by 50 other statutes now on the books.

Another important reason why this power should be given the Attorney General is to provide a practical and moderate means of restoring "deliberate speed" toward achieving the constitutional imperative of the court's decision. Regrettably, all of the States having segregated school systems have enacted State laws designed to prevent desegregation. Voluntary desegregation has gradually been slowing down—from a high of 297 districts in 1955 to 61 in 1957 to 37 in 1958. Without intervention by the Attorney General, it may well grind to a halt. We cannot, as a nation, tolerate another 90 years of segregation in our schools.

### TECHNICAL ASSISTANCE

In those States that have undertaken "token" desegregation, as well as those that have initiated comprehensive programs, there has developed a demonstrated need for the kinds of technical and financial assistance contained in S. 810, S. 3045, and various other measures. If a local school board, desiring to comply with the law, finds need for assistance, it should not be prevented by the State. It is most important that such assistance be made available directly to the local school board requesting it *without approval by State officials*. In this regard, the administration's proposal is unacceptable (S. 3001). The Commission on Civil Rights in its report commented on this question as follows:

> If State governments do not permit local school officials to develop such plans for good-faith compliance the effectiveness of the school system in the State as a whole will be impaired (p. 325).

The report goes on to say:

> It is important that any transition should not result in the lowering of educational standards for either the white or Negro student. If possible, it should result in an improvement of educational standards for both (p. 325).

It is clear that there are school boards willing to consider plans for desegregation. They are burdened with such considerations as inadequate plant, understaffed faculties, wide differentials in teacher preparation, inadequate programs of community relations and interpretation. Financial and technical assistance to meet these problems must be made available to local communities willing to take steps toward desegregation. The House bill must be amended to include them.

CHART I

*Progress in desegregation of school districts, 1954-59*

| | Total number of school districts, 1958-59 | Number having both white and Negro pupils 1958-59 | Number of districts newly desegregated in the school year beginning September— | | | | | Total desegregated, May 1959 | Number desegregated by court order | Number segregated, May 1959 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1954 | 1955 | 1956 | 1957 | 1958 | | | |
| Alabama | 113 | 113 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 113 |
| Arkansas | 423 | 228 | 2 | 2 | 1 | 4 | 0 | 9 | 1 | 219 |
| Delaware | 97 | 57 | 13 | 0 | 1 | 0 | 0 | 14 | 2 | 43 |
| District of Columbia | 1 | 1 | 1 | ----- | ----- | ----- | ----- | 1 | 0 | 0 |
| Florida | 67 | 67 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 67 |
| Georgia | 200 | 198 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 198 |
| Kentucky | 215 | 175 | 0 | 37 | 71 | 8 | 7 | 123 | 7 | 52 |
| Louisiana | 67 | 67 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 67 |
| Maryland | 24 | 23 | 1 | 8 | 11 | 3 | 0 | 23 | 2 | 0 |
| Mississippi | 151 | 151 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 151 |
| Missouri | 3,600 | 243 | 114 | 39 | 40 | 16 | 2 | 211 | 0 | 33 |
| North Carolina | 172 | 172 | 0 | 0 | 0 | 3 | 1 | 4 | 0 | 168 |
| Oklahoma | 1,469 | 271 | 0 | 124 | 70 | 22 | 22 | 238 | 4 | 33 |
| South Carolina | 107 | 107 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 107 |
| Tennessee | 152 | 141 | 0 | 1 | 1 | 1 | 0 | 3 | 2 | 138 |
| Texas | 1,650 | 722 | 1 | 73 | 48 | 1 | 1 | 124 | 0 | 598 |
| Virginia | 129 | 128 | 0 | 0 | 0 | 0 | 4 | 4 | 4 | 124 |
| West Virginia | 55 | 43 | 22 | 13 | 5 | 3 | 0 | 43 | 4 | 0 |
| Total | 8,692 | 2,907 | 154 | 297 | 248 | 61 | 37 | 797 | 26 | 2,111 |
| Number acting under court order, by years | | | 2 | 3 | 4 | 9 | 9 | | | |

Source: Report of the U.S. Commission on Civil Rights, 1959, p. 296.

### OTHER PROVISIONS

The above provisions would produce a really effective bill. Other proposals have merit. Even though it would not significantly alter the limited authority already available to it under the Executive order, we support the proposal to establish the President's Committee on Government Contracts by legislation. We believe the referee proposal would be less cumbersome by deleting the requirement that the citizen must go back to the State or local registration official *after* the Federal court has found a pattern and practice of discrimination against his class exists.

### CONCLUSIONS.

We believe the bill reported by the Judiciary Committee to be inadequate unless amended and strengthened. We recommend the bill include the following:

(*a*) An enrollment officer plan as an alternative procedure to the judicial referee plan.

(*b*) Authority for the Attorney General to obtain injunctive relief in school and other violations of equal protection of the law.

(*c*) Technical and financial assistance for school districts moving to undertake desegregation in compliance with the Supreme Court decision. Local boards should not be required to obtain approval from State officials.

THOS. C. HENNINGS, Jr.
THOMAS J. DODD.
J. P. BOYD.
PHILIP A. HART.

I dissent with some of the statements and conclusions contained in the report entitled "separate views" but agree generally with the objectives desired.

JOHN A. CARROLL.

# EXHIBIT 11

| 86TH CONGRESS 1st Session | HOUSE OF REPRESENTATIVES | REPORT No. 956 |
|---|---|---|

# CIVIL RIGHTS

AUGUST 20, 1959.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. RODINO, from the Committee on the Judiciary, submitted the following

# REPORT

[To accompany H.R. 8601]

The Committee on the Judiciary to whom was referred the bill (H.R. 8601) to enforce constitutional rights, and for other purposes, having considered the same, report favorably thereon without amendment and recommend that the bill do pass.

## PURPOSE OF THE LEGISLATION

The bill is designed primarily to provide more effective means to enforce the civil rights of persons within the jurisdiction of the United States. In furtherance of that objective, the bill proposes to strengthen the penal law with respect to the obstruction of court orders in public school desegregation cases. It proposes to make criminal flight in interstate or foreign commerce to avoid prosecution or punishment for damaging or destroying any building or other real or personal property. The bill provides for preservation of Federal election records and authorizes their inspection by the Attorney General. It amends the Civil Rights Act of 1957 so as to extend the existence of the Civil Rights Commission for 2 years. Finally, it contains a proposal to enable the Federal Government to provide for the education of all children of the members of our Armed Forces, whether they are or are not residents on Federal property, when public schools have been closed because of desegregation decisions or orders.

## HISTORY OF THE LEGISLATION

Shortly after the convening of the 86th Congress, many bills concerning civil rights were introduced and referred to the Committee on the Judiciary.

★

On February 5, 1959, the President of the United States transmitted to the Congress a message of recommendations pertaining to civil rights (H. Doc. No. 75, 86th Cong., 1st sess.). On the same day executive communications which implemented the message of the President were forwarded to the Congress by the Attorney General, Secretary of Labor, and the Secretary of Health, Education, and Welfare.

A Judiciary Subcommittee conducted hearings on the 39 bills which had been referred to it. These proposals related to almost every aspect and facet of civil rights, including such topics as voting, antilynch, fair employment practices, equal protection of the laws, crimes involving discrimination and deprivation of civil rights, school desegregation, Civil Rights Commission, Joint Congressional Committee on Civil Rights, and authorization for the Attorney General to institute civil actions to protect and enforce civil rights.

The hearings were held on March 4, 5, 11, 12, 13, 18, 19; April 14, 15, 16, 17, 22, 23, 24, 29, 30; May 1, 1959 (civil rights hearing before Subcommittee No. 5 of the Committee on the Judiciary, House of Representatives, 86th Cong., 1st sess., serial No. 5).

During the course of those hearings, the testimony—while it related to all the subjects of the legislative proposals—was devoted primarily to two bills, H.R. 3147 and H.R. 4457, introduced by Representatives Celler and McCulloch, respectively. The witnesses represented all of the various interests concerned with the legislation; the witnesses included the congressional authors of the proposals, other Members of Congress, the Attorney General, the Secretaries of Labor and of Health, Education, and Welfare, representatives of the Civil Rights Commission and of the President's Committee on Government Contracts, State officials—Governors, attorneys general, members of State legislatures, local officials—private citizens as well as representatives of various organizations concerned with the legislation. The subcommittee afforded to all who were interested a reasonable opportunity to present their views and interests on the proposals. Those who did not appear personally were given the opportunity to submit for the record any relevant matter.

After the hearing, the subcommittee met in executive sessions to consider the bill H.R. 3147: It struck out of that proposal all after the enacting clause and inserted in lieu thereof an amendment in the nature of a substitute. The substituted proposal consisted of a combination of the legislative provisions contained in the bills, H.R. 3147 and H.R. 4457, and the amended version was recommended to the full Judiciary Committee.

The substitute version of the legislation before the full Judiciary Committee contained nine titles. Briefly, these were:

     1. Obstruction of Court Orders in School Desegregation Cases.
     2. Flight To Avoid Prosecution for Destruction of Educational or Religious Structures.
     3. Authorization to the Attorney General To Institute Civil Proceedings To Protect the Right to Equal Protection of the Laws.
     4. Preservation of Federal Election Records.
     5. Extension of the Civil Rights Commission for 2 Years.
     6. Creation of a Commission on Equal Job Opportunity Under Government Contracts.

7. Provision for the Education of Children of Members of the Armed Forces.

8. Provision for Grants To Assist State and Local Educational Agencies To Effect Desegregation.

9. A General Separability Provision.

The full Judiciary Committee, in its deliberation and consideration of the amended bill H.R. 3147, adopted six of the recommendations of the subcommittee, namely, the obstruction of court orders, flight to avoid prosecution with a broadened provision to include the destruction of any building or other real or personal property, preservation of Federal election records, extension of the Civil Rights Commission for 2 years, education of children of members of the Armed Forces and, finally, a separability title. Certain other amendments were made in each of these titles with the exception of that title relating to the education of children of members of the Armed Forces. Thus eliminated were the titles relating to the authorization to the Attorney General and the Commission on Equal Job Opportunity Under Government Contracts and grants to assist State and local educational agencies to effectuate desegregation. After the full committee had approved this substitute version of H.R. 3147, the chairman introduced a clean bill, H.R. 8601 which contained the titles as amended and approved by the full Judiciary Committee. That bill, H.R. 8601, was referred to the Committee on the Judiciary and the full committee then ordered it reported without amendment.

### GENERAL STATEMENT

Since May 17, 1954, the date in which the Supreme Court of the United States rendered its opinion in the school segregation cases, the principle has been recognized that racial segregation sanctioned by law is not equality under the law. This Nation has been cognizant of its moral responsibility of protecting the constitutional rights of all within the jurisdiction of the United States. By the enactment of the Civil Rights Act of 1957, Congress, for the first time since the days of Reconstruction, placed upon the statute books a law designed to implement the constitutional rights provided in the 14th and 15th amendments.

While it is true that over the past 4 years some progress has been made toward achieving the American goal of providing equal opportunity for all and elimination of discrimination because of race, creed, color or national origin, the problem is far from being solved and the ultimate goal still far distant. The hearings conducted on this legislation clearly indicate the need for additional legislation to implement the enforcement of civil rights. There have been instances and incidents of disorder and violence in the field of desegregation in public education, many State statutes have been enacted designed to impede and obstruct the ruling of our Federal courts in desegregation cases as well as examples of interference with the fundamental American right to vote.

H.R. 8601 is designed to assist in the achievement of the great American goal of equal rights for all under the law by strengthening the law enforcement functions of the Federal government. Its objective is to make more certain that the rights guaranteed under the Constitution and the laws of the United States will be enjoyed by all,

**4**                                  CIVIL RIGHTS

regardless of race, creed, color or national origin. It is not directed at any particular section of the country or segment of our population. but its scope is national and its applicability general. It is the opinion of the committee that the enactment of this legislation would provide adequate tools for the protection of rights and privileges guaranteed by the Constitution and the laws of the United States, particularly with regard to the right to vote.

### A SECTIONAL ANALYSIS OF THE LEGISLATION

#### Title I (obstruction of court orders)

Section 101 of the bill proposes to amend chapter 73 of title 18 of the United States Code with respect to obstruction of court orders in school desegregation cases. Accordingly, it amends that title by adding at the end of the chapter a new section. The measure would make it a Federal offense to willfully use force or threats of force to obstruct or impede court orders for school desegregation purposes; upon conviction, the offender could be punished by a fine of not more than $1,000 or imprisonment for not more than 60 days or both.

It further provides that other injunctive or civil relief against the type of conduct made criminal by this proposal is not to be denied on the grounds that such conduct is a crime. In this regard, provision is made that any fine or imprisonment imposed for the violation of such an injunction shall not be in addition to that imposed for a violation of this section.

It further provides for the exemption of the acts of the student, officer, or employee of a school when the act is done at the direction of or is subject to discipline by an officer of the school.

The need for this particular legislation is amply demonstrated by the experience of the occurrence in Little Rock in 1957. While it is true that this section properly covers individual actions, it is contemplated that its use would be principally in coping with concerted action. It is impossible for a democracy to function if mob violence replaces our tested methods of free expression either in judicial or political processes. The Federal Government must have authority to act effectively whenever the execution of the decrees of the Federal court are obstructed by force or threats of force.

It is the opinion of the Department of Justice that there is doubt as to whether the existing authority of Federal courts is sufficient to impose effective sanctions against the members of a mob who, by threats or force, willfully prevent, obstruct, impede, or interfere with the exercise of rights or the performance of duties under a school desegregation order of a Federal court. The objective of this proposal is to remove that doubt. Under Federal procedure, an individual cannot ordinarily be held in contempt of court unless he was either a party against whom the decree was issued or was acting in concert with such a party. Thus it is clear that in an ordinary situation a mob is not in concert with those named in a school desegregation order. The only alternative the Government would have in such a case of mob action would be to return to the court for a new injunction against its leaders and then prove subsequent acts on their part violating the order so as to establish a contempt.

The present obstruction of justice statute (18 U.S.C. 1503) also appears to be inadequate for such a situation. The particular provi-

sion of that section, namely 4, dealing with one who corrupts or by threats of force endeavors to impede "due administration of justice" would be applicable only if it could be considered that the action involved obstructed or impeded the "due administration of justice." That particular phrase has been a subject of narrow interpretation by the courts and while it is not possible to state categorically that a desegregation decree is beyond the reach of the existing statute, there is much doubt as to whether or not a prosecution of mob leaders could be sustained. The Department of Justice has recommended the enactment of this provision as a specific and firm responsibility of the proven need for effective Federal action to preserve the lawfully determined rights of individual citizens and the integrity of our Federal judicial system.

*Title II (flight to avoid prosecution for damaging or destroying any building or other real or personal property)*

The proposal would make it a felony, punishable by a fine of not more than $5,000 or imprisonment of not more than 5 years or both, to move in interstate or foreign commerce, to avoid local prosecution, custody, or confinement after conviction for willfully damaging or destroying or attempting to damage or destroy by fire or explosive any building, structure, facility, vehicle, dwelling house, synagogue, church, religious center, or educational institution, public or private. Flight to avoid testifying in criminal proceedings relating to such offenses would likewise be punishable. Such criminal offenses as these bombings present very difficult investigation and detection problems for local law enforcement agents, for it is one of the most difficult types of crime to solve. Clues and evidence are ordinarily destroyed by the explosive and more often than not there are very few clues, such as are ordinarily available in other crimes, which would assist in the apprehension of the offender. It is the type of crime that requires scientific equipment and investigation. Moreover, the interstate aspects of the offenses demand utilization of the resources and powers of the Federal Government. It is believed that the Federal Bureau of Investigation can provide the much needed experience and scientific investigative technique to assist—as it has done in the past—local law enforcement officials. The fugitive felon approach is not new, for the Fugitive Felon Act was enacted in 1934 (18 U.S.C. 1073) and has been the means of punishing persons who travel in interstate commerce with the intent to avoid prosecution of the State law for certain enumerated felonies, or to avoid testifying in State felony proceedings. This proposal is consistent with that provision as well as with the principle that local crimes are the responsibility of local law enforcement agencies and that in such cases the Federal Bureau of Investigation is not a national police force but acts to supplement State law enforcement. It is not designed as a substitute for State or local action.

The proposal differs from the Fugitive Felon Act in certain particulars. While the Fugitive Felon Act applies to flight from prosecution in enumerated common law and statutory felonies, this proposal applies to flight from any prosecution of the willful destruction or damaging by fire or explosive of any building or other real or personal property. Whether the State prosecution would be for a felony or misdemeanor is immaterial.

Prosecutions under this proposal would be had in the Federal judicial district in which the original crime was alleged to be committed or in which the person is held in custody or confinement. It also contains a specific proviso the purpose of which is to make clear that this section shall not be construed to prevent any State or local body from prosecuting an offense over which they have jurisdiction in the absence of this new section.

The Department of Justice, in its recommendations for the enactment of this section, limited its applicability to those instances of flight to avoid prosecution for the destruction of educational or religious structure only. However, it was the opinion of the committee that this proposal should be broadened so as to encompass flight to avoid prosecution for the destruction of any building or other real or personal property.

*Title III (Federal election records)*

Section 301 would require the retention and preservation for a period of 2 years of any general, special, or primary election records involving candidates for Federal office. The Federal offices are the Office of the President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner of Puerto Rico. It would include all records and papers in the possession of election officers relating to application, registration, payment of poll tax, or any other act requisite to voting in such elections. Provision is made, however, that where such records are required by State law to be deposited with a custodian, such election records may be so deposited and the duty of retention and preservation then devolves upon that custodian. A willful failure to retain and preserve the records is made an offense punishable by a fine of not more than $1,000 or imprisonment for not more than 1 year or both.

Section 302 provides that any person, whether or not an officer of election or custodian, willfully steals, destroys, conceals, mutilates, or alters any of the records required to be retained and preserved shall be fined not more than $1,000 or imprisoned not more than 1 year or both.

Section 303 provides that such records as required to be preserved by this title shall, upon the written demand of the Attorney General or his representative to the party having custody, possession, or control of them shall be made available for inspection, reproduction and copying by the Attorney General or his representative. Demand, however, must contain a statement of the basis and the purpose therefor.

Section 304 provides that when a demand is made by the Attorney General, the record shall be reproduced either at the principal office of the person upon whom the demand is made or at the office of the U.S. attorney in the district in which the records and papers are located.

Section 305 provides that unless ordered by a court of the United States, neither the Attorney General nor his representative nor any employee of the Department of Justice should disclose any record or paper produced pursuant to this title except to the Congress and any of its committees, governmental agencies, or in the presentation of a case or proceeding before a court or grand jury.

CIVIL RIGHTS                          7

Section 306 provides that in the event of nonproduction, jurisdiction would be conferred upon the Federal district courts to resolve any dispute which might arise in connection with the exercise of the authority conferred upon the Attorney General by this title including appropriate process to compel the production of the record or paper.

Section 307 defines the term "officer of election" to include any person who under color of the law performs or is authorized to perform any function, duty or task with any application, registration, payment of poll tax or other act requisite to voting at any one of the enumerated elections at which votes are cast for candidates for the specified Federal offices.

The Department of Justice has recommended the enactment of the substances of this proposal.

The purpose of title III is to provide a more effective protection of the right of all qualified citizens to vote without discrimination on account of race.   This is the same purpose contained in the Civil Rights Act of 1957, which authorizes the Attorney General to institute civil proceedings for preventive relief from the discriminatory denial of the right to vote.   Experience has shown the need for this legislation.   So long as there is lacking a suitable provision for access to voting records during the course of an investigation and prior to the institution of a suit, the authority of the Attorney General is rendered relatively ineffective.   The situation requires evidence which is practically impossible to assemble unless access is had to detailed information concerning application, registration, tests, and other acts and procedures requisite to voting.

Moreover, such information is mandatory for a proper evaluation of complaints.

The Department of Justice has no existing power in civil proceedings to require the production of these records during any investigation it may conduct on complaints of a denial to vote because of race. The need for this legislation is evident from the refusal of some State and local authority to permit such inspection.   Moreover, the Civil Rights Commission, which does have the power to subpena such records, has found it necessary to utilize its power to compel production.   As was said in the recent Alabama case in re *George C. Wallace et al.* (170 F. Supp. 63, 1959), the inspection of voting records—

> must be considered to be an essential step in the process of enforcing and protecting the right to vote regardless of color, race, religion, or national origin.

The constitutionality of the provisions contained in title III of the bill is beyond question of a doubt under the authority of *United States* v. *Classic* (313 U.S. 299), wherein the authority of Congress to legislate concerning any and all elections affecting Federal offices, whether general, special, or primary, as long as they are "an intricate part of the procedure of choice or where in fact the primary effectively controls their choice."

The Department of Justice has recommended the substance provisions of title III of the proposal.

*Title IV (Civil Rights Commission extended for 2 years)*

Section 401 would extend the life of the Civil Rights Commission for an additional 2 years.   Under the Civil Rights Act of 1957, the

Commission is required to submit its final report not later than September 9, 1959. Provision is made in this section also for an interim report to be submitted to the President and the Congress not later than September 1, 1959.

Because of circumstances beyond its control, the Civil Rights Commission was not able to commence operations for a number of months following the enactment on September 9, 1957, of the Civil Rights Act. Termination of the existence of the Commission by September of this year would not provide a full opportunity to meet the statutory responsibility imposed upon it by Congress. There is a definite need for further extension in order to make the study and analysis of the problems involved in this complex and difficult field. Moreover, in attempting to carry out the duties imposed upon it by the Congress, the Commission has encountered extensive litigation as indicated by the examples in Alabama and more recently in Louisiana. In these instances, the Commission was concerned with the inspection of election records relative to its study of the question of voting rights.

The Commission has also undertaken programs of research, study, and investigation in the fields of education and housing. Thus the extension of the life of the Commission would permit it to continue its work in these three particular fields as well as new programs in other related fields dealing with equal protection of the laws. It is the opinion of the committee that the best interests of the country would be served by the extension of the life of the Commission.

Section 402 of title III would remove any doubt as to the authority of the members of the Commission to administer oaths. Some questions have been raised as to the power of the Commissioner to administer oaths to witnesses, and it is the purpose of the proposed amendment to remove such doubt. Since existing law requires that complaints submitted to the Commission be under oath of affirmation, it is only proper that the subsequent investigation of that complaint should also be in the form of sworn testimony. The authority provided by this section would facilitate the handling of these complaints particularly during the course of hearings.

Section 403 would amend the Civil Rights Act of 1957, section 105(a), by striking all the words "in accordance with Civil Service and Classification Laws" and inserting "without regard to the provisions of the Civil Service Laws and the Classification Act of 1945, as amended." The Commission, which is a temporary Government agency, has experienced difficulty in obtaining the services of an adequate number of fully qualified personnel for part-time and short tenure employment. This has been true not only on the clerical level but also among professional personnel. It is the opinion of the committee that, as has been done with other commissions of a temporary nature, the requirements for employment under the Civil Service Laws and Classification Act should be removed in order to facilitate the work of the Commission. The Department of Justice has recommended substantive provisions of this title.

*Title V (education of children of members of the Armed Forces)*

Title V would amend Public Laws 815 and 874, 81st Congress, as amended, which authorize Federal payments to school districts which provide free public education to children whose parent resides or works on Federal property which is not subject to State or local taxation.

CIVIL RIGHTS                                    9

This title recognizes the unique responsibility of the Federal Government with respect to the education of children of military personnel. Since the members of the Armed Forces serve in communities under orders, their children receive public education as it is provided in the community in which they reside.

The recent closure of certain secondary schools in Norfolk, Va., involved approximately 2,500 school-age children whose parent was on active duty with the Armed Forces in the area. Of that number, 350 children who resided on Federal military posts would have been the only ones for which the Federal Government could have provided schooling if the schools had remained closed. The purpose of this title is to permit the Government to provide for those other children of military personnel who live off Federal property. It is estimated that the proposed legislation could possibly affect the education of some 70,000 children of military personnel situated in States where the closure of schools is a possibility.

Section 6(a), Public Law 874, now requires the Commissioner of Education to make arrangements to provide free public education for children residing on Federal property if the State and its subdivisions may not spend tax revenues for their education or if no local public educational agency is able to provide suitable free public education for them.

Section 501 of the bill would amend section 6(a) to permit the Commissioner to make arrangements also for children of members of the Armed Forces on active duty, whether or not residing on Federal property, where the schools usually provide free public education for them are made unavailable to them by official action of State or local governmental authority and no local public educational agency is able to provide them with suitable free public education.

Subsection (b) of 501 provides complementary amendments to section 6(d) of Public Law 874. The existing provision permits the Commissioner, when he makes the arrangements for provision of education for the federally connected children, to make such arrangements only with a local educational agency or with the Federal agency having jurisdiction over the property on which they reside. Where this new category of children of Armed Forces personnel are involved, arrangements could also be made with the head of the Federal department or agency having jurisdiction over the parents of some or all of the children.

Section 6(d) of Public Law 874 limits the arrangements to those which provide for the use of either facilities situated on Federal property or facilities belonging to a local educational agency. The amendment provided in subsection (b) of section 501 would make this limitation inapplicable where the Commissioner is required to make these arrangements for the new category of children.

Section 502 of title IV of the bill amends Public Law 815, 81st Congress, as amended. The proposal of the bill would authorize the Commissioner of Education to acquire possession of any school building constructed with the aid of Federal funds after the enactment of the proposed amendments contained in this section, when the local educational agency which owns the building is no longer using it for free public education and the Commissioner needs the building to provide education for children of military personnel or for other children who reside on Federal property. While the school remains

in Federal possession, the Commissioner would pay the local district a rental fee proportionate to its share of the cost of constructing the building.

Section 6(b), Public Law 815, 81st Congress, as amended, now requires applications of local educational agencies for the approval of construction projects, which must be filed before the agencies may receive payments to help finance such projects, to contain or be supported by various assurances relating to the authority of the local agency, and other relevant matters. The amendment proposed in section 502 of the bill would add to this provision the requirement of an assurance that any facilities constructed with aid under this law, the application for which is approved after the enactment of the bill, will be made available to the Commissioner in case they are not being used to provide free public education and that the Commissioner need them to provide facilities for the education of children who reside on Federal property or whose parent is on active duty with the Armed Forces. Subsection (b) of section 502 would amend section 10 of Public Law 874.

Subsection (b) of section 502 would amend section 10 of Public Law 815. Existing law now requires the Commissioner to make arrangements for the constructing or otherwise providing the minimum facilities necessary for the education of children who will be residing on Federal property at the end of the next fiscal year if the State and its subdivisions may not spend tax revenues for their education or if no local educational agency is able to provide suitable free public education for them.

Section 502(b) of the bill would amend this section to permit the Commissioner to make such arrangements to provide, on a temporary basis, such facilities for children of the members of the Armed Forces on active duty, whether or not residing on Federal property, where the schools usually providing free public education for them are made unavailable to them by official action of State or local governmental authority and no local educational agency is able to provide them with suitable free public education.

Section 502(c) of the bill further amends section 10 of Public Law 815 by adding a new subsection which authorizes the Commissioner of Education to take possession of facilities constructed with the aid of funds provided for by Public Law 815, under an application approved after the enactment of the bill, if they are not being used for free public education and are needed by the Commissioner, as minimum facilities necessary for the children residing on Federal property or children of the Armed Forces personnel on active duty. Possession would be taken under the terms and conditions prescribed in regulations of the Commissioner of Education. Payment by the Commissioner of a reasonable rental on the portion of the facilities financed with non-Federal funds would be required. Provision is also made for the return of those facilities to the school district when the district reopens those schools and makes them available to the federally connected children or when the Commissioner no longer needs the facilities for direct Federal operation purposes. However, the best interests of the federally connected children, the objectives of this proposal, and the commitments to the personnel employed in the direct Federal operation would be factors to be considered in determining the appropriate time for the return of the facilities.

This title has been recommended by the Department of Health, Education, and Welfare.

*Title VI (separability)*

Section 601 merely provides that if any provision of this act is held invalid, the remainder of the act shall not be affected thereby.

## EXECUTIVE COMMUNICATIONS

There is included at this point in the report, executive communications received from Hon. William P. Rogers, Attorney General of the United States, directed to the Speaker of the House of Representatives and dated February 5, 1959, as well as a similar communication from Hon. Arthur S. Flemming, Secretary of the Department of Health, Education, and Welfare, directed to the Speaker of the House of Representatives and dated February 5, 1959.

FEBRUARY 5, 1959.

The SPEAKER,
*House of Representatives,*
*Washington, D.C.*

DEAR MR. SPEAKER: It is my privilege to transmit for your consideration and appropriate reference the text of four of the seven civil rights legislative proposals recommended by the President and discussed in some detail in his message of this date.

The enclosures are:

1. A bill to strengthen the law with respect to obstruction of court orders in school desegregation cases.

2. A bill to punish flight to avoid prosecution for unlawful destruction of educational or religious structures.

3. A bill to require the preservation of Federal election records and authorizing the Attorney General to inspect them.

4. A bill to extend the life of the Civil Rights Commission for an additional 2 years.

The Bureau of the Budget has advised that the submission of this legislation is in accord with the program of the President.

Sincerely,

WILLIAM P. ROGERS,
*Attorney General.*

A BILL To amend chapter 73 of title 18, United States Code, with respect to obstruction of court orders

That chapter 73 of title 18, United States Code, is amended by adding at the end thereof a new section as follows:

"§ 1509. Obstruction of certain court orders.

"Whoever corruptly, or by threats or force, or by any threatening letter or communication, willfully prevents, obstructs, impedes or interferes with or willfully endeavors to prevent, obstruct, impede or interfere with the due exercise of rights or the performance of duties under any order, judgment, or decree of a court of the United States which (1) directs that any person or class or persons shall be admitted to any school, or (2) directs that any person or class of persons shall not be denied admission to any school because of race or color, or (3) approves any plan of any State or local agency the

effect of which is or will be to permit any person or class of persons to be admitted to any school, shall be fined not more than $10,000 or imprisoned not more than two years, or both.

"No injunctive or other civil relief against the conduct made criminal by this section shall be denied on the ground that such conduct is a crime.

"This section shall not apply to an act of a student, officer or employee of a school if such act is done pursuant to the direction of, or is subject to disciplinary action by, an officer of such school."

"SEC. 2. The analysis of chapter 73 of such title is amended by adding at the end thereof the following:

"1509. Obstruction of certain court orders."

---

A BILL To provide for the retention and preservation of Federal election records and to authorize the Attorney General to compel the production of such records

That every officer of election shall retain and preserve, for a period of three years from the date of any general, special or primary election at which candidates for the office of President, Vice President, presidential elector, Member of the Senate or Member of the House of Representatives are voted for, all records and papers which come into his possession relating to any application, registration, payment of poll tax or other act requisite to voting in such election, except that, when required by law, such records and papers may be delivered to another officer of election and except that if a State designates a custodian to retain and preserve these records and papers at a specified place, then such records and papers may be deposited with such custodian, and the duty to retain and preserve any record or paper so deposited shall devolve upon such custodian. Any officer of election or custodian who willfully fails to comply with this section shall be fined not more than $1,000 or imprisoned not more than one year, or both.

SEC. 2. Any person, whether or not an officer of election or custodian, who willfully steals, destroys, conceals, mutilates or alters any record or paper required by section 1 to be retained and preserved shall be fined not more than $5,000 or imprisoned not more than five years, or both.

SEC. 3. Any record or paper required by section 1 to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying by the Attorney General or his representative.

SEC. 4. Any record or paper demanded pursuant to section 3 shall be produced for inspection, reproduction, and copying at the principal office of the person upon whom such demand is made or at an office of the United States attorney in the district in which such records or papers are located.

SEC. 5. Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this Act, or any

CIVIL RIGHTS                                          13

reproduction or copy, except as is necessary in the performance of his official duties, including presentation of any case or proceeding before any court or grand jury.

Sec. 6. The United States district court for the district in which a demand is made pursuant to section 3, or in which a record or paper so demanded is located, shall have jurisdiction by appropriate process to compel the production of such record or paper.

Sec. 7. As used in this Act, the term "officer of election" means any person who, under color of any Federal, State or local law, statute, ordinance, regulation, authority, custom or usage, performs or is authorized to perform any function, duty or task in connection with any application, registration, payment of poll tax or other act requisite to voting in any general, special or primary election at which candidates for the office of President, Vice President, presidential elector, Member of the Senate or Member of the House of Representatives are voted for.

———

A BILL To amend the Civil Rights Act of 1957 to afford the Civil Rights Commission an additional two years within which to submit its final report, and for other purposes

That section 104(b) of the Civil Rights Act of 1957 (71 Stat. 635; 42 U.S.C. Supp. V 1975c(b)) is amended to read as follows:

"(b) The Commission shall submit an interim report to the President and to the Congress not later than September 1, 1959, and at such other times as either the Commission or the President shall deem desirable. It shall submit to the President and to the Congress a final and comprehensive report of its activities, findings, and recommendations not later than four years from the date of enactment of this Act."

———

A BILL To amend chapter 49 of title 18, United States Code, to punish flight to avoid prosecution for unlawful destruction of educational or religious structures

That chapter 49 of title 18, United States Code, is amended by adding at the end thereof a new section as follows:

"§ 1074. Flight to avoid prosecution for destruction of educational or religious structures.

"Whoever moves or travels in interstate or foreign commerce with intent either (1) to avoid prosecution, or custody, or confinement after conviction, under the laws of the place from which he flees, for willfully damaging or destroying or attempting to damage or destroy by fire or explosive any building, structure, facility or vehicle, if such building, structure, facility or vehicle is used primarily for religious purposes or for the purposes of public or private primary, secondary or higher education, or (2) to avoid giving testimony in any criminal proceeding relating to any such offense—shall be fined not more than $5,000 or imprisoned not more than five years, or both.

"Violations of this section may be prosecuted in the Federal judicial district in which the original crime was alleged to have been committed or in which the person was held in custody or confinement or in the Federal judicial district in which the person is apprehended."

Sec. 2. The analysis of chapter 49 of such title is amended by adding thereto the following:

"1074. Flight to avoid prosecution for destruction of educational or religious structures."

**14**            CIVIL RIGHTS

DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE,

*February 5, 1959;*

Hon. SAM RAYBURN,
*Speaker of the House of Representatives,*
*Washington, D.C.*

DEAR MR. SPEAKER: I enclose for your consideration two legislative proposals which would enable this Department to discharge responsibilities in the field of public education in accordance with the recommendations of the President in his civil rights message of February 5.

Each of these recommendations is designed to meet separate problems. One would provide, at their request, assistance to certain States and localities in adjusting their school systems to a desegregated basis. The other would amend Public Laws 815 and 874, 81st Congress, to provide for the education of children of members of the Armed Forces in communities where the public schools which they normally attend are closed or otherwise made unavailable to them.

*A. Grants and technical assistance*

The first draft bill would establish an affirmative role for the Federal Government in helping those States which have previously required or permitted racially segregated public schools, and which must now develop programs of transition to desegregation. Such States established their school systems in good faith and in reliance upon earlier Supreme Court rulings that public school racial segregation was lawful, provided that separate but equal facilities were maintained. Now, in carrying out their duty to comply with the present ruling of the Court, these States and their communities are required to make adjustments which may impose temporary but serious financial and educational burdens on their existing school systems.

The bill would authorize appropriations for grants to States which required or permitted segregation in their public elementary and secondary schools as of May 17, 1954, the date of the first Supreme Court decision declaring such segregation to be unlawful. Funds appropriated would be allotted to the States proportionately according to their May 17, 1954, school population in segregated public school systems on that date. The bill would authorize appropriations only for the fiscal years 1960 and 1961. In January 1961, the Secretary would be required to report to Congress his recommendations as to the extension or modification of the legislation.

Federal grants would be available to pay half the costs borne by local educational agencies in providing the additional nonteaching professional services required by their desegregation programs. Included would be the services of supervisory or administrative personnel, pupil-placement officers, social workers and visiting teachers, and similar professional staff members needed to help resolve adjustment problems arising in the course of desegregation.

In addition, part of the State's allotment could be used to pay half of its expenditures at the State level for developing and carrying out State desegregation policies and programs, including the provision of technical assistance to local educational agencies.

To receive funds under this bill, a State would submit to the Commissioner of Education a plan setting forth its methods and criteria

for approving applications of local educational agencies, and describing the State-level activities for which the State would use grants. If in any year an approvable State plan is not filed, the Commissioner could, if the State consents or indicates it has no responsibility in the matter, make grants directly to local educational agencies in the State.

The draft bill would also authorize the Commissioner of Education to collect and disseminate information on the progress of public school desegregation, and, at the request of the States or local agencies, to provide technical assistance in the development of desegregation programs and to initiate or participate in conferences called to help resolve educational problems arising as a result of efforts to desegregate.

An enclosed summary explains in greater detail the provisions of the proposed program. Also enclosed is a statement of cost estimates and personnel requirements which would be entailed, as required by Public Law 801, 84th Congress.

*B. Amendments to Public Laws 815 and 874, 81st Congress*

Public Laws 815 and 874, 81st Congress, authorize Federal payments to school districts which provide free public education to children whose parents reside or work on Federal property which is not subject to State or local taxation.

When the public schools in a federally affected area are closed as the result of State or local attempts to avoid compliance with Federal court decisions or decrees requiring desegregation, children of military personnel, like all other children in the community, are deprived of their education. The Federal Government has a particular responsibility for the large numbers of children of military personnel in such federally affected areas, since armed services personnel are located there under military orders rather than by their own free choice. Under the present law, the Commissioner of Education may provide for the education of children of military personnel only in the case of those who live on military reservations or other Federal properties.

The proposed bill would amend the present laws to enable the Commissioner and the armed services concerned to provide for the education of children of military personnel, regardless of where they live, when the public schools are closed to them. In such situations the Commissioner would also be authorized to make temporary provision for such school facilities as may be necessary for their education.

The bill would further authorize the Commissioner to acquire possession of any school building constructed with the aid of Federal funds after enactment of the proposed amendments, when the local educational agency which owns the building is no longer using it for free public education and the Commissioner needs the building to provide education to children of military personnel or to other children who reside on Federal property. While the school remains in Federal possession, the Commissioner would pay the local district a rental fee proportionate to its share in the cost of constructing the building.

No statement of estimated expenditures and man-years of civilian employment as described in Public Law 801, 84th Congress, is submitted with this proposal. The proposed new legislation would confer "standby" authority, and the number and nature of the situations, if any, which may occasion exercise of this authority cannot be pre-

CIVIL RIGHTS

dicted. Also, any additional costs incurred under the bill would be wholly, or in large part, offset by reductions in payments to school districts under the two laws which would be realized in the situations to which the legislative proposal is addressed.

Enclosed is a summary explanation of the provisions of this draft bill.

I would appreciate it if you would refer both of the enclosed draft bills to the appropriate committee for consideration.

The Bureau of the Budget advises that enactment of this proposed legislation would be in accord with the program of the President.

Sincerely yours,

ARTHUR S. FLEMMING, *Secretary.*

DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE

*Estimate of financial requirements for assistance for public school desegregation for fiscal years 1960 through 1964 in accordance with Public Law 801, 84th Cong.*

PROGRAM FUNDS

|  | 1960 | 1961 | 1962 | 1963 | 1964 |
|---|---|---|---|---|---|
| New obligational authority | [1] $1,500,000 | $3,000,000 | 0 | 0 | 0 |
| Expenditures | 1,125,000 | 2,625,000 | 750,000 | 0 | 0 |

ADMINISTRATIVE EXPENSES

|  | 1960 | 1961 | 1962 | 1963 | 1964 |
|---|---|---|---|---|---|
| Personal services | $90,000 | $142,500 | $75,000 | 0 | 0 |
| Other | 30,000 | 37,500 | 20,000 | 0 | 0 |
| Total new obligational authority | 120,000 | 180,000 | 95,000 | 0 | 0 |
| Expenditures | 110,000 | 175,000 | 110,000 | 0 | 0 |
| Man-years employment | 12 | 19 | 10 | 9 | 0 |

[1] Assumes allotments based on $3,000,000.

CHANGES IN EXISTING LAW

In compliance with clause 3 of rule XIII of the House of Representatives, there is printed below in roman existing law in which no change is proposed, with matter proposed to be stricken out enclosed in black brackets, and new matter proposed to be added shown in italics:

CIVIL RIGHTS                              **17**

# TITLE 18, UNITED STATES CODE

## Chapter 73.—OBSTRUCTION OF JUSTICE

Sec.
1501. Assault on process server.
1502. Resistance to extradition agent.
1503. Influencing or injuring officer, juror or witness generally.
1504. Influencing juror by writing.
1505. Influencing or injuring witness before agencies and committees.
1506. Theft or alteration of record or process; false bail.
1507. Picketing or parading.
1508. Recording, listening to, or observing proceedings of grand or petit juries while deliberating or voting.
*1509. Obstruction of certain court orders.*

§ 1501. * * *
§ 1502. * * *
§ 1503. * * *
§ 1504. * * *
§ 1505. * * *
§ 1506. * * *
§ 1507. * * *
§ 1508. * * *

## § 1509. *Obstruction of certain court orders*

*Whoever corruptly, or by threats or force, or by any threatening letter or communication, willfully prevents, obstructs, impedes, or interferes with or willfully endeavors to prevent, obstruct, impede, or interfere with the due exercise of rights or the performance of duties under any order, judgment, or decree of a court of the United States which (1) directs that any person or class of persons shall be admitted to any public school, or (2) directs that any person or class of persons shall not be denied admission to any public school because of race or color, or (3) approves any plan of any State or local agency the effect of which is or will be to permit any person or class of persons to be admitted to any public school, shall be fined not more than $1,000 or imprisoned not more than sixty days, or both.*

*No injunctive or other civil relief against the conduct made criminal by this section shall be denied on the ground that such conduct is a crime; provided that any such fine or imprisonment imposed for violation of such injunction shall be concurrent with and not consecutive or supplemental to any criminal penalty imposed hereunder.*

*This section shall not apply to an act of a student, officer, or employee of a school if such act is done pursuant to the direction of, or is subject to disciplinary action by, an officer of such school.*

# TITLE 18, UNITED STATES CODE

## Chapter 49.—FUGITIVES FROM JUSTICE

Sec.
1071. Concealing person from arrest.
1072. Concealing escaped prisoner.
1073. Flight to avoid prosecution or giving testimony.
*1074. Flight to avoid prosecution for damaging or destroying any building or other
real or personal property.*

§ 1071. * * *
§ 1072. * * *
§ 1073. * * *

## § 1074. *Flight to avoid prosecution for damaging or destroying any building or other real or personal property*

*Whoever moves or travels in interstate or foreign commerce with intent either (1) to avoid prosecution, or custody, or confinement after conviction, under the laws of the place from which he flees, for willfully attempting to or damaging or destroying by fire or explosive any building, structure, facility, vehicle, dwelling house, synagogue, church, religious center or educational institution, public or private, or (2) to avoid giving testimony in any criminal proceeding relating to any such offense shall be fined not more than $5,000 or imprisoned not more than five years, or both.*

*Violations of this section may be prosecuted in the Federal judicial district in which the original crime was alleged to have been committed or in which the person was held in custody or confinement: Provided, however, That this section shall not be construed as indicating an intent on the part of Congress to prevent any State, Territory, Commonwealth, or possession of the United States of any jurisdiction over any offense over which they would have jurisdiction in the absence of such section.*

---

# CIVIL RIGHTS ACT OF 1957

## PUBLIC LAW 85–315—SEPTEMBER 9, 1957

### (71 Stat. 634 et seq.)

PART I—ESTABLISHMENT OF THE COMMISSION ON CIVIL RIGHTS

SEC. 101. * * *

#### RULES OF PROCEDURE OF THE COMMISSION

SEC. 102. * * *

#### COMPENSATION OF MEMBERS OF THE COMMISSION

SEC. 103. * * *

#### DUTIES OF THE COMMISSION

SEC. 104. (a) The Commission shall—
(1) investigate allegations in writing under oath or affirmation that certain citizens of the United States are being deprived of their right to vote and have that vote counted by reason of their

color, race, religion, or national origin; which writing, under oath or affirmation, shall set forth the facts upon which such belief or beliefs are based;

(2) study and collect information concerning legal developments constituting a denial of equal protection of the laws under the Constitution; and

(3) appraise the laws and policies of the Federal Government with respect to equal protection of the laws under the Constitution.

〔(b) The Commission shall submit interim reports to the President and to the Congress at such times as either the Commission or the President shall deem desirable, and shall submit to the President and to the Congress a final and comprehensive report of its activities, findings, and recommendations not later than two years from the date of the enactment of this Act.〕

---

*(b) The Commission shall submit an interim report to the President and to the Congress not later than September 1, 1959, and at such other times as either the Commission or the President shall deem desirable. It shall submit to the President and to the Congress a final and comprehensive report of its activities, findings, and recommendations not later than four years from the date of enactment of this Act.*

(c) Sixty days after the submission of its final report and recommendations the Commission shall cease to exist.

---

## CIVIL RIGHTS ACT OF 1957

### Public Law 85–315—September 9, 1957

### (71 Stat. 634 et seq.)

Sec. 105(a) There shall be a full-time staff director for the Commission who shall be appointed by the President by and with the advice and consent of the Senate and who shall receive compensation at a rate, to be fixed by the President, not in excess of $22,500 a year. The President shall consult with the Commission before submitting the nomination of any person for appointment to the position of staff director. Within the limitations of its appropriations, the Commission may appoint such other personnel as it deems advisable 〔in accordance with the civil service and classification laws,〕 *without regard to the provisions of the civil service laws and the Classification Act of 1949, as amended,* and may procure services as authorized by section 15 of the Act of August 2, 1946 (60 Stat. 810; 5 U.S.C. 55a), but at rates for individuals not in excess of $50 per diem.

(b) The Commission shall not accept or utilize services of voluntary or uncompensated personnel, and the term "whoever" as used in paragraph (g) of section 102 hereof shall be construed to mean a person whose services are compensated by the United States.

(c) The Commission may constitute such advisory committees within States composed of citizens of that State and may consult with governors, attorneys general, and other representatives of State

and local governments, and private organizations, as it deems advisable.

(d) Members of the Commission, and members of advisory committees constituted pursuant to subsection (c) of this section, shall be exempt from the operation of sections 281, 283, 284, 434, and 1914 of title 18 of the United States Code, and section 190 of the Revised Statutes (5 U.S.C. 99).

(e) All Federal agencies shall cooperate fully with the Commission to the end that it may effectively carry out its functions and duties.

(f) The Commission, or on the authorization of the Commission any subcommittee of two or more members, at least one of whom shall be of each major political party, may, for the purpose of carrying out the provisions of this Act, hold such hearings and act at such times and places as the Commission or such authorized subcommittee may deem advisable. Subpenas for the attendance and testimony of witnesses or the production of written or other matter may be issued in accordance with the rules of the Commission as contained in section 102 (j) and (k) of this Act, over the signature of the Chairman of the Commission or of such subcommittee, and may be served by any person designated by such Chairman.

(g) In case of contumacy or refusal to obey a subpena, any district court of the United States or the United States court of any Territory or possession, or the District Court of the United States for the District of Columbia, within the jurisdiction of which the inquiry is carried on or within the jurisdiction of which said person guilty of contumacy or refusal to obey is found or resides or transacts business, upon application by the Attorney General of the United States shall have jurisdiction to issue to such person an order requiring such person to appear before the Commission or a subcommittee thereof, there to produce evidence if so ordered, or there to give testimony touching the matter under investigation; and any failure to obey such order of the court may be punished by said court as a contempt thereof.

(h) *Without limiting the generality of the foregoing, each member of the Commission shall have the power and authority to administer oaths or take statements of witnesses under affirmation.*

---

## PUBLIC LAW 874, 81ST CONGRESS

### Act of September 30, 1950, as amended

AN ACT to provide financial assistance for local educational agencies in areas affected by Federal activities, and for other purposes.

\*        \*        \*        \*        \*        \*        \*

### CHILDREN FOR WHOM LOCAL AGENCIES ARE UNABLE TO PROVIDE EDUCATION

SEC. 6. (a) In the case of children who reside on Federal property—

(1) if no tax revenues of the State or any political subdivision thereof may be expended for the free public education of such children; or

(2) if it is the judgment of the Commissioner, after he has consulted with the appropriate State educational agency, that no local educational agency is able to provide suitable free public education for such children;

CIVIL RIGHTS                                                                   21

the Commissioner shall make such arrangements (other than arrangements with respect to the acquisition of land, the erection of facilities, interest, or debt service) as may be necessary to provide free public education for such children. *Such arrangements to provide free public education may also be made for children of members of the Armed Forces on active duty, if the schools in which free public education is usually provided for such children are made unavailable to them as a result of official action by State or local governmental authority and it is the judgment of the Commissioner, after he has consulted with the appropriate State educational agency, that no local educational agency is able to provide suitable free public education for such children.* To the maximum extent practicable, the local educational agency, or the head of the Federal department or agency, with which any arrangement is made under this section shall take such action as may be necessary to ensure that the education provided pursuant to such arrangement is comparable to free public education provided for children in comparable communities in the State, or, in the case of education provided under this section outside the continental United States, Alaska, and Hawaii, comparable to free public education provided for children in the District of Columbia. For the purpose of providing such comparable education, personnel may be employed without regard to the civil-service or classification laws. In any case where education was being provided on January 1, 1955, or thereafter under an arrangement made under this subsection for children residing on an Army, Navy (including the Marine Corps), or Air Force installation, it shall be presumed, for the purposes of this subsection, that no local educational agency is able to provide suitable free public education for the children residing on such installation, until the Commissioner and the Secretary of the military department concerned jointly determine, after consultation with the appropriate State educational agency, that a local educational agency is able to do so.

(b) In any case in which the Commissioner makes such arrangements for the provision of free public education in facilities situated on Federal property, he may also make arrangements for providing free public education in such facilities for children residing in any area adjacent to such property with a parent who, during some portion of the fiscal year in which such education is provided, was employed on such property, but only if the Commissioner determines after consultation with the appropriate State educational agency (1) that the provision of such education is appropriate to carry out the purposes of this Act, (2) that no local educational agency is able to provide suitable free public education for such children, and (3) in any case where in the judgment of the Commissioner the need for the provision of such education will not be temporary in duration, that the local educational agency of the school district in which such children reside, or the State educational agency, or both, will make reasonable tuition payments to the Commissioner for the education of such children. Such payments may be made either directly or through deductions from amounts to which the local educational agency is entitled under this Act, or both, as may be agreed upon between such agency and the Commissioner. Any amounts paid to the Commissioner by a State or local educational agency pursuant to this section shall be covered into the Treasury as miscellaneous receipts.

CIVIL RIGHTS

(c) In any case in which the Commissioner makes arrangements under this section for the provision of free public education in facilities situated on Federal property in Puerto Rico, Wake Island, Guam, or the Virgin Islands, he may also make arrangements for providing free public education in such facilities for children residing with a parent employed by the United States, but only if the Commissioner determines after consultation with the appropriate State educational agency (1) that the provision of such education is appropriate to carry out the purposes of this Act, and (2) that no local educational agency is able to provide suitable free public education for such children.

(d) The Commissioner may make an arrangement under this section only with a local educational agency or with the head of a Federal department or agency administering Federal property on which children reside who are to be provided education pursuant to such arrangement *or, in the case of children to whom the second sentence of subsection (a) applies, with the head of any Federal department or agency having jurisdiction over the parents of some or all of such children.* [Arrangements] *Except where the Commissioner makes arrangements pursuant to the second sentence of subsection (a), arrangements* may be made under this section only for the provision of education in facilities of a local educational agency or in facilities situated on Federal property.

(e) To the maximum extent practicable, the Commissioner shall limit the total payments made pursuant to any such arrangement for educating children within the continental United States, Alaska, or Hawaii, to an amount per pupil which will not exceed the per pupil cost of free public education provided for children in comparable communities in the State. The Commissioner shall limit the total payments made pursuant to any such arrangement for educating children outside the continental United States, Alaska, or Hawaii, to an amount per pupil which will not exceed the amount he determines to be necessary to provide education comparable to the free public education provided for children in the District of Columbia.

(f) In the administration of this section, the Commissioner shall not exercise any direction, supervision, or control over the personnel, curriculum, or program of instruction of any school or school system.

---

## PUBLIC LAW 815, 81ST CONGRESS

### Act of September 23, 1950, as amended

AN ACT relating to the construction of school facilities in areas affected by Federal activities, and for other purposes.

\*        \*        \*        \*        \*        \*        \*

#### APPLICATIONS

SEC. 6. (a) No payment may be made to any local educational agency under this Act except upon application therefor which is submitted through the appropriate State educational agency and is filed with the Commissioner in accordance with regulations prescribed by him.

CIVIL RIGHTS                                    23

(b) (1) Each application by a local educational agency shall set forth the project for the construction of school facilities for such agency with respect to which it is filed, and shall contain or be supported by—

(A) a description of the project and the site therefor, preliminary drawings of the school facilities to be constructed thereon, and such other information relating to the project as may reasonably be required by the Commissioner;

(B) assurance that such agency has or will have title to the site, or the right to construct upon such site school facilities as specified in the application and to maintain such school facilities on such site for a period of not less than twenty years after the completion of the construction;

(C) assurance that such agency has legal authority to undertake the construction of the project and to finance any non-Federal share of the cost thereof as proposed, and assurance that adequate funds to defray any such non-Federal share will be available when needed;

(D) assurance that such agency will cause work on the project to be commenced within a reasonable time and prosecuted to completion with reasonable diligence;

(E) assurance that the rates of pay for laborers and mechanics engaged in the construction will be not less than the prevailing local wage rates for similar work as determined in accordance with Public Law Numbered 403 of the Seventy-fourth Congress, approved August 30, 1935, as amended;

(F) assurance that the school facilities of such agency will be available to the children for whose education contributions are provided in this Act on the same terms, in accordance with the laws of the State in which the school district of such agency is situated, as they are available to other children in such school district; [and]

(G) assurance that such agency will from time to time prior to the completion of the project submit such reports relating to the project as the Commissioner may reasonably require[.]; and

(H) *assurance that such agency will make the school facilities included in any such project, the application for which is approved after enactment of this clause, available to the Commissioner pursuant to section 10(b).*

(2) The Commissioner shall approve any application if he finds (A) that the requirements of paragraph (1) have been met and that approval of the project would not result in payments in excess of those permitted by sections 4 and 5, (B) after consultation with the State and local educational agencies, that the project is not inconsistent with overall State plans for the construction of school facilities, and (C) that there are sufficient Federal funds available to pay the Federal share of the cost of such project and of all other projects for which Federal funds have not already been obligated and applications for which, under section 3, have a higher priority: *Provided,* That the Commissioner may approve any application for payments under this Act at any time after it is filed and before any priority is established with respect thereto under section 3 if he determines that—

(1) on the basis of information in his possession, it is likely that the urgency of the need of the local educational agency is

24                              CIVIL RIGHTS

such that it would have a priority under section 3 which would qualify it for payments under this Act when such priorities are established, and

(ii) the number of children in the increase under section 5(a) is in large measure attributable to children who reside or will reside in housing newly constructed on Federal property.

(c) No application under this Act shall be disapproved in whole or in part until the Commissioner of Education has afforded the local educational agency reasonable notice and opportunity for hearing.

\*      \*      \*      \*      \*      \*      \*

CHILDREN FOR WHOM LOCAL AGENCIES ARE UNABLE TO PROVIDE
EDUCATION

SEC. 10. (a) In the case of children who it is estimated by the Commissioner in any fiscal year will reside on Federal property at the end of the next fiscal year—

(1) if no tax revenues of the State or any political subdivision thereof may be expended for the free public education of such children; or

(2) if it is the judgment of the Commissioner, after he has consulted with the appropriate State educational agency, that no local educational agency is able to provide suitable free public education for such children,

the Commissioner shall make arrangements for constructing or otherwise providing the minimum school facilities necessary for the education of such children. *Such arrangements may also be made to provide on a temporary basis, minimum school facilities for children of members of the Armed Forces on active duty, if the schools in which free public education is usually provided for such children are made unavailable to them as a result of official action by State or local governmental authority and it is the judgment of the Commissioner, after he has consulted with the appropriate State educational agency, that no local educational agency is able to provide suitable free public education for such children.* To the maximum extent practicable school facilities provided under this section shall be comparable to minimum school facilities provided for children in comparable communities in the State. This section shall not apply (A) to children who reside on Federal property under the control of the Atomic Energy Commission, and (B) to Indian children attending federally operated Indian schools. Whenever it is necessary for the Commissioner to provide school facilities for children residing on Federal property under this section, the membership of such children may not be included in computing under section 5 the maximum on the total of the payments for any local educational agency.

(b) *Whenever the Commissioner determines that—*

(1) *any school facilities with respect to which payments were made under section 7 of this Act, pursuant to an application approved under section 6 after the enactment of this subsection, are not being used by a local educational agency for the provision of free public education, and*

(2) *such facilities are needed in the provision of minimum facilities under subsection (a),*

*he shall notify such agency of such determination and shall thereupon be entitled to possession of such facilities for purposes of subsection (a), on*

CIVIL RIGHTS                    **25**

*such terms and conditions as may be prescribed in regulations of the Commissioner. Such regulations shall include provision for payment of rental in an amount which bears the same relationship to what, in the judgment of the Commissioner, is a reasonable rental for such facilities as the non-Federal share of the cost of construction of such facilities bore to the total cost of construction thereof (including the cost of land and off-site improvements), adjusted to take into consideration the depreciation in the value of the facilities and such other factors as the Commissioner deems relevant. Upon application by the local educational agency for the school district in which such facilities are situated and determined by the Commissioner that such agency is able and willing to provide suitable free public education for the children in the school district of such agency to whom section 10 is applicable, or upon determination by the Commissioner that such facilities are no longer needed for purposes of subsection (a), possession of the facilities shall be returned to such agency. Such return shall be effected at such time as, in the judgment of the Commissioner, will be in the best interest of the children who are receiving free public education in such facilities, and in the light of the objectives of this Act and the commitments made to personnel employed in connection with operation of such facilities pursuant to arrangements made by the Commissioner.*

\*    \*    \*    \*    \*    ●    \*

## ADDITIONAL VIEWS

No subject before this Congress is of greater importance than the civil rights bill which is the subject of this report. The need for full understanding of what this legislation does, and does not, do, has led us to state these additional views. We fully subscribe to the majority report; but we also feel that this bill could have provided, and ought to provide, an even firmer basis for Federal efforts to obtain equal protection of the laws. The problem is national in scope. If denials of equal protection of the laws occur in one local community, the fiber of our national community is weakened.

The bill is a moderate, balanced approach to several of the most urgent civil rights problems.

Title I makes it a misdemeanor—not a felony—to obstruct court orders.

Title II will permit Federal authorities to assist in the apprehension of those who have willfully bombed or destroyed by fire any building or other real or personal property, or who flees to avoid testifying in criminal proceedings relating to such acts. Introduced into the hearings was a chart of the bombings and attempted bombings of recent years. The chart shows close to 100 such incidents, in every area of the United States.

Title III is a necessary supplement to part IV of the Civil Rights Act of 1957, which prohibits threats or intimidation designed to prevent persons from exercising their right to vote. The new proposal would implement Federal enforcement of this protection by requiring State elections officials to retain for 2 years voting and registration records for all Federal elections, and to make them available for examination by the U.S. Attorney General.

Title IV of the bill would extend the life of the Civil Rights Commission, scheduled presently to expire next month, until September 1961. The need for full-time study and investigation of alleged denials of equal protection of the laws in every corner of the country has been demonstrated. We approve of the strict impartiality and reasonable approach of the Commission, which has conducted significant investigations in both North and South. Its services are still needed.

The final title (title V) of the bill is based upon the need to prevent children of Armed Forces personnel stationed in communities which have closed their public schools from being made the innocent victims of such actions. Present laws relating to children of servicemen stationed on bases would be broadened to make provision for all children of servicemen, whether or not living on bases, if public schools which they normally attend are closed down by State or local authorities.

Hon. Arthur S. Flemming, Secretary of the Department of Health, Education, and Welfare, has testified that there are approximately 70,000 such children living in the 6 States which, by reason of their laws, may close their public schools.

26

The foregoing is what the bill does. As far as it goes, it is good. But it is a bare minimum. Here is what it does not do:

The original bill reported out by the subcommittee contained three titles which did not survive the full-committee deliberation. The most important, in our opinion, was title VIII, the so-called technical-assistance provision. It represented a sensible, fair, and effective approach to the problems that may accompany the initial stages of school desegregation. It is a recognition of Government responsibility to share in the solution of such problems. The best description of this provision was provided by Secretary Flemming in his letter of February 5, 1959, to the Congress, forwarding the legislative proposal:

*A. Grants and technical assistance*

The first draft bill would establish an affirmative role for the Federal Government in helping those States which have previously required or permitted racially segregated public schools, and which must now develop programs of transition to desegregation. Such States established their school systems in good faith and in reliance upon earlier Supreme Court rulings that public school racial segregation was lawful, provided that separate but equal facilities were maintained. Now, in carrying out their duty to comply with the present ruling of the Court, these States and their communities are required to make adjustments which may impose temporary but serious financial and educational burdens on their existing school systems.

The bill would authorize appropriations for grants to States which required or permitted segregation in their public elementary and secondary schools as of May 17, 1954, the date of the first Supreme Court decision declaring such segregation to be unlawful. Funds appropriated would be allotted to the States proportionately according to their May 17, 1954, school population in segregated public school systems on that date. The bill would authorize appropriations only for the fiscal years 1960 and 1961. In January 1961, the Secretary would be required to report to Congress his recommendations as to the extension or modification of the legislation.

Federal grants would be available to pay half the costs borne by local educational agencies in providing the additional nonteaching professional services required by their desegregation programs. Included would be the services of supervisory or administrative personnel, pupil-placement officers, social workers and visiting teachers, and similar professional staff members needed to help resolve adjustment problems arising in the course of desegregation.

In addition, part of the State's allotment could be used to pay half of its expenditures at the State level for developing and carrying out State desegregation policies and programs, including the provision of technical assistance to local educational agencies.

To receive funds under this bill, a State would submit to the Commissioner of Education a plan setting forth its methods and criteria for approving applications of local

28                         CIVIL RIGHTS

educational agencies, and describing the State-level activities
for which the State would use grants. · If in any year an
approvable State plan is not filed, the Commissioner could,
if the State consents or indicates it has no responsibility in
the matter, make grants directly to local educational agencies
in the State.

The draft bill would also authorize the Commissioner of
Education to collect and disseminate information on the prog-
ress of public school desegregation, and, at the request of
the States or local agencies, to provide technical assistance
in the development of desegregation programs and to initiate
or participate in conferences called to help resolve educational
problems arising as a result of efforts to desegregate.

We believe this measure to be of tremendous importance and we
will support its restoration to the bill on the floor of the House.

The original bill, as reported to the full committee, contained a
title (title III) which would have authorized the Attorney General (a)
to initiate civil injunctive proceedings against individuals depriving a
person of the equal protection of the law by reason of race, color,
religion, or national origin, upon the Attorney General's receiving a
complaint from such person so alleging and upon the Attorney
General's certifying the inability of such person to obtain legal pro-
tection himself; (b) to seek civil injunctive relief against persons
hindering Federal or State officials from according equal protection
of the laws or from carrying out court orders; and (c) to seek civil
injunctive relief, on complaint received, against individuals endeavor-
ing under color of State authority to deprive persons of rights guaran-
teed by the 14th amendment. Civil action thus instituted could be
brought in U.S. district courts, without abiding the exhaustion of
State or administrative remedies.

The Attorney General and the administration recommended such a
measure in 1957. The Judiciary Committee did likewise. We see no
reason not to do so in 1959. The reasons for title III were well said
by the Attorney General of the United States in 1957, as follows:

In such a civil proceeding the facts can be determined, the
rights of the parties adjudicated, and future violations of the
law prevented by order of the court without having to sub-
ject State officials to the indignity, hazards, and personal
expense of a criminal prosecution in the courts of the United
States. * * * At the present time section 1985 of title 42,
United States Code, authorizes civil suits by private persons
who are injured by acts done in furtherance of a conspiracy
to prevent officers from performing their duties, to obstruct
justice, or to deprive persons of their rights to equal protec-
tion of the laws and equal privileges under the laws.

So we think that a subsection could be added to that
statute which would give authority to the Attorney General
to institute a civil action for preventive relief whenever any
person is engaged or about to engage in acts or practices
which would give rise to a cause of action under the present
provisions of the law.

I think it would be simpler, I think it would be more flex-
ible, and I think it would be more reasonable, and I think it

CIVIL RIGHTS                                    **29**

would be more effective than the criminal sanctions which are the only remedy now available.

We think the same reasoning applies now.

Finally, the original bill also contained a title VI, which would have given legislative sanction to the President's Committee on Government Contracts. This committee, under Executive sanction, polices Government contracting practices to promote the elimination of discrimination in employment based on race, creed, color, or national origin in the performance of Government contracts or subcontracts. The Secretary of Labor, Hon. James P. Mitchell, said this at the hearings:

> * * * if a Commission of this type is to do its job fully and effectively, its basis in law should be clear and unequivocal. If the task of Government to advance equal job opportunities is worth doing, it is worth doing right, and it is worth doing with the full weight of Congress behind it. An agency of this kind should be strengthened with congressional approval (hearings, p. 322, Mar. 12, 1959).

We concur with his sentiment. The measure should be restored.

JOHN V. LINDSAY.
WILLIAM T. CAHILL.

## ADDITIONAL VIEWS

Although there are differences of opinion among the members of the House Judiciary Committee as to what, if any, civil rights legislation is necessary, it is my opinion that H.R. 8601 as reported by the House Judiciary Committee, is good legislation *with one exception.* The exception to which I strenuously object is the committee amendment to title II.

Title II as originally considered by the committee, added a new section under the Federal unlawful flight to avoid prosecution statute. Under existing law, title 18, section 1073, permits the Federal Government to investigate and apprehend individuals who travel in interstate and foreign commerce with the intent either (1) to avoid prosecution, or custody or confinement after conviction, under the laws of the place from which he flees, for murder, kidnaping, burglary, robbery, mayhem, rape, assault with a deadly weapon, arson punishable as a felony, or extortion accompanied by threats of violence, or attempt to commit any of the foregoing offenses, or (2) to avoid giving testimony in any criminal proceedings in such place in which the commission of an offense punishable by imprisonment in a penitentiary is charged. The penalty is not more than $5,000 or imprisonment not more than 5 years, or both.

The original bill added a new section listing an additional crime under the unlawful flight statute, to wit, willfully damaging or destroying or attempting to damage or destroy by fire or explosives any building, structure, facility, or vehicle if such building, structure, facility, or vehicle is *used primarily for religious purposes or for the purposes of public or private, primary, secondary or higher education.*

The committee amended these proposed provisions of title II so that it now reads as follows:

> for willfully attempting to or damaging or destroying by fire or explosives any building, structure, facility, vehicle, dwelling house, synagogue, church, religious center or educational institution, public or private.

The bill as amended is too broad since it would cover any attempts to damage or destroy any structure or vehicle or actual damage or destruction to any such structure or vehicle by fire or explosive. Among the unlimited items covered under the amendment would be motels, hotels, theaters, restaurants, stores, barns and homes and automobiles of labor leaders, hoodlums and gamblers. There are thousands of such incidents occurring throughout the United States annually. These are strictly local offenses and should be handled as such.

Although the amended bill does not presume interstate flight, the language is broad enough for the supporters of such legislation to expect the Federal Government to enter every case to determine whether or not a Federal offense has occurred. The bill does not permit discretion and individuals could demand the Federal Govern-

ment to initiate investigation in incidents which are strictly local offenses. In this connection it is noted that the Department of Justice in discussing the administration's proposal, which would penalize interstate flight to avoid prosecution for the destruction of religious or educational facilities, had stated that such bill would not necessarily presume such flight but that the FBI would be justified in conducting immediate investigation to determine if a Federal offense existed. The supporters of the amended bill would use such an expression in demanding Federal investigation whenever any building, dwelling, structure, or vehicle, such as a liquor store or barn, or a truck or an automobile in strike areas, was destroyed by fire or explosives.

The primary responsibility for the protection of life and property rests, of course, with State and local authorities. They are, in the final analysis, the Nation's first line of defense against crime which is essentially a local problem and one which can best be analyzed and met on the community level. Legislation drawing the Federal Government into a wide variety of local criminal violations could tend to relieve local authorities of their primary responsibility in such matters. If local authorities do not maintain the authority and legal obligation to secure the peace, they cannot be expected to accept the responsibility. They could develop undue dependence upon Federal authorities, particularly in controversial and tense matters such as labor disputes, contested local elections, local gang wars, etc., causing an end result of increased Federal police powers and a decrease in the willingness of local authorities to assume the primary responsibility that is rightfully theirs.

In testifying before Subcommittee No. 5 of the Committee on the Judiciary of the House of Representatives, the Attorney General in presenting the administration's program pointed out that the purpose of such a bill was to provide a Federal deterrent to the bombing of schools and places of worship which was the type of outrage that shocked all decent people. He pointed out that such incidents presented important problems in the national as well as the local level inasmuch as racial and religious intolerance are of extremely serious national and international concern. The amended bill going far beyond educational and religious buildings and facilities would extend jurisdiction of the Federal Government into matters that are entirely the concern of only the local community.

It is my opinion that title II of the reported bill should be amended so that this additional crime under the unlawful flight statute is tied down to religious and educational purposes. To do so the words *"used primarily for the purpose of a"* should be inserted between "dwelling house and synagogue." This will make the language read—

> \* \* \* for willfully attempting to or damaging or destroying by fire or explosives any building, structure, facility, vehicle, dwelling house, *used primarily for the purpose of a* synagogue, church, religious center, or educational institution, public or private.

H. Allen Smith.

## MINORITY VIEWS ON H.R. 8601

Since the 84th Congress, when the so-called civil rights legislation came under active consideration by the House Judiciary Committee and the House of Representatives, the opponents of this legislation have unanimously expressed the opinion that the more the legislation was subjected to analysis and scrutiny, the more the imperfections became evident. The experience of the 85th Congress itself during the consideration of the Civil Rights Act of 1957 corroborates that position. Now, in the 86th Congress, the same conclusion is true.

Of the many bills which were originally introduced on the subject, all have been abandoned by the Judiciary Committee except the one now under consideration, H.R. 8601. This bill, however, is the result of radical amendment. The deliberations of both the subcommittee and the full Judiciary Committee have resulted in major and substantial changes.

In its consideration of the original bill, H.R. 3147, the subcommittee struck out all of its provisions and substituted its own version, a version vastly different from that contained in the bill as introduced. The version of the subcommittee provided for such subjects as obstruction of court orders, flight to avoid prosecution for damaging or destroying buildings used primarily for educational or religious purposes, authorizations of the Attorney General to institute civil proceedings to provide equal protection of the laws or to prevent discrimination, to prevent deprivation of civil rights in general, an extension of the Civil Rights Commission for 2 years, a statutory Commission for Equal Job Opportunities under Government Contracts, education of children of the members of the Armed Forces, grants to assist State and local educational agencies to effectuate desegregation, and finally preservation of Federal election records.

The full committee, in its consideration and deliberation of these proposals, brought to light each and every facet of both the factual and legal ramifications of each proposal. The action of the full committee substantiates the position of the opponents of this legislation that many of the proposals were unwarranted, unnecessary, and would totally fail to achieve the objectives which the proponents maintained was the purpose of the legislation. The discussion in the full committee raised serious questions as to the constitutionality of many of these proposals; it brought to the surface the latent but dangerous implications and ramifications of the legislation. As a result, the full committee partially sustained the position of the opponents of this legislation by adopting the following amendments: The broadening of title II of the bill so as to include flights from prosecution for the destruction and damaging of all property, both real and personal; the deletion in its entirety of the provision authorizing the Attorney General to bring civil actions—the so-called title III as proposed originally in the 85th Congress; the elimination of the entire provision creating a Commission on Equal Job Opportunity Under Government Contracts and the complete deletion of the provision for grants to assist State and local educational agencies to effectuate desegregation.

In addition to these major changes, the full committee, by amendments, attempted to refine and perfect those titles which are contained in the bill H.R. 8601. These amendments were many and varied. For instance, title I—obstruction of court orders—was amended so as to limit its application only to court orders affecting a public school; the crime itself was changed from a felony to a misdemeanor by a reduction in the punishment and provision was made to prohibit and prevent consecutive sentencing. As for title III—Federal election records—the retention period was reduced from 3 to 2 years, the penalty for violation of the section was reduced so as to be consistent in both instances, the demand of the Attorney General was circumscribed so as to make it more definite and certain, thus preventing any abuse, and finally, protection against unwarranted disclosure of the records was amended so as to permit reproduction for the Congress or any of its committees and other governmental agencies.

Title IV, extending the Civil Rights Commission for 2 years, was amended so as to permit members to administer oaths and also waived the existing requirement that its personnel be employed under civil service and classification laws.

Even though the action of the full committee can be categorized as one of refinement and improvement on the legislation, it should not be construed as even the slightest indicia of approval of the bill on the part of the undersigned. Our opposition and disapproval of this bill would never be overcome by any amendment. Our fundamental principle is that this legislation with all of its ramifications, is fundamentally wrong and can never be made right. The legislation is bad in principle and any mitigation of the evil still leaves the quintessence of evil. We point out this legislative history as indicative and demonstrative of our warnings, our fears, and our arguments which we have promulgated in the past, which have been proven by experience and which caution as to future dangers involved in this proposal.

The proponents of this legislation, who supported the Civil Rights Act of 1957 cannot deny the serious effects which that law has had upon this Nation. The warnings which we sounded during the debate in the 85th Congress on that legislation have unfortunately come to pass. The best interests of our Nation have not been served by that law.

No better proof of this can be found than in the position now taken by the President and the Attorney General in the abandonment today of the position both advocated in 1957, namely, the authorization for the Attorney General to institute civil proceedings for the protection of civil rights. Fortunately, that provision was eliminated from the Civil Rights Act of 1957 and today as a result of experience, it is no longer desired by the President or the Attorney General. Yet some of the proponents of civil rights legislation still seek that provision which, as we have said, has been rejected by the Judiciary Committee.

Unfortunately, however, there has been a reversal in the position of the administration in another aspect from that which it took in 1957. The then Attorney General, Mr. Brownell, in his executive communication to the Speaker dated April 9, 1956, on civil rights, stated:

> In this area, as pointed out more fully below, more emphasis should be placed on civil law remedies. Civil rights enforcement activities of the Department of Justice should not therefore be confined to the Criminal Division. * * * The present laws affecting the right of franchise were con-

34                          CIVIL RIGHTS

ceived in another era.  Today, every interference with this
right should not necessarily be treated as a crime.  Yet the
only method of enforcing existing laws protecting this right
is through criminal proceedings.
    Civil remedies have not been available to the Attorney
General in this field.  We think that they should be.  Crimi-
nal cases in a field charged with emotion are extraordinarily
difficult for all concerned.  Our ultimate goal is the safe-
guarding of the free exercise of the voting right, subject to
the legitimate power of the State to prescribe necessary and
fair voting qualifications.  To this end, civil proceedings to
forestall denials of the right may often be far more effective
in the long run than harsh criminal proceedings to punish
after the event.

In the light of that statement, attention is invited to the current
proposal of both the President and his Attorney General.  The At-
torney General, in supplementing the President's message on civil
rights, sent an executive communication to the Speaker, dated Febru-
ary 5, 1959, recommending four legislative proposals.  Three of these
legislative proposals involve criminal prosecution.  This is a com-
plete reversal of position from that taken 2 years ago.  In the detailed
analysis of the various sections, the ramifications of this reversal of
position will be set forth.
It is our conviction that an objective approach, buttressed by the
facts and substantiated by law, will warrant the support of the ma-
jority of the Members of the House to reject this proposal on its
merits.  If the United States is to maintain its position in the world
as the leader of the free nations, it must first set its own house in order.
This H.R. 8601 will not do.  Just as the Civil Rights Act of 1957
was divisive in its effect on our peoples, this proposal will only
accentuate and exacerbate the wounds and the scars inflicted upon a
free people by ill-conceived, imperfectly drafted, and constitutionally
unsound legislation which this bill is, beyond a question of a doubt.


              TITLE I—OBSTRUCTION OF COURT ORDERS

The bill proposes to amend the Criminal Code with respect to the
obstruction of court orders in school desegregation cases.  The measure
would make it a Federal offense willfully to use force or threats of force
to obstruct court orders in school desegregation cases.  The original
version made this offense a felony, with punishment up to a fine of
$10,000 or imprisonment of not more than 2 years, or both.  However,
as previously noted, this bill, H.R. 8601, reduces the punishment to a
fine of not more than $1,000 or imprisonment of not more than 60
days, or both, thus changing the crime from a felony to a misdemeanor.
The language of this title is of a doubtful constitutionality.  It may
be violative of the right to freedom of speech under the first amend-
ment of the Constitution and in addition, as a penal statute, it may
fall because the language is vague and indefinite.  The language—

    Whoever corruptly, or by threats or force, or by any threat-
    ening letter or communication, willfully prevents, obstructs,
    impedes, or interferes with or willfully endeavors to prevent,
    obstruct, impede, or interfere with the due exercise of rights

or the performance of duties under any order, judgment, or decree of a court of the United States which—

(the reference here being to school desegregation orders) fails to properly inform an individual of just what act or action constitutes a violation of this section, and is broad and sweeping.

That language, moreover, interferes with freedom of speech and in this particular field is fraught with danger. In the history of this Nation, no court decision has been more widely discussed, argued, disagreed with throughout the length and breadth of this land than the decisions of our Federal courts involving school desegregation cases. It is our contention that this language would encompass honest discussion as to the merits or demerits of such an order. It can possibly reach out to editorial comment which might oppose integration under a court order of this type.

In addition to our initial objection, there are several other specific objections to the language contained in this title. The use of the word "endeavor" is a very interesting one, and is one which should be carefully understood. Ordinarily in a criminal statute, there is set forth a definition of the substantive crime or an attempt to commit that crime. The word "attempt" in criminal jurisprudence is a very significant one. Normally "attempt" means some act beyond mere preparation and will amount to the commencement of the consummation of the crime. It should be noted that this language does not use the word "attempt" but rather the word "endeavor." In the case of *U.S.* v. *Russell* (255 U.S. 138), at page 143 the Court said: "We think, however, that neither the contention nor the cases are pertinent to the section under review and upon which the indictment was based. The word of the section" (referring to the obstruction-of-justice section of the Criminal Code) "is 'endeavor,' and by using it the section got rid of the technicalities which might be urged as besetting the word 'attempt,' and it describes any effort or essay to accomplish the evil purpose that the section was enacted to prevent." Thus, by the use of the word "endeavor" instead of the word "attempt" the prosecution has a lesser degree of the burden of proving guilt than it would have if the word "attempt" had been used.

A striking feature of this particular title is the designation to cover only school desegregation orders and not any other type. According to the Attorney General, the need for this particular designation is exemplified by the occurrence at Little Rock in 1957 and the alleged concomitant mob action there. On the other hand, no other justification is given nor is there any justification afforded for giving preferential treatment to court orders in school desegregation cases over the many other types of Federal court orders issued. From day to day throughout the United States, court orders of every type and description are issued. In the case of court orders involving labor disputes, violation of the orders more often than not are accomplished by violence. Yet this particular type of order is not included. The selection of the court order in school desegregation cases is unprecedented. No other type of court order has ever been singled out so as to make a violation of it a Federal crime.

One of the reasons advanced for this selective treatment is that the use of contempt of court in cases of mob action would not necessarily involve the leaders of the mob, whereas the enactment of this proposal would permit a criminal prosecution. Here it should be noted

**CIVIL RIGHTS**

that it would be possible for one who is named in the order to be subject to more than one prosecution for a single act. If the act of such a party violated the court order, he would be subject to criminal contempt of court and, parenthetically here, not entitled to a jury trial. Also, he could possibly be subject to prosecution for a violation of the obstruction of justice statute, title 18, United States Code, section 1503, for corruptly or by threats or force, obstructing or impeding the due administration of justice and at the same time be subject to a prosecution for violating this new section. It is also a possibility that he would be further subject to a criminal prosecution for a violation of a State penal law since most of the acts which would constitute a violation of this section would at the same time be violative of State criminal law.

It is possible at the present time to deal with the situation of mob violence as has been done in the past in school desegregation cases by returning to a court and obtaining an order against those who are acting to impede or obstruct the order. From there on any subsequent act in violation of the order would constitute contempt. The Attorney General has referred to this procedure as being time consuming and as being of no practical use in producing prompt action to disperse the mob.

The present obstruction-of-justice statute has been referred to by the proponents of this legislation as being inadequate to cope with the specific situation involved in school desegregation orders. However, the Attorney General stated during the course of the hearings that while it was true that the phrase "due administration of justice" as used in the existing law has been subjected to narrow interpretation, he could not state categorically that a desegregation decree is necessarily beyond the reach of the existing obstruction-of-justice statute. That conclusion is a sound one because interference with an existing order clearly relates to a case that is pending and thus disturbs the ordinary and proper functions of the court within the meaning of the statute.

In passing on this particular title, it should also be noted that the enactment into law of this new section of the Penal Code would authorize Federal authorities to make an arrest on the spot for an act violative of this section.

Included in this proposed new criminal section is a provision that no injunctive or other civil relief against conduct made criminal by this new section shall be denied on the grounds that such conduct is a crime. There appears to be no apparent reason for the insertion of this particular language unless it is the intent to use the acts constituting an offense under new language proposed as the basis for securing a court order prohibiting subsequent violative acts. Thus arises the possibility of citation for contempt of such an order for subsequent violative acts. Stated another way, a man could be convicted for violating the proposed new section, then a court order enjoining him obtained, and any act thereafter violating the order would then subject him not only to a new prosecution for violating the proposed section again but also a criminal contempt citation for violating the order. It was for that very reason that amendment was proposed to this particular provision so that any fine or imprisonment proposed for violating such injunction could not be consecutive

or supplemental to any punishment imposed for violating this particular criminal provision.

We believe that this title should be stricken from the bill for the reasons which we have stated. Its possible infringement on constitutional rights, its invitation to multiple criminal prosecutions for the same act, its vagueness and generality is repugnant to our basic tenets and principles of American criminal jurisprudence. The need for it has never been justified but the danger of it upon enactment is proven.

### TITLE II—FLIGHT TO AVOID PROSECUTION FOR DAMAGING OR DESTROYING ANY BUILDING OR OTHER REAL OR PERSONAL PROPERTY

This title would amend the Criminal Code so as to make it a felony, punishable by a fine of not more than $5,000 or imprisonment not more than 5 years, or both, to move in interstate or foreign commerce to avoid local prosecution, custody or confinement after conviction, for willfully damaging or destroying or attempting to damage or destroy, by fire or explosive any building, structure, facility, vehicle, dwelling house, synagogue, church, religious center, or educational institution, public or private. Flight to avoid testifying in criminal proceedings relating to such offense would likewise be punished.

This particular title does not belong in the bill H.R. 8601. It in no way deals with the subject matter of the bill; namely, constitutional and civil rights. The testimony adduced during the course of the hearings on this proposal, even as it was originally introduced in the version which limited it in scope to destruction of buildings used primarily for educational or religious purposes, justifies its exclusion in view of the overall alleged purpose of the bill; namely, the enforcement of constitutional rights. It is not relevant to that subject matter.

However, being confronted with a civil rights bill which contained a provision amending the Fugitive Felon Act, but limited in its application to the bombing of religious and educational institutions, we deemed it right and proper to amend this title of the bill so as to make it embrace the bombing of any type of property, real or personal.

### TITLE III—FEDERAL ELECTION RECORDS

This title requires all records of elections preserved for 2 years from the date of any election in which candidates for the office of President, Vice President, presidential elector, Member of Congress, Resident Commissioner are voted for, all records and papers relating to any application, registration, payment of poll tax, or other act requisite to voting in such an election, under penalty of fine or imprisonment. These records are to be made available to the Attorney General for inspection, reproduction and copying on demand, which would be in writing, setting forth the basis and purpose thereof. Jurisdiction is conferred on the U.S. district courts to compel the production of such records. The term "election" would include a general, special, or primary election for the specified Federal officers. The willful failure to comply carries a punishment of a fine of not more than $1,000 or of imprisonment for not more than 1 year, or both, and the same

38                                   CIVIL RIGHTS

penalty is provided for one who willfully steals, destroys, conceals, mutilates, or alters such record required to be retained or preserved.

Here again is another instance of the reversal of the position of the Department of Justice between 1957 and 1959 as outlined earlier in these minority views. In 1957, while testifying before the Senate Subcommittee on Constitutional Rights in support of legislation in the field of civil rights, Mr. Brownell stated:

> The major defect in the statutory picture, however, has been the failure of Congress thus far to authorize specifically the Attorney General to invoke civil powers and remedies. Criminal prosecutions, of course, cannot be instituted until after the harm has been actually done, yet no amount of criminal punishment can rectify the harm which the national interest suffers when citizens are illegally kept from the polls. Furthermore, criminal prosecutions are often unduly harsh in this peculiar field where the violators may be respected local officials. What is needed, and what the legislation sponsored by the administration would authorize, is to lodge power in the Department of Justice to proceed in civil suits in which the problem can often be solved in advance of the election and without the necessity of imposing upon any official the stigma of criminal prosecution.

The substance of title III is absolutely contradictory to the position taken by Mr. Brownell in 1957. This proposal imposes on both State and local officials a Federal statutory responsibility, a violation of which is made a Federal criminal offense. No need, no justification for such a reversal of position has been given. The enactment of the Civil Rights Act of 1957 provided the Attorney General with the authority to prevent by civil litigation the deprivation of the right to vote. Today the Attorney General seeks to bolster that authority through the medium of the proposed title III. The entire title is subject to doubt as to its constitutionality from the standpoint of the authority of Congress to enact such legislation in the field of Federal elections.

The power of Congress with respect to the election of Members of the House of Representatives is on a basis different from that applicable to elections of presidential electors, State, county, or city officers and possibly even U.S. Senators. The powers of Congress over elections are delineated in article I, section 4, article II, section 1, and the 17th amendment.

Article I, section 4, permits Congress to make or alter regulations as to the times, places, and manner of holding elections for Senators and Representatives. It is our position that the language proposed in title III of H.R. 8601 has no relationship or bearing on either the time or place or manner of holding an election and is not, therefore, within that enumerated power of the Congress.

The 17th amendment governing the election of Senators merely provides for the qualification of electors or voters in any election for a U.S. Senator. That amendment cannot be construed as a source of authority for the enactment of the language proposed in title III of the bill.

There is no power in Congress as to the election of its Members which would authorize it to impose new duties or obligations upon a

State, county, or municipal officer acting under State laws in the registering of voters, or in conducting the time, place, or manner of holding the election.

Congress, moreover, cannot assume full control of all elections at which congressional representatives are chosen in conjunction with State and county officers (*Ex parte Perkins*, 29 Fed. 900).

The power of Congress over the selection of presidential electors is even more limited (art. II, sec. 1, Constitution). Congress may not interfere with the method designated by the State legislature for the appointment of presidential electors. For these presidential electors are State officers and not Federal officers (*In re Green*, 134 U.S. 377, *Walker* v. *United States*, 93 F. 2d 383, certiorari denied, 303 U.S. 644).

Congress, therefore, has no power over presidential elections or electors except to determine the time of choosing the electors and the day upon which they cast their votes. The power of the States in choosing presidential electors is exclusive (*McPherson* v. *Blacker*, 146 U.S. 1).

Indeed, if the source of congressional authority to enact this title pivots on the 15th amendment, then it must be noted that the 15th amendment is applicable not only to the Federal Government but also to the States. While title III purports to be restricted to Federal officers only, in view of the provisions of the 15th amendment, this language would be applicable to State elections as well. Never before has the Congress been asked to enact such a proposal. Therefore, not only because of the doubtful constitutionality of this proposal but the unwarranted, unprecedented intrusion of Federal authority into purely State and local elections demands the rejection of this title. Another latent defect of this title is that in effect the enactment of title III would hand to the Attorney General of the United States unlimited power of discovery. Congress in the past has rejected requests to provide the Attorney General of the United States with the power of subpena. Here, however, he would be provided with even greater power than that available under the ordinary power of subpena upon a mere demand, the refusal of which can be made the subject of a contempt of court and the failure to meet the statutory requirement is made a criminal offense. All the election records of each State of the United States are made available to him for a period of 2 years. Such an extraordinary grant of power should be denied to anyone. This mere fact alone would be sufficient grounds for rejection of title III.

In addition, this proposal would place an undue financial burden upon the States, a burden in which the Federal Government would have no share.

### TITLE IV—EXTENDING CIVIL RIGHTS COMMISSION FOR 2 YEARS

Title IV of H.R. 8601 would extend the Civil Rights Commission for 2 additional years with the requirement that it should submit an interim report to the President and Congress not later than September 1, 1959, and a final report not later than September 9, 1961. The present law would require the final report to be submitted not later than September 9, 1959. In addition, title IV would authorize members of the Commission to administer oaths and also repeal the requirement that its personnel be employed under the civil service and classification laws.

At this very moment, the constitutionality of the Civil Rights Act of 1957 is under attack in the Federal district court in Louisiana. In addition, no report has been filed to date by the Commission on any of its activities. It has submitted copies of its hearings held recently in Alabama in regard to voting. The testimony during the course of the hearings before the subcommittee of the House Judiciary Committee indicated that it has undertaken studies in the fields not only of voting but also in housing and education. As to the latter two subjects, no reports have been made as yet.

The Commission's initial public hearing in December 1958 in Montgomery, Ala., concerning denial of voting rights have been published. However, in connection with that hearing, there has been extended litigation concerning the Commission's right to inspect election records. A U.S. district court ruled that under the Civil Rights Act of 1957, the Attorney General under the enforcement provisions of the Commission's subpena power could not name a State as a party to such an action. That decision has been affirmed by the Court of Appeals for the Fifth Circuit.

When the provision to create this Commission was under consideration in 1957, the opponents of the legislation pointed out the inconsistency of establishing a commission to make a study of certain aspects of the civil rights problem and, at the same time in the same bill, asked the Congress to enact statutes on the very same subject matter. We maintained then that such an enactment placed upon the statute books of the United States would be a statutory paradox. In the proposal of H.R. 8601, the same assertion is true. The Commission has undertaken studies in the fields of school desegregation, voting and housing, yet in this same bill, H.R. 8601, Congress has asked to enact a criminal statute for violation of Federal court orders involving school desegregation, in title V we are asked to amend existing law to provide for the education of children of certain members of the Armed Forces when local public schools are closed because of desegregation orders and, finally, we are asked to enact legislation for the preservation of Federal election records.

Why is there a need to extend the Commission—a Commission from which no report has been forthcoming—if we as legislators are to proceed on the very same subjects, namely, voting rights and education. Either we need the study and report and therefore should await the same, or there is no need for the Commission if titles I, III, and V are necessary.

If the experience of the Commission to date is indicative of what will be accomplished during a 2-year extension, it means that nothing will be served by such an extension. To date, nothing has been reported, nothing has been recommended. In the opinion of many, the Commission has defeated the very purpose for which it was created. Instead of the greater public understanding of civil rights and the charting of a course of progress in the years to come, the activities of the Commission appear to have accomplished the direct opposite. The result has been ill feelings on the part of many of our people, that there has been undue interference particularly in the voting area by the Commission as indicated by the litigation which has resulted. As for a chart of progress to guide us in the future, there has been neither the chart nor a recommendation. Thus, there appears to be no need nor reason why the Commission on Civil Rights should be extended for an additional 2 years.

TITLE V—EDUCATION OF CHILDREN OF MEMBERS OF THE ARMED FORCES

This title would amend Public Laws 815 and 874 of the 81st Congress, as amended, which authorized payment to school districts which provide free public education to children whose parent resided or works on Federal property which is not subject to State or local taxation. The amendment proposed by this title to the present laws would enable the Commissioner of Education and the armed services concerned to provide for the education of children of military personnel, regardless of where they live, when the public schools are closed to them. Under existing law, the Commissioner cannot provide for the education of children of members of the Armed Forces who live off Federal property. The proposed title would authorize the Commissioner to make temporary provision for such school facilities as may be necessary for the education of those children of members of the Armed Forces who reside off Federal property.

The title would also authorize the Commissioner to acquire possession of any school building constructed with the aid of Federal funds after the enactment of this title, when the local educational agency which owns the building is no longer using it for free public education and the Commissioner needs the building to provide education to these children of military personnel or for other children who reside on Federal property. Provision is made for the payment of a rental fee by the Commissioner which would be proportionate to its share in the costs of constructing the building so long as the school structure remains in Federal possession.

We add this word of caution. Under the existing law and the amendments thereto proposed in this title the Federal Government comes into the educational picture when, among other conditions, it is the judgment of the Commissioner that no local educational agency is able to provide suitable free public education. What is the limit of the power thereby vested in the Commissioner in the exercise of his judgment as to what constitutes "suitable free public education"?

This title, like title II, is not relevant to the purpose and subject matter of the overall proposal of the bill H.R. 8601. Legislation of this type comes under the Rules of the House of Representatives within the jurisdiction of the Committee on Education and Labor. In fact, the executive communication from the Secretary of the Department of Health, Education, and Welfare to the Speaker of the House of Representatives, dated February 5, 1959, was referred to that committee.

It should be noted that the proposed amendments of this title to Public Law 815 of the 81st Congress, as amended, may be an opening wedge for the entrance of the Federal Government into eventual control of public school education throughout this land.

Section 502 of the bill requires the applying educational agency to assure the Commissioner, should a school building erected with Federal funds under an application approved after the enactment of the bill, that the building will be made available for use by the Commissioner to educate children not only of members of the Armed Forces but also of other Federal employees residing on Federal properties. The conditions under which this assurance would come into being would be in the case where the local school facility is no longer providing free public education and the Commissioner needs the facility to provide education for those children herein above mentioned.

CIVIL RIGHTS

In effect, this proposed amendment means that whenever there is need for the construction of a new school, following the enactment of this proposal, that school, if it wants Federal financial assistance, must knuckle down to a Federal requirement that if the school is closed and the Federal Government needs it, it will be available to the Commissioner of Education. The return of such property is subject to the Commissioner's discretion.

Such a proposal, while it does not state so, in so many words, means that if a public school is closed under State law in the face of a school desegregation court order, it may be subject to possession by the Federal Government so long as it needs it. Moreover, the operation of such a school by the Federal Government for the children of certain Federal employees and of members of the Armed Forces would be operated on an integrated basis.

The effect and the ramifications of such a situation is self-evident to any and all who oppose Federal intervention in the education of the children of Federal personnel. It is the opinion of the undersigned that this is a "backdoor approach," a Federal aid to education which ultimately means Federal control of education. The adage "the power to subsidize is the power to control" would find personification in the enactment of section 502 as contained in title V of this bill.

> E. E. WILLIS.
> RICHARD H. POFF.
> JOHN DOWDY.
> E. L. FORRESTER.
> ROBERT T. ASHMORE.
> BASIL L. WHITENER.
> FRANK CHELF.
> WM. M. TUCK.
> J. CARLTON LOSER.
> WILLIAM C. CRAMER.

O

# EXHIBIT 12

86TH CONGRESS } HOUSE OF REPRESENTATIVES { DOCUMENT
1st Session   }                                { No. 75

---

# CIVIL RIGHTS

---

# MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

RECOMMENDATIONS PERTAINING TO CIVIL RIGHTS

---

FEBRUARY 5, 1959.—Referred to the Committee on the Judiciary and ordered to
be printed

---

*To the Congress of the United States:*

Two principles basic to our system of government are that the rule of law is supreme, and that every individual regardless of his race, religion, or national origin is entitled to the equal protection of the laws. We must continue to seek every practicable means for reinforcing these principles and making them a reality for all.

The United States has a vital stake in striving wisely to achieve the goal of full equality under law for all people. On several occasions I have stated that progress toward this goal depends not on laws alone but on building a better understanding. It is thus important to remember that any further legislation in this field must be clearly designed to continue the substantial progress that has taken place in the past few years. The recommendations for legislation which I am making have been weighed and formulated with this in mind.

First, I recommend legislation to strengthen the law dealing with obstructions of justice so as to provide expressly that the use of force or threats of force to obstruct court orders in school desegregation cases shall be a Federal offense.

There have been instances where extremists have attempted by mob violence and other concerted threats of violence to obstruct the accomplishment of the objectives in school decrees. There is a serious question whether the present obstruction of justice statute reaches

such acts of obstruction which occur after the completion of the court proceedings. Nor is the contempt power a satisfactory enforcement weapon to deal with persons who seek to obstruct court decrees by such means.

The legislation that I am recommending would correct a deficiency in the present law and would be a valuable enforcement power on which the Government could rely to deter mob violence and such other acts of violence or threats which seek to obstruct court decrees in desegregation cases.

Second, I recommend legislation to confer additional investigative authority on the FBI in the case of crimes involving the destruction or attempted destruction of schools or churches, by making flight from one State to another to avoid detention or prosecution for such a crime a Federal offense.

All decent, self-respecting persons deplore the recent incidents of bombings of schools and places of worship. While State authorities have been diligent in their execution of local laws dealing with these crimes, a basis for supplementary action by the Federal Government is needed.

Such recommendation when enacted would make it clear that the FBI has full authority to assist in investigations of crimes involving bombings of schools and churches. At the same time, the legislation would preserve the primary responsibility for law enforcement in local law-enforcement agencies for crimes committed against local property.

Third, I recommend legislation to give the Attorney General power to inspect Federal election records, and to require that such records be preserved for a reasonable period of time so as to permit such inspection.

The right to vote, the keystone of democratic self-government, must be available to all qualified citizens without discrimination. Until the enactment of the Civil Rights Act of 1957, the Government could protect this right only through criminal prosecutions instituted after the right had been infringed. The 1957 act attempted to remedy this deficiency by authorizing the Attorney General to institute civil proceedings to prevent such infringements before they occurred.

A serious obstacle has developed which minimizes the effectiveness of this legislation. Access to registration records is essential to determine whether the denial of the franchise was in furtherance of a pattern of racial discrimination. But during preliminary investigations of complaints the Department of Justice, unlike the Civil Rights Commission, has no authority to require the production of election records in a civil proceeding. State or local authorities, in some instances, have refused to permit the inspection of their election records in the course of investigations. Supplemental legislation, therefore, is needed.

Fourth, I recommend legislation to provide a temporary program of financial and technical aid to State and local agencies to assist them in making the necessary adjustments required by school desegregation decisions.

The Department of Health, Education, and Welfare should be authorized to assist and cooperate with those States which have previously required or permitted racially segregated public schools,

and which must now develop programs of desegregation.    Such assist-ance should consist of sharing the burdens of transition through grants-in-aid to help meet additional costs directly occasioned by desegregation programs, and also of making technical information and assistance available to State and local educational agencies in preparing and implementing desegregation programs.

I also recommend that the Commissioner of Education be specifi-cally authorized, at the request of the States or local agencies, to provide technical assistance in the development of desegregation programs and to initiate or participate in conferences called to help resolve educational problems arising as a result of efforts to desegre-gate.

Fifth, I recommend legislation to authorize, on a temporary basis, provision for the education of children of members of the Armed Forces when State-administered public schools have been closed because of desegregation decisions or orders.

The Federal Government has a particular responsibility for the children of military personnel in federally affected areas, since armed-services personnel are located there under military orders rather than of their own free choice.    Under the present law, the Commissioner of Education may provide for the education of children of military personnel only in the case of those who live on military reservations or other Federal property.    The legislation I am recommending would remove this limitation.

Sixth, I recommend that Congress give consideration to the establishing of a statutory Commission on Equal Job Oppor-tunity Under Government Contracts.

Nondiscrimination in employment under Government contracts is required by Executive orders.    Through education, mediation, and persuasion, the existing Committee on Government Contracts has sought to give effect not only to this contractual obligation, but to the policy of equal job opportunities generally.    While the pro-gram has been widely accepted by Government agencies, employers, and unions, and significant progress has been made, full implementa-tion of the policy would be materially advanced by the creation of a statutory commission.

Seventh, I recommend legislation to extend the life of the Civil Rights Commission for an additional 2 years.    While the Com-mission should make an interim report this year within the time originally fixed by law for the making of its final report, because of the delay in getting the Commission appointed and staffed, an additional 2 years should be provided for the completion of its task and the making of its final report.

I urge the prompt consideration of these seven proposals.

DWIGHT D. EISENHOWER.

THE WHITE HOUSE, *February 5, 1959.*

O

# EXHIBIT 13

*Georgia registration statistics—Continued*

| County | Total population, 1950 | 1950, whites over 18 | Whites registered, 1958 | Percent whites over 18 registered | 1950, non-whites over 18 | 1958, non-whites registered | Percent non-whites over 18 registered |
|---|---|---|---|---|---|---|---|
| Twiggs | 8,308 | 2,027 | 2,517 | 100.0 | 2,583 | 348 | 14 |
| Union | 7,318 | 4,245 | 4,944 | 100.0 | 0 | 0 | |
| Upson | 25,078 | 11,698 | 5,437 | 47.0 | 3,827 | 466 | 12 |
| Walker | 38,198 | 22,463 | 23,324 | 100.0 | 1,401 | 1,127 | 80 |
| Walton | 20,230 | 9,024 | 6,873 | 76.0 | 3,199 | 805 | 25 |
| Ware | 30,289 | 13,940 | 11,418 | 82.0 | 4,495 | 2,318 | 52 |
| Warren | 8,799 | 2,152 | 2,006 | 93.0 | 2,823 | 195 | 7 |
| Washington | 21,012 | 8,934 | 6,696 | 79.0 | 6,389 | 1,704 | 27 |
| Wayne | 14,248 | 6,659 | 7,931 | 100.0 | 1,649 | 1,439 | 87 |
| Webster | 4,081 | 949 | 934 | 98.0 | 1,296 | 0 | 0 |
| Wheeler | 6,712 | 2,808 | 3,157 | 100.0 | 1,089 | 435 | 40 |
| White | 5,951 | 3,296 | 3,932 | 100.0 | 193 | 189 | 98 |
| Whitfield | 34,432 | 20,291 | 15,920 | 79.0 | 935 | 857 | 90 |
| Wilcox | 10,167 | 4,003 | 3,059 | 76.0 | 1,836 | 230 | 13 |
| Wilkes | 12,388 | 3,639 | 3,364 | 93.0 | 3,734 | 290 | 8 |
| Wilkinson | 9,781 | 3,350 | 3,041 | 93.0 | 2,619 | 411 | 16 |
| Worth | 19,357 | 5,975 | 5,855 | 98.0 | 4,802 | 296 | 6 |
| Total | 3,444,578 | 1,554,784 | 1,127,939 | 72.5 | 623,458 | 158,082 | 25.3 |

Mr. JAVITS. Mr. President, I should like to finish my remarks, and then I will yield to my colleague from Illinois.

Mr. President, all this shows a pattern, in a number of our States, of deprivation of the right to vote. This, occurring in this day and age, is intolerable and unacceptable, in my opinion, to the American people.

I believe the outcome of this debate must be, inevitably, a law which will eliminate that kind of situation from our body politic. I deeply hope the Senators from each of the States affected will read carefully what is to be printed in the RECORD, again with a view toward telling us how they account for what has happened and what they think ought to be done about it, from their own points of view.

I now yield to my colleague from Illinois.

Mr. DOUGLAS. Would it be appropriate to put in the RECORD at this point a quotation from page 52 of the report of the President's Commission on Civil Rights, as follows:

The figures showing 16 counties where Negroes constituted a majority of the voting-age population in 1950 but where not a single Negro was registered at last report, and showing 49 other Negro-majority counties with a few but less than 5 percent of voting-age Negroes registered, indicate something more than the lower status and level of achievement of the rural southern Negro.

Mr. JAVITS. Mr. President, I wish to invite attention to the pertinent fact that in Alabama in 1950 the Negro voting age population of 516,245 comprised about 30 percent of the total voting age population.

According to the best information we can get, some 73,000 Negroes were registered to vote in 1958, or about 14 percent. Alabama has 67 counties. In 12 counties Negroes constituted a majority of the 1950 voting age population. In two of these counties no Negroes were registered to vote in 1958. In 7 of the other 10 counties, the number of Negroes registered to vote in 1958 was fewer than 5 percent of the county's 1950 voting age population.

At the time of the Alabama hearing before the Federal Civil Rights Commission, a total of 91 legally sufficient complaints had been received from 6 counties, all of which, except Montgomery

County, contained majority Negro populations.

Mr. President, I have put that information into the RECORD to provide some color and climate to the nature of our debate and to indicate the urgency, in the fundamental interests of our people, of passage of a bill in regard to what we are discussing.

Mr. DOUGLAS. Mr. President, will the Senator yield?

Mr. JAVITS. I yield.

Mr. DOUGLAS. Will the Senator permit me to quote some figures from page 50 of the report of the President's Commission on Civil Rights. The Commission states that of the total 1950 voting age population of 1,208,063, 497,354, or 41 percent of the voting population, were nonwhite. In 1954, the total of nonwhite registered voters in Mississippi was 22,000, and this represented in that year 3.89 percent of the total 1950 population of voting age nonwhites. So approximately 4 percent of the nonwhites of voting age were registered.

Mr. JAVITS. I thank my colleague for bringing that to my attention.

Mr. KEATING and Mr. HART addressed the Chair.

Mr. JAVITS. I yield first to my colleague from New York, and then I will yield to my colleague from Michigan.

Mr. KEATING. It may well be what I mention is included in the compilation which the Senator is making a part of the RECORD, but whether it is or not, I think two of these items deserve special emphasis.

The first is the voucher system, which is in use at least in Alabama in cases even where registrars are properly functioning.

Under this system a person cannot vote unless he is accompanied by an already registered voter. So this process feeds upon itself. A registered voter can vouch for only two applicants a year; and in at least one county, Macon County, the evidence shows that in recent years not a single white elector has vouched for a Negro applicant.

That is the site of Tuskegee Institute, one of the fine educational institutions of this country, where the proportion of Negroes of age 25 and over who have at least a high school education is the highest of any in the State, and where the percentage of Negro residents

holding college degrees is the highest in any of the States.

Let me touch upon one other matter, having to do with the State of Tennessee. In Tennessee, it is true that the intimidation of Negroes in voting has taken place in only three counties, which is a comparatively creditable performance. But I believe the evidence showed that in Fayette County in 1958 there existed a condition which should cause all of us, no matter what our position is on this issue, to be pretty disturbed.

When 12 Negro war veterans endeavored to register they were so intimidated when they appeared to vote that only 1 of the 12 actually voted, and he expressed doubt that his ballot was counted, because he believed that he had handed it to someone instead of dropping it in the box. Two of them were frightened away when some deputy sheriffs approached them. One was told by his banker that something might happen to him if he tried to vote. Another, who was in the hauling business, lost all his customers, and the police threatened to arrest any of his drivers found on the highway in his trucks.

These were men who had fought for their country, men who had fought side by side with their white brothers. When they sought to exercise their franchise they were deprived of that privilege.

I believe that really distressing situation lends emphasis to the need for some Federal legislation to insure that those who fight for their country and are ready to die for their country should have the right to vote for those who are to conduct the affairs of their country.

Mr. JAVITS. I thank my colleague for his very eloquent and affirmative contribution.

Mr. HART. Mr. President, will the Senator yield?

Mr. JAVITS. I yield to the Senator from Michigan.

Mr. HART. First, let me express the belief that the statement made today by the senior Senator from New York is all to the good in the development of an understanding of the basic issues.

However, with respect to the point he now proposes, and is developing in preliminary fashion, namely, the best and most effective approach to the development of an instrument which will insure

Case 2:25-cv-09149-DOC-Document 32-2 Filed 07/25 Page 121 of 237 Page ID #:453

the broadest possible participation at the ballot box by all our citizens, would it not be fairer to those of us who advocate civil rights legislation to insist at this point, at the very outset, that while we seek a device which is wholly constitutional and efficient, we seek a device aimed at mass disenfranchisement. What we are looking for is a device which will permit mass enfranchisement.

I ask these questions because early in the debate I sensed the development of the thought that if we could find a very refined, precise, and procedurally lengthy system, we would have found the ideal answer.

Is it not the belief of the senior Senator from New York that what we most need is the very simplest approach, which will permit mass enfranchisement, in the face of the figures which the senior Senator from New York and the Senator from Illinois introduced only a few minutes ago?

Mr. JAVITS. I think the Senator is absolutely correct, in that we need that element as one of our elements, but I am not satisfied that we need only that. Certainly we need a technique for mass enfranchisement, in view of the fact that mass enfranchisement has not been afforded by the States. But we also must take account of the fact that we have met mass resistance and mass disenfranchisement, which implies a determination to deny the right to vote somewhere along the line. Therefore we need a piece of machinery which will give us the degree of authority which will enable us to surmount the hard core of the problem.

I believe that the only wise solution, in which the remedy meets the difficulty, is the solution which has been proposed, of some capability for doing either, dependent upon the particular situation.

Mr. HART. I did not want the senior Senator from New York to take a final, ultimate position on the question of devices, but I wished to introduce very early the point that what we face is mass resistance and mass disenfranchisement, and that in evaluating the devices we should welcome one which would permit mass enfranchisement, and not reject it because it proposes mass enfranchisement.

Mr. JAVITS. I thank my colleague.

Mr. President, I was about to call attention to the activities of the Civil Rights Division of the Department of Justice, which were brought into issue last night by the distinguished Senator from Georgia [Mr. TALMADGE]. I shall address myself to that subject in a few minutes. I hope the attachés of the Senate will notify him, so that he may be present to hear what I have to say on the subject.

We have already discussed the matter of an official registrar, a device based upon widespread denials of voting opportunity. I should like to address myself to one other question which has arisen in this respect, and that is the destruction of voting records, which apparently needed the attention of the Civil Rights Commission, and also the Civil Rights Division of the Department of Justice.

CVI——232

As an example of what has occurred in that connection, although there is ample reference to it in the report of the Civil Rights Commission, I am informed of an Alabama law, 17 Alabama Code, 31, providing that voting registration records are not public records, and that registrars might dispose of records pertaining to unsuccessful applicants. We all know what that means. It means that it will be impossible ever to find the evidence of denial of a voting opportunity.

The administration's bill on this subject provides for the retention and preservation of voting records by Federal officials for 3 years, and makes it a crime willfully to destroy any such records. It would also give the Attorney General the right to inspect and copy such records upon written demand. This has been a very serious obstacle even to the administration of the Civil Rights Act of 1957.

Again I point to the general feeling, even among those most opposed to civil rights legislation, that the voting right should be assured. I can hardly see how the destruction of voting records can be condoned, or how anyone could condone denying to the Attorney General, or to a proper Government agency, the right to inspect them. So I believe that the case for this particular provision of the Dirksen substitute is absolutely unquestionable.

Mr. President, I shall wait until the close of my remarks to address myself to the questions raised by the two Senators from Georgia, and shall move on now to two of my final points on the whole question of legislation, one being the Commission on Equal Job Opportunity Under Government Contracts.

This was a part of the recommendations of the President of the United States to the Congress in his message of February 5, 1959. It is a part of the administration's package, and it should be enacted into law.

It seems elementary that where employment is afforded as a result of expenditure by the United States of money of the taxpayers, employment opportunities should be afforded equally, without regard to race, creed, or color.

Unless it be thought that this is a small matter, let us note that the United States executes about 3½ million prime contracts a year, expending about $15 billion in the process. I am informed that since August 1953, when the present Committee on Equal Job Opportunity Under Government Contracts—now headed by Vice President NIXON—was created, it has received about 1,000 complaints.

It has endeavored to do its best by adjusting complaints, largely through the process of conference and mediation.

The lack of a statutory base results in the committee having no real staff of investigators or attorneys, and must rely for its compliance work almost solely upon the contracting agencies, and having a status which can always be questioned by anyone who deals with it. There are no sanctions for noncompliance insofar as the committee is con-

cerned, except the potential risk of a noncomplying contractor being barred from any Government business.

Mr. TALMADGE. Mr. President, will the Senator yield?

Mr. JAVITS. I yield.

Mr. TALMADGE. I regret that I was not on the floor throughout the Senator's address this morning. The Senator stated that he would be prepared to submit this morning in his address the names of people who were legally qualified to vote, had attempted to assert that right in either State or Federal courts, or both, and had been denied their right to do so. Is the Senator prepared to submit any names this morning?

Mr. JAVITS. I am glad the Senator from Georgia is on the floor. I should like to read his question, and then I shall answer it. I refer now to page 2870 of the CONGRESSIONAL RECORD for February 18, 1960, in which the Senator from Georgia asked:

At this time I should like to ask, if the Senator will permit me to do so, one more question of the Senator from New York: Does the Senator from New York know the name of any qualified individual, anywhere—North, South, East, or West—who claims the right to vote, and has instituted an action in the courts, either State or Federal, and has not been protected in the exercise of that right?

I should like to refer my colleague to the following matters:

In Sellers v. Wilson (123 F. Stat. 917), decided in Alabama in 1954, four Negroes sued the county board of registrars for a judgment declaring their alleged policy, custom, and usage in refusing to register them because of race or color was unlawful, and asking for a permanent injunction and money damages.

The finding of the court is as follows:

The supreme law of this Republic is that no tests can be required of a Negro applicant as a prerequisite to registration as a voter that is not required of a white applicant; therefore, let no board of registrars try to devise any scheme or artifice to do otherwise.

The plaintiffs have proven no money damages on account of the illegal and wrongful accounts of these defendants and therefore no award of money damages is made.

By virtue of their resignations as members of the Board of Registrars of Bullock County, Ala., these defendants are now beyond the vale of an injunctive directive from this court in this matter; however, the court retains jurisdiction of the case and will grant the injunctive relief prayed for in plaintiff's petitions in the event either or all of these defendants again become members of this board.

Therefore, Mr. President, I state that, as shown by the case of Sellers against Wilson in these particular pleadings, four Negroes, fully qualified to vote, were frustrated in their right to vote because the court process could not reach an election board which resigned rather than give them the right to vote.

If the Senator wishes me to stop at each case, I will be glad to stop, or I will submit the other cases for the RECORD.

Mr. TALMADGE. The Senator points out, as I understand, in that particular observation, four cases. And the reason therefor is because no registrars are

available to be sued? Is that the Senator's statement?

Mr. JAVITS. That is correct.

Mr. TALMADGE. Does the Senator have any more than these four individuals, of the 180 million Americans, who come in the same category?

Mr. JAVITS. It seems to me, if I might answer, that I have already fully complied when I named one, because the Senator from Georgia said "Does the Senator from New York know the name of any qualified individual anywhere"—"any qualified individual anywhere," and my answer was that I knew that there were such cases, and that I would dig into them. Now I have produced four qualified individuals. I will go further; but that is enough.

Mr. TALMADGE. 4 out of 180 million.

Mr. JAVITS. It does not make any difference whether it is 4 out of 2½ billion. The Senator has asked for it, and I have produced it.

Mr. TALMADGE. I am very happy the Senator has produced the four. Would the Senator take the position, because there are four rapists or four murderers or four citizens anywhere in America who have violated the law, that we ought to send the U.S. Marines up there to see that the law is enforced?

Mr. JAVITS. The Senator from New York has just put into the RECORD facts and figures, of which the Senator from Georgia is fully aware, as is also the Senator from New York, of the widespread disenfranchisement in other areas of the South of Negroes by various devices, as found by the Civil Rights Commission to be recorded in many cases.

The Senator from New York was only addressing himself to this particular point, to this one question, which he tried to answer in all honesty, where the Senator from Georgia affirmed that I could not find the answer. I do not know whether the Senator really believed I could not find a case in which qualified voters were denied the right to vote. But I have produced such a case, for whatever it means. I think what it means is that it bears upon the fact, and I think it bears upon the fact with reasonable importance, though I believe the Federal Civil Rights Commission's findings are much more important, and cover much more ground; but I think it bears upon the fact that here is an example of how the right to vote was frustrated, though it is an individual case.

Mr. TALMADGE. Mr. President, will the Senator yield?

Mr. JAVITS. I will be happy to yield in just a minute.

True, it is an individual case. True, there are four people. But I was addressing myself to the particular challenge which the Senator from Georgia made. And I respectfully submit, citing even one case, though I have a few others, I have met the issue which was posed to me by the Senator from Georgia.

Mr. TALMADGE. Mr. President, will the Senator yield at this point?

Mr. JAVITS. I yield.

Mr. TALMADGE. Would the Senator also deal in his statement this morning with the alleged hundreds of thousands of Puerto Ricans in New York State who have been disenfranchised?

Mr. JAVITS. I am very happy to state to the Senator that the Senator from New York would be willing to restate what he had discussed with the Senator from Georgia on a previous occasion about Puerto Ricans in New York, and to point out that they are not disenfranchised, but that they are enfranchised equally with whites; and that the only complaint which we can make as the basis for legislation by the Congress is the fact that the laws of the States are not being equally applied. That is what the Federal Civil Rights Commission found. So that I, as a matter of fact, took the precaution, when I introduced the parts of the Federal Civil Rights Commission's report, to introduce the material about New York at the same time.

Mr. TALMADGE. Is it the position of the distinguished Senator from New York that New York State is competent to handle its qualifications statutes?

Mr. JAVITS. I believe New York is competent to handle its qualification statutes. But I believe that New York, like any other State, should be subject to Federal law and scrutiny by the Federal Government where it denies equal opportunity under its own laws to any of its citizens, whatever may be their color. I would accept it for New York, just as I would hope that every southern Senator would accept it for his State, where a violation of basic civil rights is so clearly shown.

Mr. TALMADGE. I agree with the distinguished Senator that New York State is thoroughly competent to handle its qualification of voters. But I would like to state that the other 49 States are equally competent to do so. Is it the Senator's premise that some States are denying this right and, because of that fact, the Federal Government ought to move in and take charge of their election machinery and control it?

Mr. JAVITS. It is my contention that the Federal Government has a right to see that the 15th amendment and the 14th amendment are living and expressive bodies of law, and also that in the elections of Federal officials, like Senators and Representatives, then give every individual who has the qualifications the right to vote. I think that is a duty of the Federal Government, and I do not believe that that constitutes taking over the elective machinery or putting the United States in the place of the States. I believe it refers only to that balance between the powers of the Federal and the State governments, powers which are inherent in the whole security of our Nation.

Mr. TALMADGE. Mr. President, will the Senator yield further at that point?

Mr. JAVITS. Certainly.

Mr. TALMADGE. Would the Senator under that premise think, then, that it was appropriate and proper, if there were a pattern of crime or violence in any particular area of our country, and law and order had broken down, for the Federal Government to move in and take charge of the situation?

Mr. JAVITS. Again the Senator refers to the degree of balance between the Federal and State Governments, and I should like to point out to the Senator that the Federal Government did send troops into Little Rock to suppress a situation of disorder and anarchy. But even the great heroes of the Southern States, like some of our former Presidents, were compelled to use Federal troops in situations of this character, in the South and elsewhere, when problems had gotten beyond the control of local officials.

Again, this is one of the prices which the State pays for the Federal Union. And this involves the balance of powers we all talk about. We accordingly accept it as part of our great democracy, and that is what I am talking about in regard to this voting legislation.

Mr. TALMADGE. Would the Senator yield at that point?

Mr. JAVITS. I yield.

Mr. TALMADGE. Would the Senator think, under that premise, if a pattern of rape or violence or suicide or murder were existing in public schools anywhere in our country, to the extent that it required armed police to protect the teachers and to protect the pupils, that the President ought to send the U.S. Marines to preserve order in such a school?

Mr. JAVITS. The Senator knows very well, being a very competent lawyer, just what are the requirements for the invocation of the Federal power with respect to public disorder or anarchy in a particular community. I think I have made my views on that subject very clear. The Senator knows, as well as I do, that we cannot make the generic decisions such as he would like to have me make upon this subject, because it depends strictly upon the extent to which public order is broken down and whether it has reached the point where the constitutional authority of the United States would be properly applicable.

Mr. TALMADGE. What I am trying to say to the Senator is that I feel that no area of our great country is completely free of crime. We do not live in a utopia. No laws are enforced 100 percent.

But if we are to start casting stones at one great region of our country, when that region has proven itself capable of self-government, I say the Senator lives in a glasshouse, and he ought to be the last man on the floor of the Senate to cast stones of aspersion at any other region of the country about the lack of law enforcement in that area of the Nation.

Mr. JAVITS. The Senator from New York will state that he has no desire to cast either stones or aspersions, but only to look at the record. The record is very clear. And, for whatever it means, I have invited individual Senators from the States which are affected, and the facts about which are set forth in the Federal Civil Rights Commission's report, to tell us what they think ought to be done about the conditions. And I point out to my colleague from Georgia that the 15th amendment, which was adopted

by the United States as a very hallowed part of our Constitution, specifies voting, speaks of it in so many words. And it does seem to me that we, as a Congress, are here to see that the promises of our Constitution are redeemed. And I certainly made a promise to the people of the United States of the most solemn kind in respect to voting rights.

Mr. TALMADGE. Would the Senator permit me at this point again to ask for unanimous consent to insert in the RECORD 10 full pages of laws, in addition to the Civil Rights Act of 1957, which afford the Federal law guaranteeing the right for any citizen of America to vote under any conditions?

Mr. JAVITS. I have no objection whatever to the introduction by the Senator of that material.

Mr. TALMADGE. There are laws in abundance on that subject. If anyone has been illegally denied his right to vote, he has a remedy in the State court, and he has a remedy in the Federal court. Those courts are adequate and afford penal remedies, such as fines, and civil remedies, as well.

If in any area of our country any citizen has been deprived of the right to vote, all the Attorney General needs to do is to invoke criminal penalties and move into the case, and action can be obtained immediately.

The Senator from New York is an able lawyer. I believe he knows that these 10 pages of laws, plus the Civil Rights Act of 1957 afford any citizen in this great country adequate remedies to protect his right to vote.

Mr. JAVITS. Obviously the remedies are inadequate, because hundreds of thousands of Americans are denied their right to vote. The Attorney General himself has asked for additional law. The President has asked for additional law. If once we take the position that all the statutes on the books are sufficient, what are we doing here? We are passing laws every day to deal with matters which appeal to us as requiring law, notwithstanding the fact that there is other law on the statute books.

Mr. President, I should like to include three cases relating to the idea that an individual who is qualified to vote only has to sue to get his right to vote. Another case is the United States v. Raines (172 F. Supp. 552), a case in which the Civil Rights Act of 1957 itself was declared unconstitutional. In that case, four school teachers in the Georgia school system, all graduates of Georgia colleges, and one having a master of arts degree from New York University, were declared unable to pass the literacy tests of the State of Georgia. That matter is before the Supreme Court of the United States.

The third case——

Mr. TALMADGE. Mr. President, will the Senator yield at that point?

Mr. JAVITS. I yield.

Mr. TALMADGE. Mr. President, I ask unanimous consent to have printed at this point in the RECORD the complete decision of the Federal district judge holding that particular phase of the Civil Rights Act of 1957 unconstitutional.

Mr. JAVITS. I have no objection to that.

There being no objection, the decision was ordered to be printed in the RECORD, as follows:

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE MIDDLE DISTRICT OF GEORGIA, AMERICUS DIVISION—UNITED STATES OF AMERICA, PLAINTIFF v. JAMES GRIGGS RAINES, DIXON OXFORD, ROSCOE RADFORD, REGISTRARS OF TERRELL COUNTY, GA.; F. LAWSON COOK, SR., AND MRS. F. LAWSON COOK, SR., DEPUTY REGISTRARS, DEFENDANTS—CIVIL ACTION No. 442

ORDER DISMISSING COMPLAINT

In accordance with the opinion filed in the above stated case on this date, it is hereby ordered and adjudged that the complaint in said cause be and the same is hereby, dismissed. Costs are taxed against the United States.

This the 16th day of April 1959.

T. HOYT DAVIS,
U.S. District Judge.

District Judge DAVIS. This is an action instituted by the Attorney General in the name of and on behalf of the United States under the provisions of the Civil Rights Act of 1957. The complaint is one seeking preventive relief against the alleged deprivation of voting rights of certain named persons on account of their race or color. The action is brought against James Griggs Raines, Dixon Oxford, Roscoe Radford, registrars of Terrell County, Ga., F. Lawson Cook, Sr., and Mrs. F. Lawson Cook, Sr., deputy registrars of Terrell County, Ga. It is alleged that these defendants have engaged in wrongful acts and practices, which will deprive otherwise qualified persons of the right to vote because of their race or color. No attack is made upon any State law, but rather, it is alleged that the wrongful deprivation of voting rights will result from the improper and wrongful administration of the Georgia registration laws by the named defendants. It is against this allegedly wrongful administration of the registration laws that this complaint seeks relief.

The complaint was filed on September 4, 1958. On September 23, 1958, a motion to dismiss said action was filed on behalf of all named defendants. This motion was set down for hearing in Americus, Ga., on January 26, 1959. Briefs were subsequently filed by counsel for all parties. Reply briefs and supplemental briefs were likewise filed. The court has given careful consideration to the pleadings, oral arguments and extensive and exhaustive briefs filed with the court.

The motion to dismiss is based primarily upon four main grounds. The first is the unconstitutionality of the section authorizing the Attorney General to file this action. This contention is grounded on two arguments. The defendants argue that the sections involved are not appropriate legislation within the meaning of Section 2 of the 15th amendment to the Constitution of the United States. Secondly, they urge that Congress had no authority to authorize the Attorney General to file a suit of this nature, since it is neither an action in law or equity. This deals in part with the authority of Congress to authorize the grant of an injunction without regard to exhaustion of other available remedies. The second main ground of the motion to dismiss is the failure of the complaint to state a cause of action under the Civil Rights Act of 1957, even if constitutional. The third ground asserts that the cause should be dismissed by the court in the exercise of its sound discretion. Because of the court's ultimate judgment in this matter and to facilitate clarity of presentation, these grounds will be considered in reverse order.

In the third ground of their motion, the defendants argue that the court should exercise its discretion and deny the relief sought, even though it be decided that the act under which it is brought is constitutional and the complaint states a cause of action under the statute. In support of this ground, it was pointed out that no emergency existed, such as that contemplated by Congress when this act was enacted. Though a general election was held in Georgia in November 1958, this complaint did not seek a temporary restraining order, or any other remedy which might have enabled the allegedly wronged parties to vote in that election. It seeks instead to secure an injunction at a time when the next scheduled election is over a year in the future. The defendants argue that the State can afford the desired remedy prior to any election and that no such emergency exists as would justify this court's intervention.

While some of the language of the congressional hearings does indicate that this remedy was primarily designed for emergency use, the wording of the statute imposed no such limitation. This court cannot so limit the applicability of the statute. Similarly, the failure of the complaint to seek such relief as might have protected the voting rights of the allegedly wronged parties prior to the November election does not impede the operation of the statute. It may raise some question as to the motive of the litigation, but the court without hearing any of the evidence would not be disposed to dismiss the proceedings in the exercise of its discretion. It is true that equitable relief may be denied in the exercise of the court's discretion, but it should be a discretion informed by evidence. The court is of the opinion that, based on the complaint alone, it is not in possession of sufficient facts to dismiss the complaint in the exercise of its sound discretion.

The Court next comes to a consideration of the question of whether or not this complaint states a cause of action under the provisions of 42 U.S.C. 1971. The complaint alleges that the defendants, as individuals, acting in the exercise of their State given authority as registrars and deputy registrars of Terrell County, Ga., engaged in certain acts and practices, designed and intended to deny otherwise qualified persons the right to vote because of their race and color. It is alleged that they delayed handling of Negro applications for registration, arbitrarily refused to register Negroes who demonstrated their qualification to vote, and for purposes of discrimination, applied more difficult and stringent registration standards to Negro applicants than to white applicants.

It is further alleged that registration is a legal prerequisite to voting in Georgia, and that this discrimination in administration of registration procedures was on account of the race of the applicants.

There can be no question but that these allegations are sufficient to bring the allegedly wrongful conduct of the defendants within the coverage of 42 U.S.C. 1971. Whether that statute be construed as one limited to State action, as argued by the United States, or as extending to purely individual action, as contended by the defendants, the language of the complaint would state a cause of action. It alleges that these defendants have engaged in certain acts or practices which will deprive others of their right to vote, when otherwise qualified, without distinction as to race or color. The acts and practices alleged are those of the defendants while acting (even though wrongfully) in the exercise of State given authority. Thus, under any reading of the statute, the facts alleged make out a cause of action.

So it is, that this is not a case such as Collins v. Hardyman (341 U.S. 651) where the

court can avoid the question of constitutionality. Having determined that none of the other grounds of the motion to dismiss are valid, the court now passes to the final and most important point raised by that motion; to wit, the constitutionality of the act under which this action is brought.

The first prong of the constitutional attack on the statute questions the authority of Congress to authorize the Attorney General to bring an action in this court, which is neither an action in law or equity. It is urged that this is not a legal action, seeking as it does injunctive relief. On the other hand, it is argued that it is not an equitable action, since it violates one of the oldest rules of equity, the unavailability of the injunctive process where other legal remedies are available. The defendants thus contend that this is neither a suit in law or equity, and that Congress had no right to authorize it. This court cannot accept this contention.

While a court may question the wisdom of overruling an old and well-established maxim of equity, the court knows of no limitation on the powers of Congress to legislate in this field. The fact that Congress in subsection (d) of section 1971 provided that the courts shall exercise that jurisdiction "without regard to whether the party aggrieved shall have exhausted any administrative or other remedies that may be provided by law," does not change the nature of this action from one in equity. It merely provides that in such an equitable proceeding a certain well-established principle shall not be applicable. The court knows of no limitation on the rights of Congress to so legislate. It is well known that the Federal courts have often refused to act because the complainants had failed to exhaust their other remedies (Peay v. Cox, 190 F. 2d, 123, 125 (5th Cir.)). This rule, however, could hardly be applied where Congress has expressly directed the courts to exercise their jurisdiction without regard to such fact.

The defendants contend that such a limitation of the court's exercise of their jurisdiction is an invasion by the legislative branch of matters properly committed to the judicial branch and thus violative of the separation-of-powers doctrine. The court is far from convinced as to the soundness of this argument, but has not explored it extensively because it does not seem necessary, in view of the ultimate disposition of this motion.

This brings us, finally, to what appears to be the most substantial contention of the defendants; that is, that 42 U.S.C. 1971 is not appropriate legislation within the meaning of section 2 of the 15th amendment and exceeds the jurisdiction of the Congress.

It should be noted at the outset that this action is one brought by the Attorney General in the name of and on behalf of the United States. It is not an action by the allegedly wronged party under the provisions of 42 U.S.C. 1983, and differs materially from those cases. In that type of case, the "self-executing ban" of the 15th amendment proscribes certain conduct and section 1983 provides a remedy therefor, without resort to 42 U.S.C. 1971. It was the availability of this "self-executing ban" which has heretofore allowed the Supreme Court to apparently bypass a clear ruling on the constitutionality of section 1971—(a) Terry v. Adams, 345 U.S. 461, 481).

In the instant case, however, the Attorney General has no standing for the bringing of this action, except the recently enacted provisions of section 1971. Any right that he has to seek preventive relief, where citizens allegedly have been or about to be denied their right to vote on account of race, is based on section 1971 (c). Prior to its enactment, such an action could not have been entertained. Thus, it is that the question of

the constitutionality of this section cannot be sidestepped or bypassed. Due to the wording of subsection (c) of the statute and the way in which it is tied to subsection (a), the latter must also be given its first really critical examination.

As originally enacted and as it remained on the statute books of this country from 1870 until 1957, the present subsection (a) (formerly section 1971 in its entirety) was merely a general statement of principle or of rights, without providing any sanction or remedy for its violation (U.S. v. Reese, 92 U.S. 214; U.S. v. Cruikshank, 92 U.S. 542). For this reason, no action could ever be based upon this section alone. Many actions were filed under sections 1983 and 1971, relying also on the 15th amendment. It will be noted that in any suit filed under section 1983 there could be no question such as is here presented, since section 1983 is applicable only to persons acting "under color of any statute, ordinance or regulation, custom or usage, of any State or territory." By its unmistakably clear language, section 1983 did not authorize any action for purely private acts, even though such practice resulted in a person being deprived of the right to vote on account of his race.

This brings into focus the question which is now presented for determination by this court. Under section 1971, as passed in 1957, is the Attorney General permitted to institute proceedings for preventive relief, where the alleged wrongful deprivation is that of a private citizen, not a State officer, not acting under color of any State law, custom, or usage?

In considering this question, we must close our mind to the allegations of the complaint in the instant case. The question is not what the Attorney General has done here, but what Congress has authorized him to do. As was clearly demonstrated in the case of United States v. Reese et al. (92 U.S. 214), where a statute is enacted in general terms sufficiently broad to apply to wrongful acts, outside as well as within the constitutional jurisdiction of Congress, such a statute cannot be limited by judicial construction so as to make it operate only on that which Congress might rightfully prohibit. "To limit this statute in the manner now asked would be to make a new law, not to enforce an old one" (ibid). It is well to note that the Supreme Court was there considering one section of the act of 1870, of which section 1971(a) was a part.

Thus, it is not for this court to decide whether this particular fish is properly within the net, but whether the net is so large as to catch many fish not properly within it.

It is clear beyond question, that the 15th amendment to the Constitution relates "solely to action by the United States or by any State and does not contemplate wrongful individual acts." James v. Bowman, 190 U.S. 127. The statute which is here under consideration, as did the one in the above cited case, "on its face * * * purports to be an exercise of the power granted to Congress by the 15th amendment." The Government of the United States is one of delegated, limited, and enumerated powers. Therefore, every valid act of Congress must find in the Constitution some warrant for its passage" (US. v. Harris, 106 U.S. 629). The power of Congress to legislate at all upon the subject of voting at State elections rests upon the 15th amendment. Prior to its enactment there was no constitutional guaranty against discrimination on account of race, color, or previous condition of servitude (U.S. v. Reese, et al, 92 U.S. 214).

Thus, it will be seen that, if section 1971 (c) is constitutional, it is because of the power given Congress by the 15th amendment. As stated, that amendment relates solely to action by the United States or by any State and does not contemplate wrong-

ful individual acts. The Court is mindful, of course, of the cases holding that a State acts through its lawfully constituted officials and that action by one exercising his State-given authority (even though wrongly exercising it) constitutes State action. Thus, for present purposes, it will be assumed that the 15th amendment authorizes Congress, by appropriate legislation, to prohibit and punish deprivation of voting privileges on account of race or color by any State or by the officers of any State while in the exercise of State-given authority. It does not, however, authorize Congress to prohibit or punish purely individual and private action depriving another of his right to vote on account of his race or color.

This brings us to the meat of the controversy here: What does section 1971(c) seek to do? Is it limited to State action, as previously defined, or is it sufficiently broad to encompass wrongful action by individuals?

In determining the scope of section 1971 (c), the court must first consider the language of that section. Is there any limitation within the section itself? The section, as enacted in 1957, reads as follows:

"Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice which would deprive any other person of any right or privilege secured by subsection (a) or (b) of this section, the Attorney General may institute for the United States, or in the name of the United States, a civil action or other proper proceeding for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order. In any proceeding hereunder the United States shall be liable for costs the same as a private person" (42 U.S.C. 1971(c)).

It will be noted at the outset that the section itself includes no limitation as to the persons subject to suit under it. It includes any person engaging in or about to engage in a certain type of conduct. By its own terms the section is applicable to any person engaging in the type of action described herein. Thus, it follows that the only limitation, if any there be, must come from the act or practice described therein. In other words, any person capable of engaging in the type of act or practice described would be subject to suit by the Attorney General. If any person other than one clothed with State authority can engage in such act or practice, then the section is broad enough to allow suit against him and is not limited to State action. It will be particularly noted that the section makes no reference to color of law, a phrase with which the Congress is very familiar, having used it in other sections of this, as well as other civil rights acts. More will be said about this later.

Now, what is the proscribed act or practice which brings this section into play? It is not any act or practice which would deprive another of his rights under the 15th amendment. If that were the language, there could be no doubt about its limitation to State action, since a private citizen acting individually cannot deprive another of his rights under the 15th amendment. As argued in James v. Bowman (190 U.S. 127, 135), a statute in such general language aimed only at such acts as deprived another of whatever rights he had under the 15th amendment could not be unconstitutional. It would just be up to the courts then to determine in each case whether or not the statute applied to the conduct alleged in the complaint. The statute itself would proscribe only that which violated the amendment. Any set of facts falling short of a violation of the amendment would not be a cause of action under the statute.

Here, however, Congress did not so limit the statute. The action proscribed therein is "any act or practice which would deprive any other person of any right or privilege

secured by subsection (a) or (b) of this section." Again we come to the question: Can any person other than one clothed with the authority of the State engage in such an act or practice? To properly determine that, we must first determine what rights and privileges are secured by subsection (a) of section 1971. (All parties concede that subsection (b) is not here involved.)

Subsection (a) of 42 U.S.C. 1971 was originally passed in 1870, as a part of what was known as the Enforcement Act, consisting of 23 sections. It was enacted soon after the adoption of the 14th and 15th amendments. It was in some respects a sort of preamble to the Enforcement Act, in that it merely stated a right or privilege, while the sections that followed it sought to establish remedies for specific violations of civil rights. The section, as originally enacted, was reenacted in 1957 as subsection (a) of section 1971. Therefore it had been the entire section. The subsection reads as follows:

"All citizens of the United States who are otherwise qualified by law to vote at any election by the people in any State, Territory, district, county, city, parish, township, school district, municipality, or other territorial subdivision, shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation of any State or Territory, or by or under its authority, to the contrary notwithstanding" (42 U.S.C. 1971 (a)).

Now, what is the right or privilege secured by this subsection? In this court's opinion, it is the right and privilege of all persons otherwise qualified to vote to be entitled and allowed to vote, without distinction of race or color and to effectuate this right, all State constitutional provisions, laws, customs, usages, and regulations to the contrary are expressly set aside.

But, this right to be entitled and allowed to vote, as stated, is not simply the right to be free of State interference but is the right to be free of interference from any source on account of one's race or color. It may be that the word "entitled," as used, carries with it some idea of State action only, since entitlement to vote can come from the State alone and can be denied only by the State, acting through its officials. Entitlement is a legal status, which can neither be conferred nor denied by a private citizen. But the phrase "allowed to vote" carries with it no such idea of State action or legal status. It denotes the physical action of voting and it may be interfered with or denied to another by any person—State official or private citizen. A person who is kidnaped at the polls and spirited away has been denied his right to be allowed to vote. One who is prevented from voting through threats or intimidation has been denied his right to be allowed to vote, just as completely as if the poll manager had refused to accept his ballot. It thus appears to this court that the right secured by this subsection is such a right of which a person can be deprived, by the act or practice of any other person—State official or private citizen.

This view is strengthened by a look at the other provisions of the Enforcement Act of 1870, of which this subsection, verbatim, was the first section. As previously stated, it was a sort of preamble to that act, in that it stated general principles while the following sections contained the "teeth."

The court feels that it is, therefore, proper to consider the fact that in section 5 of the Enforcement Act of 1870, Congress made it a crime for any individual to hinder, control, or intimidate others by bribery or threats from exercising their right of suffrage guaranteed by the 15th amendment. While this section was declared unconstitutional in the case of *James* v. *Bowman* (190

U.S. 127), on the grounds here urged, and is no longer on the books, it does have some bearing, in that it reflects the thinking of the Congress which originally enacted this legislation. In this court's opinion, the imposition of a criminal sanction, for purely private and individual action, indicates that the previous general statement of principle and rights was sufficiently broad to include the right to be free from private as well as State interference.

It is of interest to note that sections 3, 4, and 5 of the act of 1870 have since been declared unconstitutional as in excess of the jurisdiction conferred upon Congress by the 15th amendment. This, to say the least, waters down considerably any presumption that Congress on this occasion was acting within the scope of its legislative authority. Any such presumption is further weakened by the principle that the Government of the United States, being a Government of limited and enumerated powers, every valid act of Congress must find in the Constitution some warrant for its passage (*U.S.* v. *Harris*, 106 U.S. 629, 636).

In carefully scrutinizing this passage, in order to determine whether the right therein declared is limited to the right to be free from State discrimination, the court is impressed with the reasoning of the dissenting opinion of Justices Burton, Black, and Douglas, in the case of *Collins* v. *Hardyman* (341 U.S. 651, 663, 664), wherein it was stated: "The language of the statute refutes the suggestion that action under color of State law is a necessary ingredient of the cause of action which it recognizes. R.S. section 1980(3) speaks of 'two or more persons in any State or territory' conspiring. That clause is not limited to State officials. Still more obviously, when the section speaks of persons going 'in disguise on the highway * * * for the purpose of depriving * * * any person or class of persons of the equal protection of the laws,' it certainly does not limit its reference to actions of that kind by State officials. When Congress, at this period, did intend to limit comparable civil rights legislation to action under color of State law, it said so in unmistakable terms."

It is the opinion of this court that this statement applies with equal force to subsections (a) and (c). In 1870, when (a) was first enacted, and in 1957 when (c) was enacted, Congress in other and similar legislation demonstrated its ability to limit such legislation to State officials by the use of clear and unequivocable language. The terms "under color of law" was employed in subsection (b) of the act of 1957. Other sections of the act of 1870 employed the phrase "whenever by, or under the authority of * * * of any State."

It is interesting to note, in this connection, that the complaint of the United States in this case defines the rights and privileges secured by subsection (a) of the statute in paragraph 1, in the following language: "The right and privilege of citizens of the United States who are otherwise qualified by law to vote at any election by the people in the State of Georgia to be entitled and allowed to vote at all such elections without distinction of race or color."

This statement of the right secured completely omits any reference to State constitutions, laws, usage, custom, or regulations. The right is similarly defined in the majority report of the House committee which recommended passage of the act (House Rept. No. 291, United States Code Cong. and Admin. News, 85th Cong., 1st sess., 1957, p. 1977).

The language of the subsection following the semicolon; to wit: "Any constitution, law, custom, usage, or regulation of any State or territory, or by or under its authority, to the contrary notwithstanding," was not intended to qualify and limit all that had gone before it in the section. To so hold would mean

that even direct and positive State action of discrimination in voting rights on account of color could not be reached under this statute, unless the State action was based on some constitutional provision, law, custom, usage, or regulation. Clearly, this was not intended when the section was reenacted by Congress in 1957. This point is supported by the testimony of Attorney General Brownell during the House hearings on the Civil Rights Act of 1957, wherein he stated:

"For example, if you have a registrar of voters who arbitrarily strikes off several thousand names of Negro voters shortly before the deadline for qualification of voters and gives no hearing to them or an inadequate hearing, then I would think that would be a case that would alert the Attorney General under this bill to the need for some injunctive action, which would give those people their day in court and allow them, like any other citizen, the right of franchise" (hearings of subcommittee of House on the Civil Rights Act of 1957, Serial No. 1, p. 601).

Clearly, it could not be argued that such conduct by one registrar in contravention of State law was based on any constitutional provision, statute, usage, custom, or regulation. An isolated example could hardly be termed a State custom or usage. Congress did not intend to so limit the application of this section. If it was not an absolute limitation as written, it could hardly be reworded by the courts to limit the section to a deprivation of voting rights by State officials only.

It may be argued, and has been, that the reliance on this section over the years proves its constitutionality. In viewing this contention, it must be remembered that this section was in no wise remedial. It was relied upon only in cases brought under remedial statutes, which included the term "under color of statute, ordinance, regulation, custom, or usage, of any State or territory," and other similar language. When the two sections were construed together * * * individual action. Thus, there was no reason for any attack on subsection (a). Now, however, Congress seeks to tie together two sections, neither of which is limited to State action or action by State authority. This it cannot do. When linked with a remedial statute properly limited, subsection (a) is harmless. But, when linked, as here, with a remedial section which uses the phrase "any person," it renders the remedial section beyond the jurisdiction of Congress and unconstitutional.

Subsection (c) creates a remedy against purely private, as distinguished from State, deprivation of voting rights on account of race or color. The fact that the instant case is a suit against State officials cannot alter the scope of the statute. This illustrates the danger of this type of legislation, which danger was recognized as early as the case of *United States* v. *Reese, et al.* (92 U.S. 214). There the Court said: "We are, therefore, directly called upon to decide whether a penal statute enacted by Congress, with its limited powers, which is in general language broad enough to cover wrongful acts, without as well as within the constitutional jurisdiction, can be limited by judicial construction, so as to make it operate only on that which Congress may rightfully prohibit and punish. For this purpose, we must take these sections of the statute as they are. We are not able to reject a part which is unconstitutional and retain the remainder, because it is not possible to separate that which is unconstitutional, if there be any such, from that which is not. The proposed effect is not to be attained by striking out or disregarding words that are in the section, but by inserting those that are not now there."

It is true that there the court was dealing with a penal statute. Here we are dealing with a statute authorizing an injunction,

Case 2:25-cv-09149-DOC-DFM  Document 1-5  Filed 11/07/25  Page 126 of 237  Page ID #:727

violation of which may carry its own penalty. The same principle would seem applicable.¹ When a person is enjoined from violating a statute, he is entitled to know what that statute proscribes, without awaiting the finality of an authoritative court opinion.

As stated in the Reese case, supra: "It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large."

That this is exactly what this section seeks to do is demonstrated by the testimony of Attorney General Brownell in the Senate hearings before the Subcommittee on Constitutional Rights while considering the Civil Rights Act of 1957. On page 25 of those hearings, Mr. Brownell testified: "These sections 4 and 5" (subsections (c) and (d) of the law as enacted) "are added here as machinery to enforce whatever the constitutional authority of the Federal Government may be in this area, and does not add to the substantive provisions of the statute."

Again, at page 51, he testified: "Our guiding principle will be that only those statutes, parts of statutes that are constitutional, would be enforced by us, and we would not act in anyway contrary to a Supreme Court opinion which holds that a statute or any part thereof that is unconstitutional." This indicates that the statute as written is sufficiently broad to include unconstitutional matter, but that the Attorney General expressed his intention of administering it in such a way as to seek no unconstitutional relief. While this is a noteworthy sentiment, the tenure of the Attorney General being what it is, the courts can hardly rely on his intentions as to the administration of an act which in itself would support the grant of unconstitutional relief, if requested.

The court has explored this question with particularity, because it is not unmindful in the least of the seriousness of the problem. This court has never and shall never consider wrongful deprivation of the constitutional rights of any person by a State official or a private citizen. On the other hand, this court is also sensitive to the dual sovereignty system of government under which we operate and is sincerely devoted to its preservation.

It is this court's considered opinion that this statute would allow the Attorney General to seek an injunction against a private citizen for an individual act, divorced completely from State action. It is the province of the several States to protect the rights of one citizen against the wrongful practices of another person (James v. Bowman, 190 U.S. 127). Congress should not be allowed to extend the authority of the Federal Government into this field. This it has tried to do. The court is of the opinion that, if Congress intended only to authorize the Attorney General to enjoin or seek preventive relief against wrongful State action, it could easily have been accomplished, without resort to such confused legislation. Similar, if Congress wishes to leave the courts some

latitude in deciding what may and what may not be enjoined, this may be accomplished by tying the remedy directly to the 15th amendment, rather than to another section, the constitutionality of which is far from clear.

For the reasons set forth above, the court concludes that section 1971(c) of title 42 is beyond the jurisdiction of Congress and unconstitutional. It is not appropriate legislation within the meaning of section 2 of the 15th amendment to the Constitution of the United States. There existing no other basis for an action by the Attorney General in the name of the United States seeking the remedy here sought, the motion to dismiss should be, and the same is hereby, granted.

Mr. JAVITS. Mr. President, the next case is that of Gomillion v. Lightfoot (270 F. 2d 594).

This is a famous case in Alabama, decided in 1958. It is the result of the gerrymandering, as the curbstone saying goes, by the Alabama Legislature of the boundaries of the city of Tuskegee, the city, as my colleague from New York [Mr. KEATING] has just brought out, in which the famous Tuskegee Institute is located. This decision effectively disfranchises all but 10 of the 400 Negroes living in the city.

The reason for their disfranchisement was that they could not vote in Tuskegee in the city election because of the gerrymandering. Although they were perfectly qualified to vote, they could not vote. They were effectively barred from voting.

The minority opinion in that case, which is also before the Supreme Court, was rendered by Judge Brown, who said:

The effect of the act is clear. The district court so found. As the boundaries are redefined by said act No. 140, the municipality of Tuskegee resembles a sea dragon. The effect of the act is to remove from the municipality of Tuskegee all but four or five of the qualified voters and none of the qualified white voters (167 F. Supp. 407) (p. 608).

*   *   *   *   *

For there can be no relief at the polls for those who cannot register and vote. Significantly the complaint in this case further alleged: "Macon County had no board of registrars to qualify applicants for voter registration for more than 18 months, from January 16, 1956, to June 3, 1957. Plaintiffs allege that the reason for no Macon County board of registrars is that almost all of the white persons possessing the qualification to vote in said county are already registered, whereas thousands of Negroes, who possess the qualifications, are not registered and cannot vote." It was this fact, incidentally, which gave rise to the necessity of the dismissal of a cause of action against the board of registrars of Macon County for discriminatory practices in registration (United States v. State of Alabama (5 Cir., 1959, 267 F. 2d 808)). In Macon County, of which Tuskegee is a geographical part, neither the Constitution nor Congress nor the courts are thus far able to assure Negro voters of this basic right (p. 611).

*   *   *   *   *

This case differs from all cases involving successful complaints of discrimination under the 14th and 15th amendments in that there is no effective remedy. An injunction will enable a citizen to vote—if he lives in a voting district where an election is held. It is an empty right when he does not live in a voting district. The best that this court could do for the plaintiffs would be to declare Act 140 of 1957 invalid. There is nothing to prevent the legislature of Ala-

bama from adopting a new law redefining Tuskegee town limits, perhaps with small changes, or perhaps a series of laws, each of which might also be held unconstitutional, each decision of the court and each act of the legislature progressively increasing the strain on Federal-State relations (p. 615).

In short, the situation is unmanageable. If we intervene we shall only intensify the very dispute we are asked to settle. And Federal courts have no mission—from the presence of higher law so often as to undue on constitutional decisions—to find a judicial solution for every political problem presented in a complaint that makes a strong appeal to the sympathies of the court. To repeat the words of Chief Justice John Marshall: "If courts were permitted to indulge their sympathies, a case better calculated to excite them can scarcely be imagined. * * * (But) such an interruption by the court * * * savors too much of the exercise of political power to be within the proper province of the judicial department" (p. 616).

Mr. GORE. Mr. President, will the Senator yield?

Mr. JAVITS. I yield.

Mr. GORE. How would the Senator's proposal provide relief in this particular case?

Mr. JAVITS. I know the Senator has asked that question thoughtfully and not lightly. I should like to answer it in that way.

In a case which was actually pending, for example, the Tuskegee case, a voting referee could be appointed, who would then register the particular individuals, who would then be entitled to vote, because elections were being held.

Hence, they would be entitled to proceed. Election officials who denied that right would be subject to the jurisdiction of the court for contempt, and the question could be tested.

There might be some other reason for denying the right to vote, or, as an alternative, the case involved Federal voting, a registrar appointed by the President for that particular area could register the people with the same effect.

If the Macon County registrars had been in this case—which they are not—they could vote. If the voting officials denied them their right to vote, and if they had reason for it, that reason could be tested in court by a suit for declaratory judgment, or the matter could wait until the registrar had been accused of a violation of the act after it became law.

In any case, machinery would be provided by which an individual could not be frustrated—which is what happened in this instance—in his right to vote merely by the fact that there was nobody to talk to or nobody to deal with.

Mr. GORE. Would the Senator believe it necessary to differentiate between Federal elections and local elections?

Mr. JAVITS. The Federal registration proposal is confined to Federal elections. The voting referee proposal, which would come under the cognizance of a court, which then would make an adjudication under the amendments to the Federal Constitution, applies to State elections, as well. Of course the Senator will recall that the 14th and 15th amendments to the Constitution

---

¹ During the subcommittee hearings on the Civil Rights Act of 1957, Senator ERVIN made the following remark: "If Congress has no power to provide any criminal penalties for those acts under the Constitution because it has no right to legislate in that particular area, it certainly would have no right to enact a civil law."

To which Mr. Brownell replied: "That is correct, and we are not asking for it." The difference between the type of remedy provided would not seem to alter the right of Congress to legislate with reference to it (hearings before the Subcommittee on Constitutional Rights of the Committee on the Judiciary, U.S. Senate, Feb. 14, 1957, p. 25).

assure equal protection under State law. So, Mr. President, on the basis of a proper jurisdictional finding, there is authority for qualifying a voter, through a Federal official, to vote in a State election, as well as in a Federal election.

I shall not argue the mechanics of the matter, because I am sure the Senator from Tennessee and all other Senators will have their own views on that point. But certainly the Congress could pass a constitutional law giving that right. Congress may not choose to do so; Congress may choose to confine the provisions of such law to Federal elections only—in which case Congress might have to deal separately with Jim Crow tactics in connection with ballots in State elections. But certainly equality under State law is guaranteed by those amendments to the Constitution.

Mr. DOUGLAS. Mr. President, will the Senator from New York yield?

Mr. JAVITS. I yield.

Mr. DOUGLAS. In view of the fact that the 15th amendment has been referred to—that amendment frequently has been ignored and, it seems, at times has not been recognized—will the Senator from New York permit me to read into the RECORD the text of that amendment?

Mr. JAVITS. Certainly; and I ask unanimous consent for that purpose, Mr. President.

The PRESIDING OFFICER. Is there objection? Without objection, it is so ordered.

Mr. DOUGLAS. The 15th amendment to the Constitution reads as follows:

AMENDMENT XV

SECTION 1. The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude—

SEC. 2. The Congress shall have power to enforce this article by appropriate legislation.

As I read that amendment, if any State, in either a State election or a Federal election, denies or abridges the right of a citizen to vote because of race, color, or previous condition of servitude, Congress can deal with that subject directly, by legislation. Is that not correct?

Mr. JAVITS. That is correct.

Mr. DOUGLAS. So the 15th amendment gives Congress ample legislative authority to guarantee the right to vote in State elections, as well as in Federal elections, does it not?

Mr. JAVITS. Yes; it does.

Mr. DOUGLAS. And the matter is simply one for the exercise of discretion on our part as to whether we shall extend protection to both of those types of elections or to only one of them.

Mr. JAVITS. That is entirely correct.

Mr. KEATING. Mr. President, in that connection will my colleague yield to me?

Mr. JAVITS. I yield.

Mr. KEATING. Let me say to the Senator from Illinois that the amendment, which I have prepared, is based on the ground he has stated. My Federal voting amendment would apply to both State and Federal elections, because

based upon that 15th amendment there is no doubt in my mind about the constitutionality of such a provision.

Now let me ask my colleague whether he has completed his citation of cases, in answer to the distinguished Senator from Georgia?

Mr. JAVITS. Not yet; I have a few more.

Mr. KEATING. There is one which I should like to add, if I may do so.

Mr. JAVITS. I shall be very glad to have my colleague do so.

Mr. KEATING. I do not know whether this one is included in my colleague's list; but it strikes me as a very interesting one. Like one of those the Senator mentioned, this matter is involved in a case now pending before the Supreme Court. Obviously, the Court will have to decide the case; but the facts are set forth as follows:

The matter arose in Louisiana, in connection with the registration card of a Mrs. Ethel A. Smith, a Negro woman. Her ballot was challenged by two of the individual defendants, on the ground of miscomputation of her age. It was claimed that her age was incorrectly figured by 1 day; but, actually, it was incorrect only if the date on which the registration card was executed was counted; otherwise, it was correct.

Right next to it, and in the same ward, was the registration card of a Mrs. William A. Lewis, a white woman. Her registration was not challenged, although she computed her age on exactly the same basis; and, on exactly the same basis, her computation of her exact age was 1 day off. In addition, on the card of Mrs. Lewis, in spelling "Louisiana," she spelled it "Louisaina."

And in the same litigation is shown the registration card of a James D. Cyrus, a Negro, whose registration card was challenged by two of the individual defendants, because of misspelling of the county of his birth. The challenged form is also shown. On his registration card, the name "Pearl River" was spelled "Peral River"; and the one who was challenging him for that misspelling stated, as the reason for his challenge, the "mispelling" on his application. In other words, the challenger misspelled the word "misspelling."

Also in connection with this matter there was shown the registration card of a Herman K. Manning, Jr., in exactly the same ward. His registration was not challenged; but on his card appeared a misspelling of his own name; in spelling it, he ran his first name and his last name together, and spelling them "Hermanning"; and he also designated his sex as "female." But he was allowed to vote.

And in the same parish of Washington, in the State of Louisiana, the deputy registrar of voters—one Curtis M. Thomas—who signed the registration of disqualification because the age was not computed correctly, disqualified another individual in the same parish for an error in spelling—spelled by Mr. Thomas "spilling."

I think those facts indicate—and I say this without prejudice to the pending litigation—that the same consideration

was not given in the registration of the white voters and in the registration of the Negro voters.

Mr. JAVITS. I thank my colleague; and if he will allow me to finish my presentation of the list of cases, I shall then be glad to yield to him. I am very grateful to my colleague for referring to those cases in so specific and marked a fashion.

The other class of cases to which I should like to refer is composed of cases in which Negroes won on appeal, but the courts found that class actions could not be brought; the courts held that the benefit of the victory in the case was applicable only to the party suing. So the mass problem can immediately be perceived: There would have to be tens or hundreds of thousands of suits, unless there were a more generic case—which is what we are trying to provide for, with relation to persons who had been barred from registration. The cases in that class included Raddix versus Lucky, 148 Federal Supplement 108, from Louisiana, in 1957; and Mitchell versus Wright, 62 Federal Supplement 580, from Alabama, in 1945. Those are fair samples. Those cases went up on appeal. The appeal citations are as follows:

(a) *Raddix* v. *Lucky* (148 F. Supp. 108 (La. 1957)): District court denied all relief and failed to grant summary judgment immediately only because there were open questions whether State law had been violated. Appeal, 252 F. 2d 930 (1958).

Negro plaintiff, won, but class action denied—court must decide each case on individual merits.

(b) *Mitchell* v. *Wright* (62 F. Supp. 580 (Ala.) 1945)): A Macon County case. District court found against plaintiff on the merits; also indicated that whether a person is to be registered is an individual decision and cannot be determined by class actions. Appeal, 154 F. 2d 954 (1946).

Individual plaintiff won an appeal but ruling of court as to class actions affirmed.

Finally, Mr. President, I should like to cite the case of United States against Alabama, 177 Federal Supplement 728, also involving Macon County. These cases were completely frustrated by the fact that the local registrars resigned, and the court held that although the Civil Rights Act of 1957 was constitutional, those actions would not lie, in its opinion, under that act, against the State; and that in view of the fact that the registrars had resigned, the only party defendant left was the State. Therefore, the actions failed. Again, there was no question of qualifications; there was simply frustrating complete frustration of the opportunity to vote.

That case is pending before the Supreme Court, and, indeed, I believe it was argued by the Attorney General.

I yield to my colleague from Tennessee.

Mr. GORE. I would like to return to the question about which I interrogated the Senator earlier. Like the senior Senator from Illinois, I am impressed

Case 2:25-cv-09149-DOC-PVC   Document 1   Filed 11/17/25   Page 128 of 237   Page ID #:460

with the 15th amendment. I raised this question earlier with the distinguished senior Senator from North Carolina [Mr. ERVIN], who cited certain authorities holding that this distinction, to which I referred, between Federal elections and local, municipal, county, and State elections, had been clearly drawn. Due to limitations of time, I have not yet researched this question, but knowing that the distinguished senior Senator from New York has done so, I wondered if he would be willing to give the Senate the benefit of his views with respect to this particular question, which, as I have said, was raised in colloquy between the junior Senator from Tennessee and the senior Senator from North Carolina.

Mr. JAVITS. I thank the Senator, and I shall be glad to give him my views; and I would reserve the right to expand upon those views, as occasion requires, because I am doing it pretty much without having again consulted the individual books and cases. But the authority in Federal elections rests, essentially, upon the time, place, and manner provisions of article I, section 4 of the Constitution, giving the Congress a far more direct route to acting in those cases. Congress could pass a law, without provocation, practically taking away from the States the time, place, and manner of the holding of these elections for Federal officials; that is, the House and the Senate.

When we move into the State area, which is the equal opportunity to vote under the amendments of the Constitution, which relates to the 14th and 15th amendments, there is a need for some preliminary findings of a wrong which is being done before the Congress has a right to implement those particular amendments. Therefore, there is a situation in which the Congress could—it never has and I believe it never will—move to take over the Federal election under the time, place, and manner provision of the Constitution, and is another situation in which there must be a wrong before Congress can act—an amendment is being violated; therefore, we must do something about it.

What my colleagues are saying, really—and my colleague from New York is on his feet, and I know will speak for himself—is that in this case we have a conjuncture of the two. Congress not only could, but should, take over the time, place, and manner of elections in the face of this admitted set of wrongs; and the wrongs having been proved or being easily susceptible of proof, Congress may also invoke the application to State elections which arises from the amendments.

Therefore, though there is a difference in the cases and there is a difference in the constitutional authorities, there is shown such a body of wrong as there is here. So for practical purposes, we can make our remedy applicable to both. That is the answer.

Mr. KEATING. Mr. President, will my colleague yield?

Mr. JAVITS. I yield to my colleague.

Mr. KEATING. This question of constitutionality of the Federal registrar proposal as dealing with State elections was raised in the course of our hearings before the Rules and Administrative Committee. I feel strongly that it is constitutional to apply it to State elections. It is a question of whether we want to do it. I consulted Prof. Arthur E. Sutherland, professor of constitutional law at Harvard Law School, and he fully supports my view in this respect. Later in the debate I shall put some of his statement into the RECORD.

My view is that it is constitutional and completely in order for us to apply a Federal registrar proposal to both State and Federal elections, under the 15th amendment of the Constitution.

If my colleague will allow me to intrude once more, because it is necessary for me to be off the floor for a few moments, I want, before leaving, to express my commendation to him for the very learned and scholarly presentation and the great contribution which he has made to this debate and to our thinking on these important subjects. I commend him for the orderly method which he has suggested as the way to deal with the problems before us. If we can keep our minds and hearts focused on some such orderly procedure we shall be able to allow everyone to be heard in full and still to terminate our determination of the important issues involved here, one way or the other, within a reasonable length of time.

Mr. JAVITS. I am very grateful to my colleague.

Mr. President, if my colleague will remain just one moment more, I wish to say I earnestly emphasize that there is great sobriety on this subject; that we are not being blinded by zeal or passion or anything else. We are very sober about this. We really feel that there are serious wrongs that need to be corrected, and we ought to proceed in an orderly, honorable, loyal-like way to correct them.

I thank my colleague from New York for his contribution.

Mr. COTTON. Mr. President, will the Senator yield?

Mr. JAVITS. I yield.

Mr. COTTON. The question I should like to ask the Senator seems appropriate at this time, although I dislike to interrupt him before he has completed his enumeration of examples.

First, I should like to say I have waited to question the distinguished Senator from New York because, through the years in which I have served with him both in the House of Representatives and in the Senate, I have come to have a profound respect for his objectivity, his legal knowledge, his constitutional knowledge, and his direct fundamental honesty in approaching these matters.

The distinguished Senator from New York has just been speaking about the matter of sobriety, the necessity of proceeding without passion or prejudice in righting certain wrongs. As one who has struggled with this problem in his own mind, forgetting for the moment the constitutional right of the Congress to deal with purely State and local elections, or voting lists used in such elections, forgetting for the moment the moral urge many sincere persons may have as a result of the decisions of the Supreme Court regarding social equality of the races, it has seemed to the Senator from New Hampshire that the logical, effective way of proceeding in this civil rights field is, first, to try to accomplish what for over 90 years the Congress of the United States has failed to accomplish, namely, the bare enforcement of the 15th amendment, the guarantee of the right of all citizens of this country to vote in national elections.

The reason why the Senator from New Hampshire did not sign as a sponsor the so-called Dirksen substitute was the fact that he felt we should first insure these voting rights—the naked voting rights we have been struggling with for 90 years—before we move into a field in which we have been involved 6 years, before we move into a field of local elections.

I hope the Senator will pardon me for prolonging this but I want to give the Senator my picture of the situation. The developments in the Senate in the past week or 10 days, with the threats which have taken place—I do not say "threats" in the obnoxious sense, but refer to the declaration of intent we have heard—have strengthened the feeling of the junior Senator from New Hampshire, who wants to see the Senate have the right to vote, to work its will, and who wants to see us move ahead in this field, in which we have been frustrated for more than 90 long years. The Senator from New Hampshire wonders, if our desire is to accomplish something rather than to create a political issue, if it would not be wiser to take from some of these bills page after page of matter which has to do with segregation or integration in the schools, or perhaps in the buses or in any other public places. Should we not be a little patient for a while, on the purely local and State elections, to make the first step in this field by nailing down definitely, finally, and completely after more than 90 years at least the right of all citizens to vote in national elections, to vote without intimidation, to vote freely and fully and on a fair basis.

On that question the Senator from New Hampshire would greatly value the opinion of the distinguished Senator from New York.

Mr. JAVITS. I must say, first, that I deeply appreciate the fine things said about me by the Senator, because he and I have served for a very long time together and he is a very honest man. I know that he would not say what he did so graciously unless he meant every word of it, and I would like to answer in kind. I respect fully what the Senator has said.

I should like to state to the Senator the two points which motivated me. First, there is no such thing as a pure guarantee of the voting right. It is immediately complicated by the need for other law. For example, the whole bombing business is obviously some throw-off, disastrous in its consequences, of the strains which are here created. That is just one example. The fact that voting records should not be destroyed, where that has interfered with adminis-

Case 2:25-cv-09149-DOC-MAR   Document 1   Filed 07/25   Page 129 of 237   Page ID #:461

tration of the very process which the Senator talks about, is another illustration.

If we exclude voting registration for State elections from the law, will we be able to identify every man's vote? A certain segment of the community will get only a Federal ballot and others will get only a State ballot, if they are entitled to it, as construed by the State officials. This will induce yet other problems.

This is quite apart from any antilynching provision or anything like that. We may argue as to whether these things have any relation to the fundamental state of mind which has perpetuated these injustices for 90 years.

So the problem is not a pure thing. We cannot do one thing alone and even guarantee that very one right the Senator is talking about.

Mr. COTTON. May the Senator from New Hampshire interpolate that in his question he agreed that the protection against violence, the protection of the law, is an inseparable part of this package. Thus far the Senator from New Hampshire agrees completely with the Senator from New York.

Mr. JAVITS. I thank the Senator. I shall now address myself specifically to his question. I understand it very well. It is, why introduce problems of desegregation in the public schools, and all the things that implies? I shall be glad to tell the Senator why.

In the first place, we could not tolerate a situation of disrespect for law. This has an epidemic effect. It communicates itself to everything else. What Senator in this Chamber does not weep with mortification over sitdowns in cafeterias, the turning of hoses on a group of Americans, or anything else of that type? Yet what Senator in this Chamber does not understand that the minute violence starts, whether it is because of a bombing or something else, there is simply no end to it. We have to be equally strict about suppressing all violence.

So we have the problem of flouting of law. The idea that the Supreme Court has no relation to the Constitution is simply impossible for me to understand, as a lawyer. How else could this Government operate? I assure the Senator, the South did not take that position in regard to the Dred Scott decision. On the contrary, the South fought tooth and nail the other way, and would do the same in regard to any decision on ratemaking or anything else which suited them.

Argument No. 1 is that we have to have respect for the law. This is the law; therefore, we have to see it is all respected.

The second argument is that we simply do not have that kind of time any more. The hot breath of the most grim challenge we have ever faced is right on the backs of our necks. What is happening in Chattanooga and Nashville and Atlanta and every other place in the United States is the "hottest" possible news where it does us the most harm. Fortunately the people in these areas—a billion strong—from what we can see in their press reports, understand if we are

trying, but they do not understand if we are not trying.

As I say, I am not trying to state this should necessarily be the view of the Senator, but for me, and I think for many like me, these are the two determining points which make me feel that we have to do more than provide simply a strict voting right, with an antibombing provision and what the Senator said, which really comprises the violence package, as it were.

I yield to my colleague again.

Mr. COTTON. Mr. President, I shall not prolong this colloquy and delay the distinguished Senator from resuming his speech. I cannot refrain from saying to the Senator, however, while I am much impressed by and deeply appreciative of what he has to say, I cannot forget one day, some 3 years ago, when I stood on the shore of the pool near the Lincoln Memorial and listened to speeches by some of the leaders of the Negro race in this Nation. One after another those leaders rose and exhorted their own people, and the others who were there in a very vast audience. This happened after the Supreme Court decision. The theme of the speakers was this: "If you will give to us the right to vote, which you guarantee to us as a matter of reality and not as a matter of form, so that our people can vote without fear of reprisal, without fear of boycotts, without fear of being discriminated against, we will take care of the rest."

The Senator from New Hampshire cannot help but feel rather strongly that in this matter it is not necessary to go the whole way. Every law must be respected. The Supreme Court can interpret the law, but there have been very few times in history when the Supreme Court has made itself an enforcement agency. Usually the Court has at least left to the Congress the field of enforcing decisions which it has made.

It seems to the Senator from New Hampshire that if what we desire is a concrete accomplishment to show the world, rather than a political issue to appeal to the electorate, we would be much wiser to stick to a fundamental principle which has been ignored, defied, and frustrated for 90 years. We should accomplish what is needed in that regard before we move into these other fields.

I thank the Senator for his patience. I appreciate his views, and I appreciate his permitting me to air my views at this point.

Mr. JAVITS. I thank the Senator.

I should like to finish the section on the Commission on Equal Employment Opportunity under Government contracts. In that regard, I trust that Senators who read my remarks will relate what I am now saying to what I said in outlining the proposal.

The administration bill gives the Commission legal status, so that it may receive the authority and the appropriation to which a properly constituted agency is entitled. I point out that in 1945 an amendment called the Russell amendment, named after our colleague from Georgia, barred agencies created by executive order from existing for more

than 1 year unless they received a legislative appropriation. This killed the committee which had been functioning at that time, in 1946, and has since inhibited setting up this Commission in an effective way. The Commission needs this kind of statutory backing in order to function effectively and properly in the interests of fairness so far as the American people are concerned; and it should have such authority.

The section has been submitted by the Senator from Illinois [Mr. DIRKSEN] does not have any particular sanction. All it provides is that the Commission shall make recommendations with respect to contract clauses relating to nondiscrimination, and their enforcement. It is my hope to be able to offer as an addition a new section giving persons discriminated against in violation of those contract clauses relating to nondiscrimination a right of action against the employer, as a third party beneficiary for damages, including costs and reasonable attorneys' fees. Such action would not adversely affect the right of the United States to enforce in other ways the nondiscrimination provisions of such contract clauses.

I move from that subject very briefly to the subject of an antilynching bill. This is not in the administration's package. Such an amendment will undoubtedly be proposed. There are a number of bills pending on this subject, including the bill of the Senator from Illinois [Mr. DOUGLAS] and myself.

For the assistance of Senators, I ask unanimous consent to have printed in the RECORD at this point as a part of my remarks a brief summary analysis, which, I emphasize, is made by me, and not by the authors of the various bills pending on this subject, calling special attention to the item relating to the so-called Javits-Douglas measure, which will be before us in a specific way, and which is printed.

There being no objection, the summary analysis was ordered to be printed in the RECORD, as follows:

PROPOSALS

A. HART: S. 1848.

B. HUMPHREY: S. 2041.

C. JAVITS: S. 2784.

D. JAVITS-DOUGLAS: S. 3045, title IV.

E. KEATING: S. 3039.

DESCRIPTION

A. Federal Antilynching Act: The assemblage of two or more persons which shall, without authority (1) commit violence upon the person of any citizen because of his race, creed, color, national origin, ancestry, language, or religion, or (2) exercise by physical violence any power of correction over any person in the custody of a peace officer or suspected of, charged with, or convicted of the commission of any criminal offense, with the purpose or consequence of preventing the apprehension or trial or punishment not authorized by law, shall constitute lynching. Any person who is a member of a lynch mob or who shall instigate, aid, or commit a lynching, shall be subject to $1,000 fine and/or imprisonment for 1 year. If the lynching results in death or serious physical or mental injury, the maximum penalty shall be $10,000 fine and/or 30 years' imprisonment. A State or local officer knowingly or through neglect, etc., failing to prevent a lynching, or to apprehend or

prosecute any member of a lynch mob, shall be punished by a $5,000 fine and/or 5 years' imprisonment.

Requires the Attorney General to cause an investigation to be made to determine a violation of this act upon oath that a lynching has occurred and Government officers have failed to prevent the lynching; been negligent in custodial duties of the person lynched; or failed to apprehend or prosecute any person who is a member of a lynch mob.

B. The assemblage of two or more persons which shall, without authority of law (1) commit violence upon the person of any citizen because of his race, creed, color, national origin, ancestry, language, or religion, or (2) exercise by physical violence, any power of correction over any person in the custody of a peace officer or suspected of, charged with, or convicted of the commission of any criminal offense, with the purpose or consequence of preventing the apprehension or trial or punishment not authorized by law, shall constitute lynching. Any person who is a member of a lynch mob or who shall instigate, aid, or commit a lynching, shall be subject to $1,000 fine and/or imprisonment for 1 year. If the lynching results in death or serious physical or mental injury, the maximum penalty shall be $10,000 fine and/or 20 years' imprisonment. A State or local officer knowingly or through neglect, etc., failing to prevent a lynching, or to apprehend or prosecute any member of a lynch mob, shall be punished by a $5,000 fine and/or 5 years' imprisonment. The United States or any Government subdivision failing to prevent a lynching, or a seizure and abduction followed elsewhere by a lynching, or persons instigating or participating in a lynching, shall be liable for damages. In cases of death or violent physical or mental injury, the judgment shall be not less than $2,000. The interstate transportation of persons with a view to lynching is made subject to the penalties provided in the Lindbergh kidnapping law (i.e., death or imprisonment) (amending U.S.C. 18:20, 1202).

C. Expresses a congressional finding that willful interference with or obstruction of any process or proceeding in State or territory of a person charged with crime to be a deprivation of rights, privileges, and immunities under the Constitution and that when two or more persons acting in concert willfully interfere with or obstruct any process or proceeding then that such action shall be subject to $1,000 fine and/or imprisonment for 1 year. If such action results in death, or serious physical or mental injury, the maximum penalty shall be $10,000 fine and/or 20 years' imprisonment. A State or local officer knowingly or through neglect, etc., failing to prevent a lynching, or to apprehend or prosecute any member of a lynch mob, shall be punished by a $5,000 fine and/or 5 years' imprisonment.

D. Identical to C.

E. Amends section 241 of title 18 (conspiracy against rights of citizens) to add to existing maximum punishment of not more than $5,000 fine or 10 years of imprisonment, or both, the additional penalty of any term of years to life, and death on jury recommendation, if death to any person results.

Amends section 242 of title 18 (deprivation of rights under color of law) to add to the existing maximum punishment of not more than $1,000 fine or 1 year imprisonment, or both, the additional penalty of not more than $5,000 fine or 10 years' imprisonment, or both, if personal injury results; and any term of years to life, or death on jury recommendation, if death to any person results.

Mr. JAVITS. In that connection, I point out that, as we all know, lynching is condemned by everyone, without exception, including every southern Sen-

ator, I am sure. They are as much concerned about it as any of the rest of us.

We have seen an example, in the Poplarville, Miss., situation, of the complete frustration which can come to the legal process. Those who feel as I do are of the opinion that even the FBI reports in that situation did not receive the recognition to which we would expect them to be entitled, in respect to the possible prosecution for crime.

This is an area in which the intervention of the FBI is left almost to local government request and discretion. The crime involved is certainly one of which the United States should take cognizance, within the spirit of the equal protection of the laws.

If, on the other hand, it is said that lynching is by all means a very rare occurrence, let it also be said that when it does occur it is a blot and a shame on the United States, and we ought to have every piece of legal machinery possible, including Federal legal and investigatory machinery, to deal with it. We should not be in the position in which we demonstrated our laws to be in respect to this very tragic Poplarville, Miss., lynching.

One further section of my remarks relates to a question asked by the Senator from Georgia [Mr. RUSSELL]. He is not now in the Chamber. I suggested that it might be well if he heard this presentation, but I am sure it will be before him, so I should like to place it in the RECORD at this time.

It will be remembered that the Senator from Georgia asked why only four suits had been filed under the Civil Rights Act of 1957, if this was such a hot subject.

In the first place, the four suits represent by no means the totality of the complaints encountered in respect of this subject.

First, I ask unanimous consent to have printed in the RECORD at this point as a part of my remarks a list of complaints which has been compiled for me. These complaints were made to the Federal Civil Rights Commission. This compilation updates the list found in the report of the Civil Rights Commission, involving complaints from the States of Alabama, Mississippi, and North Carolina, relating to denials of the voting right.

There being no objection, the list was ordered to be printed in the RECORD, as follows:

Alabama: Since the printing of the report, 44 voting complaints were received from Montgomery County, Ala., all of which have been investigated.

Mississippi: The total voting complaints received to date from Mississippi, and investigated, are as follows: Bolivar, 3; Claiborne, 9; Clarke, 7; Forrest, 11; Jefferson Davis, 26; LeFlore, 1; Sunflower, 3; Tallahatchie, 2; Walthall, 1; Amite, 2.

North Carolina: Since the printing of the report, 20 voting complaints have been received from North Carolina, have been investigated, and are listed as follows: Greene, 2; Halifax, 12; Northampton, 6.

Mr. JAVITS. Mr. President, as to the civil rights division of the Department of Justice, the following has been reported to me: The question has been asked why only four suits have been filed under the Civil Rights Act of 1957, the

implication being that no substantial problem exists as to voting discrimination against Negroes, and hence that there is no need for additional legislation.

Nothing could be further from the fact. Each of the cases which have been filed under the act involves a vital aspect of its application. As is often the case with new legislation which is resisted and attacked in the courts, resolution of the legal problems must necessarily precede broadscale application of the statute.

In that connection, I refer to the Internal Security Act of 1950, now 10 years old, which is still pending, in terms of its constitutionality, in connection with the effort to cause to be registered under it those who are believed to be Communists, or to have Communist affiliations. This shows the timelag involved in connection with a statute which is as hotly contested as the instant Civil Rights Act of 1957.

Also, I point out that it took the Senate from January 1958 to August 1958, almost a full legislative year, to confirm the nomination of the first head of the civil rights division, Mr. White. That is a point in respect to the work which this division has been able to accomplish.

Hence it can be assumed that when these pilot cases are ultimately decided by the courts, the act will have a much wider application and many additional suits can be instituted to secure voting rights for Negroes.

In addition, during the initial stages of the Department's administration of the act, various practical problems have manifested themselves which have necessitated recommendations for implementing legislation which are now before the Congress.

In order to prove racial discrimination it was found essential to have access to registration records. It has for example, become increasingly apparent that local officials are often not willing to make such records available, and in many cases are even precluded from doing so by State law. This was dramatically illustrated when the Commission on Civil Rights was denied the right to examine records in several counties of Alabama. Indeed, following the Commission's hearing in the State, Alabama hastily enacted a law providing for the destruction of the voting records at the discretion of local registrars. Incidentally, it would normally be those same local registrars who would be the defendants in action, brought under the Civil Rights Act.

Typical of another obstacle in this same area is the statement recently made before the Supreme Court by the attorney general of Louisiana that FBI agents will not be given access to voting records unless they meet the particular residence and other requirements of local law.

Experience has also shown that local registration officials engage in every possible dilatory tactic to delay enforcement of voting rights suits. It is to meet this problem that the Federal voting referee and similar bills have been proposed. Enactment of these bills will in-

sure that persons who are in sympathy with the protection of constitutional rights will fairly administer the registration procedures of State law wherever the problem of racial discrimination exists.

Beyond that, however, it must not be supposed that the four lawsuits filed thus far by the Department of Justice represent merely the complaints of but a handful of individuals, or that they would, if successfully carried through the courts, result in relief on only a limited scale. The fact is that relief in each of these suits will immediately strike down discrimination on at least on a county-wide basis and will have incidental benefits of far wider score.

For example, the Supreme Court has just recently heard arguments in a case in which the State of Louisiana is appealing an order of a lower Federal court to restore to the voting rolls of one parish 1,377 Negroes who were purged because of such deficiencies as misspellings, failure to compute age within 1 day and similar trivialities.

This was referred to by my colleague from New York [Mr. KEATING]. At the same time, only 10 white voters out of over 11,000 were challenged for the same reasons, although by the registrar's own admission at least half the registration cards of those on the rolls today have the same defects. This situation has resulted from a wholesale program in Louisiana where the self-proclaimed goal is to reduce the number of Negro voters by 90 percent. It is anticipated that if the Government's contentions with respect to this shocking inequity are upheld, similar suits on a much wider scale can be brought to rectify discriminatory purges of this kind throughout the State of Louisiana and other areas as well.

Another example of the Government's effort to establish a sound basis for dealing with the various types of evasive tactics which have been used is the suit brought in Macon County, Ala. There at the seat of the famed Tuskegee Institute the local registration board for years has engaged in the tactic of ceasing to function for months on end whenever it became apparent that Negroes were about to register in significant numbers. Following the last of a series of such resignations, the Department of Justice brought suit; and upon dismissal of the action, sought immediate appellate review. This case, too, is now pending before the Supreme Court, and it is hoped that it will provide the weapon with which to deal once and for all, and everywhere, with this device of the resignation of voting officials for the very purpose of keeping Negroes from voting.

Finally, it may be mentioned that the very first case brought under the Civil Rights Act—one which involved action by the registrars which prevented Negro schoolteachers, among others, from voting and that on the ground that they could not pass a literacy test—resulted in a holding by the lower court that the Civil Rights Act is unconstitutional. While the Attorney General did not accept this determination by the lower court as conclusive, and himself argued the constitutionality of the act before the

Supreme Court, it cannot be denied that the ruling had a deterrent effect upon enforcement efforts. In this case, as in other cases where initial difficulties have been encountered in enforcing the statute, it is perfectly clear that many individuals who would otherwise come forward with regard to their own experience in not being allowed to register to vote are awaiting the outcome of the litigation before doing so.

It is to be expected that as soon as these pilot suits will have led to the registration and voting of many heretofore disfranchised Negroes, others will make application either directly to the Department of Justice or to the newly-appointed voting referees if the pending bill should be enacted and thus accelerate the momentum of the enforcement drive.

It is noteworthy, too, that the three cases presently before the Supreme Court and the case involving the constitutionality of the operation of the Commission on Civil Rights were all brought to the Supreme Court with almost unprecedented speed. The Louisiana case, for example, was heard in the Supreme Court only about 6 weeks after the decision had been handed down by the district court.

Mr. President, it will be noted that there is one subject to which I have not addressed myself, namely, the question of an amendment prohibiting the poll tax.

As I stated in colloquy some time ago, I reserve for myself, and others of my colleagues who are interested, the right to consider that question as we go along in the debate.

Other than that, in all fairness we believe we have set forth in our amendments already filed and printed, directed to the various sections of the Dirksen substitute, the matters upon which we will place our primary case in submitting them to the Senate for action in order to give us a meaningful civil rights bill.

Mr. President, I would like to conclude upon this note. We have gone to considerable pains today—and I must say for myself, into far more debate than I had anticipated—to do what my colleague, the Senator from Illinois [Mr. DOUGLAS] has always done in these debates. We have always been grateful to him. This time he was carrying so many other burdens, that he allowed me to carry this one.

I refer to presenting to the Senate at one time, in one place, the full record, as complete as we can make it. I am sure there are plenty of interstices, but we have tried, in order to bring before the Senate an outline in an orderly way, to show the wrongs which we believe need to be righted, and the techniques which we recommend for righting them.

Finally, we lay out our idea of a form of procedure which, following normal practice of the Senate, will, by the process of entertaining an amendment and voting it up or down, then going to the next one, all of them directed toward the various sections of the Dirksen substitute, will give us a completely orderly way in which the Senate can exercise

its will without any confusion and without any undue expense of time.

Mr. President, the civil rights proponents, of whom I have the honor to be one, in this way are trying to demonstrate their fidelity to the proposition that what they are seeking to attain is a result, in the most expeditious time and with full respect not only for the merits of what we are proposing and its urgent need on the part of the country and our country's leadership all over the world, but also with full respect for the views of those on the other side of the question and the sincerity of their espousals.

Mr. DOUGLAS. Mr. President, will the Senator yield?

Mr. JAVITS. I yield.

Mr. DOUGLAS. Mr. President, first I wish to congratulate the Senator from New York for his moving, able, and effective statement. It is important that he has made the record which he has made this morning.

At various times during the period that the Senator was speaking, certain Senators came up to me and asked if we were assisting the opponents of the civil rights by taking up this time. My reply always was no; that just because we believe that we have the votes to pass some kind of civil rights bill should not mean that we should refuse to discuss the issues. We who believe that the Senate should have the right ultimately to decide, also believe that there should be full and thorough discussion of the issues.

We should not depend on immediate political power, but upon basic rights and truth.

Therefore the Senator from New York has performed a great service in indicating some of the steps which he believes should be taken. I expect to vote for every one of the amendments of this tenor which he or others may propose on these matters.

However, I believe one can narrow the objectives somewhat by saying that in my mind there are three which are primarily important.

The first is a further protection of the right to register and to vote. I think much more could and can be done under the voting rights bill of 1957, but I shall not go into that question. Certainly weaknesses have developed in that act as regards registration. I hope that in the provisions which we pass on registration and voting rights we do not get tied up in legal redtape. And this is one reason why I somewhat fear an exclusive resort to the judicial processes in connection with this matter.

If we appoint a referee and confine the activities of that referee to individual cases, and require the applicants first to try to register under a State system which is hostile to them, and then deal with these issues upon appeal to the referee, with the findings of the referee in turn appealed to the district Federal judge, and with the further possibility of appeal to the circuit court and to the U.S. Supreme Court, I think we open up illimitable possibilities for delay and, by delay, the defeat of the fundamental purpose, namely, to enable a person to vote, because the election will have passed and been over for months and perhaps for

# EXHIBIT 14

a vote is a man without protection. He is virtually helpless—dependent upon the charitable impulses of others.

But a man with a vote immediately acquires status—as every one of my colleagues is well aware. He has his destiny in his own hands and he can do far more to help himself than others can do to help him.

A man with a vote also does something else. He strengthens the unity of America.

Mr. President, tonight, conscious as we are of the Civil Rights Commission report documenting areas in this Nation where great masses of American citizens are not given the opportunity to vote, what we must seek in Congress is a device which permits massive enfranchisement, because we are fighting mass disenfranchisement.

An administrative remedy more effectively reaches that end, rather than the device which lawyers know to be the delight of the side in a lawsuit which wants to drag its feet, namely, getting the court to appoint a referee or master.

___

RECESS TO 11 A.M. TOMORROW

Mr. MUSKIE. Mr. President, in accordance with the order previously entered, I move that the Senate now recess until 11 o'clock tomorrow morning.

The motion was agreed to; and (at 9 o'clock and 49 minutes p.m.) the Senate took a recess, under the order previously entered, until tomorrow, Friday, March 11, 1960, at 11 o'clock a.m.

___

CONFIRMATIONS

Executive nominations confirmed by the Senate March 10 (legislative day of March 8), 1960:

U.S. CIRCUIT COURT

Clifford O'Sullivan, of Michigan, to be U.S. circuit judge, for the sixth circuit.

U.S. ATTORNEY

William C. Spire, of Nebraska, to be U.S. attorney for the district of Nebraska for the term of 4 years.

U.S. MARSHALS

Robert C. McFadden, of Indiana, to be U.S. marshal for the southern district of Indiana for a term of 4 years.

Santos Buxo, Jr., of Puerto, Rico, to be U.S. marshal for the district of Puerto Rico for the term of 4 years.

___

# HOUSE OF REPRESENTATIVES

THURSDAY, MARCH 10, 1960

The House met at 12 o'clock noon.

The Chaplain, Rev. Bernard Braskamp, D.D., offered the following prayer:

Romans 10: 12: *The same Lord who is over all is rich unto all who call upon Him.*

Almighty God, in this moment of prayer, may we yield our minds and hearts to the promptings and persuasions of Thy holy spirit to be touched to finer and nobler ideas.

Teach us the truth, made known in the precepts and example of our blessed Lord, that we are members one of another and that by cultivating the fraternal spirit we shall gain a more vivid sense of Thy divine and universal fatherhood.

Show us how we may close the chasm between the strong and the weak, the prosperous and the unfortunate, the privileged and the handicapped by casting into it our pride and prejudice, our indifference and selfishness, and thus transform it into a highway where we may walk together in liberty and justice and blessedness for all.

Inspire our souls with a longing to achieve for mankind everywhere a life that is more abundant economically, a freedom that is coordinated with discipline and civic responsibility, and a happiness that is more abiding spiritually.

Hear us in the name of the Prince of Peace. Amen.

___

THE JOURNAL

The Journal of the proceedings of yesterday was read and approved.

___

MESSAGE FROM THE PRESIDENT

A message in writing from the President of the United States was communicated to the House by Mr. Ratchford, one of his secretaries.

___

MESSAGE FROM THE SENATE

A message from the Senate by Mr. McGown, one of its clerks, announced that the Senate had passed the following resolution:

S. RES. 286

*Resolved,* That the Senate has heard with profound sorrow and deep regret the announcement of the death of Hon. Richard L. Neuberger, late a Senator from the State of Oregon.

*Resolved,* That a committee of Senators be appointed by the President of the Senate to attend the funeral of the deceased.

*Resolved,* That the Secretary communicate these resolutions to the House of Representatives and transmit a copy thereof to the family of the deceased.

*Resolved,* That, as a further mark of respect to the memory of the deceased, the Senate do now take a recess until 9 o'clock ante meridian tomorrow.

___

CALL OF THE HOUSE

The SPEAKER. The Chair recognizes the gentleman from Mississippi [Mr. COLMER].

Mr. WILLIAMS. Mr. Speaker, I make the point of order that a quorum is not present.

The SPEAKER. Evidently a quorum is not present.

Mr. McCORMACK. Mr. Speaker, I move a call of the House.

A call of the House was ordered.

The Clerk called the roll and the following Members failed to answer to their names:

[Roll No. 19]

| Anderson, Mont. | Ford | Porter |
|---|---|---|
| Baumhart | Gavin | Powell |
| Bentley | Grant | Randall |
| Blatnik | Gray | Rooney |
| Brewster | Green, Oreg. | Shelley |
| Burleson | Inouye | Sheppard |
| Davis, Tenn. | Jensen | Spence |
| Dent | Mack, Ill. | Ullman |
| Flynn | Multer | Widnall |
| Forand | Mumma | |
| | Norblad | |

The SPEAKER. On this rollcall 400 Members have answered to their names, a quorum.

By unanimous consent further proceedings under the call were dispensed with.

___

COMMITTEE MEETING DURING SESSION OF THE HOUSE

Mr. McCORMACK. Mr. Speaker, at the request of the gentleman from Georgia [Mr. BROWN], I ask unanimous consent that Subcommittee No. 2 of the Committee on Banking and Currency may be permitted to sit today during general debate.

The SPEAKER. Is there objection to the request of the gentleman from Massachusetts?

There was no objection.

___

ANNUAL REPORT OF U.S. CIVIL SERVICE COMMISSION FOR 1959—MESSAGE FROM THE PRESIDENT OF THE UNITED STATES (H. DOC. NO. 253)

The SPEAKER laid before the House the following message from the President of the United States, which was read and, together with the accompanying papers, referred to the Committee on Post Office and Civil Service and ordered to be printed with illustrations:

*To the Congress of the United States:*

I transmit herewith the annual report of the United States Civil Service Commission for the fiscal year ended June 30, 1959.

DWIGHT D. EISENHOWER.

THE WHITE HOUSE, *March 10, 1960.*

___

REPORT OF THE RAILROAD RETIREMENT BOARD FOR FISCAL YEAR ENDED JUNE 30, 1959—MESSAGE FROM THE PRESIDENT OF THE UNITED STATES (H. DOC. NO. 267)

The SPEAKER laid before the House the following message from the President of the United States, which was read and, with accompanying papers, referred to the Committee on Interstate and Foreign Commerce:

*To the Congress of the United States:*

In compliance with the provisions of section 10(b)(4) of the Railroad Retirement Act, approved June 24, 1937, and of section 12(l) of the Railroad Unemployment Insurance Act, approved June 25, 1938, I transmit herewith for the information of the Congress, the report of the Railroad Retirement Board for the fiscal year ended June 30, 1959.

DWIGHT D. EISENHOWER.

THE WHITE HOUSE, *March 10, 1960.*

___

CIVIL RIGHTS

Mr. COLMER. Mr. Speaker, by direction of the Committee on Rules, I call up House Resolution 359 and ask for its immediate consideration.

The Clerk read the resolution, as follows:

*Resolved,* That upon the adoption of this resolution, the Speaker shall recognize the chairman of the Committee on the Judiciary, to move that the House resolve itself into the Committee of the Whole House on

the State of the Union for the consideration of the bill (H.R. 8601) to enforce constitutional rights, and for other purposes. All points of order against said bill are hereby waived. After general debate, which shall be confined to the bill and continue not to exceed two days to be equally divided and controlled by the chairman of the Committee on the Judiciary and the ranking minority member thereof, the bill shall be considered as having been read and open at any point for amendment under the five-minute rule. At the conclusion of such consideration, the Committee shall rise and report the bill to the House with such amendments as shall have been adopted, and the previous question shall be considered as ordered on the bill and amendments thereto to final passage without intervening motion except one motion to recommit with or without instructions.

With the following committee amendments:

Page 1, line 1, strike out the words "the Speaker shall recognize the chairman of the Committee on the Judiciary, to move", and insert "It shall be in order to move."

Page 1, line 7, strike out "All points of order against said bill are hereby waived."

Page 1, line 9, strike out "two days" and insert "fifteen hours."

Page 2, line 2, after the word "rule" insert "It shall be in order to consider, without the intervention of any point of order, the text of the bill, H.R. 10035, as introduced under the date of January 28, 1960, as an amendment to the bill, H.R. 8601."

Mr. COLMER. Mr. Speaker, I yield the usual 30 minutes to the gentleman from Ohio [Mr. Brown] and, pending that, I yield at this time 5 minutes to the gentleman from Indiana [Mr. Madden].

Mr. MADDEN. Mr. Speaker, I wish to commend the chairman and members of the Judiciary Committee for reporting favorably on H.R. 8601, known as the civil rights bill. When this legislation was before the Rules Committee, there was considerable discussion as to the length of time which should be allotted for House debate. It is my firm opinion that, in the final analysis, very few votes will be changed by reason of the long 15-hour period which the Rules Committee allotted as time for debate on this bill. Civil rights legislation has been discussed and rediscussed on the floor of this House in other sessions of Congress and it is my belief that practically all the Members of this legislative body have their minds made up as to how they will cast their vote on the final rollcall. No doubt there will be a number of amendments offered during the 5-minute period, and I look forward to the discussion on amendments during this period to take several days. Any or all Members can have an opportunity to discuss their position on this bill and various amendments thereto during the 5-minute period, and it is my thought that the 15-hour time for debate set aside by the Rules Committee was exorbitant and an unnecessary length of time.

It was mentioned several times at the hearing before the Rules Committee that this was a political bill and was being pressed because of the coming presidential election. I have in my hands copies of the 1952 and 1956 platforms adopted by both the Democrat and Republican conventions. In these two presidential election years both parties unequivocally adopted civil rights planks and promised the American people that if successful their respective parties would enact effective civil rights legislation.

I am satisfied that the vast majority of the people in the United States are aware that the Congress has a moral responsibility to enact legislation that will protect all the constitutional rights of all the people within our Nation's borders. Three years ago the Congress enacted the civil rights bill of 1957, which was the first law placed upon the statute books pertaining to the rights of citizens in over 80 years. No doubt some progress has been made since the 1957 bill was passed. There has been revealed in the hearings conducted by the Judiciary Committee that further legislation is necessary to implement enforcement of voting rights for all citizens. We have observed in the interim disorders and violations in the efforts to enforce the 1954 decision of the Supreme Court on desegregation in our schools; also the fact that great numbers of American citizens are still unable to exercise their fundamental American right to cast their vote in county, State, and Federal elections. The purpose of this legislation is to try to further improve provisions deemed necessary by the law-enforcement branches of our Government in their task of carrying out the legislative provisions on civil rights. The Department of Justice feels that the present laws are not sufficient to effectively impose sanctions on members of mobs who by force or threats willfully obstruct, impede, and interfere with the rights and performance of the duties under the school-desegregation order of the Federal court.

This bill also makes it a felony for anybody convicted of willfully damaging, destroying, attempting to damage or destroy by fire or explosion any building or structure used for religious or educational purposes.

Title III of the bill provides for the preservation of election records involving Federal officials. It also provides a penalty for any official who willfully steals, conceals, or mutilates ballots or records pertaining to these elections. It also provides a more effective protection of the right of all qualified citizens to vote without discrimination on account of race. This bill contains necessary provisions enabling the Government to carry out the legislation of 3 years ago which lacked suitable provisions for access to voting records and for other detailed information concerning voting applications, registrations, tests, and other acts and procedures requisite to voting. There is no existing power for the Department of Justice to require the production of these records during an investigation based on complaint of denial to vote because of race or other reasons.

This bill would also extend the life of the Civil Rights Commission for an additional 2 years. This extension is highly necessary in order to complete the study and analysis of the problems involved in this complex and difficult field. This Commission is also working on programs of research, study, and investigation in the fields of education and housing.

Title IV of this bill permits the Government to provide schooling for children of military personnel who live off Federal property and their children are denied education by reason of certain localities arbitrarily closing their schools in defiance of desegregation regulations.

The members of the Judiciary Committee who spent long hours listening to witnesses, including Government officials, pertaining to the technical phase of this legislation, are highly qualified to outline and explain to the Members detailed facts not only concerning the necessity for this legislation, but also the most practical and simplified provisions set out in this bill which will be constitutional and enforceable by the executive department of our Government.

During my 18 years in Congress, I, along with most other Members of Congress, have constantly carried on and pressed for reasonable and enforceable civil rights legislation which will give all our citizens equal justice under the law as provided for in our Constitution. The 14th amendment of the Constitution provides that every person is entitled to the equal protection of the law. Equal justice for all is also set out under our Bill of Rights. At the beginning of our Government, the Father of our Country, George Washington, emphatically stated that our Government must be based on principles that give freedom and justice to all. Our forefathers wanted to curb bigotry and give persecution no assistance or encouragement. It is also good news to millions throughout our country to realize that our Congress has been annually considering and striving for effective civil rights legislation. We are encouraged that as time marches on, we will succeed to give to all citizens the necessary protection to which they are entitled under the Federal law.

It is unfortunate that part III of the civil rights bill was deleted in the other body 3 years ago. This section protected the wide range of civil rights which the Supreme Court had decreed to be guaranteed by the Constitution. These are rights specifically set out in the 14th amendment. The national organization of the NAACP is a voluntary organization of citizens who by reason of their activities in various States have contributed greatly to bring to national attention facts concerning civil rights violations in various localities. When one reflects back during the last 30 years we can observe that progress has been made by reason of education and publicity. Progress in human relations between the races will be much more rapidly advanced in the future.

This Congress has appropriated billions of dollars since World War II to aid the economy of countries ruined by war. This year the President is asking for about $4 billion for mutual aid for neutral and undeveloped countries in order to win the minds of millions in Africa and Asia for the world democracies. We must overcome Communist propaganda in those areas. About $40

billion will be appropriated for military defense of our Nation and other nations against the Communist aggressor. A small fraction of this money should be diverted into an educational campaign among these new democracies in Africa and Asia, selling our great free democracy to the people of these new undeveloped nations.

Truth, facts, and information about communism and democracy is the greatest and cheapest weapon our Nation has to combat Communist propaganda and aggression. The passage of effective civil rights legislation for all nationalities within the United States would help curb the Communist propaganda and agitators from their greatest weapon against free government.

I hold in my hand a map of Africa, published in the U.S. News & World Report 2 weeks ago. It shows that Morocco, Libya, Sudan, Belgium Congo, Nigeria, Ghana, Guinea, Liberia, Somalia are African nations which won independent government for their people during the last 12 years. A dozen more African nations have won autonomous republics and will win their freedom in the near future.

The time is not too far distant when our Nation will fight in world competition for trade and commerce with these African independent nations. These countries will possess fabulous wealth in production, minerals, oil, and other natural resources. The first step our Government must take to compete in the economic race is to win the minds and good will of these millions in Africa who are launching on a new era of independent government and international relations. We cannot participate in this limitless African international trade resource if millions of their own nationals who are citizens of the United States are submitted to an existence of second-class citizens within our borders.

Great progress has been made in the last 25 years in all areas throughout the United States in overcoming bigotry and prejudice as to employment and other angles of civil rights. Negroes are rendering great service in my congressional district as public officials and in other capacities of civil service to their community and government.

On the national and international scene, to mention but a few, Ralph Bunche of United Nations and Nobel Prize winner; Federal Judge William H. Hastie, former Governor of the Virgin Islands; Ernest Williams, E. Frederick Morrow, Roy Wilkins, Dr. Channing H. Tobias, Charles H. Houston, Frederick Douglas, Carter Woodson, Booker T. Washington, George Washington Carver, Gen. Benjamin O. Davis, and his son, Colonel Davis, commander of the 99th Fighter Squadron in Europe during World War II. Among the distinguished Negro women, Mary McLeod Bethune, Harriet Tubman, Edith Sampson, Marian Anderson, and to the list of both men and women could be added many more Negro names who have made invaluable contributions to their community, State, Nation, and to the peace of the world.

Patriotic Negroes of America only ask that their future generations are not called upon to combat the economic and educational impediments which their ancestors endured.

The enactment of H.R. 8601 will mark a milestone in the long fight to make practical and implement all the provisions of the U.S. Constitution for all humans who are citizens under the American flag.

Mr. BROWN of Ohio. Mr. Speaker, I yield myself such time as I may consume.

Mr. HALLECK. Mr. Speaker, will the gentleman yield to me before he begins his statement?

Mr. BROWN of Ohio. I yield to the gentleman from Indiana, the minority leader.

Mr. HALLECK. Mr. Speaker, I would like to say at this point that I am glad this measure is before us. I am glad it is before us by reason of the action of the Committee on Rules.

Just as a matter of record the measure was reported by the Committee on the Judiciary late in the last session. Time had pretty well run out on the session. When we met in January of this year there was quite a bit of conversation around in different places about bringing up the bill and how it might be brought up. I took the position and many others took the position that it ought to come up under action of the Committee on Rules in the regular way. And that is the way the measure is now before us.

So I just want to say now that I trust that when the time comes to vote on the adoption of the rule it will be adopted. I should like a rollcall vote and I trust the gentleman from Ohio will insist on getting it. Then we will have a chance to demonstrate that we want this bill considered on its merits under an open rule and, in fact, a more than open rule, because the rule provides for the consideration of the latest proposal which has to do with voting referees.

Mr. BROWN of Ohio. Mr. Speaker, I thank the gentleman from Indiana for his comment.

Mr. Speaker, as I am sure most of us know, House Resolution 359, as amended, makes in order the consideration of H.R. 8601, the so-called civil rights bill—over which there is, of course, much controversy—all under an open rule, with 15 hours of general debate.

Those of you who may have a copy of the resolution, which bears the name of Mr. CELLER, will note his original measure was amended and reported favorably by the Committee on Rules on February 23, last. As a member of the Rules Committee, I moved the adoption of this resolution with the amendments thereto. Under its provisions, the House is authorized to resolve itself into a Committee of the Whole House on the State of the Union for consideration of H.R. 8601, to enforce certain constitutional rights, under general debate which shall be confined to the bill and continue, not to exceed 15 hours, to be equally divided and controlled by the chairman of the Committee on the Judiciary and the ranking minority member thereof. Following this, the bill shall be considered as having been read and open at any point for amendment under the 5-minute rule,

at which time it shall be in order to offer and to consider, without the intervention of any point of order, as an amendment, the text of the bill H.R. 10035 as introduced under date of January 28, 1960, by Congressman McCulloch, a member of the Judiciary Committee. The rule also provides for the usual one motion to recommit, with or without instructions.

In voting to report this resolution, and the rule it provides, for the consideration of the House, the majority of the membership of the Rules Committee, after long discussion, believed it proper to give to all Members full opportunity to express themselves on this legislation. Thus, 15 hours of general debate has been provided for, instead of 2 legislative days, as originally proposed.

Since H.R. 8601 was originally reported from the House Committee on the Judiciary by its chairman and author, the gentleman from New York [Mr. CELLER], in late August, last year, just a short time before the 1st session of the 86th Congress adjourned, it was discovered H.R. 8601 did not provide methods or means to properly protect the right of each qualified citizen to vote in any and all elections. So various new proposals or bills were considered by the Committee on the Judiciary throughout most of February, with that august committee still sitting at the time the Rules Committee took action and reported this resolution.

The question arose as to whether or not any bill, carrying either the Federal registrar or the Federal court referee provision, for enforcing the rights of qualified citizens to vote would be held germane to the original measure, H.R. 8601, as written. So there could be no question of germaneness, the majority of the members of the Rules Committee accepted an amendment, which I offered, to make in order the text of the bill, H.R. 10035 as an amendment to H.R. 8601.

H.R. 10035, or the so-called McCulloch bill, would not only amend H.R. 8601, but also the Civil Rights Act of 1957, so as to provide for Federal court appointment of voting referees. Of course, H.R. 10035, being made in order and offered as an amendment to H.R. 8601, can, in turn, be amended. In other words, an amendment to the amendment can be offered. So, under this rule, which is an open one, the House can work its will on this legislation, which deals with the important issue of constitutional and civil rights.

For many, many years most of the civil rights provided for in this legislation, and especially the right of all qualified citizens to vote, have not created any great problems or issues in many of our so-called Northern States. Instead, as you all know—and there is no reason why we should not discuss this matter frankly—most of this legislation is directed at protecting constitutional rights or civil rights—and especially the right of all qualified citizens to vote—in but a few of our Southern States.

Many of the opponents of this type of legislation feel its enactment will endanger State and local rights. Being well acquainted with the South, as well

As a practical matter, Federal authorities do not now have the authority necessary to do the job. The contempt power is too restrictive, while the obstruction-of-justice statutes are too limited. The dilemma of Federal authorities at Little Rock was described by Attorney General Rogers at the committee hearings last year. Regarding the contempt power, he had this to say:

A mob was incited to resist the orders of the court concerning the operation of the school. This conduct did not involve contempt of the decree which ordered the school desegregated, since the persons responsible were not parties to that decree, and there was no proof that they acted in concert with those named in the decree.

The limited authority of our present obstruction-of-justice statutes was also commented on by the Attorney General, as follows:

There is so much doubt as to the scope of the present law that arrests of mob leaders or others by Federal authorities would be precarious and their prosecution probably unsuccessful.

Enactment of title I of H.R. 8601 would serve to fill this enforcement gap. I, therefore, urge favorable consideration for this valuable enforcement tool upon which the Government could rely in dealing with those who would use force and threats of force to obstruct orderly and deliberate school desegregation.

TITLE II

Title II of H.R. 8601 seeks to deal with another facet of potential lawlessness in the emotionally charged area of civil rights. In recent years, the Nation has been both shocked and outraged by a rash of bombings of churches and schools. While local law enforcement officials have been diligent in their attempts to apprehend and stamp out this type of crime, their efforts have not always been successful. The reason for such failure is that bombings present extremely difficult problems of investigation and detection. Unlike the ordinary type of offense that authorities have to deal with, clues and other evidence are ordinarily destroyed in a bombing. Furthermore, the offenders sometimes flee across State lines to avoid prosecution.

With the best will in the world, local officials have, therefore, been unable to cope with the problem in some States, both North and South. The reason is that they usually do not possess the scientific equipment and training essential to do the job.

Enactment of title II would bring into action the Nation's leading law enforcement organization, the Federal Bureau of Investigation, in partnership with local officials. The Bureau's tremendous resources and scientific skills could be utilized to stamp out this most heinous offense.

Specifically, title II would amend the Criminal Code, title 18, chapter 49, so as to make it a felony to move or travel in interstate or foreign commerce to avoid prosecution for willfully destroying or attempting to destroy real or personal property, public or private, by fire or explosion.

As originally recommended by President Eisenhower, this proposal was limited to bombings of religious and educational institutions. Our hearings last year brought out the fact, however, that the problem of bombings and the difficulties in solving them was not limited to the field of civil rights.

The committee, therefore, objected to restricting the application of the proposal to schools and churches—and I must say, I fully supported their reasoning.

No logical argument was presented, and none occurs to me now, which would justify restricting the coverage of this proposal based upon the type of facility involved. Bombings are universally reprehensible. Since they are all equally difficult of solution, they are all worthy of Congressional cognizance.

A majority of the committee was of the opinion that all citizens are entitled to the protection of life and limb where they live, where they worship, where they learn and where they earn.

The approach of the flight provision is neither new nor novel. It was long ago adopted to deal with the very special problems of law enforcement arising out of our Federal-State system. The Fugitive Felon Act (18 U.S.C. 1073) was enacted in 1934. It outlaws travel in interstate commerce to avoid State prosecution for certain more serious criminal offenses.

The intervening quarter century has shown that this approach works, and works well, to maintain effective law enforcement while, at the same time, keeping responsibility where it belongs, on the local level.

Far from supplanting State enforcement machinery, Federal activities under the act have been complementary in nature—the FBI serving as an adjunct of, rather than as a replacement for, the local agency.

Thus it is, that fugitives apprehended out of the State where the offense was committed, in an overwhelming percent of cases, are returned with dispatch for trial and punishment to the jurisdiction where the offense was committed. In 1957, for example, of the 947 fugitives located by the Bureau, only 9 were ever prosecuted in the Federal courts.

TITLE III

The subject of voting has been much in the news of late. Universally recognized as the very cornerstone of representative government, few Americans will condone the arbitrary denial of the elective franchise to a qualified citizen. President Eisenhower, in his message to the Congress last year, said:

The right to vote, the keystone of democratic self-government, must be available to all qualified citizens without discrimination.

In 1957, this body acted to insure that all Americans would be secure in the elective franchise. The Civil Rights Act, passed that year, was directly aimed at protecting the right of all eligible citizens to vote. But events brought to light in the intervening period have shown that our efforts have not been fully effective.

State voting records have, in some instances, been withheld from Federal authorities investigating alleged denial of the elective franchise to qualified citizens. Certain States have condoned or authorized the destruction of election records and have adopted devices calculated to keep qualified Negroes from expressing their will at the polls. Proposed, pending, or passed in the legislatures of some States are measures authorizing the destruction of voting records soon after elections in order to prevent their inspection and use by Federal investigators.

The dilemma faced by law enforcement officials attempting to investigate allegations that the right to vote has been denied was sketched clearly and succinctly by Attorney General William P. Rogers at hearings of the Judiciary Committee last Spring. I should like to quote a brief exerpt from his testimony. It appears on page 211 of the printed transcript:

Proof of denial or threatened denial of the right to vote because of racial discrimination requires a showing not only that qualified persons are not permitted to register or vote, but that the denial is based on racial discrimination. This calls for evidence that individuals of a particular race had in fact either satisfactorily demonstrated their qualifications under State law or that they were able to demonstrate their qualifications and had offered to do so and were, nevertheless, not allowed to register or vote, while individuals of another race no better qualified, had been permitted to register or vote.

To assemble the necessary proof of discrimination is impracticable, if not impossible, without access to detailed information concerning applications, registrations, or other acts, tests, and procedures requisite to voting. From such information, it becomes possible to determine who has been permitted to register or vote and who has not, and to make a breakdown on the basis of race. The only source of such comparative information—necessary for proper evaluation of complaints and in the preparation of cases—is the records of registrations or other action required for exercise of the franchise.

The Department of Justice has no existing power in civil proceedings to require the production of such records during any investigation it conducts as to complaints that qualified persons have been denied the right to vote in violation of Federal law. The need for this power is evident from the refusal of some State and local authorities to permit inspection.

Title III is designed to fill this need. It would require that Federal election records be preserved by the States for a period of 3 years. General, special or primary elections in which Federal candidates were involved would be covered by the provision.

Willful failure to preserve such records by duly appointed officers, or their willful theft or destruction by any person, would be punishable by a $1,000 fine, a year imprisonment, or both.

Voting records preserved under title III would be subject to inspection and copying upon demand made by the Attorney General or his representative in the district in which said papers were located.

Local U.S. district courts would have jurisdiction to compel the production of demanded documents by appropriate process.

To insure that this provision will be used and not abused, records procured

under it would be for official use of authorized governmental agencies only.

It is noteworthy that under the proposed title III, no power of removal by subpena is authorized to the Attorney General. Such power was withheld deliberately so that such records would always be available to local officers for official use.

I shall have more to say on the subject of protection of the elective franchise at a later time in this debate.

### TITLE IV

Turning now to title IV of H.R. 8601, I have only a few remarks to make relating to the Commission on Civil Rights.

As reported by the Judiciary Committee last year, title IV of H.R. 8601 not only provided for the extension of the Commission for an additional 2 years, but, in addition, it contained two amendments aimed at assisting it in its assigned duties.

The first amendment would remove any doubt, and doubt apparently exists, as to the authority of members of the Commission to administer oaths. Since the original act setting up the Commission requires that complaints submitted to it be by oath or affirmation, it seems reasonable that we confer such power upon the Commissioners.

The second amendment approved by the committee related to the staffing problems experienced by the Commission as a result of the legislative requirement that personnel be selected in accordance with civil service and classification laws.

The record shows that partisanship in appointments to the Commission have been nonexistent. If anything, the administration has "leaned over backward" to avoid even the appearance of partisan motivation in the selection of personnel.

Therefore, granting this authority can reasonably be supported by everyone interested in seeing that the Commission continues the excellent job it has begun.

### TITLE V

The final provision of H.R. 8601, title V, deals with the important problem of providing education for children of military personnel where State administered schools are closed because of desegregation decisions or orders. President Eisenhower made this compelling observation:

The Federal Government has a particular responsibility for the children of military personnel in federally affected areas, since armed services personnel are located there under military orders rather than of their own free choice.

Under existing statutes, the Commissioner of Education is empowered to provide for the education of children of members of the Armed Forces when local facilities are inadequate or nonexistent. But the law, as it stands contains a serious limitation. Only children of personnel residing on Federal property are eligible for benefits. Such an exclusion from coverage is not justified under present conditions.

Enactment of title V would remedy this defect. Specifically, it would amend the act of September 30, 1950—Public

Law 874, 81st Congress—so as to authorize the Commissioner of Education to provide schools for servicemen's children where local schools are closed as a result of official State or local action. Temporary facilities would then be set up, without regard to whether or not the children affected reside on or off the base.

Additionally, future grants to federally impacted areas would be conditioned upon assurance that if schools constructed with such funds were closed, they would be delivered to the Commissioner of Education, upon request, in order that a temporary educational program could be established.

During the period of Federal occupancy a reasonable rental would, of course, be paid. And when the facilities were no longer needed, that is when the local schools had reopened, they would be returned to local authority upon a request approved by the Commissioner.

I believe that enactment of title V is warranted at this time. While the Supreme Court's program of school integration is proceeding satisfactorily, it is far from completed. New crises may arise in the future—some of them affecting children of members of the services.

Title V would provide, in the words of Secretary of Health, Education, and Welfare, Dr. Arthur Flemming, "a practical and promptly usable method, on a standby basis, for meeting a serious problem if it arises." It would give "assurance that military personnel ordered to duty in certain States will not be placed in the impossible situation of having to undertake emergency and makeshift arrangements for the education of their children, with the Federal Government powerless to assist."

The rule which we have just adopted has, in effect, made in order the voting-referee bill, H.R. 10035, which I introduced on January 28, 1960. So that this bill and the improved version thereof, H.R. 10625, which I introduced on February 23, 1960, which will be offered as an amendment or substitute at the proper time, will be on each Member's desk tomorrow, I shall ask unanimous consent in the House that both bills be incorporated in the RECORD at this point:

### H.R. 10035

A bill to amend the Civil Rights Act of 1957 by providing for court appointment of United States voting referees, and for other purposes

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That section 2004 of the Revised Statutes (42 U.S.C. 1971), as amended by section 131 of the Civil Rights Act of 1957 (71 Stat. 637), is amended as follows:

(a) Add the following as subsection (e) and designate the present subsection (e) subsection "(f)":

"In any proceeding instituted pursuant to subsection (c) of this section, in the event the court finds that under color of law or by State action any person or persons have been deprived on account of race or color of any right or privilege secured by subsection (a) or (b) of this section, and that such deprivation was or is pursuant to a pattern or practice, the court may appoint one or more persons (to be known as voting referees) to receive applications from any person claiming such deprivation as to the right to regis-

ter or otherwise to qualify to vote at any election and to take evidence and report to the court findings as to whether such applicants or any of them (1) are qualified to vote at any election, and (2) have been (a) deprived of the opportunity to register to vote or otherwise to qualify to vote at any election, or (b) found by State election officials not qualified to register to vote or to vote at any election.

"Any report of any person or persons appointed pursuant to this subsection shall be reviewed by the court and the court shall accept the findings contained in such report unless clearly erroneous. The court shall issue a supplementary decree which shall specify which person or persons named in the report are qualified and entitled to vote at any election within such period as would be applicable if such person or persons had been registered or otherwise qualified under State law. The Attorney General shall cause to be transmitted certified copies of the original decree and any supplementary decree to the appropriate election officials of the State, and any such official who, with notice of such original or supplementary decree, refuses to permit any person, named as qualified to vote in such original or supplementary decree, to vote at any election covered thereby, or to have the vote of any such person counted, may be proceeded against for contempt.

"The court may authorize such person or persons appointed pursuant to this subsection to issue to each person named in the original decree or any supplementary decree as qualified and entitled to vote at an election, a certificate identifying the holder thereof as a person qualified and entitled, pursuant to the court's original decree or supplementary decree to vote at any such election.

"The court may authorize such person or persons appointed pursuant to this subsection (or may appoint any other person or persons) (1) to attend at any time and place for holding any election at which any person named in the court's original decree or any supplementary decree is entitled to vote and report to the court whether any such person has been denied the right to vote, and (2) to attend at any time and place for counting the votes cast at any election at which any person named in the court's original decree or any supplementary decree is entitled to vote and report to the court whether any vote cast by any such person has not been properly counted.

"Any person or persons appointed by the court pursuant to this subsection shall have all the powers conferred upon a master by rule 53 (c) of the Federal Rules of Civil Procedure. The compensation to be allowed to any person or persons appointed by the court pursuant to this subsection shall be fixed by the court and shall be payable by the United States.

"The court shall have authority to take any other actions, consistent with the provisions of this subsection, reasonably appropriate or necessary to enforce its decrees."

(b) Add the following sentence at the end of subsection (c):

"When any official of a State or subdivision thereof has resigned or has been relieved of his office and no successor has assumed such office, any act or practice of such official constituting a deprivation of any right or privilege secured by subsection (a) or (b) hereof shall be deemed that of the State and the proceeding may be instituted or continued against the State as party defendant."

### H.R. 10625

A bill to amend the Civil Rights Act of 1957 by providing for court appointment of United States voting referees, and for other purposes

*Be it enacted by the Senate and House of Representatives of the United States of*

EXHIBIT 15

634    PUBLIC LAW 85-315—SEPT. 9, 1957    [71 STAT.

Public Law 85-315

September 9, 1957
[H. R. 6127]

AN ACT

To provide means of further securing and protecting the civil rights of persons within the jurisdiction of the United States.

Civil Rights Act
of 1957.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

PART I—ESTABLISHMENT OF THE COMMISSION ON CIVIL RIGHTS

SEC. 101. (a) There is created in the executive branch of the Government a Commission on Civil Rights (hereinafter called the "Commission").

(b) The Commission shall be composed of six members who shall be appointed by the President by and with the advice and consent of the Senate. Not more than three of the members shall at any one time be of the same political party.

(c) The President shall designate one of the members of the Commission as Chairman and one as Vice Chairman. The Vice Chairman shall act as Chairman in the absence or disability of the Chairman, or in the event of a vacancy in that office.

(d) Any vacancy in the Commission shall not affect its powers and shall be filled in the same manner, and subject to the same limitation with respect to party affiliations as the original appointment was made.

(e) Four members of the Commission shall constitute a quorum.

RULES OF PROCEDURE OF THE COMMISSION

SEC. 102. (a) The Chairman or one designated by him to act as Chairman at a hearing of the Commission shall announce in an opening statement the subject of the hearing.

(b) A copy of the Commission's rules shall be made available to the witness before the Commission.

(c) Witnesses at the hearings may be accompanied by their own counsel for the purpose of advising them concerning their constitutional rights.

(d) The Chairman or Acting Chairman may punish breaches of order and decorum and unprofessional ethics on the part of counsel, by censure and exclusion from the hearings.

(e) If the Commission determines that evidence or testimony at any hearing may tend to defame, degrade, or incriminate any person, it shall (1) receive such evidence or testimony in executive session; (2) afford such person an opportunity voluntarily to appear as a witness; and (3) receive and dispose of requests from such person to subpena additional witnesses.

(f) Except as provided in sections 102 and 105 (f) of this Act, the Chairman shall receive and the Commission shall dispose of requests to subpena additional witnesses.

Evidence or
testimony.
Release.

(g) No evidence or testimony taken in executive session may be released or used in public sessions without the consent of the Commission. Whoever releases or uses in public without the consent of the Commission evidence or testimony taken in executive session shall be fined not more than $1,000, or imprisoned for not more than one year.

(h) In the discretion of the Commission, witnesses may submit brief and pertinent sworn statements in writing for inclusion in the record. The Commission is the sole judge of the pertinency of testimony and evidence adduced at its hearings.

(i) Upon payment of the cost thereof, a witness may obtain a transcript copy of his testimony given at a public session or, if given at an executive session, when authorized by the Commission.

(j) A witness attending any session of the Commission shall receive $4 for each day's attendance and for the time necessarily occupied in going to and returning from the same, and 8 cents per mile for going from and returning to his place of residence. Witnesses who attend at points so far removed from their respective residences as to prohibit return thereto from day to day shall be entitled to an additional allowance of $12 per day for expenses of subsistence, including the time necessarily occupied in going to and returning from the place of attendance. Mileage payments shall be tendered to the witness upon service of a subpena issued on behalf of the Commission or any subcommittee thereof.

*Witness fees.*

(k) The Commission shall not issue any subpena for the attendance and testimony of witnesses or for the production of written or other matter which would require the presence of the party subpenaed at a hearing to be held outside of the State, wherein the witness is found or resides or transacts business.

### COMPENSATION OF MEMBERS OF THE COMMISSION

SEC. 103. (a) Each member of the Commission who is not otherwise in the service of the Government of the United States shall receive the sum of $50 per day for each day spent in the work of the Commission, shall be reimbursed for actual and necessary travel expenses, and shall receive a per diem allowance of $12 in lieu of actual expenses for subsistence when away from his usual place of residence, inclusive of fees or tips to porters and stewards.

(b) Each member of the Commission who is otherwise in the service of the Government of the United States shall serve without compensation in addition to that received for such other service, but while engaged in the work of the Commission shall be reimbursed for actual and necessary travel expenses, and shall receive a per diem allowance of $12 in lieu of actual expenses for subsistence when away from his usual place of residence, inclusive of fees or tips to porters and stewards.

### DUTIES OF THE COMMISSION

SEC. 104. (a) The Commission shall—

(1) investigate allegations in writing under oath or affirmation that certain citizens of the United States are being deprived of their right to vote and have that vote counted by reason of their color, race, religion, or national origin; which writing, under oath or affirmation, shall set forth the facts upon which such belief or beliefs are based;

(2) study and collect information concerning legal developments constituting a denial of equal protection of the laws under the Constitution; and

(3) appraise the laws and policies of the Federal Government with respect to equal protection of the laws under the Constitution.

(b) The Commission shall submit interim reports to the President and to the Congress at such times as either the Commission or the President shall deem desirable, and shall submit to the President and to the Congress a final and comprehensive report of its activities, findings, and recommendations not later than two years from the date of the enactment of this Act.

*Reports to President and Congress.*

(c) Sixty days after the submission of its final report and recommendations the Commission shall cease to exist.

*Termination of Commission.*

636                    PUBLIC LAW 85-315—SEPT. 9, 1957          [71 STAT.

### POWERS OF THE COMMISSION

Staff director.    SEC. 105. (a) There shall be a full-time staff director for the Commission who shall be appointed by the President by and with the advice and consent of the Senate and who shall receive compensation at a rate, to be fixed by the President, not in excess of $22,500 a year. The President shall consult with the Commission before submitting the nomination of any person for appointment to the position of staff director. Within the limitations of its appropriations, the Commission may appoint such other personnel as it deems advisable, in accordance with the civil service and classification laws, and may procure services as authorized by section 15 of the Act of August 2, 1946 (60 Stat. 810; 5 U. S. C. 55a), but at rates for individuals not in excess of $50 per diem.

(b) The Commission shall not accept or utilize services of voluntary or uncompensated personnel, and the term "whoever" as used in paragraph (g) of section 102 hereof shall be construed to mean a person whose services are compensated by the United States.

(c) The Commission may constitute such advisory committees within States composed of citizens of that State and may consult with governors, attorneys general, and other representatives of State and local governments, and private organizations, as it deems advisable.

(d) Members of the Commission, and members of advisory committees constituted pursuant to subsection (c) of this section, shall be exempt from the operation of sections 281, 283, 284, 434, and 1914 of title 18 of the United States Code, and section 190 of the Revised Statutes (5 U. S. C. 99).

62 Stat. 697 et seq.

(e) All Federal agencies shall cooperate fully with the Commission to the end that it may effectively carry out its functions and duties.

Hearings, etc.    (f) The Commission, or on the authorization of the Commission any subcommittee of two or more members, at least one of whom shall be of each major political party, may, for the purpose of carrying out the provisions of this Act, hold such hearings and act at such times and places as the Commission or such authorized subcommittee

Subpenas.    may deem advisable. Subpenas for the attendance and testimony of witnesses or the production of written or other matter may be issued in accordance with the rules of the Commission as contained in section 102 (j) and (k) of this Act, over the signature of the Chairman of the Commission or of such subcommittee, and may be served by any person designated by such Chairman.

(g) In case of contumacy or refusal to obey a subpena, any district court of the United States or the United States court of any Territory or possession, or the District Court of the United States for the District of Columbia, within the jurisdiction of which the inquiry is carried on or within the jurisdiction of which said person guilty of contumacy or refusal to obey is found or resides or transacts business, upon application by the Attorney General of the United States shall have jurisdiction to issue to such person an order requiring such person to appear before the Commission or a subcommittee thereof, there to produce evidence if so ordered, or there to give testimony touching the matter under investigation; and any failure to obey such order of the court may be punished by said court as a contempt thereof.

### APPROPRIATIONS

SEC. 106. There is hereby authorized to be appropriated, out of any money in the Treasury not otherwise appropriated, so much as may be necessary to carry out the provisions of this Act.

### PART II—To Provide for an Additional Assistant Attorney General

Sec. 111. There shall be in the Department of Justice one additional Assistant Attorney General, who shall be appointed by the President, by and with the advice and consent of the Senate, who shall assist the Attorney General in the performance of his duties, and who shall receive compensation at the rate prescribed by law for other Assistant Attorneys General.

### PART III—To Strengthen the Civil Rights Statutes, and for Other Purposes

Sec. 121. Section 1343 of title 28, United States Code, is amended as follows:

62 Stat. 932.

(a) Amend the catch line of said section to read,

"§ 1343. Civil rights and elective franchise"

(b) Delete the period at the end of paragraph (3) and insert in lieu thereof a semicolon.

(c) Add a paragraph as follows:

"(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote."

Sec. 122. Section 1989 of the Revised Statutes (42 U. S. C. 1993) is hereby repealed.

Repeal.

### PART IV—To Provide Means of Further Securing and Protecting the Right To Vote

Sec. 131. Section 2004 of the Revised Statutes (42 U. S. C. 1971), is amended as follows:

(a) Amend the catch line of said section to read, "Voting rights".

(b) Designate its present text with the subsection symbol "(a)".

(c) Add, immediately following the present text, four new subsections to read as follows:

"(b) No person, whether acting under color of law or otherwise, shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to vote or to vote as he may choose, or of causing such other person to vote for, or not to vote for, any candidate for the office of President, Vice President, presidential elector, Member of the Senate, or Member of the House of Representatives, Delegates or Commissioners from the Territories or possessions, at any general, special, or primary election held solely or in part for the purpose of selecting or electing any such candidate.

"(c) Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice which would deprive any other person of any right or privilege secured by subsection (a) or (b), the Attorney General may institute for the United States, or in the name of the United States, a civil action or other proper proceeding for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order. In any proceeding hereunder the United States shall be liable for costs the same as a private person.

"(d) The district courts of the United States shall have jurisdiction of proceedings instituted pursuant to this section and shall exercise the same without regard to whether the party aggrieved shall have exhausted any administrative or other remedies that may be provided by law.

"(e) Any person cited for an alleged contempt under this Act shall be allowed to make his full defense by counsel learned in the law; and the court before which he is cited or tried, or some judge thereof, shall immediately, upon his request, assign to him such counsel, not exceeding two, as he may desire, who shall have free access to him at all reasonable hours. He shall be allowed, in his defense to make any proof that he can produce by lawful witnesses, and shall have the like process of the court to compel his witnesses to appear at his trial or hearing, as is usually granted to compel witnesses to appear on behalf of the prosecution. If such person shall be found by the court to be financially unable to provide for such counsel, it shall be the duty of the court to provide such counsel."

PART V—TO PROVIDE TRIAL BY JURY FOR PROCEEDINGS TO PUNISH CRIMINAL CONTEMPTS OF COURT GROWING OUT OF CIVIL RIGHTS CASES AND TO AMEND THE JUDICIAL CODE RELATING TO FEDERAL JURY QUALIFICATIONS

Criminal contempt.
Penalties.

SEC. 151. In all cases of criminal contempt arising under the provisions of this Act, the accused, upon conviction, shall be punished by fine or imprisonment or both: *Provided however*, That in case the accused is a natural person the fine to be paid shall not exceed the sum of $1,000, nor shall imprisonment exceed the term of six months: *Provided further*, That in any such proceeding for criminal contempt, at the discretion of the judge, the accused may be tried with or without a jury: *Provided further, however*, That in the event such proceeding for criminal contempt be tried before a judge without a jury and the sentence of the court upon conviction is a fine in excess of the sum of $300 or imprisonment in excess of forty-five days, the accused in said proceeding, upon demand therefor, shall be entitled to a trial de novo before a jury, which shall conform as near as may be to the practice in other criminal cases.

Nonapplicability.

This section shall not apply to contempts committed in the presence of the court or so near thereto as to interfere directly with the administration of justice nor to the misbehavior, misconduct, or disobedience, of any officer of the court in respect to the writs, orders, or process of the court.

Nor shall anything herein or in any other provision of law be construed to deprive courts of their power, by civil contempt proceedings, without a jury, to secure compliance with or to prevent obstruction of, as distinguished from punishment for violations of, any lawful writ, process, order, rule, decree, or command of the court in accordance with the prevailing usages of law and equity, including the power of detention.

62 Stat. 951.

SEC. 152. Section 1861, title 28, of the United States Code is hereby amended to read as follows:

"§ 1861. Qualifications of Federal jurors

"Any citizen of the United States who has attained the age of twenty-one years and who has resided for a period of one year within the judicial district, is competent to serve as a grand or petit juror unless—

"(1) He has been convicted in a State or Federal court of record of a crime punishable by imprisonment for more than one year and his civil rights have not been restored by pardon or amnesty.

"(2) He is unable to read, write, speak, and understand the English language.

"(3) He is incapable, by reason of mental or physical infirmities to render efficient jury service."

Short title.

SEC. 161. This Act may be cited as the "Civil Rights Act of 1957".
Approved September 9, 1957.

EXHIBIT 16



NO POSTAGE
NECESSARY
IF MAILED
IN THE
UNITED STATES

## BUSINESS REPLY MAIL

FIRST-CLASS MAIL        PERMIT NO. 85814        SACRAMENTO CA

POSTAGE WILL BE PAID BY ADDRESSEE

SHIRLEY N. WEBER, PH.D.
SECRETARY OF STATE
ELECTIONS DIVISION
PO BOX 4045
SACRAMENTO CA   95812-9925

## SOS

### Important Registration Information

- To vote in the next election, you **must** be at least 18 years old on Election Day and mail or deliver this card at least **15 days** before the next election.
- If you miss the 15-day deadline, you can still register and vote. Contact your county elections official.
- 16- and 17-year-olds that pre-register to vote will automatically be registered voters when they turn 18.
- New voters that register by mail may have to show a form of identification the first time they vote, if they didn't provide a driver license or SSN when registering.
- Once registered, you may vote for any candidate for state or congressional office, regardless of the candidate's or your party preference or lack of party preference.

### Can I vote by mail in the next election?

Yes. County elections officials mail vote-by-mail ballots to all active registered voters.

### Questions, problems, or to report fraud?

Contact the Secretary of State's office:
- **(800) 345-VOTE (8683)**
- www.sos.ca.gov/elections
- elections@sos.ca.gov    • RegisterToVote.ca.gov

Or contact your local elections office.

### Can I check my voter registration status?

Yes! Check online at:
https://voterstatus.sos.ca.gov

### ⚠ Safe at Home

If sharing your address could put you in life threatening danger, you may be eligible to register to vote confidentially.

For more information, contact the Safe at Home program.

Safe at Home: **(877) 322-5227**
Online: **SafeAtHome.sos.ca.gov**

### ¿Cómo puedo verificar si ya estoy inscrito o no?

Puede consultarlo en línea en:
https://voterstatus.sos.ca.gov

### ⚠ Safe at Home (Seguro en su casa)

Si el poner su dirección puede poner en peligro su vida, puede ser elegible para inscribirse para votar en forma confidencial.

Para obtener más información, comuníquese con el programa Safe at Home (Seguro en su casa).

Safe at Home: **(877) 322-5227**
En línea: **SafeAtHome.sos.ca.gov**

### Información importante de inscripción

- Para votar en la próxima elección, **tiene que** tener al menos 18 años de edad para el día de la elección y enviar por correo o entregar esta tarjeta por lo menos **15 días** a ntes de la próxima elección.
- Si se pasa de la fecha límite de 15 días, igual se puede inscribir y votar. Comuníquese con el funcionario electoral de su condado.
- Las personas de 16 y 17 años que se preinscriban para votar serán automáticamente votantes inscritos cuando cumplan 18 años de edad.
- Los votantes nuevos que se inscribieron por correo y no indicaron su número de licencia de manejar ni del Seguro Social, pueden tener que mostrar un documento de identidad la primera vez que voten.
- Una vez inscrito, puede votar por cualquier candidato a un cargo estatal o del Congreso, sin importar la preferencia partidaria de usted o del candidato, o incluso si no tienen preferencia partidaria.

### ¿Puedo votar por correo en la próxima elección?

Sí. Los funcionarios electorales del condado envían las boletas electorales de votación por correo a todos los votantes registrados activos.

### Preguntas, problemas o para denunciar fraude:

Póngase en contacto con la Secretaría de Estado al:
- **(800) 232-8682**
- www.sos.ca.gov/elections
- elections@sos.ca.gov    • RegisterToVote.ca.gov
O comuníquese con la oficina electoral de su condado.

For election information in other languages, please visit: www.sos.ca.gov, or call:
Para obtener información electoral en otros idiomas, visite: www.sos.ca.gov, o llame al:

| | | |
|---|---|---|
| Español: (800) 232-8682 | 한국어: (866) 575-1558 | ใหย: (888) 345-2692 |
| 中文: (800) 339-2857 | Tagalog: (800) 339-2957 | हिंदी: (888) 345-4917 |
| Việt ngữ: (800) 339-8163 | 日本語: (800) 339-2865 | ਪੰਜਾਬੀ: (855) 345-3933 |

## California Voter Registration/Pre-Registration Application
## Solicitud de Inscripción/Preinscripción de Votante de California



(Rev. 01/23) SOS/ES 25 159932_35

SHIRLEY N. WEBER, PH.D.
SECRETARY OF STATE
ELECTIONS DIVISION
1500 11TH STREET
SACRAMENTO CA 95814-5701

# California Voter Registration Application
# Solicitud de Inscripción/Preinscripción de Votante de California

## SOS

Print clearly using blue or black ink. Use this form if you: (1) are a new voter, (2) are pre-registering to vote, (3) have changed your name, (4) have moved and need to update your voter registration address, or (5) want to change your political party preference. **You can also register to vote online at RegisterToVote.ca.gov.** — Escriba en letra de molde usando tinta azul o negra. Use este formulario si: (1) es votante nuevo; (2) se está preinscribiendo para votar; (3) cambió de nombre; (4) se mudó y tiene que actualizar el domicilio en su inscripción de votante; o (5) quiere cambiar su preferencia de partido político. **También puede inscribirse en línea en RegisterToVote.ca.gov.**

**Qualifications / Requisitos** — **1**

I am a U.S. citizen and resident of California .......................... ☐ Yes–Sí   ☐ No
Soy ciudadano de EE.UU. y residente de California

I am 18 or older — Tengo al menos 18 años de edad ..................... ☐ Yes–Sí   ☐ No
I am 16 or 17 and want to pre-register .................................... ☐ Yes–Sí   ☐ No
Tengo 16 y 17 años de edad y quiero preinscribirme

If "No," you CANNOT register. – Si "No", NO PUEDE inscribirse para votar.

Only choose one. – Elija solo una.

**Your legal name / Su nombre legal** — **2**

☐ Mr. – Sr.   ☐ Ms. – Sra.   ☐ Mrs. – Sra.   ☐ Miss – Srta.   *(optional) – (optativo)*

First – Primer nombre                    Middle – Segundo nombre

Last *(including suffix, such as Jr., Sr., III)* – Apellido *(con sufijo, como Jr., Sr., III)*

**Identification / Identificación** — **3**

If you do not have a CA driver license or CA ID card, list the last 4 numbers of your Social Security Number (SSN). If you have one. – Si no tiene una licencia de manejar de CA o tarjeta de identidad de CA, ponga las últimas 4 cifras de su número del Seguro Social (SSN), si tiene uno.

Date of birth – Fecha de nacimiento (mes/día/año)
M M   D D   Y Y Y Y

California driver license or ID card # – Núm. de licencia de manejar o tarjeta de identidad de California

SSN *(last 4 numbers)*
SSN *(las últimas 4 cifras)* X X X - X X -  _ _ _ _

U.S. state or foreign country of birth
Estado de EE.UU. o país extranjero donde nació

**The address where you live / La dirección donde vive** — **4**

Do not use a P.O. Box #
No ponga apartado postal

Home address – Domicilio                    Apt or Unit # – Nº de depto. o Unidad

City                  State              Zip                California county
Ciudad                Estado   CA        Cód. postal        Condado de California

If you do not have a street address, describe where you live including cross streets, Route, N, S, E, W, etc. – Si no tiene una dirección con calle y número, describa dónde vive (cruce de calles, ruta, N, S, E, O, etc.)

**The address where you receive mail – La dirección donde recibe su correo** — **5**

Skip if same as address above. No llene si es la misma que puso más arriba.

Mailing address – if different from above or a P.O. Box #
Dirección postal, si no es la misma que puso más arriba o es apartado postal

City                  State              Zip                Foreign country
Ciudad                Estado             Cód. postal        País extranjero

**Registration history / Historial de inscripción** — **6**

If you were previously registered or pre-registered to vote, fill out this section. Si se inscribió o preinscribió para votar anteriormente, llene esta sección.

First name – Primer nombre        Middle initial – Inicial del segundo nombre        Last name – Apellido

Previous address – Dirección anterior                    City – Ciudad

State      Zip          Previous county          Previous political party preference *(if any)*
Estado     Cód. postal  Condado anterior         Preferencia de partido político anterior *(si corresponde)*

**Vote by mail in all elections / Votación por correo en todas las elecciones** — **7**

All active registered voters will be mailed a vote-by-mail ballot for every election. If you want to vote in person, you must turn in your vote-by-mail ballot or you may be required to vote a provisional ballot.
A todos los votantes registrados activos se les enviará por correo una boleta electoral de votación por correo para cada elección. Si desea votar en persona, debe entregar su boleta electoral de votación por correo o se le puede solicitar que vote en una boleta provisional.

**Political party preference / Preferencia de partido político** — **8**

If you choose "No Party/None," you may not be able to vote for some parties' candidates at a primary election for U.S. President, or for a party's central committee. Si selecciona "Ningún partido/Ninguno", es posible que no pueda votar por algunos de los candidatos partidarios en una elección primaria para presidente de EE.UU. o comité central partidario.

**I want to choose a political party preference — Deseo indicar una preferencia de partido político**

☐ American Independent Party / Partido Americano Independiente
☐ Democratic Party – Partido Demócrata
☐ Green Party – Partido Verde
☐ Libertarian Party – Partido Libertario
☐ Peace and Freedom Party / Partido Paz y Libertad
☐ Republican Party – Partido Republicano
☐ Other *(specify):* – Otro *(especificar):*

**I do not want to choose a political party preference — No deseo indicar una preferencia de partido político.**

☐ No Party / None – Ningún partido / Ninguno

**Optional voter information – Datos optativos del votante** — **9**

Email – Email
(  )

Phone number – Número de teléfono
(  )
☐ I would like to receive election information by text message.
Quiero recibir información electoral por mensaje de texto.

My language preference for receiving election materials is: – Mi preferencia de idioma para recibir materiales electorales es:

☐ English   ☐ Spanish / Español   ☐ Chinese / 中文   ☐ Hindi / हिंदी   ☐ Japanese / 日本語
☐ Khmer / ខ្មែរ   ☐ Korean / 한국어   ☐ Tagalog   ☐ Thai / ไทย   ☐ Vietnamese / Việt ngữ
☐ Other language: – Otro idioma:

☐ I want voting materials in an accessible format. – Quiero recibir materiales electorales en un formato accesible.
☐ I want to be a poll worker. – Quiero ser un trabajador(a) electoral.
My ethnicity/race is: – Mi origen étnico/raza es:

**Affidavit / Declaración jurada** — **10**

You must sign in the red box for your registration to be complete. When you return a vote-by-mail ballot, your signature on the return envelope must compare with your signature on this form or other signatures in your voter registration record. –Para completar su inscripción, tiene que firmar en la casilla roja. Cuando devuelva su boleta electoral de votación por correo, su firma en el sobre de devolución debe coincidir con su firma en este formulario u otras firmas en su registro de votante.

I swear or affirm that: — Juro o afirmo que:
I am a **U.S. citizen** and a resident of California and **at least 16 years old**. I am not currently serving a state or federal prison term for the conviction of a felony. I am not currently found mentally incompetent to vote by a court. I understand that it is a crime to intentionally provide incorrect information on this form. I declare under penalty of perjury under the laws of the State of California that the information on this form is true and correct. — Yo soy un **ciudadano de los EE.UU.** y un residente de California y **de al menos 16 años de edad**. No estoy actualmente cumpliendo una condena en una prisión estatal o federal por cometer un delito. Actualmente no he sido declarado mentalmente incompetente para votar por un tribunal. Entiendo que es un crimen proporcionar intencionalmente información incorrecta en este formulario. Declaro bajo pena de perjurio, de acuerdo con las leyes del Estado de California, que la información de este formulario es verdadera y correcta.

X

Signature – Firma          Date Signed – Fecha de la firma     Month – Mes   Day – Día   Year – Año

60 YA          **872001**                    240002

Tear here and fold. Tape to seal. Do not staple. The bottom part is your receipt.
Separar aquí y doblar. Sellar con cinta. No use grapas. La parte inferior es su recibo.
Keep it until you receive a notice from your county elections official.
Guárdelo hasta que reciba un aviso del funcionario electoral de su condado.

The law protects your voter registration information against commercial use.
Report any problems to the Secretary of State's Voter Hotline: (800) 345-8683.
La ley prohíbe el uso comercial de su información de inscripción como votante.
Reporte cualquier problema a la Línea de asistencia del Secretario de Estado: (800) 232-8682.

60 YA          **872001**

**Did someone help you fill out or deliver this form? – ¿Alguien le ayudó a llenar o entregar este formulario?**
If "yes", the person who helped you **must** fill out and sign **both** parts of this blue box. Si "sí", la persona que lo ayudó **tiene que** llenar y firmar **ambas** partes de esta casilla azul.

Signature – Firma                    Date – Fecha ____/____/____
Name, address, and phone #: – Nombre, dirección y núm. de teléfono:

Org. name and phone #: – Nombre y núm. de teléfono de la organización:

Signature – Firma                    Date – Fecha ____/____/____
Name, address, and phone #: – Nombre, dirección y núm. de teléfono:

Org. name and phone #: – Nombre y núm. de teléfono de la organización:

*(This part is the voter's receipt.)*
*(Esta parte es el recibo para el votante.)*

# EXHIBIT 17



U.S. Department of Justice

Civil Rights Division

*Voting Section*
*950 Pennsylvania Ave, NW – 4CON*
*Washington, DC 20530*

July 2, 2025

<u>Via Mail and Email</u>
The Honorable Nancy Dahlstrom
Lieutenant Governor
P.O. Box 110015
Juneau, AK 99811-0001


Dear Lieutenant Governor Dahlstrom:

     We write to you as the chief election official for the State of Alaska to request information regarding the State's procedures for complying with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 et seq.

     Please provide a list of the election officials who are responsible for implementing Alaska's general program of voter registration list maintenance, including those responsible officials not employed by your office (such as local election officials) who are also involved in that effort. Please also provide a description of the steps that you have taken to ensure that the State's list maintenance program has been properly carried out in full compliance with the NVRA.

     A review of the most recent report from the Election Assistance Commission's Election Administration and Voting Survey ("EAVS") report indicates that there are more registered voters listed as active in the State of Alaska than citizen voting age population in the State.

     The NVRA requires each state and the District of Columbia to make available for inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). Section 11 of the NVRA authorizes the Attorney General to bring NVRA enforcement actions.

     Pursuant to Section 20507(i) of the NVRA, the Attorney General requests that you produce for inspection the following records:

1. The most current or most updated electronic copy of the State of Alaska's computerized statewide voter registration list ("statewide voter registration list") as required by Section 303(a) of the Help America Vote Act. Please include all fields contained within the list.

Additionally, please provide the following information. The time period for these requests is January 1, 2023, to December 2024.

1. In the EAVS data for Question A3d, Alaska had 4,893 voters (.5 percent) with duplicate registrations, which was well below the national average. In the EAVS data for Question A12h, Alaska also reported it removed no voters. Please provide a list of all registrations that were cancelled based on the determination that they were duplicate registration records. If the records were merged, please provide that information.

2. A list of all registrations that were cancelled due to non-citizenship of the registrant.

3. A complete vote history of all registrants determined to be non-citizens.

4. No data was listed for Alaska regarding removals due to mental incompetence. Please provide a list of all registrants who were removed from the statewide voter registration list due to a finding of mental incompetence.

Please provide this information within 20 days of the date of this letter. The information and materials may be sent by encrypted email to ▮▮▮▮▮▮▮▮▮▮▮ r via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS).

Should further clarification be required, please contact Maureen Riordan at ▮▮▮▮▮▮▮▮▮▮▮ We look forward to your assistance in advance.

Sincerely,

*Maureen Riordan*
Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division

cc:    Carol Beecher
       Director, Division of Elections
       Court Plaza Building
       240 Main Street, 4th Floor
       Juneau, AK 99801
       ▮▮▮▮▮▮▮▮▮▮▮

**U.S. Department of Justice**

Civil Rights Division

*Voting Section*
*950 Pennsylvania Ave, NW – 4CON*
*Washington, DC  20530*

July 28, 2025

<u>Via Mail and Email</u>

The Honorable Adrian Fontes
Arizona Secretary of State
1700 W. Washington Street, Seventh Floor
Phoenix, AZ 85007-2808
sosadmin@azsos.gov

Dear Secretary Fontes:

We write to you as the chief election official for the State of Arizona to request information regarding Arizona's procedures for complying with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq*.

Please provide a list of the election officials who are responsible for implementing Arizona's general program of voter registration list maintenance from November 2022 through receipt of this letter, including those responsible officials not employed by your office (such as local election officials) who are also involved in that effort. Please also provide a description of the steps that you have taken, and when those steps were taken, to ensure that the State's list maintenance program has been properly carried out in full compliance with the NVRA.

The NVRA requires each state and the District of Columbia to make available for inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). Section 11 of the NVRA authorizes the Attorney General to bring NVRA enforcement actions. *See* 52 U.S.C. § 20510.

Pursuant to Section 20507(i) of the NVRA, the Attorney General requests that you produce for inspection the following records:

The current electronic copy of Arizona's computerized statewide voter registration list ("statewide voter registration list") as required by Section 303(a) of the Help America Vote Act.  Please include all fields contained within the list. Please produce each list in a .xls, .csv, or delimited-text file format.  Please specify what delimiter is used, if applicable, or provide a file layout along with a database user manual, coding list, or other materials that define or explain how a voter record is coded into the statewide voter registration list and reported in the electronic copy of the statewide voter registration list.

Additionally, please provide the following information in electronic form. The time period for these requests is close of registration for the November 2022 general election through the close of registration for the November 2024 general election, the same time period as the most recent report from the Election Assistance Commission's Election Administration and Voting Survey ("EAVS"). If you are unable to provide the data, please explain why the data is not available.

1. Confirmation notice data for Questions A10a through A10f was either missing or far from the national average. For example:
    a. The response to Question 10a, the total confirmation notices sent to voters, was 172.70 percent of voters, or roughly 7.5 million people. Likewise, Apache County, Maricopa County, Pima County, Gila County, Mohave County, Yavapai County, and Yuma County sent out more Confirmation Notices than the citizen voting age population.
    b. For question 10b, four counties - Mohave County, Yavapai County, Apache County, and Gila County - are below the national average. Four counties did not report any data: Maricopa, Pima, Pinal, and Yuma.
    c. For question 10c, six counties - Yavapai County, La Paz County, Yuma County, Apache County, Greenlee County, and Mohave County - are below national average. Six counties did not report address change: Cochise, Maricopa, Mohave, Pima, Pinal, and Santa Cruz.
    d. For question 10d, five counties -  Graham County, Apache County, Yavapai County, La Paz County, and Gila County - fall below the national average. Six counties did not report any data: Maricopa, Navajo, Pima, Greenlee, Santa Cruz, and Yuma.
    e. 3.7 percent of Confirmation Notices throughout Arizona were returned undeliverable, less than half the national average.
    f. 94 percent of Confirmation Notices came back as status unknown (Question A10f). This is almost one and a half times the national average.

Footnote 2 on page 183 in that section of the EAVS Report states "[s]ome jurisdictions are either unable to break down A10b and A10c or are unable to track returned notices confirming registration changes or updates." Please explain how Arizona determines who receives a confirmation notice, explain how it tracks the results for the confirmation notices sent, and explain both state and county level results using the categories in 10b-f of the EAVS Report.

2. Virtually no data was listed for Question A12h regarding duplicate registrants who were removed from the statewide voter registration database (Navajo County listed one duplicate). Please explain what actions Arizona is taking to identify duplicate registrations and to remove those duplicates from the voter registration list. Please explain when in the last two years that Arizona has searched for duplicate registrations in the statewide voter registration list. If records were merged, please provide that information.

3. Please provide a description of the steps that Arizona has taken, and when those steps were taken, to identify registered voters who are ineligible to vote as well as the

procedures it used to remove those ineligible voters from the registration list. Please identify the number of registered voters identified as ineligible to vote for the time period of the close of registration for the November 2022 general election through present for each of the following reasons:

1.  Non-citizen

2.  Adjudicated incompetent

3.  Felony conviction

For each of those voters identified in categories 1-3 above, provide their registration information on the statewide voter registration list, including their vote history.

Please provide this information within 14 days of the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS).

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov. We look forward to your assistance in advance.

Sincerely,

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division

Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division

cc:    Lisa Marra
Director, Elections Division
1700 W. Washington St, 7th Floor
Phoenix, AZ 85007-2808
lmarra@azsos.gov

**U.S. Department of Justice**

Civil Rights Division

*Voting Section*
*950 Pennsylvania Ave, NW – 4CON*
*Washington, DC  20530*

July 11, 2025

<u>Via Mail and Email</u>

The Honorable Anthony Albence
State Election Commissioner
905 South Governors Avenue, Suite 170
Dover, DE  19904
anthony.albence@delaware.gov

Dear Commissioner Albence:

We write to you as the chief election official for the State of Delaware to request information regarding the state's procedures for complying with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq*.

Please provide a list of the election officials who are responsible for implementing Delaware's general program of voter registration list maintenance from November 2022 through receipt of this letter, including those responsible officials not employed by your office (such as local election officials) who are also involved in that effort. Please also provide a description of the steps that you have taken, and when those steps were taken, to ensure that the state's list maintenance program has been properly carried out in full compliance with the NVRA. Please include both the actions taken by Delaware officials as well as county officials.

The NVRA requires each state and the District of Columbia to make available for inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). Section 11 of the NVRA authorizes the Attorney General to bring NVRA enforcement actions. *See* 52 U.S.C. § 20510.

Pursuant to Section 20507(i) of the NVRA, the Attorney General requests that you produce for inspection the following records:

1. The current electronic copy of Delaware's computerized statewide voter registration list ("statewide voter registration list") as required by Section 303(a) of the Help America Vote Act. Please include all fields contained within the list. Please produce each list in a .xls, .csv, or delimited-text file format.  Please specify what delimiter is used, if applicable, or provide a file layout along with a database user manual, coding list, or other materials that define or explain how a voter record is coded into the statewide voter

registration list and reported in the electronic copy of the statewide voter registration list.

Additionally, please provide the following information in electronic form. The time period for these requests is close of registration for the November 2022 general election through the close of registration for the November 2024 general election, the same time period as the most recent report from the Election Assistance Commission's Election Administration and Voting Survey ("EAVS"). If you are unable to provide the data, please explain why the data is not available.

1. A review of the most recent report from EAVS report indicates that in response to Question A1b, there are nearly as many registered voters listed as active as the citizen voting age population in Delaware, with a registration rate in 2024 of 96.3 percent of the citizen voting age population. Furthermore, the EAVS report indicates that the ratio of registered voters to citizen voting age population has been unusually high for several years, with Delaware reporting a registration rate of 93.1 percent of citizen voting age population in 2022 and 98.1 percent in 2020. Please explain what actions Delaware is taking to ensure that voters who should not be on the voter roll are being removed.

2. In the EAVS data for Question A3d, Delaware had 2,044 voters (0.4 percent) with duplicate registrations, well below the nationwide average of 12.7 percent. Please provide a list of all registrations that were cancelled based on the determination that they were duplicate registration records. If the records were merged, please provide that information.

3. In the EAVS data for Question A10d, Delaware had 20,889 invalid registrations out of 56,820 confirmation notices sent (36.8 percent), more than twelve times higher than the nationwide average of 2.9 percent. Please explain why the percentage of invalid registrations was so high in Delaware compared to the number of confirmation notices sent.

Please provide a description of the steps that Delaware has taken, and when those steps were taken, to identify registered voters who are ineligible to vote as well as the procedures the Delaware used to remove those ineligible voters from the registration list. Please identify the number of registered voters identified as ineligible to vote for the time period of the close of registration for the November 2022 general election through present for each of the following reasons:

1. Non-citizen

2. Adjudicated incompetent

3. Felony conviction

For each of those voters identified in categories 1-3 above, provide all fields of their registration information on the statewide voter registration list, including their vote history.

Please provide this information within 14 days of the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS).

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov. We look forward to your assistance in advance.

Sincerely,

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division

Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division

**U.S. Department of Justice**

Civil Rights Division

*Voting Section*
*950 Pennsylvania Ave, NW – 4CON*
*Washington, DC 20530*

August 7, 2025

<u>Via Mail and Email</u>

The Honorable Brad Raffensperger
Secretary of State
214 State Capitol
Atlanta, GA 30334
soscontact@sos.ga.gov

Dear Secretary Raffensperger:

We write to you as the chief election official for the State of Georgia to request Georgia's statewide voter registration list and information regarding Georgia's procedures for complying with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq.* On July 9, we contacted your office about obtaining an electronic copy of the statewide voter registration list for purposes of enforcing the NVRA and the Help America Vote Act, 52 U.S.C. § 20901 *et seq,* and we are renewing our request for that information today.

The NVRA requires each state and the District of Columbia to make available for inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). Section 11 of the NVRA authorizes the Attorney General to bring NVRA enforcement actions. *See* 52 U.S.C. § 20510.

The plain text of § 20507(i) requires disclosure. The phrase "all records" envisions an expansive application and includes the registration information of cancelled records and accompanying voter history. *Project Vote/Voting for Am, Inc. v. Long*, 682 F.3d 331, 336 (4th Cir. 2012); *see also Voter Reference Foundation, LLC v. Torrez*, 727 F.Supp.3d 1014, 1212 (D. N.M. 2024) (finding "all records" includes voter list). Similarly, "programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters" encompasses a broad range of state programs, including the removal of non-citizens from voter rolls. *Id*. The capacious language of the Public Disclosure Provision has been found to "set[] a floor, not a ceiling" to the types of records that must be disclosed. *Public Interest Legal Foundation, Inc. v. Matthews*, 589 F.Supp.3d 932, 941 (C.D. Ill. 2022) (citing *Project Vote/Voting for Am., Inc.*, 682 F.3d at 337). The request for the statewide voter registration list sits firmly above that floor. Courts have continuously found that Section 8(i) requires the disclosure of voter registration records. *See, e.g., Public Interest Legal Foundation v. Boockvar*, 431 F.Supp.3d 553, 556 (M.D. Pa. 2019) (permitting disclosure of documents regarding "all registrants who were identified as potentially not satisfying the citizenship

requirement"); *Project Vote/Voting for Am, Inc*, 682 F.3d at 333 (4th Cir. 2012) (requiring disclosure of voter registration applications for "*any individual*" who timely completed an application) (emphasis added); *Project Vote, Inc. v. Kemp*, 208 F.Supp.3d 1320, 1344 (N.D. Ga. 2016) (holding that "Section 8(i) requires the disclosure of individual voter registration records").

Congress passed the NVRA in an effort to "protect the integrity of the electoral process" and "ensure that accurate and current voter registration rolls are maintained." NVRA § 20501. This intention is achieved through the public disclosure provision, which Congress created to establish external checks on potential administrative oversights or inefficiencies regarding ineligible voters appearing on voter rolls. *See Project Vote/Voting for Am, Inc.*, 682 F.3d at 334-35. State laws are not a bar to providing this information. If the NVRA, a federal act, and state law "do not operate harmoniously in a single procedural scheme for federal voter registration, then Congress has exercised its power to 'alter' the state's regulation, and that regulation is superseded." *Gonzalez v. Arizona*, 677 F.3d 383, 394 (9th Cir. 2012) (en banc), *aff'd sub nom. Arizona v. Inter Tribal Council of Arizona, Inc.* ("*ITCA*"), 570 U.S. 1 (2013).

Please also provide a list of the election officials who are responsible for implementing Georgia's general program of voter registration list maintenance from November 2022 through receipt of this letter, including those responsible officials not employed by your office (such as local election officials) who are also involved in that effort. Please also provide a description of the steps that you have taken, and when those steps were taken, to ensure that the State's list maintenance program has been properly carried out in full compliance with the NVRA.

Please provide this information within 14 days of the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS).

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov. We look forward to your assistance in advance.

Sincerely,

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division

Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division

cc:     Blake Evans
        Director, Elections Division
        Floyd West Tower
        2 MLK Jr. Dr. S.E., Suite 802
        Atlanta, GA 30334
        bevans@sos.ga.gov



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

September 8, 2025

<u>Via Mail and Email</u>

The Honorable Scott T. Nago
Chief Election Officer
Office of Elections
802 Lehua Avenue
Pearl City, HI 96782
elections@hawaii.gov

Re:    **Request for Complete Hawaii's Voter Registration List with All Fields**

Dear Chief Election Officer Nago:

        We write to you as the chief election official for the State of Hawaii concerning your State's compliance with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq*., and the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901, *et seq.*  Please provide a copy of Hawaii's statewide voter registration list ("VRL") within fourteen days of the date of this letter.

        The electronic copy of the statewide VRL should contain *all fields*, which means, your state's VRL must include the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required under HAVA[1] to register individuals for federal elections.  *See* 52 U.S.C. § 21083(a)(5)(A)(i).

        We request Hawaii's VRL to assess your state's compliance with the statewide VRL maintenance provisions of the NVRA. Our request is pursuant to the Attorney General's authority under Section 11 of the NVRA to bring enforcement actions. *See* 52 U.S.C. § 20510(a).

        HAVA also provides authority for the Justice Department to seek the State's VRL via Section 401, which makes the Attorney General solely responsible for actions to enforce HAVA's

---

[1] In charging the Attorney General with enforcement of the voter registration list requirements in the HAVA and in the NVRA, Congress plainly intended that DOJ be able to conduct an independent review of each state's list.  Any statewide prohibitions are clearly preempted by federal law.

computerized statewide voter registration list requirements. *See* 52 U.S.C. § 21111; *see also Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 (2008) (*per curiam*) (finding no private right of action to enforce HAVA requirements).

In addition to those authorities, the Attorney General is also empowered by Congress to request records pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), codified at 52 U.S.C. § 20701, *et seq.* Section 301 of the CRA requires state and local officials to retain and preserve records related to voter registration and other acts requisite to voting for any federal office for a period of twenty-two months after any federal general, special or primary election. *See* 52 U.S.C. § 20701.

Section 303 of the CRA provides, in pertinent part, "Any record or paper required by section 20701 to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative…" *See* 52 U.S.C. § 20703.

Pursuant to the foregoing authorities, including the CRA, the Attorney General is requesting an electronic copy of Hawaii's complete and current VRL. The purpose of this request is to ascertain Hawaii's compliance with the list maintenance requirements of the NVRA and HAVA.

To the extent there are privacy concerns, the voter registration list is subject to federal privacy protections. Section 304 of the CRA provides the answer:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

52 U.S.C. § 20704. HAVA specifies that the "last 4 digits of a social security number . . . shall not be considered to be a social security number for purposes of section 7 of the Privacy Act of 1974" (5 U.S.C. § 522a note); 52 U.S.C. § 21083(c). In addition, any prohibition of disclosure of a motor vehicle record contained in the Driver's License Protection Act, codified at 18 U.S.C. § 2721(b)(1), is exempted when the disclosure is for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority as the Justice Department is now doing. That said, all data received from you will be kept securely and treated consistently with the Privacy Act explained at Civil Rights Division - Department of Justice - Privacy Policy[2].

Please provide the requested electronic VRL[3] to the Justice Department fourteen days from the date of this letter. The information and materials may be sent by encrypted email to

---

[2] Available at: https://civilrights.justice.gov/privacy-policy#:~:text=Our%20Statutes-,Privacy%20Act%20Statement,the%20scope%20of%20our%20jurisdiction.
[3] Containing *all fields*, which includes either the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required by HAVA.

voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing ("JEFS"). If Hawaii would be interested in a data sharing agreement with the Civil Rights Division, please reply to voting.section@usdoj.gov prior to the expiration of the fourteen-day response window. Upon receipt, we will send you an agreement template.

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov.

Regards,

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

September 8, 2025

<u>Via Mail and Email</u>

The Honorable Phil McGrane
Secretary of State
P.O. Box 83720
Boise, ID 83720-0080
secretary@sos.idaho.gov;
pmcgrane@sos.idaho.gov

Re:    **Request for Complete Idaho Voter Registration List with All Fields**

Dear Secretary McGrane:

We write to you as the chief election official for the State of Idaho concerning your State's compliance with the statewide voter registration list maintenance provisions of the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901, *et seq*.  Please provide a copy of Idaho's statewide voter registration list ("VRL") within 14 days of the date of this letter.

The electronic copy of the statewide VRL should contain *all fields*, which means, your state's VRL must include the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required under the HAVA[1] to register individuals for federal elections.  *See* 52 U.S.C. § 21083(a)(5)(A)(i).

HAVA provides authority for the Justice Department to seek the State's VRL via Section 401, which makes the Attorney General solely responsible for actions to enforce HAVA's computerized statewide voter registration list requirements.  *See* 52 U.S.C. § 21111; *see also Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 (2008) (*per curiam*) (finding there is no private right of action to enforce those requirements in HAVA).

---

[1] In charging the Attorney General with enforcement of the voter registration list requirements in the HAVA and in the NVRA, Congress plainly intended that DOJ be able to conduct an independent review of each state's list.  Any statewide prohibitions are clearly preempted by federal law.

In addition to those authorities, the Attorney General is also empowered by Congress to request records pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), codified at 52 U.S.C. § 20701, *et seq*. Section 301 of the CRA requires state and local officials to retain and preserve records related to voter registration and other acts requisite to voting for any federal office for a period of 22 months after any federal general, special or primary election. *See* 52 U.S.C. § 20701.

Section 303 of the CRA provides, in pertinent part, "Any record or paper required by section 20701 to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative…" 52 U.S.C. § 20703.

Pursuant to the foregoing authorities, including the CRA, the Attorney General is demanding an electronic copy of Idaho's complete and current VRL. The purpose of the request is to ascertain Idaho's compliance with the list maintenance requirements of the NVRA and HAVA.

To the extent there are privacy concerns, the voter registration list is subject to federal privacy protections. Section 304 of the CRA provides the answer:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

52 U.S.C. § 20704. HAVA specifies that the "last 4 digits of a social security number . . . shall not be considered a social security number for purposes of section 7 of the Privacy Act of 1974" (5 U.S.C. § 522a note); 52 U.S.C. § 21083(c). In addition, any prohibition of disclosure of a motor vehicle record contained in the Driver's License Protection Act, codified at 18 U.S.C. § 2721(b)(1), is exempted when the disclosure is for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority as the Justice Department is now doing. That said, all data received from you will be kept securely and treated consistently with the Privacy Act explained at Civil Rights Division - Department of Justice - Privacy Policy[2].

Please provide the requested electronic VRL[3] to the Justice Department by fourteen days from this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing ("JEFS"). If Idaho would be interested in a data sharing agreement with the Civil Rights Division, please reply to voting.section@usdoj.gov prior to the expiration of the seven-day response window. Upon receipt we will send you an agreement template.

---

[2] Available at: https://civilrights.justice.gov/privacy-policy#:~:text=Our%20Statutes-,Privacy%20Act%20Statement,the%20scope%20of%20our%20jurisdiction.
[3] Containing *all fields*, which includes either the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required by HAVA.

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov.

Regards,

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division

cc:    Guillermo Velasco
       Elections Director
       P.O. Box 83720
       Boise, ID 83720-0080
       gvelasco@sos.idaho.gov

**U.S. Department of Justice**

Civil Rights Division

*Voting Section*
*950 Pennsylvania Ave, NW – 4CON*
*Washington, DC  20530*

July 28, 2025

<u>Via Mail and Email</u>

The Honorable Bernadette Matthews
Executive Director
State Board of Elections
2329 S. MacArthur Boulevard
Springfield, IL 62704-4503
bmatthews@elections.il.gov

Dear Executive Director Matthews:

We write to you as the chief election official for the State of Illinois to request information regarding the State's procedures for complying with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 et seq.

Please provide a list of the election officials who are responsible for implementing Illinois' general program of voter registration list maintenance from November 2022 through receipt of this letter, including those responsible officials not employed by your office (such as local election officials) who are also involved in that effort. Please also provide a description of the steps that you have taken to ensure that the State's list maintenance program has been properly carried out in full compliance with the NVRA.  Please include both the actions taken by State officials as well as county officials.

The NVRA requires each state and the District of Columbia to make available for inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). Section 11 of the NVRA authorizes the Attorney General to bring NVRA enforcement actions.

Pursuant to Section 20507(i) of the NVRA, the Attorney General requests that you produce for inspection the following records:

1. The current electronic copy of the State of Illinois' computerized statewide voter registration list ("statewide voter registration list") as required by Section 303(a) of the Help America Vote Act. Please include all fields contained within the list. Please produce each list in a .xls, .csv, or delimited-text file format.  Please specify what delimiter is used, if applicable, or provide a file layout.

Additionally, please provide the following information in electronic form. The time period for these requests is close of registration for the November 2022 general election through the close of registration for the November 2024 general election, the same time period as the most recent report from the Election Assistance Commission's Election Administration and Voting Survey ("EAVS"). If you are unable to provide the data, please explain why the data is not available.

1. In response to EAVS Question A10a, nearly one-third of Illinois' counties (32 out of 102) reported that they did not send out any confirmation notices: Bond County; Boone County; Brown County; Bureau County; Clay County; DeWitt County; Fulton County; Gallatin County; Greene County; Grundy County; Jasper County; Johnson County; Lawrence County; Livingston County; Logan County; Macoupin County; Mason County; McDonough County; Mclean County; Menard County; Monroe County; Montgomery County; Morgan County; Pope County; Putnam County; Richland County; Schuyler County; Scott County; Stark County; Stephenson County; Wabash County; and Warren County. Please explain why each of these 32 counties reported they did not send out any confirmation notices. For each of the 32 counties that have not sent confirmation notices, please explain why they did not send confirmation notices. Please explain what steps Illinois is taking to ensure that these counties are conducting list maintenance including when those steps were taken.

2. Despite the fact that nearly one-third of counties did not respond to Question A10a, Illinois reported that it sent out over 3.8 million confirmation notices, which comprised 46.9 percent of all registered voters. The national average was 19.5 percent. Please explain why the number of confirmation notices and percentage sent to all registered voters was so high. Please explain how it is determined who receives a confirmation notice.

3. A review of the county-level data accompanying the most recent EAVS report indicates that in response to Question A10a, sixteen counties in Illinois reported that the number of confirmation notices they sent was more than one hundred percent of all registered voters: Alexander County (239.3 percent); Carroll County (123.2 percent); Christian County (265 percent); Crawford County (127 percent); Edwards County (244.5 percent); Jackson County (208.2 percent); Jefferson County (143.2 percent); Jo Daviess County (678.6 percent); Lee County (131.7 percent); Macon County (139.7 percent); Massac County (128.2 percent); Mercer County (120.5 percent); Perry County (123.5 percent); Saline County (220.1 percent); Tazewell County (144.2 percent); and Washington County (232.7 percent). Please explain why the percentage of confirmation notices that these counties sent to all registered voters was so high.

4. In response to Questions A10a through Question A10i, Illinois reported that it had over 2.3 million results of confirmation notices that were "not categorized," which was 62.3 percent of all confirmation notices sent. The national average was 17.8 percent. Please explain why the number and percentage of results of confirmation notices that were "not categorized" was so high. Furthermore, of the results of confirmation notices included as "not categorized," please provide the number for each category (e.g., "valid with no

address update," "valid with address update," "invalid," "confirmation notices returned undeliverable," and "unreturned confirmation notices").

5. In response to Questions A12i through Question A12k, Illinois reported that it had 258,976 voters removed for a reason described as "other," comprising 25.8 percent of all confirmation notices sent. The national average was 3.7 percent. Please explain why the number and percentage of voters removed for the "other" reason was so high. Furthermore, of the voters removed for "other" reasons, please provide the number of voters removed for each reason that Illinois included in the "other" category.

6. A review of the county-level data accompanying the most recent EAVS report indicates that in response to Question A12i through Question A12k, eighteen counties reported more than a quarter of voters listed as being removed were removed for a reason described as "other": Clay County (30.8 percent); Cook County (67.5 percent); DeWitt County (41.7 percent); Edgar County (36.5 percent); Fulton County (71.2 percent); Greene County (50.4 percent); Grundy County (26 percent); Jefferson County (99.4 percent); Jersey County (42.2 percent); Kendall County (47.5 percent); Knox County (30.7 percent); Logan County (25.2 percent); McDonough County (39.1 percent); McHenry County (65 percent); McLean County (68.2 percent); Morgan County (51.5 percent); Washington County (51 percent); and Winnebago County (87.3 percent). Illinois' two most populous counties, Cook County and DuPage County, together accounted for 63.4 percent of the 258,976 voters Illinois reported were removed for a reason described as "other." For each of these eighteen counties, please explain why the number and percentage of voters removed for the "other" reason was so high. Furthermore, of the voters removed for "other" reasons in each county, please provide the number of voters removed for each reason that the county included in the "other" category.

Please provide a description of the steps that Illinois has taken, and when those steps were taken, to identify registered voters who are ineligible to vote as well as the procedures that Illinois used to remove those ineligible voters from the registration list. Please identify the number of registered voters identified as ineligible to vote for the time period of the close of registration for the November 2022 general election through present for each of the following reasons:

1. Non-citizen

2. Adjudicated incompetent

3. Felony conviction

For each of those voters identified in categories 1-3 above, provide their registration information on the statewide voter registration list, including their vote history.

Please provide this information within 14 days of the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS).

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov. We look forward to your assistance in advance.

Sincerely,

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division

Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division

cc:    Laura K. Donahue
       Chair, State Board of Elections
       2329 S. MacArthur Boulevard
       Springfield, IL 62704-4503
       webmaster@elections.il.gov

**U.S. Department of Justice**

Civil Rights Division

*Voting Section*
*950 Pennsylvania Ave, NW – 4CON*
*Washington, DC 20530*

August 6, 2025

<u>Via Mail and Email</u>

The Honorable Scott Schwab
Secretary of State
Memorial Hall, 1st Floor
120 SW 10th Avenue
Topeka, KS 66612-1594
sos@sos.ks.gov; kssos@ks.gov

Dear Secretary Schwab:

We write to you as the chief election official for the State of Kansas to request Kansas'
statewide voter registration list and information regarding Kansas' procedures for complying
with the statewide voter registration list maintenance provisions of the National Voter
Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq.* On July 3, we contacted your office
about obtaining an electronic copy of the statewide voter registration list for purposes of
enforcing the NVRA and the Help America Vote Act, 52 U.S.C. § 20901 *et seq,* and we are
renewing our request for that information today.

The NVRA requires each state and the District of Columbia to make available for
inspection "all records concerning the implementation of programs and activities conducted for
the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C.
§ 20507(i)(1). Section 11 of the NVRA authorizes the Attorney General to bring NVRA
enforcement actions. *See* 52 U.S.C. § 20510.

The plain text of § 20507(i) requires disclosure. The phrase "all records" envisions an
expansive application and includes the registration information of cancelled records and
accompanying voter history. *Project Vote/Voting for Am, Inc. v. Long*, 682 F.3d 331, 336 (4th
Cir. 2012); *see also Voter Reference Foundation, LLC v. Torrez*, 727 F.Supp.3d 1014, 1212 (D.
N.M. 2024) (finding "all records" includes voter list). Similarly, "programs and activities
conducted for the purpose of ensuring the accuracy and currency of official lists of eligible
voters" encompasses a broad range of state programs, including the removal of non-citizens from
voter rolls. *Id*. The capacious language of the Public Disclosure Provision has been found to
"set[] a floor, not a ceiling" to the types of records that must be disclosed. *Public Interest Legal
Foundation, Inc. v. Matthews*, 589 F.Supp.3d 932, 941 (C.D. Ill. 2022) (citing *Project
Vote/Voting for Am., Inc.*, 682 F.3d at 337). The request for the statewide voter registration list
sits firmly above that floor. Courts have continuously found that Section 8(i) requires the
disclosure of voter registration records. *See, e.g.*, *Public Interest Legal Foundation v. Boockvar*,
431 F.Supp.3d 553, 556 (M.D. Pa. 2019) (permitting disclosure of documents regarding "all

registrants who were identified as potentially not satisfying the citizenship requirement"); *Project Vote/Voting for Am, Inc*, 682 F.3d at 333 (4th Cir. 2012) (requiring disclosure of voter registration applications for "*any individual*" who timely completed an application) (emphasis added); *Project Vote, Inc. v. Kemp*, 208 F.Supp.3d 1320, 1344 (N.D. Ga. 2016) (holding that "Section 8(i) requires the disclosure of individual voter registration records").

Congress passed the NVRA in an effort to "protect the integrity of the electoral process" and "ensure that accurate and current voter registration rolls are maintained." NVRA § 20501. This intention is achieved through the public disclosure provision, which Congress created to establish external checks on potential administrative oversights or inefficiencies regarding ineligible voters appearing on voter rolls. *See Project Vote/Voting for Am, Inc.*, 682 F.3d at 334-35. State laws are not a bar to providing this information. If the NVRA, a federal act, and state law "do not operate harmoniously in a single procedural scheme for federal voter registration, then Congress has exercised its power to 'alter' the state's regulation, and that regulation is superseded." *Gonzalez v. Arizona*, 677 F.3d 383, 394 (9th Cir. 2012) (en banc), *aff'd sub nom. Arizona v. Inter Tribal Council of Arizona, Inc.* ("*ITCA*"), 570 U.S. 1 (2013).

Please also provide a list of the election officials who are responsible for implementing Kansas' general program of voter registration list maintenance from November 2022 through receipt of this letter, including those responsible officials not employed by your office (such as local election officials) who are also involved in that effort. Please also provide a description of the steps that you have taken, and when those steps were taken, to ensure that the State's list maintenance program has been properly carried out in full compliance with the NVRA.

Please provide this information within 14 days of the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS).

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov. We look forward to your assistance in advance.

Sincerely,

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division


Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division

cc:    Bryan Caskey
       Director, Elections Division
       Memorial Hall, 1st Floor
       120 SW 10th Avenue
       Topeka, KS 66612-1594
       bryan.caskey@sos.ks.gov



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

September 8, 2025

<u>Via Mail and Email</u>

The Honorable Nancy Landry
Secretary of State
PO Box 94125
Baton Rouge, LA 70804-9125
admin@sos.la.gov

Re:    **Request for Complete Louisiana's Voter Registration List with All Fields**

Dear Secretary Landry:

We write to you as the chief election official for the State of Louisianna concerning your State's compliance with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq*., and the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901, *et seq*.  Please provide a copy of Louisianna's statewide voter registration list ("VRL") within fourteen days of the date of this letter.

The electronic copy of the statewide VRL should contain *all fields*, which means, your state's VRL must include the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required under HAVA[1] to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A)(i).

We request Louisiana's VRL to assess your state's compliance with the statewide VRL maintenance provisions of the NVRA. Our request is pursuant to the Attorney General's authority under Section 11 of the NVRA to bring enforcement actions. *See* 52 U.S.C. § 20510(a).

HAVA also provides authority for the Justice Department to seek the State's VRL via Section 401, which makes the Attorney General solely responsible for actions to enforce HAVA's computerized statewide voter registration list requirements. *See* 52 U.S.C. § 21111; *see also Brunner*

---

[1] In charging the Attorney General with enforcement of the voter registration list requirements in the HAVA and in the NVRA, Congress plainly intended that DOJ be able to conduct an independent review of each state's list. Any statewide prohibitions are clearly preempted by federal law.

*v. Ohio Republican Party*, 555 U.S. 5, 6 (2008) (*per curiam*) (finding no private right of action to enforce HAVA requirements).

In addition to those authorities, the Attorney General is also empowered by Congress to request records pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), codified at 52 U.S.C. § 20701, *et seq.* Section 301 of the CRA requires state and local officials to retain and preserve records related to voter registration and other acts requisite to voting for any federal office for a period of twenty-two months after any federal general, special or primary election. *See* 52 U.S.C. § 20701.

Section 303 of the CRA provides, in pertinent part, "Any record or paper required by section 20701 to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative…" *See* 52 U.S.C. § 20703.

Pursuant to the foregoing authorities, including the CRA, the Attorney General is requesting an electronic copy of Louisiana's complete and current VRL. The purpose of this request is to ascertain Louisiana's compliance with the list maintenance requirements of the NVRA and HAVA.

To the extent there are privacy concerns, the voter registration list is subject to federal privacy protections. Section 304 of the CRA provides the answer:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

52 U.S.C. § 20704. HAVA specifies that the "last 4 digits of a social security number . . . shall not be considered to be a social security number for purposes of section 7 of the Privacy Act of 1974" (5 U.S.C. § 522a note); 52 U.S.C. § 21083(c). In addition, any prohibition of disclosure of a motor vehicle record contained in the Driver's License Protection Act, codified at 18 U.S.C. § 2721(b)(1), is exempted when the disclosure is for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority as the Justice Department is now doing. That said, all data received from you will be kept securely and treated consistently with the Privacy Act explained at Civil Rights Division - Department of Justice - Privacy Policy[2].

Please provide the requested electronic VRL[3] to the Justice Department fourteen days from the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File

---

[2] Available at: https://civilrights.justice.gov/privacy-policy#:~:text=Our%20Statutes ,Privacy%20Act%20Statement,the%20scope%20of%20our%20jurisdiction.
[3] Containing *all fields*, which includes either the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required by HAVA.

Sharing ("JEFS").  If Louisiana would be interested in a data sharing agreement with the Civil Rights Division, please reply to voting.section@usdoj.gov prior to the expiration of the fourteen-day response window. Upon receipt we will send you an agreement template.

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov.

Regards,

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division

cc:     Sherri Hadskey
        Commissioner of Elections
        8585 Archives Ave.
        Baton Rouge, LA 70809
        sherri.hadskey@sos.louisiana.gov

**U.S. Department of Justice**

Civil Rights Division

*Voting Section*
*950 Pennsylvania Ave, NW – 4CON*
*Washington, DC 20530*

July 14, 2025

<u>Via Mail and Email</u>

The Honorable Jared DeMarinis
State Administrator of Elections
Maryland State Board of Elections
P.O. Box 6486
Annapolis, MD 21401-0486
jared.demarinis@maryland.gov

Dear State Administrator DeMarinis:

We write to you as the chief election official for the State of Maryland to request information regarding the state's procedures for complying with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq.*

Please provide a list of the election officials who are responsible for implementing Maryland's general program of voter registration list maintenance from November 2022 through receipt of this letter, including those responsible officials not employed by your office (such as local election officials) who are also involved in that effort. Please also provide a description of the steps that you have taken, and when those steps were taken, to ensure that the state's list maintenance program has been properly carried out in full compliance with the NVRA. Please include both the actions taken by Maryland officials as well as county officials.

The NVRA requires each state and the District of Columbia to make available for inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). Section 11 of the NVRA authorizes the Attorney General to bring NVRA enforcement actions. *See* 52 U.S.C. § 20510.

Pursuant to Section 20507(i) of the NVRA, the Attorney General requests that you produce for inspection the following records:

1. The current electronic copy of Maryland's computerized statewide voter registration list ("statewide voter registration list") as required by Section 303(a) of the Help America Vote Act. Please include all fields contained within the list. Please produce each list in a .xls, .csv, or delimited-text file format. Please specify what delimiter is used, if applicable, or provide a file layout along with a database user manual, coding list, or other materials that define or explain how a voter record is coded into the statewide voter

registration list and reported in the electronic copy of the statewide voter registration list.

Additionally, please provide the following information in electronic form. The time period for these requests is close of registration for the November 2022 general election through the close of registration for the November 2024 general election, the same time period as the most recent report from the Election Assistance Commission's Election Administration and Voting Survey ("EAVS"). If you are unable to provide the data, please explain why the data is not available.

1. A review of the most recent EAVS report indicates that in response to Question A1b, there are nearly as many registered voters listed as active as the citizen voting age population in Maryland, with a registration rate in 2024 of 95.9 percent of the citizen voting age population.  Furthermore, the EAVS report indicates that the ratio of registered voters to citizen voting age population has been unusually high for several years, with Maryland reporting a registration rate of 93.9 percent of citizen voting age population in 2022 and 96 percent in 2020. Please explain what actions Maryland is taking to ensure that voters who should not be on the voter roll are being removed.

2. In the EAVS data for Question A3a, Maryland had 6,491,862 registration transactions processed, which is significantly more than Maryland's 4,231,112 active registered voters.  Please explain why the number of registration transactions was significantly higher than the number of active registered voters.  In Question A3b, there are 524,189 new valid registrations, which is less than the 613,352 new registrations listed on your website in the year end activity reports for 2023 and 2024 combined: Voter Registration Statistics. Please explain why there is a difference in those registration statistics.

3. In the EAVS data for Question A10a, Maryland sent 1,559,430 confirmation notices, which is 36.9 percent of all active registered voters and well above the national average of 19.5 percent.  Based on the responses to Question A11b, it appears that most of these notices were sent because voters may have moved.  Please explain why Maryland sent confirmation notices to so many registered voters.

4. In the EAVS data for Questions A10e and A10f, Maryland combined the responses and stated that 1,520,490 confirmation notices were unreturned, which is 97.5 percent of all notices sent. According to the most recent EAVS report, only 320,634 voters are inactive. Please explain the process for determining how a voter becomes an inactive voter.  Please explain why the number of inactive voters is so low relative to the number of confirmation notices not being returned.

5. In the EAVS data for Question A12b, 44,869 voters were removed because they had moved outside of the jurisdiction.  In the EAVS data for Question A12e, 123,312 voters were removed because they failed to respond to a sent confirmation notice and had not voted in the two most recent federal elections.  Together that means a maximum of 168,181 voters might have been removed for reasons related to confirmation notices. Please explain why the number of voters removed is so low relative to the number of unreturned confirmation notices.

6. In October 2023, the Office of Legislative Audits published a report regarding the State Board of Elections (SBE). State Board of Elections - 10-31-23  The Audit found that "SBE's match of voter records to State death records were not as comprehensive as necessary to identify certain potentially deceased voters." Audit at 11. Because SBE only followed up on exact matches and information received by SBE from the Maryland Department of Health was not complete, the Audit identified potentially thousands of deceased individuals with active voter registration. *Id.* Please explain if the process to remove deceased voters has changed since the issuance of that Audit, and if so, please describe the process.

7. The Audit also found that Local Boards of Elections (LBE) were not removing deceased voters promptly. "For example, as of May 2022, one LBE had not removed a voter for 332 days after receiving notification of the voter's death." Audit at 12. The Audit's finding was that the SBE failed to ensure that LBEs were correcting voter data. Audit at 10. The Audit also noted a similar finding and recommended corrective action in 2019 that was not implemented. Audit at 12. Please explain if the process that the State Board uses to ensure that LBEs are promptly updating voter rolls has changed since the issuance of the most recent Audit, and if so, please describe the updated process and when the changes were implemented.

8. The Audit also found that the duplicate voter registrations were not being removed from the voter rolls. The Audit identified potential duplicate voter registrations. *See* Audit at 11. In the EAVS data for Question A3d, Maryland said that there were no duplicate registrations. In the EAVS data for Question A12h, Maryland said it removed only 430 duplicate registrations, well below the national average. Please explain the process for removing duplicate registrations and whether the State Board or the LBEs are responsible for removing those voters. If the records were merged, please provide that information and explain that process. Please provide the number of registrations if they were merged.

Please provide a description of the steps that Maryland has taken, and when those steps were taken, to identify registered voters who are ineligible to vote as well as the procedures Maryland used to remove those ineligible voters from the registration list. Please identify the number of registered voters identified as ineligible to vote for the time period of the close of registration for the November 2022 general election through present for each of the following reasons:

1. Non-citizen

2. Adjudicated incompetent

3. Felony conviction

For each of those voters identified in categories 1-3 above, provide their registration information on the statewide voter registration list, including their vote history.

Please provide this information within 14 days of the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS).

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov. We look forward to your assistance in advance.

Sincerely,

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division

Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division

4

**U.S. Department of Justice**

Civil Rights Division

*Voting Section*
*950 Pennsylvania Ave, NW – 4CON*
*Washington, DC  20530*

July 24, 2025

<u>Via Mail and Email</u>

The Honorable Shenna Bellows
Secretary of State
148 State House Station
Augusta, Maine 04333-0148
shenna.bellows@maine.gov; sos.office@maine.gov

Dear Secretary Bellows:

      We write to you as the chief election official for the State of Maine to request information regarding Maine's procedures for complying with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq.*

      Please provide a list of the election officials who are responsible for implementing Maine's general program of voter registration list maintenance from November 2022 through receipt of this letter, including those responsible officials not employed by your office (such as local election officials) who are also involved in that effort. Please also provide a description of the steps that you have taken, and when those steps were taken, to ensure that the State's list maintenance program has been properly carried out in full compliance with the NVRA.

      The NVRA requires each state and the District of Columbia to make available for inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). Section 11 of the NVRA authorizes the Attorney General to bring NVRA enforcement actions. *See* 52 U.S.C. § 20510.

      Pursuant to Section 20507(i) of the NVRA, the Attorney General requests that you produce for inspection the following records:

      The current electronic copy of Maine's computerized statewide voter registration list ("statewide voter registration list") as required by Section 303(a) of the Help America Vote Act.  Please include all fields contained within the list. Please produce each list in a .xls, .csv, or delimited-text file format.  Please specify what delimiter is used, if applicable, or provide a file layout along with a database user manual, coding list, or other materials that define or explain how a voter record is coded into the statewide voter registration list and reported in the electronic copy of the statewide voter registration list.

Additionally, please provide the following information in electronic form. The time period for these requests is close of registration for the November 2022 general election through the close of registration for the November 2024 general election, the same time period as the most recent report from the Election Assistance Commission's Election Administration and Voting Survey ("EAVS"). If you are unable to provide the data, please explain why the data is not available.

1. A review of the most recent EAVS report indicates that in response to Question A1b, there are nearly as many registered voters listed as active as the citizen voting age population in Maine, with a registration rate in 2024 of 92.4 percent of the citizen voting age population. Please explain what actions Maine is taking to ensure that ineligible voters are being removed.

2. In response to Question A3d, Maine had 11,011 voters (3.5 percent) with duplicate registrations, almost four times fewer than the nationwide average of 12.7 percent. In response to the same question for the 2022 EAVS Report, Maine had 3,638 duplicate registrations (2 percent). No data was listed for Question A12h regarding duplicate registrants who were removed from the statewide voter registration database. Moreover, no data was provided for Question 13a, regarding what records were merged or linked with another record. Please explain what actions Maine is taking to identify duplicate registrations and to remove those duplicates from the voter registration list. Please provide a list of all duplicate registrants who were removed from the statewide voter registration list. If records were merged, please provide that information.

3. Confirmation notice data was missing for Questions A10a through A10f in Maine. According to Footnote 9 in that section of the EAVS Report, the "Maine elections division conducts mass confirmation notice mailings in compliance with NVRA. The last one was completed more than 90 days before the November 2022 general election. The next one is planned for 2025." Please explain how it is determined who receives a confirmation notice. If the confirmation notices have been sent out, please explain how many and when they were sent. If there have been results for the confirmation notices sent, explain the results using the categories in 10b-f of the EAVS Report.

4. Likewise, no data was provided for Question A12e regarding individuals who were removed after receiving a confirmation notice and then failed to vote in two consecutive federal elections. Explain Maine's process for sending out and keeping track of confirmation notices and removing individuals who have received confirmation notices and failed to vote in two consecutive federal elections.

5. For Question A12b, Maine had 101,771 voters (77.2 percent) removed for having moved outside the jurisdiction, which is more than twice the national average. Explain Maine's process for removing individuals who move out of the jurisdiction.

6. Please explain Maine's process for identifying and removing deceased individuals from the voter roll.

Please provide a description of the steps that Maine has taken, and when those steps were taken, to identify registered voters who are ineligible to vote as well as the procedures it used to remove those ineligible voters from the registration list. Please identify the number of registered voters identified as ineligible to vote for the time period of the close of registration for the November 2022 general election through present for each of the following reasons:

1.  Non-citizen

2.  Adjudicated incompetent

3.  Felony conviction

For each of those voters identified in categories 1-3 above, provide their registration information on the statewide voter registration list, including their vote history.

Please provide this information within 14 days of the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS).

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov. We look forward to your assistance in advance.

Sincerely,

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division

Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division

cc:    The Honorable Julie Flynn
Deputy Secretary of State
184 State House Station
Augusta, Maine 04333-0101
julie.flynn@maine.gov

**U.S. Department of Justice**

Civil Rights Division

*Voting Section*
*950 Pennsylvania Ave, NW – 4CON*
*Washington, DC  20530*

July 21, 2025

<u>Via Mail and Email</u>

The Honorable Jocelyn Benson
Secretary of State
430 W. Allegan St.
Richard H. Austin Building – 4th Floor
Lansing, MI 48918
secretary@michigan.gov

Dear Secretary of State Benson:

We write to you as the chief election official for the State of Michigan to request information regarding the State's procedures for complying with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq.*, and the voter verification requirements of the Help America Vote Act of 2002 ("HAVA"), 52 U.S.C. § 20901 *et seq*.

Please provide a list of the election officials who are responsible for implementing Michigan's general program of voter registration list maintenance from November 2022 through receipt of this letter, including those responsible officials not employed by your office (such as local election officials) who are also involved in that effort. Please also provide a description of the steps that you have taken, and when those steps were taken, to ensure that the State's list maintenance program has been properly carried out in full compliance with the NVRA. Please include both the actions taken by Michigan officials as well as local election officials.

The NVRA requires each state and the District of Columbia to make available for inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). Section 11 of the NVRA authorizes the Attorney General to bring NVRA enforcement actions. *See* 52 U.S.C. § 20510.

Pursuant to Section 20507(i) of the NVRA, the Attorney General requests that you produce for inspection the following records:

> The current electronic copy of Michigan's computerized statewide voter registration list ("statewide voter registration list") as required by Section 303(a) of HAVA. Please include all fields contained within the list. Please produce each list in a .xls, .csv, or delimited-text file format.  Please specify what delimiter is used, if applicable, or provide a file layout along with a database user manual, coding list, or other materials that define or explain how

a voter record is coded into the statewide voter registration list and reported in the electronic copy of the statewide voter registration list.

Additionally, please provide the following information in electronic form. The time period for these requests is close of registration for the November 2022 general election through the close of registration for the November 2024 general election, the same time period as the most recent report from the Election Assistance Commission's Election Administration and Voting Survey ("EAVS"). If you are unable to provide the data, please explain why the data is not available.

1. In the most recent EAVS report, the State's response to Question A1b suggests the number of registered voters listed as active is nearly the same as the State's citizen voting age population. Using the 2023 American Community Survey One-Year estimates, the State's 2024 registration rate was 95.1 percent of the citizen voting age population. Please explain what actions the State is taking to ensure that voters who should not be on the statewide voter registration list are being removed.

2. In the EAVS data for Questions A10a and A1b, Michigan reported that it sent 330,598 confirmation notices out of 8,440,236 total active registered voters. Michigan sent confirmation notices to 4.5 percent of total active registered voters in the state. The national average is 19.5 percent. Please explain Michigan's process for determining when to send a confirmation notice to an active registered voter.

3. The EAVS data for Question A12a reports that Michigan removed 357,708 voters (4.2 percent of registered voters) from the statewide voter registration list, while the national average was 9.1 percent. Please explain what actions the State is taking to remove ineligible voters from its statewide voter registration list.

4. In the EAVS data for Question A12e, Michigan reported that it removed only 96,900 voters for failure to respond to a sent confirmation notice and not voting in the two most recent federal elections. Please explain how Michigan uses the confirmation notice process to remove voters from the statewide voter registration list.

5. The EAVS data for Question A3d reflects that Michigan reported 1,869,580 duplicate registrations, which was 45.7 percent of all of the registration transactions received by Michigan. Please explain why duplicate registrations comprise such a high number of all registration transactions in Michigan.

6. Neither the State nor any of the counties provided a response to Question A12h regarding how many duplicate records were removed from the statewide voter registration list. Please identify how many registration records were removed from the statewide voter registration list by the State and counties because they were identified as duplicate registrations. If such registrations were merged or linked with another record, please provide that information. If duplicate registrations are not removed or merged, explain what happens to the duplicate registrations. Additionally, please explain the State's process for determining whether a record is a duplicate registration and how often the State and counties search for duplicate registrations on the voter registration list.

2

Potentially related to the concerns about duplicate voter registrations, the Department has received a complaint that alleges that Michigan is not compliant with HAVA's unique voter identification requirement in 52 U.S.C. § 21083(a). The complaint alleges that Michigan's Qualified Voter File assigns multiple identifiers to individual voters, with different identifiers used by the Secretary of State's Bureau of Elections office and local clerks. The complaint also alleges that Michigan does not require a driver's license number when registering to vote if the applicant has one. Please explain Michigan's practice for assigning an identifier under 52 U.S.C. § 21083(a), whether Michigan and its local jurisdictions use multiple identifiers for registered voters, and whether voter registration applicants are required to provide their driver's license number if they have one.

Please provide a description of the steps that Michigan has taken, and when those steps were taken, to identify registered voters who are ineligible to vote as well as the procedures Michigan used to remove those ineligible voters from the registration list. Please identify the number of registered voters identified as ineligible to vote for the time period of the close of registration for the November 2022 general election through present for each of the following reasons:

1. Non-citizen

2. Adjudicated incompetent

3. Felony conviction

For each of those voters identified in categories 1-3 above, provide their registration information on the statewide voter registration list, including their vote history.

Please provide this information within 14 days of the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS).

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov. We look forward to your assistance in advance.

Sincerely,

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division


Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division

cc:    Jonathan Brater
       Director, Bureau of Elections
       430 W. Allegan St.
       Richard H. Austin Building – 4th Floor
       Lansing, MI 48918
       braterj@michigan.gov

U.S. Department of Justice

Civil Rights Division

Voting Section
950 Pennsylvania Ave, NW – 4CON
Washington, DC 20530

June 25, 2025

The Honorable Steve Simon
Secretary of State
Veterans Service Building, Suite 210
20 W 12th Street
Saint Paul, MN 55155
secretary.state@state.mn.us

Dear Secretary of State Simon:

The Help America Vote Act ("HAVA") establishes minimum standards for states to follow in several key aspects of administration of federal elections, including voting systems, provisional ballots, voter information posters on election days, first-time voters who register to vote by mail, and statewide voter registration databases. HAVA is codified at 52 U.S.C. § 20901 to 21145. In particular, HAVA imposes certain list maintenance obligations on states as part of the uniform statewide database requirements of Section 303(a)(2) of HAVA, 52 U.S.C. § 21083(a)(2), including coordinating the computerized statewide voter registration list ("statewide voter registration list") with state agency records on felony status and death.

Please provide the following information regarding the State's HAVA compliance:

(1) Describe how the State processes new applications to register to vote for elections for federal office, as required by HAVA Section 303.

(2) Describe the process by which Minnesota assigns a unique identifier to each legally registered voter in Minnesota, as required by HAVA Section 303(a)(1)(A).

(3) Describe how the statewide voter registration list is coordinated with the databases of other state agencies, as required by HAVA Section 303(a)(1)(A). Provide the name of each state database used for coordination, and describe the procedures used for the coordination as well as how often the databases are coordinated with the statewide voter registration list.

(4) Describe the process by which any duplicate voter registrations are identified and removed from the statewide voter registration list under HAVA Section 303(a)(2)(B)(iii). Please include an explanation of how the State determines what constitutes a duplicate voter registration record.

(5) Describe the process by which voters who have been convicted of a felony are identified and, if applicable under state law, removed from the statewide voter registration list under HAVA Section 303(a)(2)(A)(ii)(I).

(6)    Describe the process by which deceased registrants are identified and removed from the statewide voter registration list under HAVA Section 303(a)(2)(A)(ii)(II).

(7)    Describe all technological security measures taken by the State to prevent unauthorized access to the statewide voter registration list, as required by HAVA Section 303(a)(3).

(8)    Describe the process by which voters who have moved outside the State and subsequently register to vote in another state are identified and removed from the statewide voter registration list, under HAVA Section 303(a)(4)(A).

(9)    Describe the process by which registrants who are ineligible to vote due to non-citizenship are identified and removed from the statewide voter registration list.

(10)   HAVA requires states to verify voter registration information by mandating that applicants provide certain information under HAVA Section 303(a)(5). Please provide a copy of the voter registration application(s) utilized for in-person voter registration, a link to the State's online voter registration application, and, if applicable, the voter registration application used for same-day registration.

(11)   Please describe the verification process under HAVA Section 303(a)(5) that election officials perform to verify the required information supplied by the registrant. Please describe what happens to the registration application if the information cannot be verified.

(12)   Provide a copy of the current agreement, under HAVA Section 303(a)(5)(B)(i), between the chief State election official and the State's motor vehicle authority.

(13)   Provide a copy of the current agreement between the official responsible for the State's motor vehicle authority and the Commissioner of Social Security Administration under HAVA Section 303(a)(5)(B)(ii).

(14)   Under HAVA Section 303(b), describe the State's requirements for an individual to vote if the individual registered to vote by mail and has not previously voted in an election for federal office in the State.

(15)   Please send us Minnesota's current statewide voter registration list. Please include both active and inactive voters.

Please provide this information within 30 days of the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS).

2

If you have any questions, please email voting.section@usdoj.gov. We very much appreciate your cooperation in our nationwide efforts to monitor HAVA compliance.


Sincerely,

Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division


cc:    Paul Linnell, Director, Elections Division
Veterans Service Building, Suite 210
20 W 12th Street
Saint Paul, MN 55155
secretary.state@state.mn.us



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                *Washington, D.C. 20530*

September 8, 2025

<u>Via Mail and Email</u>

The Honorable Denny Hoskins
Secretary of State
600 West Main Street
Jefferson City, MO 65101
sosmain@sos.mo.gov

Re:    **Request for Complete Missouri's Voter Registration List with All Fields**

Dear Secretary Hoskins:

We write to you as the chief election official for the State of Missouri concerning your State's compliance with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq*., and the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901, *et seq*.  Please provide a copy of Missouri's statewide voter registration list ("VRL") within fourteen days of the date of this letter.

The electronic copy of the statewide VRL should contain *all fields*, which means, your state's VRL must include the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required under HAVA[1] to register individuals for federal elections.  *See* 52 U.S.C. § 21083(a)(5)(A)(i).

We request Missouri's VRL to assess your state's compliance with the statewide VRL maintenance provisions of the NVRA. Our request is pursuant to the Attorney General's authority under Section 11 of the NVRA to bring enforcement actions. *See* 52 U.S.C. § 20510(a).

HAVA also provides authority for the Justice Department to seek the State's VRL via Section 401, which makes the Attorney General solely responsible for actions to enforce HAVA's computerized statewide voter registration list requirements. *See* 52 U.S.C. § 21111; *see also Brunner*

---

[1] In charging the Attorney General with enforcement of the voter registration list requirements in the HAVA and in the NVRA, Congress plainly intended that DOJ be able to conduct an independent review of each state's list.  Any statewide prohibitions are clearly preempted by federal law.

*v. Ohio Republican Party*, 555 U.S. 5, 6 (2008) (*per curiam*) (finding no private right of action to enforce HAVA requirements).

In addition to those authorities, the Attorney General is also empowered by Congress to request records pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), codified at 52 U.S.C. § 20701, *et seq.* Section 301 of the CRA requires state and local officials to retain and preserve records related to voter registration and other acts requisite to voting for any federal office for a period of twenty-two months after any federal general, special or primary election. *See* 52 U.S.C. § 20701.

Section 303 of the CRA provides, in pertinent part, "Any record or paper required by section 20701 to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative…" *See* 52 U.S.C. § 20703.

Pursuant to the foregoing authorities, including the CRA, the Attorney General is requesting an electronic copy of Missouri's complete and current VRL. The purpose of this request is to ascertain Missouri's compliance with the list maintenance requirements of the NVRA and HAVA.

To the extent there are privacy concerns, the voter registration list is subject to federal privacy protections. Section 304 of the CRA provides the answer:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

52 U.S.C. § 20704. HAVA specifies that the "last 4 digits of a social security number . . . shall not be considered to be a social security number for purposes of section 7 of the Privacy Act of 1974" (5 U.S.C. § 522a note); 52 U.S.C. § 21083(c). In addition, any prohibition of disclosure of a motor vehicle record contained in the Driver's License Protection Act, codified at 18 U.S.C. § 2721(b)(1), is exempted when the disclosure is for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority as the Justice Department is now doing. That said, all data received from you will be kept securely and treated consistently with the Privacy Act explained at Civil Rights Division - Department of Justice - Privacy Policy[2].

Please provide the requested electronic VRL[3] to the Justice Department fourteen days from the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File

---

[2] Available at: https://civilrights.justice.gov/privacy-policy#:~:text=Our%20Statutes,Privacy%20Act%20Statement,the%20scope%20of%20our%20jurisdiction.
[3] Containing *all fields*, which includes either the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required by HAVA.

Sharing ("JEFS"). If Missouri would be interested in a data sharing agreement with the Civil Rights Division, please reply to voting.section@usdoj.gov prior to the expiration of the fourteen-day response window. Upon receipt, we will send you an agreement template.

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov.

Regards,

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division

cc:    Chrissy Peters
       Director, Elections Division
       600 West Main Street
       Jefferson City, MO 65101
       chrissy.peters@sos.mo.gov



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

September 8, 2025

<u>Via Mail and Email</u>

The Honorable Robert Evnen
Secretary of State
P.O. Box 94608
Lincoln, NE 68509-4608
robert.evnen@nebraska.gov;
sos.info@nebraska.gov

Re:     **Request for Complete Nebraska's Voter Registration List with All Fields**

Dear Secretary Evnen:

We write to you as the chief election official for the State of Nebraska concerning your State's compliance with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq*., and the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901, *et seq*.  Please provide a copy of Nebraska's statewide voter registration list ("VRL") within fourteen days of the date of this letter.

The electronic copy of the statewide VRL should contain *all fields*, which means, your state's VRL must include the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required under HAVA[1] to register individuals for federal elections.  *See* 52 U.S.C. § 21083(a)(5)(A)(i).

We request Nebraska's VRL to assess your state's compliance with the statewide VRL maintenance provisions of the NVRA. Our request is pursuant to the Attorney General's authority under Section 11 of the NVRA to bring enforcement actions. *See* 52 U.S.C. § 20510(a).

HAVA also provides authority for the Justice Department to seek the State's VRL via Section 401, which makes the Attorney General solely responsible for actions to enforce HAVA's

---

[1] In charging the Attorney General with enforcement of the voter registration list requirements in the HAVA and in the NVRA, Congress plainly intended that DOJ be able to conduct an independent review of each state's list.  Any statewide prohibitions are clearly preempted by federal law.

computerized statewide voter registration list requirements. *See* 52 U.S.C. § 21111; *see also Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 (2008) (*per curiam*) (finding no private right of action to enforce HAVA requirements).

In addition to those authorities, the Attorney General is also empowered by Congress to request records pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), codified at 52 U.S.C. § 20701, *et seq.* Section 301 of the CRA requires state and local officials to retain and preserve records related to voter registration and other acts requisite to voting for any federal office for a period of twenty-two months after any federal general, special or primary election. *See* 52 U.S.C. § 20701.

Section 303 of the CRA provides, in pertinent part, "Any record or paper required by section 20701 to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative…" *See* 52 U.S.C. § 20703.

Pursuant to the foregoing authorities, including the CRA, the Attorney General is requesting an electronic copy of Nebraska's complete and current VRL. The purpose of this request is to ascertain Nebraska's compliance with the list maintenance requirements of the NVRA and HAVA.

To the extent there are privacy concerns, the voter registration list is subject to federal privacy protections. Section 304 of the CRA provides the answer:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

52 U.S.C. § 20704. HAVA specifies that the "last 4 digits of a social security number . . . shall not be considered to be a social security number for purposes of section 7 of the Privacy Act of 1974" (5 U.S.C. § 522a note); 52 U.S.C. § 21083(c). In addition, any prohibition of disclosure of a motor vehicle record contained in the Driver's License Protection Act, codified at 18 U.S.C. § 2721(b)(1), is exempted when the disclosure is for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority as the Justice Department is now doing. That said, all data received from you will be kept securely and treated consistently with the Privacy Act explained at Civil Rights Division - Department of Justice - Privacy Policy[2].

Please provide the requested electronic VRL[3] to the Justice Department fourteen days from the date of this letter. The information and materials may be sent by encrypted email to

---

[2] Available at: https://civilrights.justice.gov/privacy-policy#:~:text=Our%20Statutes,Privacy%20Act%20Statement,the%20scope%20of%20our%20jurisdiction.

[3] Containing *all fields*, which includes either the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required by HAVA.

voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing ("JEFS"). If Nebraska would be interested in a data sharing agreement with the Civil Rights Division, please reply to voting.section@usdoj.gov prior to the expiration of the fourteen-day response window. Upon receipt, we will send you an agreement template.

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov.

Regards,

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division

cc:    Wayne J. Bena, Esq.
       Deputy Secretary of State
       P.O. Box 94608
       Lincoln, NE 68509-4608
       wayne.bena@nebraska.gov

U.S. Department of Justice

Civil Rights Division

*Voting Section*
*950 Pennsylvania Ave, NW – 4CON*
*Washington, DC 20530*

June 25, 2025

The Honorable David Scanlan
Secretary of State
State House, Room 204
107 North Main Street
Concord, NH 03301

████████████████████

Dear Secretary of State Scanlan:

The Help America Vote Act ("HAVA") establishes minimum standards for states to
follow in several key aspects of administration of federal elections, including voting systems,
provisional ballots, voter information posters on election days, first-time voters who register to
vote by mail, and statewide voter registration databases. HAVA is codified at 52 U.S.C. § 20901
to 21145. In particular, HAVA imposes certain list maintenance obligations on states as part of
the uniform statewide database requirements of Section 303(a)(2) of HAVA, 52 U.S.C.
§ 21083(a)(2), including coordinating the computerized statewide voter registration list
("statewide voter registration list") with state agency records on felony status and death.

Please provide the following information regarding the State's HAVA compliance:

(1)    Describe how the State processes new applications to register to vote for elections
       for federal office, as required by HAVA Section 303.

(2)    Describe the process by which New Hampshire assigns a unique identifier to each
       legally registered voter in New Hampshire, as required by HAVA Section
       303(a)(1)(A).

(3)    Describe how the statewide voter registration list is coordinated with the databases
       of other state agencies, as required by HAVA Section 303(a)(1)(A). Provide the
       name of each state database used for coordination, and describe the procedures used
       for the coordination as well as how often the databases are coordinated with the
       statewide voter registration list.

(4)    Describe the process by which any duplicate voter registrations are identified and
       removed from the statewide voter registration list under HAVA Section
       303(a)(2)(B)(iii). Please include an explanation of how the State determines what
       constitutes a duplicate voter registration record.

(5)  Describe the process by which voters who have been convicted of a felony are identified and, if applicable under state law, removed from the statewide voter registration list under HAVA Section 303(a)(2)(A)(ii)(I).

(6)  Describe the process by which deceased registrants are identified and removed from the statewide voter registration list under HAVA Section 303(a)(2)(A)(ii)(II).

(7)  Describe all technological security measures taken by the State to prevent unauthorized access to the statewide voter registration list, as required by HAVA Section 303(a)(3).

(8)  Describe the process by which voters who have moved outside the State and subsequently register to vote in another state are identified and removed from the statewide voter registration list, under HAVA Section 303(a)(4)(A).

(9)  Describe the process by which registrants who are ineligible to vote due to non-citizenship are identified and removed from the statewide voter registration list.

(10) HAVA requires states to verify voter registration information by mandating that applicants provide certain information under HAVA Section 303(a)(5). Please provide a copy of the voter registration application(s) utilized for in-person voter registration, a link to the State's online voter registration application, and, if applicable, the voter registration application used for same-day registration.

(11) Please describe the verification process under HAVA Section 303(a)(5) that election officials perform to verify the required information supplied by the registrant. Please describe what happens to the registration application if the information cannot be verified.

(12) Provide a copy of the current agreement, under HAVA Section 303(a)(5)(B)(i), between the chief State election official and the State's motor vehicle authority.

(13) Provide a copy of the current agreement between the official responsible for the State's motor vehicle authority and the Commissioner of Social Security Administration under HAVA Section 303(a)(5)(B)(ii).

(14) Under HAVA Section 303(b), describe the State's requirements for an individual to vote if the individual registered to vote by mail and has not previously voted in an election for federal office in the State.

(15) Please send us New Hampshire's current statewide voter registration list. Please include both active and inactive voters.

Please provide this information within 30 days of the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS).

If you have any questions, please email voting.section@usdoj.gov. We very much appreciate your cooperation in our nationwide efforts to monitor HAVA compliance.

Sincerely,

Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division

cc:    Patricia Piecuch, Elections Director
State House, Room 204
107 North Main Street
Concord, NH 03301
███████████

3



U.S. Department of Justice

Civil Rights Division

*Voting Section*
*950 Pennsylvania Ave, NW – 4CON*
*Washington, DC  20530*

June 25, 2025

The Honorable Francisco V. Aguilar
Secretary of State



Dear Secretary of State Aguilar:

The Help America Vote Act ("HAVA") establishes minimum standards for states to follow in several key aspects of administration of federal elections, including voting systems, provisional ballots, voter information posters on election days, first-time voters who register to vote by mail, and statewide voter registration databases. HAVA is codified at 52 U.S.C. § 20901 to 21145. In particular, HAVA imposes certain list maintenance obligations on states as part of the uniform statewide database requirements of Section 303(a)(2) of HAVA, 52 U.S.C. § 21083(a)(2), including coordinating the computerized statewide voter registration list ("statewide voter registration list") with state agency records on felony status and death.

Please provide the following information regarding the State's HAVA compliance:

(1)  Describe how the State processes new applications to register to vote for elections for federal office, as required by HAVA Section 303.

(2)  Describe the process by which Nevada assigns a unique identifier to each legally registered voter in Nevada, as required by HAVA Section 303(a)(1)(A).

(3)  Describe how the statewide voter registration list is coordinated with the databases of other state agencies, as required by HAVA Section 303(a)(1)(A). Provide the name of each state database used for coordination, and describe the procedures used for the coordination as well as how often the databases are coordinated with the statewide voter registration list.

(4)  Describe the process by which any duplicate voter registrations are identified and removed from the statewide voter registration list under HAVA Section 303(a)(2)(B)(iii). Please include an explanation of how the State determines what constitutes a duplicate voter registration record.

(5)  Describe the process by which voters who have been convicted of a felony are identified and, if applicable under state law, removed from the statewide voter registration list under HAVA Section 303(a)(2)(A)(ii)(I).

(6)   Describe the process by which deceased registrants are identified and removed from the statewide voter registration list under HAVA Section 303(a)(2)(A)(ii)(II).

(7)   Describe all technological security measures taken by the State to prevent unauthorized access to the statewide voter registration list, as required by HAVA Section 303(a)(3).

(8)   Describe the process by which voters who have moved outside the State and subsequently register to vote in another state are identified and removed from the statewide voter registration list, under HAVA Section 303(a)(4)(A).

(9)   Describe the process by which registrants who are ineligible to vote due to non-citizenship are identified and removed from the statewide voter registration list.

(10)  HAVA requires states to verify voter registration information by mandating that applicants provide certain information under HAVA Section 303(a)(5). Please provide a copy of the voter registration application(s) utilized for in-person voter registration, a link to the State's online voter registration application, and, if applicable, the voter registration application used for same-day registration.

(11)  Please describe the verification process under HAVA Section 303(a)(5) that election officials perform to verify the required information supplied by the registrant. Please describe what happens to the registration application if the information cannot be verified.

(12)  Provide a copy of the current agreement, under HAVA Section 303(a)(5)(B)(i), between the chief State election official and the State's motor vehicle authority.

(13)  Provide a copy of the current agreement between the official responsible for the State's motor vehicle authority and the Commissioner of Social Security Administration under HAVA Section 303(a)(5)(B)(ii).

(14)  Under HAVA Section 303(b), describe the State's requirements for an individual to vote if the individual registered to vote by mail and has not previously voted in an election for federal office in the State.

(15)  Please send us Nevada's current statewide voter registration list. Please include both active and inactive voters.

Please provide this information within 30 days of the date of this letter. The information and materials may be sent by encrypted email to ▨▨▨▨▨▨▨▨▨ via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS).

If you have any questions, please email  We very much appreciate your cooperation in our nationwide efforts to monitor HAVA compliance.

Sincerely,

Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division

cc:



U.S. Department of Justice

Civil Rights Division

*Voting Section*
*950 Pennsylvania Ave, NW – 4CON*
*Washington, DC  20530*

June 30, 2025

The Honorable Kristen Zebrowski Stavisky
The Honorable Raymond Riley, III
Co-Executive Directors, State Board of Elections



Dear Executive Director Zebrowski Stavisky and Executive Director Riley:

The Help America Vote Act ("HAVA") establishes minimum standards for states to follow in several key aspects of administration of federal elections, including voting systems, provisional ballots, voter information posters on election days, first-time voters who register to vote by mail, and statewide voter registration databases. HAVA is codified at 52 U.S.C. §§ 20901 to 21145. In particular, HAVA imposes certain list maintenance obligations on states as part of the uniform statewide database requirements of Section 303(a)(2) of HAVA, 52 U.S.C. § 21083(a)(2), including coordinating the computerized statewide voter registration list ("statewide voter registration list") with state agency records on felony status and death.

Please provide the following information regarding the State's HAVA compliance:

(1)    Describe how the State processes new applications to register to vote for elections for federal office, as required by HAVA Section 303.

(2)    Describe the process by which New York assigns a unique identifier to each legally registered voter in New York, as required by HAVA Section 303(a)(1)(A).

(3)    Describe how the statewide voter registration list is coordinated with the databases of other state agencies, as required by HAVA Section 303(a)(1)(A). Provide the name of each state database used for coordination, and describe the procedures used for the coordination as well as how often the databases are coordinated with the statewide voter registration list.

(4)    Describe the process by which any duplicate voter registrations are identified and removed from the statewide voter registration list under HAVA Section 303(a)(2)(B)(iii). Please include an explanation of how the State determines what constitutes a duplicate voter registration record.

(5)    Describe the process by which voters who have been convicted of a felony are identified and, if applicable under state law, removed from the statewide voter registration list under HAVA Section 303(a)(2)(A)(ii)(I).

(6)    Describe the process by which deceased registrants are identified and removed from the statewide voter registration list under HAVA Section 303(a)(2)(A)(ii)(II).

(7)    Describe all technological security measures taken by the State to prevent unauthorized access to the statewide voter registration list, as required by HAVA Section 303(a)(3).

(8)    Describe the process by which voters who have moved outside the State and subsequently register to vote in another state are identified and removed from the statewide voter registration list, under HAVA Section 303(a)(4)(A).

(9)    Describe the process by which registrants who are ineligible to vote due to non-citizenship are identified and removed from the statewide voter registration list.

(10)   HAVA requires states to verify voter registration information by mandating that applicants provide certain information under HAVA Section 303(a)(5). Please provide a copy of the voter registration application(s) utilized for in-person voter registration, a link to the State's online voter registration application, and, if applicable, the voter registration application used for same-day registration.

(11)   Please describe the verification process under HAVA Section 303(a)(5) that election officials perform to verify the required information supplied by the registrant. Please describe what happens to the registration application if the information cannot be verified.

(12)   Provide a copy of the current agreement, under HAVA Section 303(a)(5)(B)(i), between the chief State election official and the State's motor vehicle authority.

(13)   Provide a copy of the current agreement between the official responsible for the State's motor vehicle authority and the Commissioner of Social Security Administration under HAVA Section 303(a)(5)(B)(ii).

(14)   Under HAVA Section 303(b), describe the State's requirements for an individual to vote if the individual registered to vote by mail and has not previously voted in an election for federal office in the State.

(15)   Please send us New York's current statewide voter registration list. Please include both active and inactive voters.

Please provide this information within 20 days of the date of this letter. The information and materials may be sent by encrypted email to ██████████████ r via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS).

2

If you have any questions, please email ▮▮▮▮▮▮▮. We very much appreciate your cooperation in our nationwide efforts to monitor HAVA compliance.

Sincerely,

Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division

cc:     Henry Berger
        Peter Kosinski

3

**U.S. Department of Justice**

Civil Rights Division

*Voting Section*
*950 Pennsylvania Ave, NW – 4CON*
*Washington, DC  20530*

August 6, 2025

<u>Via Mail and Email</u>

The Honorable Frank LaRose
Secretary of State
180 Civic Center Dr.
Columbus, Ohio 43215
secretarylarose@ohiosos.gov

Dear Secretary LaRose:

We write to you as the chief election official for the State of Ohio to request Ohio's statewide voter registration list and information regarding Ohio's procedures for complying with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq*.  On July 10, we contacted your office about obtaining an electronic copy of the statewide voter registration list for purposes of enforcing the NVRA and the Help America Vote Act, 52 U.S.C. § 20901 *et seq,* and we are renewing our request for that information today.

The NVRA requires each state and the District of Columbia to make available for inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). Section 11 of the NVRA authorizes the Attorney General to bring NVRA enforcement actions. *See* 52 U.S.C. § 20510.

The plain text of § 20507(i) requires disclosure. The phrase "all records" envisions an expansive application and includes the registration information of cancelled records and accompanying voter history. *Project Vote/Voting for Am, Inc. v. Long*, 682 F.3d 331, 336 (4th Cir. 2012); *see also Voter Reference Foundation, LLC v. Torrez*, 727 F.Supp.3d 1014, 1212 (D. N.M. 2024) (finding "all records" includes voter list). Similarly, "programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters" encompasses a broad range of state programs, including the removal of non-citizens from voter rolls. *Id*. The capacious language of the Public Disclosure Provision has been found to "set[] a floor, not a ceiling" to the types of records that must be disclosed. *Public Interest Legal Foundation, Inc. v. Matthews*, 589 F.Supp.3d 932, 941 (C.D. Ill. 2022) (citing *Project Vote/Voting for Am., Inc.*, 682 F.3d at 337). The request for the statewide voter registration list sits firmly above that floor.  Courts have continuously found that Section 8(i) requires the disclosure of voter registration records.  *See, e.g.*, *Public Interest Legal Foundation v. Boockvar*, 431 F.Supp.3d 553, 556 (M.D. Pa. 2019) (permitting disclosure of documents regarding "all registrants who were identified as potentially not satisfying the citizenship

requirement"); *Project Vote/Voting for Am, Inc*, 682 F.3d at 333 (4th Cir. 2012) (requiring disclosure of voter registration applications for "*any individual*" who timely completed an application) (emphasis added); *Project Vote, Inc. v. Kemp*, 208 F.Supp.3d 1320, 1344 (N.D. Ga. 2016) (holding that "Section 8(i) requires the disclosure of individual voter registration records").

Congress passed the NVRA in an effort to "protect the integrity of the electoral process" and "ensure that accurate and current voter registration rolls are maintained." NVRA § 20501. This intention is achieved through the public disclosure provision, which Congress created to establish external checks on potential administrative oversights or inefficiencies regarding ineligible voters appearing on voter rolls. *See Project Vote/Voting for Am, Inc.*, 682 F.3d at 334-35.  State laws are not a bar to providing this information.  If the NVRA, a federal act, and state law "do not operate harmoniously in a single procedural scheme for federal voter registration, then Congress has exercised its power to 'alter' the state's regulation, and that regulation is superseded." *Gonzalez v. Arizona*, 677 F.3d 383, 394 (9th Cir. 2012) (en banc), *aff'd sub nom. Arizona v. Inter Tribal Council of Arizona, Inc.* ("*ITCA*"), 570 U.S. 1 (2013).

Please also provide a list of the election officials who are responsible for implementing Ohio's general program of voter registration list maintenance from November 2022 through receipt of this letter, including those responsible officials not employed by your office (such as local election officials) who are also involved in that effort. Please also provide a description of the steps that you have taken, and when those steps were taken, to ensure that the State's list maintenance program has been properly carried out in full compliance with the NVRA.

Please provide this information within 14 days of the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS).

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov. We look forward to your assistance in advance.

Sincerely,

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division


Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division

cc:    Kimberly Burns
       Director of Operations & Assistant Secretary of State
       180 Civic Center Dr.
       Columbus, Ohio 43215
       kburns@ohiosos.gov

**U.S. Department of Justice**

Civil Rights Division

*Voting Section*
*950 Pennsylvania Ave, NW – 4CON*
*Washington, DC 20530*

July 16, 2025

<u>Via Mail and Email</u>

The Honorable Tobias Read
Secretary of State
900 Court Street NE, Capitol Room 136
Salem, OR 97301
oregon.sos@sos.oregon.gov

Dear Secretary of State Read:

We write to you as the chief election official for the State of Oregon to request information regarding the state's procedures for complying with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq*.

Please provide a list of the election officials who are responsible for implementing Oregon's general program of voter registration list maintenance from November 2022 through receipt of this letter, including those responsible officials not employed by your office (such as local election officials) who are also involved in that effort. Please also provide a description of the steps that you have taken, and when those steps were taken, to ensure that the state's list maintenance program has been properly carried out in full compliance with the NVRA. Please include both the actions taken by Oregon officials as well as county officials.

The NVRA requires each state and the District of Columbia to make available for inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). Section 11 of the NVRA authorizes the Attorney General to bring NVRA enforcement actions. *See* 52 U.S.C. § 20510.

Pursuant to Section 20507(i) of the NVRA, the Attorney General requests that you produce for inspection the following records:

1. The current electronic copy of Oregon's computerized statewide voter registration list ("statewide voter registration list") as required by Section 303(a) of the Help America Vote Act. Please include all fields contained within the list. Please produce each list in a .xls, .csv, or delimited-text file format. Please specify what delimiter is used, if applicable, or provide a file layout along with a database user manual, coding list, or other materials that define or explain how a voter record is coded into the statewide voter

registration list and reported in the electronic copy of the statewide voter registration list.

Additionally, please provide the following information in electronic form. The time period for these requests is close of registration for the November 2022 general election through the close of registration for the November 2024 general election, the same time period as the most recent report from the Election Assistance Commission's Election Administration and Voting Survey ("EAVS"). If you are unable to provide the data, please explain why the data is not available.

1. A review of the most recent EAVS report indicates that in response to Question A1b, there are nearly as many registered voters listed as active as the citizen voting age population in Oregon, with a registration rate in 2024 of 95.3 percent of the citizen voting age population. Furthermore, the EAVS report indicates that the ratio of active registered voters to citizen voting age population has been unusually high for several years, with Oregon reporting a registration rate of 93.3 percent of citizen voting age population in 2022 and 93.1 percent in 2020. Please explain Oregon's general program for removing ineligible voters from the official lists of eligible voters.

2. In the EAVS data for Question A10a, Oregon sent 357,959 confirmation notices, and 100% of the "Result of Confirmation Notice" is categorized under "Other." Please explain what "Other" means for the results of the 357,959 confirmation notices that Oregon sent. Please also describe Oregon's process for keeping track of the results of Confirmation Notices.

3. In the EAVS data for Question A12a, Oregon removed 111,621 voters, or 3.6% of registered voters, which is well below the national average of 9.1%. For each category of removal, except for A12e discussed below, please explain what actions Oregon is taking to ensure that ineligible voters are removed from the official lists of eligible voters. Please explain why the number of removals is so low.

4. In the EAVS data for Question A12e, Oregon reported that it removed only 4,417 voters of a total of 3,060,374 registered voters for failure to respond to a sent confirmation notice and not voting in the two most recent federal elections. Oregon, by far, has reported the lowest numbers of removals for this category of all NVRA covered states reporting data. Please explain how Oregon uses the confirmation notice process to remove voters and why the number of removals is so low.

5. In the EAVS data for Question A1c, total inactive voters, Oregon did not report any number for any county. Please explain if Oregon has any processes for determining if a voter should be listed as inactive and explain how voters are tracked when they fail to respond to a confirmation notice.

6. In the EAVS data for Question A3d, Oregon reported 1,585 total duplicate registrations. In the EAVS data for Question A12h, the number of voters removed for the reason of a duplicate voter registration record, Oregon reported "Does not apply" for all counties. In the EAVS data for Question A13a, Oregon reported 1,256 voter records were merged. Please explain what actions Oregon took with respect to the 1,585 duplicate registrations and Oregon's process for removing duplicate registrations and merging records. Please explain

whether Oregon checks the voter rolls for duplicate registrations, and if so, how often that check is performed.

Please provide a description of the steps that Oregon has taken, and when those steps were taken, to identify registered voters who are ineligible to vote as well as the procedures Oregon used to remove those ineligible voters from the registration list. Please identify the number of registered voters identified as ineligible to vote for the time period of the close of registration for the November 2022 general election through present for each of the following reasons:

1. Non-citizen

2. Adjudicated incompetent

3. Felony conviction

For each of those voters identified in categories 1-3 above, provide their registration information on the statewide voter registration list, including their vote history.

Please provide this information within 14 days of the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS).

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov. We look forward to your assistance in advance.

Sincerely,

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division

Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division

Cc:     Dena Dawson
        Elections Director
        Public Service Building, Suite 126
        255 Capitol St. NE
        Salem, OR 97310
        elections.sos@sos.oregon.gov

3

**U.S. Department of Justice**

Civil Rights Division

*Voting Section*
*950 Pennsylvania Ave, NW – 4CON*
*Washington, DC 20530*

August 4, 2025

<u>Via Mail and Email</u>

The Honorable Al Schmidt
Secretary of the Commonwealth
401 North Street, Rm 302
Harrisburg, PA 17120
Email: al.schmidt@pa.gov | ra-voterreg@pa.gov

Dear Secretary Schmidt:

We write to you as the chief election official for the Commonwealth of Pennsylvania to request information regarding the Commonwealth's procedures for complying with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 et seq.

Please provide a list of the election officials who are responsible for implementing Pennsylvania's general program of voter registration list maintenance from November 2022 through receipt of this letter, including those responsible officials not employed by your office (such as local election officials) who are also involved in that effort. Please also provide a description of the steps that you have taken to ensure that the Commonwealth's list maintenance program has been properly carried out in full compliance with the NVRA. Please include both the actions taken by Commonwealth officials as well as county officials.

The NVRA requires each state and the District of Columbia to make available for inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). Section 11 of the NVRA authorizes the Attorney General to bring NVRA enforcement actions.

Pursuant to Section 20507(i) of the NVRA, the Attorney General requests that you produce for inspection the following records:

1. The current electronic copy of the Commonwealth of Pennsylvania's computerized statewide voter registration list ("statewide voter registration list") as required by Section 303(a) of the Help America Vote Act. Please include all fields contained within the list. Please produce each list in a .xls, .csv, or delimited-text file format. Please specify what delimiter is used, if applicable, or provide a file layout.

Additionally, please provide the following information in electronic form. The time period for these requests is close of registration for the November 2022 general election through the close

of registration for the November 2024 general election, the same time period as the most recent report from the Election Assistance Commission's Election Administration and Voting Survey ("EAVS"). If you are unable to provide the data, please explain why the data is not available.

1. In the EAVS data for Question A3d, Pennsylvania identified 378,187 voters (4.49 percent) with duplicate registrations, nearly three times below the nationwide average of 12.7 percent. Moreover, we understand the Public Interest Legal Foundation recently identified an additional 19,489 registrants holding matched voter registration files in second states as of Summer 2025, 3,170 instances of same-address duplications, 70 intra-county duplicates, and 321 placeholder/fictitious dates of birth. Please explain why duplicate registrations are such a low percentage of the total registration applications received.

2. Similarly, in the EAVS data for Question A12h, 47 of 66 counties in Pennsylvania recorded either 0 or 1 transactions to remove duplicate registrants. Please confirm how frequently county personnel perform manual duplicate queries and how frequently SURE performs automated searches.

3. In the EAVS data for Question A3g, Pennsylvania listed 40,209 transactions as "other," without further explanation. Please explain those registrations listed as "other."

4. In the EAVS data for Question A4h, Pennsylvania listed 1 transaction arising from an Armed Forces Recruitment Office, which is significantly below similarly sized states. Please explain why such few transactions can be sourced to Armed Forces Recruitment Offices and what actions Pennsylvania is taking to ensure Offices fulfill their voter registration responsibility.

5. In the EAVS data for Question A11, concerning the reason for sending confirmation notices, the largest category by far is A11n, "Other." Please explain the nature of these confirmation notices and why they do not fit in available categories.

6. In the EAVS data, Pennsylvania has failed to respond to Question A13a regarding merged voter records. Please provide the requested data or an explanation for why that information is not available.

Please provide a description of the steps that Pennsylvania has taken, and when those steps were taken, to identify registered voters who are ineligible to vote as well as the procedures that Pennsylvania used to remove those ineligible voters from the registration list for categories two and three below. For all categories below, please identify the number of registered voters identified as ineligible to vote for the time period of the close of registration for the November 2022 general election through present:

1. Non-citizen

2. Adjudicated incompetent

3. Felony conviction

For each of those voters identified in categories 1-3 above, provide their registration information on the statewide voter registration list, including their vote history.

Please provide this information within 14 days of the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS).

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov. We look forward to your assistance in advance.

Sincerely,

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division

Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division

cc: Jessica Mathis, Director
Bureau of Election Services and Notaries
401 North Street, Room 210
Harrisburg, PA 17120
jesmathis@pa.gov



**U.S. Department of Justice**

Civil Rights Division

*Voting Section*
*950 Pennsylvania Ave, NW – 4CON*
*Washington, DC 20530*

August 6, 2025

<u>Via Mail and Email</u>

The Honorable Howard Knapp
Executive Director, State Election Commission
1122 Lady Street, Suite 500
Columbia, SC 29201
hknapp@elections.sc.gov; elections@elections.sc.gov

Dear Executive Director Knapp:

We write to you as the chief election official for the State of South Carolina to request South Carolina's statewide voter registration list and information regarding South Carolina's procedures for complying with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq.* On July 2, we contacted you about obtaining an electronic copy of the statewide voter registration list for purposes of enforcing the NVRA and the Help America Vote Act, 52 U.S.C. § 20901 *et seq,* and we are renewing our request for that information today.

The NVRA requires each state and the District of Columbia to make available for inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). Section 11 of the NVRA authorizes the Attorney General to bring NVRA enforcement actions. *See* 52 U.S.C. § 20510.

The plain text of § 20507(i) requires disclosure. The phrase "all records" envisions an expansive application and includes the registration information of cancelled records and accompanying voter history. *Project Vote/Voting for Am, Inc. v. Long,* 682 F.3d 331, 336 (4th Cir. 2012); *see also Voter Reference Foundation, LLC v. Torrez,* 727 F.Supp.3d 1014, 1212 (D. N.M. 2024) (finding "all records" includes voter list). Similarly, "programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters" encompasses a broad range of state programs, including the removal of non-citizens from voter rolls. *Id.* The capacious language of the Public Disclosure Provision has been found to "set[] a floor, not a ceiling" to the types of records that must be disclosed. *Public Interest Legal Foundation, Inc. v. Matthews,* 589 F.Supp.3d 932, 941 (C.D. Ill. 2022) (citing *Project Vote/Voting for Am., Inc.,* 682 F.3d at 337). The request for the statewide voter registration list sits firmly above that floor. Courts have continuously found that Section 8(i) requires the disclosure of voter registration records. *See, e.g., Public Interest Legal Foundation v. Boockvar,* 431 F.Supp.3d 553, 556 (M.D. Pa. 2019) (permitting disclosure of documents regarding "all

RETRIEVED FROM DEMOCRACYDOCKET.COM

ELECTRONICALLY FILED - 2025 Aug 29 1:54 PM - CALHOUN - COMMON PLEAS - CASE#2025CP090195

ELECTRONICALLY FILED - 2025 Aug 29 1:54 PM - CALHOUN - COMMON PLEAS - CASE#2025CP0900195

registrants who were identified as potentially not satisfying the citizenship requirement"); *Project Vote/Voting for Am, Inc*, 682 F.3d at 333 (4th Cir. 2012) (requiring disclosure of voter registration applications for "*any individual*" who timely completed an application) (emphasis added); *Project Vote, Inc. v. Kemp*, 208 F.Supp.3d 1320, 1344 (N.D. Ga. 2016) (holding that "Section 8(i) requires the disclosure of individual voter registration records").

Congress passed the NVRA in an effort to "protect the integrity of the electoral process" and "ensure that accurate and current voter registration rolls are maintained." NVRA § 20501. This intention is achieved through the public disclosure provision, which Congress created to establish external checks on potential administrative oversights or inefficiencies regarding ineligible voters appearing on voter rolls. *See Project Vote/Voting for Am, Inc.*, 682 F.3d at 334-35. State laws are not a bar to providing this information. If the NVRA, a federal act, and state law "do not operate harmoniously in a single procedural scheme for federal voter registration, then Congress has exercised its power to 'alter' the state's regulation, and that regulation is superseded." *Gonzalez v. Arizona*, 677 F.3d 383, 394 (9th Cir. 2012) (en banc), *aff'd sub nom. Arizona v. Inter Tribal Council of Arizona, Inc.* ("*ITCA*"), 570 U.S. 1 (2013).

Please also provide a list of the election officials who are responsible for implementing South Carolina's general program of voter registration list maintenance from November 2022 through receipt of this letter, including those responsible officials not employed by your office (such as local election officials) who are also involved in that effort. Please also provide a description of the steps that you have taken, and when those steps were taken, to ensure that the State's list maintenance program has been properly carried out in full compliance with the NVRA.

Please provide this information within 14 days of the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS).

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov. We look forward to your assistance in advance.

Sincerely,

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division

Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division

2

**U.S. Department of Justice**

Civil Rights Division

*Voting Section*
*950 Pennsylvania Ave, NW – 4CON*
*Washington, DC  20530*

August 7, 2025

<u>Via Mail and Email</u>

The Honorable Jane Nelson
Secretary of State
P.O. Box 12887
Austin, TX 78701
jnelson@sos.texas.gov; secretary@sos.texas.gov

Dear Secretary Nelson:

We write to you as the chief election official for the State of Texas to request Texas' statewide voter registration list and information regarding Texas' procedures for complying with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq*.  On July 8, we contacted your office about obtaining an electronic copy of the statewide voter registration list for purposes of enforcing the NVRA and the Help America Vote Act, 52 U.S.C. § 20901 *et seq,* and we are renewing our request for that information today.

The NVRA requires each state and the District of Columbia to make available for inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). Section 11 of the NVRA authorizes the Attorney General to bring NVRA enforcement actions. *See* 52 U.S.C. § 20510.

The plain text of § 20507(i) requires disclosure. The phrase "all records" envisions an expansive application and includes the registration information of cancelled records and accompanying voter history. *Project Vote/Voting for Am, Inc. v. Long*, 682 F.3d 331, 336 (4th Cir. 2012); *see also Voter Reference Foundation, LLC v. Torrez*, 727 F.Supp.3d 1014, 1212 (D. N.M. 2024) (finding "all records" includes voter list). Similarly, "programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters" encompasses a broad range of state programs, including the removal of non-citizens from voter rolls. *Id*. The capacious language of the Public Disclosure Provision has been found to "set[] a floor, not a ceiling" to the types of records that must be disclosed. *Public Interest Legal Foundation, Inc. v. Matthews*, 589 F.Supp.3d 932, 941 (C.D. Ill. 2022) (citing *Project Vote/Voting for Am., Inc.*, 682 F.3d at 337). The request for the statewide voter registration list sits firmly above that floor.  Courts have continuously found that Section 8(i) requires the disclosure of voter registration records.  *See, e.g.*, *Public Interest Legal Foundation v. Boockvar*, 431 F.Supp.3d 553, 556 (M.D. Pa. 2019) (permitting disclosure of documents regarding "all registrants who were identified as potentially not satisfying the citizenship

requirement"); *Project Vote/Voting for Am, Inc*, 682 F.3d at 333 (4th Cir. 2012) (requiring disclosure of voter registration applications for "*any individual*" who timely completed an application) (emphasis added); *Project Vote, Inc. v. Kemp*, 208 F.Supp.3d 1320, 1344 (N.D. Ga. 2016) (holding that "Section 8(i) requires the disclosure of individual voter registration records").

Congress passed the NVRA in an effort to "protect the integrity of the electoral process" and "ensure that accurate and current voter registration rolls are maintained." NVRA § 20501. This intention is achieved through the public disclosure provision, which Congress created to establish external checks on potential administrative oversights or inefficiencies regarding ineligible voters appearing on voter rolls. *See Project Vote/Voting for Am, Inc.*, 682 F.3d at 334-35. State laws are not a bar to providing this information. If the NVRA, a federal act, and state law "do not operate harmoniously in a single procedural scheme for federal voter registration, then Congress has exercised its power to 'alter' the state's regulation, and that regulation is superseded." *Gonzalez v. Arizona*, 677 F.3d 383, 394 (9th Cir. 2012) (en banc), *aff'd sub nom. Arizona v. Inter Tribal Council of Arizona, Inc.* ("*ITCA*"), 570 U.S. 1 (2013).

Please also provide a list of the election officials who are responsible for implementing Texas' general program of voter registration list maintenance from November 2022 through receipt of this letter, including those responsible officials not employed by your office (such as local election officials) who are also involved in that effort. Please also provide a description of the steps that you have taken, and when those steps were taken, to ensure that the State's list maintenance program has been properly carried out in full compliance with the NVRA.

Please provide this information within 14 days of the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS).

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov. We look forward to your assistance in advance.

Sincerely,

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division


Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division

2

cc:    Christina Adkins
        Director of Elections
        1019 Brazos St.
        Austin, TX 78701
        cadkins@sos.texas.gov

**U.S. Department of Justice**

Civil Rights Division

*Voting Section*
*950 Pennsylvania Ave, NW – 4CON*
*Washington, DC 20530*

July 15, 2025

<u>Via Mail and Email</u>

The Honorable Deidre Henderson
Lieutenant Governor
P.O. Box 142220
Salt Lake City, UT 84114-2220
deidrehenderson@utah.gov

Dear Lieutenant Governor Henderson:

We write to you as the chief election official for the State of Utah to request information regarding the state's procedures for complying with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq*.

Please provide a list of the election officials who are responsible for implementing Utah's general program of voter registration list maintenance from November 2022 through receipt of this letter, including those responsible officials not employed by your office (such as local election officials) who are also involved in that effort. Please also provide a description of the steps that you have taken, and when those steps were taken, to ensure that the state's list maintenance program has been properly carried out in full compliance with the NVRA.

The NVRA requires each state and the District of Columbia to make available for inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). Section 11 of the NVRA authorizes the Attorney General to bring NVRA enforcement actions. *See* 52 U.S.C. § 20510.

Pursuant to Section 20507(i) of the NVRA, the Attorney General requests that you produce for inspection the following records:

The current electronic copy of Utah's computerized statewide voter registration list ("statewide voter registration list") as required by Section 303(a) of the Help America Vote Act. Please include all fields contained within the list. Please produce each list in a .xls, .csv, or delimited-text file format. Please specify what delimiter is used, if applicable, or provide a file layout along with a database user manual, coding list, or other materials that define or explain how a voter record is coded into the statewide voter registration list and reported in the electronic copy of the statewide voter registration list.

Additionally, please provide the following information in electronic form.  The time period for these requests is close of registration for the November 2022 general election through the close of registration for the November 2024 general election, the same time period as the most recent report from the Election Assistance Commission's Election Administration and Voting Survey ("EAVS").  If you are unable to provide the data, please explain why the data is not available.

1. A review of the most recent EAVS report shows that Utah has the lowest rate in the nation for voter registration records removed from the voter registration rolls.  Only four of Utah's twenty-nine counties provided data regarding removals in response to Question A12a. Please supply the data for the twenty-five remaining counties. Additionally, please explain what actions the State is taking to ensure that voters who should not be on the voter roll are being removed.

2. No data was listed for any county in Utah in the EAVS survey for Question A3d, which asks for information regarding registration transactions submitted by persons already registered to vote. Please provide the data on duplicate registrations for each county in Utah. If such registrations were merged or linked with another record, please provide that information. Additionally, please explain Utah's process for determining duplicates and what happens to the duplicate registrations.

3. Most counties in Utah reported no data for Questions A10b through A10f, which track the outcome of Confirmation Notices that were mailed to registrants. Only six counties provided data for any category and only two counties provided data for all categories. The information on confirmation notices that Utah did provide indicates that those reporting counties generally did not know the result of the confirmation notice. 180,061 (65.8%) of the Result of Confirmation Notice were listed as "not categorized." Please provide the data for each county in Utah for Questions A10b through A10f.

4. Most counties in Utah provided no data on the reasons that voters were removed from the registration rolls, as is requested by Questions A12b through A12h. Only two counties in Utah reported data for voters removed because they moved outside the jurisdiction. Only one county reported data for voters removed because they failed to respond to a sent confirmation notice and failed to vote in the two most recent federal elections. All other categories – including removal of deceased voters, voter's request for removal, felony, and mental incompetence – had no data reported for any county. Please provide the data for each county in Utah for Questions A12b through A12h.

5. In response to Question A12e, Utah reported an aggregate total of 45,342 registrants removed for failure to return confirmation notices. This number is 263.7% of all voters removed from the state registration list, which Utah reported as 17,196. Please provide an explanation for the discrepancy.

Please provide a description of the steps that Utah has taken, and when those steps were taken, to identify registered voters who are ineligible to vote as well as the procedures the state used to remove those ineligible voters from the registration list. Please identify the number of registered

voters identified as ineligible to vote for the time period of the close of registration for the
November 2022 general election through present for each of the following reasons:

1. Non-citizen

2. Adjudicated incompetent

3. Felony conviction

For each of those voters identified in categories 1-3 above, provide their registration information
on the statewide voter registration list, including their vote history.

Please provide this information within 14 days of the date of this letter. The information
and materials may be sent by encrypted email to voting.section@usdoj.gov or via the
Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS).

Should further clarification be required, please contact Maureen Riordan at
maureen.riordan2@usdoj.gov. We look forward to your assistance in advance.

Sincerely,

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division


Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division

cc: Ryan Cowley
Director of Elections
350 N. State Street, Suite 200
Salt Lake City, UT 84114-2220
ryancowley@utah.gov

**U.S. Department of Justice**

Civil Rights Division

*Voting Section*
*950 Pennsylvania Ave, NW – 4CON*
*Washington, DC  20530*

July 15, 2025

<u>Via Mail and Email</u>

The Honorable Susan Beals
Commissioner, Virginia Department of Elections
1100 Bank Street, First Floor
Richmond, Virginia  23219
susan.beals@elections.virginia.gov

Dear Commissioner Beals:

We write to you as the chief election official for the Commonwealth of Virginia to request information regarding Virginia's procedures for complying with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq*.

Please provide a list of the election officials who are responsible for implementing Virginia's general program of voter registration list maintenance from November 2022 through receipt of this letter, including those responsible officials not employed by your office (such as local election officials) who are also involved in that effort.  Please also provide a description of the steps that you have taken, and when those steps were taken, to ensure that the Commonwealth's list maintenance program has been properly carried out in full compliance with the NVRA.

The NVRA requires each state and the District of Columbia to make available for inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1).  Section 11 of the NVRA authorizes the Attorney General to bring NVRA enforcement actions. *See* 52 U.S.C. § 20510.

Pursuant to Section 20507(i) of the NVRA, the Attorney General requests that you produce for inspection the following records:

The current electronic copy of Virginia's computerized statewide voter registration list ("statewide voter registration list") as required by Section 303(a) of the Help America Vote Act.  Please include all fields contained within the list. Please produce each list in a .xls, .csv, or delimited-text file format.  Please specify what delimiter is used, if applicable, or provide a file layout along with a database user manual, coding list, or other materials that define or explain how a voter record is coded into the statewide voter registration list and reported in the electronic copy of the statewide voter registration list.

Additionally, please provide the following information in electronic form.  The time period for these requests is close of registration for the November 2022 general election through the close of registration for the November 2024 general election, the same time period as the most recent report from the Election Assistance Commission's Election Administration and Voting Survey ("EAVS").  If you are unable to provide the data, please explain why the data is not available.

1.      A review of the most recent report from EAVS report indicates that in response to Question A1b, there are nearly as many registered voters listed as active as the citizen voting age population in Virginia, with a registration rate in 2024 of 92.2 percent of the citizen voting age population.  Please explain what actions Virginia is taking to ensure that voters who should not be on the voter roll are being removed.

2.      In the EAVS data for Question A3d, Virginia had 1,074,543 voters (33.2 percent) with duplicate registrations, almost three times as high as the nationwide average of 12.7 percent.  In response to the same question for the 2022 EAVS Report, Virginia had 1,226,754 duplicate registrations (36.3 percent).  Please explain why duplicate registrations are such a high percentage of the total registration applications received.  Please explain what actions Virginia is taking to identify duplicate registrations and to remove those duplicates from the voter registration list.

3.      In the EAVS data for Question A10a, Virginia sent 521,339 confirmation notices, which is 8.8 percent of all active registered voters and well below the national average of 19.5 percent.  Please explain why Virginia sent confirmation notices to so few registered voters.

4.      In the EAVS data for Question A12b, Virginia had 536,460 voters (68.4 percent) removed because they moved out of the commonwealth, which was twice as high as the national average.  Please explain how Virginia identifies voters who have moved out of the commonwealth and determines their removal from the voter registration list.

5.      In the EAVS data for Question A12e, Virginia had 61,151 voters (7.8 percent) removed due to failure to respond to confirmation notices and did not vote in the two most recent federal elections, which was well below the national average.  Based on the responses to Question A10f, 415,181 (79.6 percent) of the confirmation notices were unreturned.  Please explain why so few voters are being removed in Question A12e.  Please provide a list of all registrations that were cancelled because of failure to respond to confirmation notices and did not vote in the two most recent federal election cycles.

6.      No data was listed in the EAVS survey for Question A12h for Virginia regarding duplicate registrants who were removed from the statewide voter registration database. Please provide a list of all duplicate registrants who were removed from the statewide voter registration list.  If they were merged or linked with another record, please provide that information.

Please provide a description of the steps that Virginia has taken, and when those steps were taken, to identify registered voters who are ineligible to vote as well as the procedures the commonwealth used to remove those ineligible voters from the registration list. Please identify the number of registered voters identified as ineligible to vote for the time period of the close of registration for the November 2022 general election through present for each of the following reasons:

1. Non-citizen

2. Adjudicated incompetent

3. Felony conviction

For each of those voters identified in categories 1-3 above, provide their registration information on the statewide voter registration list, including their vote history.

Please provide this information within 14 days of the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS).

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov. We look forward to your assistance in advance.

Sincerely,

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division

Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                     *Washington, D.C. 20530*

September 8, 2025

<u>Via Mail and Email</u>

The Honorable Sarah Copeland Hanzas
Secretary of State
128 State Street
Montpelier, VT 05633
Sarah.CopelandHanzas@vermont.gov

Re:     **Request for Complete Vermont's Voter Registration List with All Fields**

Dear Secretary Copeland Hanzas:

We write to you as the chief election official for the State of Vermont concerning your State's compliance with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq*., and the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901, *et seq*.  Please provide a copy of Vermont's statewide voter registration list ("VRL") within fourteen days of the date of this letter.

The electronic copy of the statewide VRL should contain *all fields*, which means, your state's VRL must include the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required under HAVA[1] to register individuals for federal elections.  *See* 52 U.S.C. § 21083(a)(5)(A)(i).

We request Vermont's VRL to assess your state's compliance with the statewide VRL maintenance provisions of the NVRA. Our request is pursuant to the Attorney General's authority under Section 11 of the NVRA to bring enforcement actions. *See* 52 U.S.C. § 20510(a).

HAVA also provides authority for the Justice Department to seek the State's VRL via Section 401, which makes the Attorney General solely responsible for actions to enforce HAVA's computerized statewide voter registration list requirements. *See* 52 U.S.C. § 21111; *see also Brunner*

---

[1] In charging the Attorney General with enforcement of the voter registration list requirements in the HAVA and in the NVRA, Congress plainly intended that DOJ be able to conduct an independent review of each state's list.  Any statewide prohibitions are clearly preempted by federal law.

*v. Ohio Republican Party*, 555 U.S. 5, 6 (2008) (*per curiam*) (finding no private right of action to enforce HAVA requirements).

In addition to those authorities, the Attorney General is also empowered by Congress to request records pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), codified at 52 U.S.C. § 20701, *et seq.* Section 301 of the CRA requires state and local officials to retain and preserve records related to voter registration and other acts requisite to voting for any federal office for a period of twenty-two months after any federal general, special or primary election. *See* 52 U.S.C. § 20701.

Section 303 of the CRA provides, in pertinent part, "Any record or paper required by section 20701 to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative…" *See* 52 U.S.C. § 20703.

Pursuant to the foregoing authorities, including the CRA, the Attorney General is requesting an electronic copy of Vermont's complete and current VRL. The purpose of this request is to ascertain Vermont's compliance with the list maintenance requirements of the NVRA and HAVA.

To the extent there are privacy concerns, the voter registration list is subject to federal privacy protections. Section 304 of the CRA provides the answer:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

52 U.S.C. § 20704. HAVA specifies that the "last 4 digits of a social security number . . . shall not be considered to be a social security number for purposes of section 7 of the Privacy Act of 1974" (5 U.S.C. § 522a note); 52 U.S.C. § 21083(c). In addition, any prohibition of disclosure of a motor vehicle record contained in the Driver's License Protection Act, codified at 18 U.S.C. § 2721(b)(1), is exempted when the disclosure is for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority as the Justice Department is now doing. That said, all data received from you will be kept securely and treated consistently with the Privacy Act explained at Civil Rights Division - Department of Justice - Privacy Policy[2].

Please provide the requested electronic VRL[3] to the Justice Department fourteen days from the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File

---

[2] Available at: https://civilrights.justice.gov/privacy-policy#:~:text=Our%20Statutes,Privacy%20Act%20Statement,the%20scope%20of%20our%20jurisdiction.

[3] Containing *all fields*, which includes either the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required by HAVA.

Sharing ("JEFS").  If Vermont would be interested in a data sharing agreement with the Civil Rights Division, please reply to voting.section@usdoj.gov prior to the expiration of the fourteen-day response window. Upon receipt, we will send you an agreement template.

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov.

Regards,

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division

cc:    Seán Sheechan
       Director of Elections
       128 State Street
       Montpelier, VT 05633
       Sean.Sheechan@vermont.gov



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

September 8, 2025

<u>Via Mail and Email</u>

The Honorable Steve Hobbs
Secretary of State
PO Box 40220
Olympia, WA 98504-0220
steve.hobbs@sos.wa.gov;
secretaryofstate@sos.wa.gov

Re:    **Request for Complete Washington's Voter Registration List with All Fields**

Dear Secretary Hobbs:

We write to you as the chief election official for the State of Washington concerning your State's compliance with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq.*, and the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901, *et seq.* Please provide a copy of Washington's statewide voter registration list ("VRL") within fourteen days of the date of this letter.

The electronic copy of the statewide VRL should contain *all fields*, which means, your state's VRL must include the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required under HAVA[1] to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A)(i).

We request Washington's VRL to assess your state's compliance with the statewide VRL maintenance provisions of the NVRA. Our request is pursuant to the Attorney General's authority under Section 11 of the NVRA to bring enforcement actions. *See* 52 U.S.C. § 20510(a).

HAVA also provides authority for the Justice Department to seek the State's VRL via Section 401, which makes the Attorney General solely responsible for actions to enforce HAVA's

---

[1] In charging the Attorney General with enforcement of the voter registration list requirements in the HAVA and in the NVRA, Congress plainly intended that DOJ be able to conduct an independent review of each state's list. Any statewide prohibitions are clearly preempted by federal law.

computerized statewide voter registration list requirements. *See* 52 U.S.C. § 21111; *see also Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 (2008) (*per curiam*) (finding no private right of action to enforce HAVA requirements).

In addition to those authorities, the Attorney General is also empowered by Congress to request records pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), codified at 52 U.S.C. § 20701, *et seq*.  Section 301 of the CRA requires state and local officials to retain and preserve records related to voter registration and other acts requisite to voting for any federal office for a period of twenty-two months after any federal general, special or primary election. *See* 52 U.S.C. § 20701.

Section 303 of the CRA provides, in pertinent part, "Any record or paper required by  section 20701 to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative…" *See* 52 U.S.C. § 20703.

Pursuant to the foregoing authorities, including the CRA, the Attorney General is requesting an electronic copy of Washington's complete and current VRL. The purpose of this request is to ascertain Washington's compliance with the list maintenance requirements of the NVRA and HAVA.

To the extent there are privacy concerns, the voter registration list is subject to federal privacy protections. Section 304 of the CRA provides the answer:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

52 U.S.C. § 20704. HAVA specifies that the "last 4 digits of a social security number . . . shall not be considered to be a social security number for purposes of section 7 of the Privacy Act of 1974" (5 U.S.C. § 522a note); 52 U.S.C. § 21083(c).  In addition, any prohibition of disclosure of a motor vehicle record contained in the Driver's License Protection Act, codified at 18 U.S.C. § 2721(b)(1), is exempted when the disclosure is for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority as the Justice Department is now doing. That said, all data received from you will be kept securely and treated consistently with the Privacy Act explained at Civil Rights Division - Department of Justice - Privacy Policy[2].

Please provide the requested electronic VRL[3] to the Justice Department fourteen days from the date of this letter.   The information and materials may be sent by encrypted email to

---

[2] Available at: https://civilrights.justice.gov/privacy-policy#:~:text=Our%20Statutes ,Privacy%20Act%20Statement,the%20scope%20of%20our%20jurisdiction.

[3] Containing *all fields*, which includes either the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required by HAVA.

voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing ("JEFS"). If Washington would be interested in a data sharing agreement with the Civil Rights Division, please reply to voting.section@usdoj.gov prior to the expiration of the fourteen-day response window. Upon receipt, we will send you an agreement template.

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov.

Regards,

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division

cc:    Stuart Holmes
       Director of Elections
       416 Sid Snyder Ave SW
       Olympia, WA 98501
       stuart.holmes@sos.wa.gov



**U.S. Department of Justice**

Civil Rights Division

---

*Voting Section*
*950 Pennsylvania Ave, NW – 4CON*
*Washington, DC 20530*

June 17, 2025

The Honorable Meagan Wolfe
Administrator, Wisconsin Elections Commission
201 W Washington Ave
Madison, WI. 53703

Re: Request for Information Related to HAVA Compliance

Dear Ms. Wolfe:

As you are already aware, we have received several complaints regarding the Wisconsin Election Commission's ("WEC") compliance with the Help America Vote Act ("HAVA") 52 U.S.C. 20901 - 21145. Many of these complaints allege that WEC is failing to comply with the list maintenance procedure requirements of Section 303 of HAVA. To enable the Attorney General to determine if WEC is complying with these requirements, we are requesting the following information:

(1) Describe how Wisconsin's computerized statewide voter registration list ("voter registration list") is coordinated with the databases of other state agencies, as required by HAVA Section 303(a)(1)(A). Provide the name of each state database used for coordination, and describe the procedures used for coordination, as well as how often the databases are coordinated with the voter registration list;

(2) Describe the process by which voters who have been deemed ineligible are removed from the voter registration list pursuant to the list maintenance procedures referenced in HAVA Section 303(a)(2), the number of the voters currently deemed ineligible that remain on the voter registration list, and the basis for not having already removed them from the voter registration list;

(3) Describe how WEC determines who is an "inactive" voter, pursuant to the list maintenance procedures referenced in HAVA Section 303(a)(2), and explain the process for removal of inactive voters from the voter registration list;

(4) Describe the process by which any duplicate voter registrations are identified, including how the State determines what constitutes a duplicate voter registration record, and the process for their removal from the voter registration list under HAVA Section 303(a)(2)(B)(iii);

1

(5) Describe the process by which voters who have moved outside the state and subsequently registered to vote in another state are identified and removed from the voter registration list under HAVA Section 303(a)(4)(A);

(6) Describe the process by which registrants who are ineligible due to non-citizenship are identified and removed from the voter registration list; and

(7) Please send us the current voter registration list. Please include both active and inactive voters.

Please provide this information within 20 days of the date of this letter. The information and materials may be sent by email to ██████████ or by FedEx or UPS to:

U.S. Department of Justice, Civil Rights Division
Voting Section


If you have any questions, please contact Kevin Muench at ██████████ We very much appreciate your cooperation in our effort to monitor HAVA compliance.

Sincerely,

Maureen Riordan
Voting Section, Acting Chief

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division

2



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

September 8, 2025

<u>Via Mail and Email</u>

The Honorable Kris Warner
Secretary of State
1900 Kanawha Blvd.
Bldg. 1, Suite 157-K
Charleston, WV 25305
wvsos@wvsos.com

Re:     **Request for Complete West Virginia's Voter Registration List with All Fields**

Dear Secretary Warner:

      We write to you as the chief election official for the State of West Virginia concerning your State's compliance with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq*., and the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901, *et seq*.  Please provide a copy of West Virginia's statewide voter registration list ("VRL") within fourteen days of the date of this letter.

      The electronic copy of the statewide VRL should contain *all fields*, which means, your state's VRL must include the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required under HAVA[1] to register individuals for federal elections.  *See* 52 U.S.C. § 21083(a)(5)(A)(i).

      We request West Virginia's VRL to assess your state's compliance with the statewide VRL maintenance provisions of the NVRA. Our request is pursuant to the Attorney General's authority under Section 11 of the NVRA to bring enforcement actions. *See* 52 U.S.C. § 20510(a).

      HAVA also provides authority for the Justice Department to seek the State's VRL via Section 401, which makes the Attorney General solely responsible for actions to enforce HAVA's

---

[1] In charging the Attorney General with enforcement of the voter registration list requirements in the HAVA and in the NVRA, Congress plainly intended that DOJ be able to conduct an independent review of each state's list.  Any statewide prohibitions are clearly preempted by federal law.

computerized statewide voter registration list requirements. *See* 52 U.S.C. § 21111; *see also Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 (2008) (*per curiam*) (finding no private right of action to enforce HAVA requirements).

In addition to those authorities, the Attorney General is also empowered by Congress to request records pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), codified at 52 U.S.C. § 20701, *et seq.* Section 301 of the CRA requires state and local officials to retain and preserve records related to voter registration and other acts requisite to voting for any federal office for a period of twenty-two months after any federal general, special or primary election. *See* 52 U.S.C. § 20701.

Section 303 of the CRA provides, in pertinent part, "Any record or paper required by section 20701 to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative…" *See* 52 U.S.C. § 20703.

Pursuant to the foregoing authorities, including the CRA, the Attorney General is requesting an electronic copy of West Virginia's complete and current VRL. The purpose of this request is to ascertain West Virginia's compliance with the list maintenance requirements of the NVRA and HAVA.

To the extent there are privacy concerns, the voter registration list is subject to federal privacy protections. Section 304 of the CRA provides the answer:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

52 U.S.C. § 20704. HAVA specifies that the "last 4 digits of a social security number . . . shall not be considered to be a social security number for purposes of section 7 of the Privacy Act of 1974" (5 U.S.C. § 522a note); 52 U.S.C. § 21083(c). In addition, any prohibition of disclosure of a motor vehicle record contained in the Driver's License Protection Act, codified at 18 U.S.C. § 2721(b)(1), is exempted when the disclosure is for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority as the Justice Department is now doing. That said, all data received from you will be kept securely and treated consistently with the Privacy Act explained at Civil Rights Division - Department of Justice - Privacy Policy[2].

---

[2] Available at: https://civilrights.justice.gov/privacy-policy#:~:text=Our%20Statutes,Privacy%20Act%20Statement,the%20scope%20of%20our%20jurisdiction.

Please provide the requested electronic VRL[3] to the Justice Department fourteen days from the date of this letter.  The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing ("JEFS").  If West Virginia would be interested in a data sharing agreement with the Civil Rights Division, please reply to voting.section@usdoj.gov prior to the expiration of the fourteen-day response window. Upon receipt, we will send you an agreement template.

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov.


Regards,

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division


cc:     Brittany Westfall
        Elections Director
        1900 Kanawha Blvd.
        Bldg. 1, Suite 157-K
        Charleston, WV 25305
        bwestfall@wvsos.gov

---

[3] Containing *all fields*, which includes either the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required by HAVA.



**U.S. Department of Justice**

Civil Rights Division

*Voting Section*
*950 Pennsylvania Ave, NW – 4CON*
*Washington, DC 20530*

June 25, 2025

The Honorable Chuck Gray
Secretary of State
Herschler Building East
122 West 25th Street, Suite 100
Cheyenne, WY 82002-0020
chuck.gray@wyo.gov
secofstate@wyo.gov

Dear Secretary of State Gray:

The Help America Vote Act ("HAVA") establishes minimum standards for states to follow in several key aspects of administration of federal elections, including voting systems, provisional ballots, voter information posters on election days, first-time voters who register to vote by mail, and statewide voter registration databases. HAVA is codified at 52 U.S.C. § 20901 to 21145. In particular, HAVA imposes certain list maintenance obligations on states as part of the uniform statewide database requirements of Section 303(a)(2) of HAVA, 52 U.S.C. § 21083(a)(2), including coordinating the computerized statewide voter registration list ("statewide voter registration list") with state agency records on felony status and death.

Please provide the following information regarding the State's HAVA compliance:

(1)    Describe how the State processes new applications to register to vote for elections for federal office, as required by HAVA Section 303.

(2)    Describe the process by which Wyoming assigns a unique identifier to each legally registered voter in Wyoming, as required by HAVA Section 303(a)(1)(A).

(3)    Describe how the statewide voter registration list is coordinated with the databases of other state agencies, as required by HAVA Section 303(a)(1)(A). Provide the name of each state database used for coordination, and describe the procedures used for the coordination as well as how often the databases are coordinated with the statewide voter registration list.

(4)    Describe the process by which any duplicate voter registrations are identified and removed from the statewide voter registration list under HAVA Section 303(a)(2)(B)(iii). Please include an explanation of how the State determines what constitutes a duplicate voter registration record.

(5)   Describe the process by which voters who have been convicted of a felony are identified and, if applicable under state law, removed from the statewide voter registration list under HAVA Section 303(a)(2)(A)(ii)(I).

(6)   Describe the process by which deceased registrants are identified and removed from the statewide voter registration list under HAVA Section 303(a)(2)(A)(ii)(II).

(7)   Describe all technological security measures taken by the State to prevent unauthorized access to the statewide voter registration list, as required by HAVA Section 303(a)(3).

(8)   Describe the process by which voters who have moved outside the State and subsequently register to vote in another state are identified and removed from the statewide voter registration list, under HAVA Section 303(a)(4)(A).

(9)   Describe the process by which registrants who are ineligible to vote due to non-citizenship are identified and removed from the statewide voter registration list.

(10)  HAVA requires states to verify voter registration information by mandating that applicants provide certain information under HAVA Section 303(a)(5). Please provide a copy of the voter registration application(s) utilized for in-person voter registration, a link to the State's online voter registration application, and, if applicable, the voter registration application used for same-day registration.

(11)  Please describe the verification process under HAVA Section 303(a)(5) that election officials perform to verify the required information supplied by the registrant. Please describe what happens to the registration application if the information cannot be verified.

(12)  Provide a copy of the current agreement, under HAVA Section 303(a)(5)(B)(i), between the chief State election official and the State's motor vehicle authority.

(13)  Provide a copy of the current agreement between the official responsible for the State's motor vehicle authority and the Commissioner of Social Security Administration under HAVA Section 303(a)(5)(B)(ii).

(14)  Under HAVA Section 303(b), describe the State's requirements for an individual to vote if the individual registered to vote by mail and has not previously voted in an election for federal office in the State.

(15)  Please send us Wyoming's current statewide voter registration list. Please include both active and inactive voters.

Please provide this information within 30 days of the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS).

If you have any questions, please email voting.section@usdoj.gov. We very much appreciate your cooperation in our nationwide efforts to monitor HAVA compliance.

Sincerely,

Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division

cc:    Charles Young, Director, Elections Division
Herschler Building East
122 West 25th Street, Suite 99
Cheyenne, WY 82002-0019
Elections@wyo.gov