ROB BONTA
Attorney General of California
R. MATTHEW WISE
SETH E. GOLDSTEIN
Supervising Deputy Attorneys General
ROBERT WILLIAM SETRAKIAN (SBN 335045)
ANNE P. BELLOWS (SBN 293722)
LISA C. EHRLICH (SBN 270842)
MICHAEL S. COHEN (SBN 339846)
KEVIN L. QUADE (SBN 285197)
WILLIAM BELLAMY (SBN 347029)
MALCOLM A. BRUDIGAM (SBN 323707)
Deputy Attorneys General
  1300 I Street, Suite 125
  Sacramento, CA 95814
  Telephone: (916) 210-7873
  Fax: (916) 454-8171
  E-mail: Malcolm.Brudigam@doj.ca.gov
*Attorneys for Defendants Shirley Weber, in her
official capacity as the California Secretary of
State, and the State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>**v.**<br><br>**SHIRLEY WEBER, in her official capacity as Secretary of State of the State of California, and the STATE OF CALIFORNIA,**<br><br>Defendants. | 2:25-cv-09149-DOC-ADS<br><br>**NOTICE OF AMICUS BRIEFS FILED BY THE U.S. DEPT. OF JUSTICE**<br><br><br>Judge:          Hon. David O. Carter<br>Action Filed: September 25, 2025 |

## <u>NOTICE OF AMICUS BRIEFS FILED BY U.S. DEPT. OF JUSTICE</u>

This matter came before the Court yesterday, December 4, 2025, for a hearing on motions to dismiss filed by Defendants California Secretary of State Shirley Weber and the State of California ("California") (ECF No. 37); Intervenor-Defendants NAACP, NAACP California-Hawaii State Conference, and Services, Immigrant Rights and Education Network (ECF No. 62-1); and Intervenor-

Defendants League of Women Voters of California (ECF No. 67). At the hearing, the Court requested that California submit copies of amicus briefs filed by the U.S. Department of Justice ("DOJ") in three cases before the U.S. Court of Appeals for the First, Third, and Fourth Circuits. All three briefs reflect DOJ's position that the National Voter Registration Act ("NVRA") does not prohibit redaction of highly sensitive voter information disclosed under the NVRA's public inspection provision, 52 U.S.C. § 20507(i). In this case, DOJ has taken a contrary position, i.e., that such redactions are prohibited under the NVRA. ECF Nos. 64-1 at 22, 81 at 10–16. Here are the citations to DOJ's amicus briefs, which are also attached as exhibits here to.

- **Exhibit A:** Br. for the United States as Amicus Curiae in Support of Plaintiff-Appellee, at 28 – 29, *Pub. Int. Legal Found. v. Sec'y Commonwealth of Penn.*, 136 F.4th 456 (3d Cir. 2025) (Nos. 23-1590, 23-1591), 2023 WL 7486717, at *28–29.[1]

- **Exhibit B:** Br. for the United States as Amicus Curiae in Support of Plaintiff-Appellee at 27–30, *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36 (1st Cir. 2024) (No. 23-1361), 2023 WL 4882397, at *27–30.

- **Exhibit C:** Br. for the United States as Amicus Curiae in Support of Plaintiff-Appellee at 11, 25–26, *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012) (No. 11-1809), 2011 WL 4947283, at *11, 25–26.

///

///

///

---

[1] At the hearing yesterday, December 4, 2025, Counsel for California incorrectly referenced *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613 (6th Cir. 2025) as one of the cases in which DOJ took a position on redacting records in response to disclosure under the NVRA. Counsel for California apologizes for the mistake and has cited the correct case and amicus brief he was referring to, i.e., *Pub. Int. Legal Found. v. Sec'y Commonwealth of Penn.*, 136 F.4th 456 (3d Cir. 2025).

1    Dated:  December 5, 2025                    Respectfully submitted,

2                                               ROB BONTA
                                               Attorney General of California
3                                               R. MATTHEW WISE
                                               SETH E. GOLDSTEIN
4                                               Supervising Deputy Attorneys General

5

6
                                                /s/ Malcolm A. Brudigam
7                                              _____
                                               MALCOLM A. BRUDIGAM
8                                              ROBERT WILLIAM SETRAKIAN
                                               ANNE P. BELLOWS
9                                              LISA C. EHRLICH
                                               MICHAEL S. COHEN
10                                             KEVIN L. QUADE
                                               WILLIAM BELLAMY
11                                             Deputy Attorneys General
                                               *Attorneys for Defendants Shirley
12                                             Weber, in her official capacity as the
                                               California Secretary of State, and
13                                             State of California*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit A

**2023 WL 7486717 (C.A.3) (Appellate Brief)**

United States Court of Appeals, Third Circuit.

PUBLIC INTEREST LEGAL FOUNDATION, Plaintiff-Appellee-Cross-Appellant,

v.

SECRETARY OF THE COMMONWEALTH OF PENNSYLVANIA and Jonathan M. Marks, in his official

capacity as Deputy Secretary for Elections and Commissions, Defendants-Appellants-Cross-Appellees.

Nos. 23-1590, 23-1591.

November 6, 2023.

On Appeal from the United States District Court
for the Middle District of Pennsylvania

**Brief for the United States as Amicus Curiae in Support of Plaintiff-Appellee-
Cross-Appellant and Urging Affirmance on the Issue Addressed Herein**

Kristen Clarke, Assistant Attorney General, Tovah R. Calderon, Noah B. Bokat-Lindell, Attorneys, Department of Justice, Civil Rights Division, Appellate Section, Ben Franklin Station, P.O. Box 14403, Washington, D.C. 20044-4403, (202) 598-0243.

**\*i  TABLE OF CONTENTS**

INTEREST OF THE UNITED STATES ................................................................ 1

STATEMENT OF THE ISSUE ................................................................ 1

STATEMENT OF THE CASE ................................................................ 2

A. Statutory Background ................................................................ 2

B. The Present Controversy ................................................................ 3

SUMMARY OF ARGUMENT ................................................................ 8

ARGUMENT

The NVRA requires the Secretary to disclose records related to efforts to find and remove noncitizens from Pennsylvania's voter rolls ................................................................ 9

A. Section 8(i) covers records of investigations into noncitizen voter registration and removals of noncitizen registrants ................................................................ 9

B. The Secretary's restrictive view of Section 8(i) conflicts with Section 8(i)'s text, context, and purpose .... 16

1. Section 8(i) applies beyond records related to Section 8(a)(4) removal programs ................................. 16

2. Section 8(i) requires release of records related to those who responded to Pennsylvania's inquiries by canceling their registrations ................................................................ 26

C. States may redact certain information before disclosing Section 8(i) records ......................................... 28

CONCLUSION ................................................................ 30

 **\*ii**  CERTIFICATE OF BAR MEMBERSHIP

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

**\*iii  TABLE OF AUTHORITIES**
**CASES:**

Al-Hasani v. Secretary U.S. Dep't of Homeland Sec., 81 F.4th 291 (3d Cir. 2023) ................................................................ 10, 26

American C.R. Union v. Philadelphia City Comm'rs, 872 F.3d 175 (3d Cir. 2017) ................................................................ 9, 13, 19

Arcos Sanchez v. Attorney Gen. of U.S., 997 F.3d 113 (3d Cir. 2021) ............... 12

Biden v. Texas, 142 S. Ct. 2528 (2022) ................................................................ 17

Doe v. Mercy Cath. Med. Ctr., 850 F.3d 545 (3d Cir. 2017) ............................ 18, 20

Garrett v. Murphy, 17 F.4th 419 (3d Cir. 2021) ................................................ 27

Johnson v. City of Saline, 151 F.3d 564 (6th Cir. 1998) ................................ 18

*Khan v. Attorney Gen. of U.S.*, 979 F.3d 193 (3d Cir. 2020) ........................ 9, 19

*Marmon Coal Co. v. Director, Off. of Workers' Comp. Programs*, 726 F.3d 387
(3d Cir. 2013) ................................................................................................ 25

*Mercy Cath. Med. Ctr. v. Thompson*, 380 F.3d 142 (3d Cir. 2004) .................... 25

*Patel v. Garland*, 596 U.S. 328 (2022) .............................................................. 12

*Port Hamilton Refin. & Transp., LLLP v. United States EPA*, 75 F.4th 166 (3d
Cir. 2023) ...................................................................................................... 25

*Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012) ............ *passim*

*Public Int. Legal Found., Inc. v. North Carolina State Bd. of Elections*, 996
F.3d 257 (4th Cir. 2021) ................................................................................ *passim*

*Riccio v. Sentry Credit, Inc.*, 954 F.3d 582 (3d Cir. 2020) (en banc) ................. 15

*Shuker v. Smith & Nephew, PLC*, 885 F.3d 760 (3d Cir. 2018) ........................ 13

**\*iv**  *United States v. Bryant*, 996 F.3d 1243 (11th Cir.), *cert. denied*, 142 S.
Ct. 583 (2021) .............................................................................................. 20

*United States v. Gonzales*, 520 U.S. 1 (1997) .................................................. 12

*United States v. Mead Corp.*, 533 U.S. 218 (2001) ........................................... 24

*United States v. Smukler*, 991 F.3d 472 (3d Cir. 2021) .................................... 15

**STATUTES:**

Drivers Privacy Protection Act 18 U.S.C. 2721 ................................................ 5

Help America Vote Act

52 U.S.C. 21083(a)(2)(B) ................................................................................ 20

52 U.S.C. 21083(a)(4) ..................................................................................... 11

52 U.S.C. 21083(a)(5)(B)(i) ............................................................................ 20

Pub. L. No. 107-252, § 802, 116 Stat. 1726 (2002) ........................................ 25

National Voter Registration Act

52 U.S.C. 20501(a) ......................................................................................... 2

52 U.S.C. 20501(b) ......................................................................................... 15

52 U.S.C. 20501(b)(1)-(2) ............................................................................... 16, 22

52 U.S.C. 20501(b)(2)-(3) ............................................................................... 16

52 U.S.C. 20501(b)(4) ..................................................................................... 15

52 U.S.C. 20504(c)(1) ..................................................................................... 27

52 U.S.C. 20504(c)(2)(B)(ii) ........................................................................... 19

52 U.S.C. 20504(c)(2)(C) ............................................................................... 19

52 U.S.C.20504(c)(2)(D)(ii) ............................................................................ 26

52 U.S.C. 20504(e) ......................................................................................... 22

52 U.S.C. 20504-20506 .................................................................................. 19

52 U.S.C. 20505(a) ......................................................................................... 27

52 U.S.C. 20506(a)(6)(A) ............................................................................... 27

52 U.S.C. 20506(a)(6)(B)(iii) .......................................................................... 27

52 U.S.C. 20506(a)(7) ..................................................................................... 26-27

52 U.S.C. 20506(d) ......................................................................................... 22

52 U.S.C. 20507 ............................................................................................. 2, 20-21

52 U.S.C. 20507(a) ......................................................................................... 21

**\*v**  52 U.S.C. 20507(a)(1) ............................................................................ 21-22

52 U.S.C. 20507(a)(3) ..................................................................................... 18

52 U.S.C. 20507(a)(3)(A) ............................................................................... 27

52 U.S.C. 20507(a)(5)(A) ............................................................................... 21

52 U.S.C. 20507(a)(4) ..................................................................................... *passim*

52 U.S.C. 20507(b) ......................................................................................... 21

52 U.S.C. 20507(b)(1) ..................................................................................... 15, 20, 22

52 U.S.C. 20507(b)-(g) .................................................................................... 11

52 U.S.C. 20507(c) ......................................................................................... 14, 21

52 U.S.C. 20507(c)(1) ..................................................................................... 17

52 U.S.C. 20507(c)(2) ..................................................................................... 17

52 U.S.C. 20507(c)(2)(A) ............................................................................... 14, 19

52 U.S.C. 20507(c)(2)(B) ............................................................................... 17

52 U.S.C. 20507(c)(2)(B)(i) ............................................................................ 28

52 U.S.C. 20507(d) ......................................................................................... 17, 21

| | |
|---|---|
| 52 U.S.C. 20507(f) ................................................................ | 17 |
| 52 U.S.C. 20507(i) ................................................................ | 1-3 |
| 52 U.S.C. 20507(i)(1) ................................................................ | *passim* |
| 52 U.S.C. 20507(i)(2) ................................................................ | 25 |
| 52 U.S.C. 20508(b)(1)-(2) ................................................................ | 19 |
| 52 U.S.C. 20508(b)(4)(ii) ................................................................ | 27 |
| 52 U.S.C. 20510(a) ................................................................ | 1 |
| Pub. L. No. 103-31, 107 Stat. 77 (1993) ................................................ | 2 |
| Pub. L. No. 103-31, § 9(a), 107 Stat. 87 (1993) ................................... | 24 |
| Civil Rights Act of 1960 | |
| 52 U.S.C. 20701 ................................................................ | 23 |
| 52 U.S.C. 20703 ................................................................ | 23 |
| 52 U.S.C. 20704 ................................................................ | 23 |
| Pub. L. No. 86-449, Tit. III, §§ 301, 303-304, 74 Stat. 88 (1960) ................... | 23 |

**LEGISLATIVE HISTORY:**

| | |
|---|---|
| H.R. Rep. No. 9, 103d Cong., 1st Sess. (1993) .................................... | 27 |
| S. Rep. No. 6, 103d Cong., 1st Sess. (1993) ..................................... | 23-24 |

**MISCELLANEOUS:**

| | |
|---|---|
| **\*vi** Nat'l Clearinghouse on Election Admin., Fed. Election Comm'n, *Implementing the National Voter Registration Act of 1993: Requirements, Issues, Approaches, and Examples* (Jan. 1, 1994), https://perma.cc/Z5UL-LPBY ................................................................ | 24 |
| *Webster's Third New International Dictionary* (1993) ......................... | 10, 26 |

## *1 INTEREST OF THE UNITED STATES

The United States has a direct interest in this appeal, which raises important issues regarding the interpretation of Section 8(i) of the National Voter Registration Act (NVRA), 52 U.S.C. 20507(i). The Attorney General is charged with enforcing the NVRA, including Section 8(i), and relies on Section 8(i) to aid its enforcement efforts. 52 U.S.C. 20510(a). The United States has previously filed briefs addressing the proper interpretation and scope of Section 8(i). *See, e.g.*, U.S. Br. as Amicus Curiae, *Public Int. Legal Found. v. Bellows*, No. 23-1361 (1st Cir. July 25, 2023), https://perma.cc/ML4S-5V4S; U.S. Br. as Amicus Curiae, *Greater Birmingham Ministries v. Secretary of State for the State of Ala.*, No. 22-13708 (11th Cir. Mar. 20, 2023), https://perma.cc/H3TR-4UNU; U.S. Br. as Amicus Curiae, *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012) (No. 11-1809), https://perma.cc/HSM3-U964. The United States files this brief under Federal Rule of Appellate Procedure 29(a).

## STATEMENT OF THE ISSUE

The United States addresses the following issue only: Whether Section 8(i) requires disclosure of records relating to a State's efforts to find and remove from the rolls noncitizens who are registered to vote.

## *2 STATEMENT OF THE CASE

### A. Statutory Background

In 1993, Congress passed the NVRA, Pub. L. No. 103-31, 107 Stat. 77 (52 U.S.C. 20501-20511). In so doing, Congress found that the right to vote is a fundamental right, the exercise of which all levels of government have a duty to promote, and that discriminatory and unfair registration laws and procedures can damage federal voter participation and disproportionately harm voter participation by various groups, including racial minorities. *See* 52 U.S.C. 20501(a).

Section 8 of the NVRA, titled "[r]equirements with respect to administration of voter registration," establishes uniform procedures to increase voter registration in federal elections while maintaining accurate voter rolls. 52 U.S.C. 20507. This case concerns Section 8(i), titled "[p]ublic disclosure of voter registration activities." 52 U.S.C. 20507(i). Section 8(i) provides:

(1) Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

(2) The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

**\*3** *Ibid.*

### B. The Present Controversy

a. In 2017, Pennsylvania admitted that a software error in a computer system used by the Pennsylvania Department of Transportation (PennDOT) had made it possible for noncitizens applying for or renewing their driver's licenses to register to vote. App. 25 (Opinion). [1] To investigate the issue, Pennsylvania first compared PennDOT's driver records to the Statewide Uniform Registry of Electors (SURE), Pennsylvania's statewide voter registration system. *Id.* at 26. The investigation found that approximately 100,000 registered voters had "INS indicators" on their driver records, suggesting they were, or at some previous time may have been, noncitizens. *Id.* at 27. Pennsylvania also searched the SURE database itself for records related to voter registrations canceled because the registrant was a noncitizen. *Ibid.* This second investigation found that 1160 registrations had been so canceled, all after the registrants self-reported their status and asked to be removed from the voter rolls. *Ibid.*

[1]    "App. ___" refers to the corresponding page of appellant's appendix. "Doc. ___, at ___" refers to the docket entry and page number of documents filed in the district court, No. 1:19-cv-622 (M.D. Pa.). "Sec'y Br. ___" refers to the Secretary's First-Step Brief in this Court. "PILF Br. ___" refers to PILF's Second-Step Brief in this Court.

Pennsylvania's Office of Chief Counsel hired outside counsel to help it address the results of the Commonwealth's investigations. App. 28. Outside **\*4** counsel analyzed the SURE database and other voting records to determine which registrants' citizenship--and hence eligibility to vote--required greater scrutiny. *Ibid.* As a result, Pennsylvania mailed 7702 letters reminding registrants of the Commonwealth's voter-eligibility requirements and 11,198 letters asking registrants to affirm their eligibility. Recipients and their responses fell into three categories: (1) those who confirmed their citizenship, whose responses Pennsylvania retained; (2) those who requested cancellation of their registration, whose requests Pennsylvania forwarded to the proper counties; and (3) nonrespondents, whose eligibility Pennsylvania notified counties of the need to investigate further. *Ibid.*

PILF, a nonprofit concerned with "the integrity of elections nationwide," sent the Pennsylvania Department of State a request in October 2017 for access to or copies of four categories of records related to these investigations. App. 25, 28 (citation omitted). PILF sought: (1) "[d]ocuments regarding all registrants who were identified as potentially not satisfying the citizenship requirements for registration from any official information source," including all voter records involved in the 2017 investigations; (2) all requests to the Department of State since 2006 seeking removal or cancellation of registrations due to noncitizenship or other ineligibility; (3) all records of communications to the Department of State from jury officials since 2006 regarding requests to be excused from jury service **\*5** due to noncitizenship; and (4) all communications with law enforcement officials regarding list-maintenance activities related to PILF's other three requests. *Id.* at 28-29 (citation omitted). The Commonwealth denied PILF's request, asserting that the "NVRA applied only to records relating to statutorily mandated removal programs, not the records sought by PILF." *Id.* at 30.

b. PILF sued the Secretary of the Commonwealth of Pennsylvania and the Deputy Secretary for Elections and Commissions (collectively, the Secretary). Doc. 1; *see also* App. 25, 30. The Secretary moved to dismiss, arguing again that Section 8(i) does

not require disclosure of the records of its investigations into noncitizen registrants and that the Drivers Privacy Protection Act (DPPA), 18 U.S.C. 2721, separately protects the requested records. Doc. 14, at 6-14; *see also* App. 30. The district court held that Section 8(i) reaches the requested records, but that documents may be withheld under the DPPA "to the extent they include personal information obtained by PennDOT in connection with a motor vehicle record." App. 30; *see also* App. 7-18.

c. Following the district court's decision, the Secretary began to comply with PILF's requests. App. 30. However, PILF deemed the Secretary's responses to its requests inadequate for several reasons. *See id.* at 34-47. Among other things, the Secretary refused to disclose the requested records from the SURE database, asserting that Section 8(i) does not apply because database records "are **\*6** not used to update or maintain the voter rolls." *Id.* at 34. The Secretary also withheld all documents that contained personal information derived from driver records, citing the DPPA, while PILF asserted that at most the protected personal information should be redacted and the rest of the document disclosed. *Id.* at 36-37.

Both sides moved for summary judgment (Docs. 62, 65), and the district court granted partial summary judgment to each side (App. 24-49, 50-51). The court held that records from the SURE database must be disclosed under Section 8(i). App. 35-36; *see also id.* at 44-45 (requiring Secretary to un-redact voter histories, which derive from SURE database, on disclosed lists of registrants who requested removal from voter rolls citing ineligibility). And it held that the Secretary could not withhold documents that were not entirely derived from driver records; the Secretary only could redact DPPA-protected information from them. *Id.* at 36-37. Similarly, the court held that the Secretary could redact certain personal information for privacy reasons but otherwise must disclose the records containing that information. *Id.* at 37-38 & n.7. The court also resolved other disputes over the scope of certain searches and redactions, as well as over the application of attorney-client and work product privileges for records related to the outside counsel's activities. *Id.* at 38-47.

**\*7** Though the Secretary turned over many records, he also filed a motion for clarification and partial reconsideration. Doc. 88. The district court granted the motion in part and denied it in part. App. 58. Among other things, the court reiterated that the Secretary could redact for privacy reasons "(1) Social Security numbers, (2) 'identities and personal information of those subject to criminal investigations,' and (3) personal information of citizens initially identified as potentially failing to meet the citizenship requirement for voter registration but ultimately exonerated." *Id.* at 56 n.6 (citation omitted). But it clarified that "names and addresses of individuals who responded to the letter by cancelling their voter registration, or who failed to reply to the letter or have not been confirmed to be citizens, must be disclosed." *Ibid.*

d. The Secretary timely appealed the district court's rulings. App. 59-60. His First-Step Brief repeats his argument that Section 8(i) reaches only records regarding statutorily mandated removal programs, but otherwise challenges only the district court's requirement that the Secretary disclose the identities of those who received letters after the Commonwealth's 2017 investigations. Sec'y Br. 14-15. PILF cross-appealed as to the district court's rulings shielding certain information under the work product doctrine. App. 61-62; PILF Br. 14, 62-74.

## **\*8  SUMMARY OF ARGUMENT**

The district court correctly held that Section 8(i) requires the Secretary to disclose the records that PILF requested. Statutory text, context, and purpose establish that Section 8(i) covers records concerning all list-maintenance activities, including activities to remove noncitizens from the voter rolls. The Secretary argues that Section 8(i) is limited to disclosure of records related to the voter-removal programs that the NVRA *requires* States to undertake. But this reading gives short shrift to the far broader language that Congress chose for its disclosure provision, and to the distinctions Congress made between the scope of each provision of Section 8. The Secretary's reading, for instance, would exclude records related to other voter removal activities that Section 8 of the NVRA expressly authorizes. It also would remove from the NVRA's disclosure regime all records related to voter-registration activities, despite clear textual evidence that such records must be disclosed and even though their disclosure is crucial to fulfilling the NVRA's purposes. Nor does Section 8(i)'s exception for records related to declinations to register shield from disclosure records of those who already had been registered but later requested to be removed from the voter rolls.

While States may not fully withhold records covered by Section 8(i), they may redact certain particularly sensitive information before disclosing voters' **\*9** records. The NVRA also leaves intact state and federal laws designed to prevent voter intimidation or other abuses.

### ARGUMENT

**The NVRA requires the Secretary to disclose records related to
efforts to find and remove noncitizens from Pennsylvania's voter rolls.**

#### A. Section 8(i) covers records of investigations into noncitizen
voter registration and removals of noncitizen registrants.

The district court correctly held that Section 8(i) applies to the records that PILF sought regarding Pennsylvania's 2017 investigation and subsequent list maintenance activities. The NVRA's language, structure, and purpose support this reading. *See American C.R. Union v. Philadelphia City Comm'rs*, 872 F.3d 175, 181-183 (3d Cir. 2017) (interpreting NVRA by examining "the text of Section 8" and the NVRA's "purpose").

1. "As with any question of statutory interpretation, we must begin with the statutory text." *Khan v. Attorney Gen. of U.S.*, 979 F.3d 193, 197 (3d Cir. 2020) (citation and internal quotation marks omitted). Section 8(i) requires disclosure of "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. 20507(i)(1). The records at issue in this case--records related to Pennsylvania's investigation into whether its voter rolls included ineligible **\*10** noncitizens--falls squarely within this language. Taking each piece of the statutory text step by step shows why.

First, Pennsylvania's investigations into whether noncitizens were registered to vote and needed to be removed from the rolls plainly at least constitute "activities," if not a "program[]," according to those terms' "ordinary meaning . . . at the time Congress enacted the statute," *Al-Hasani v. Secretary U.S. Dep't of Homeland Sec.*, 81 F.4th 291, 296 (3d Cir. 2023) (alteration in original) (citation omitted). A "program" is "a plan of procedure" or "schedule or system under which action may be taken toward a desired goal," while an "activity" is a "natural or normal function or operation." *Webster's Third New International Dictionary* 22, 1812 (1993). Pennsylvania's efforts meet either definition.

Pennsylvania law makes United States citizenship a qualification to register to vote, 25 Pa. Stat. and Cons. Stat. Ann. § 1301(a) (West 2023), and requires election officials to "correct an error or irregularity in registration and cancel the registration of an individual whom [they] find[] to be improperly registered," *id.* § 1203(h). This cancelation process, whenever it is conducted, "is a 'program' because it is" a plan of procedure "carried out in the service of a specified end--maintenance of voter rolls." *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 335 (4th Cir. 2012) (*Project Vote*). At the least, Pennsylvania's investigation **\*11** into and removal of noncitizen registrants "is an 'activity' because it is a particular task and deed of [Pennsylvania] election employees," a normal operation for which they are responsible. *Ibid.*; *accord Public Int. Legal Found., Inc. v. North Carolina State Bd. of Elections*, 996 F.3d 257, 266 (4th Cir. 2021) (holding that election "[b]oard's efforts . . . to identify noncitizen registrants qualify as a 'program' or 'activity' to ensure an accurate list of eligible voters").

Next, these investigative, maintenance, and removal activities are "conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. 20507(i)(1). Pennsylvania's efforts to identify and remove noncitizens from the rolls, while avoiding removing registrants who are U.S. citizens, plainly are meant to ensure that the voter rolls remain both as current and as accurate as possible. *See* Sec'y Br. 4-8 (documenting efforts); *see also* 52 U.S.C. 20507(a)(4) and (b)-(g), 21083(a)(2)(B) and (a)(4) (requiring States, under both NVRA and Help America Vote Act, to conduct continuous list maintenance activities while imposing safeguards to prevent improper removals).

Further, the records that PILF seeks are "records concerning the implementation of" covered list-maintenance programs. 52 U.S.C. 20507(i)(1). Section 8(i) extends not just to records "*of*" the implementation of programs or activities, but rather to all records "concerning" implementation. *Ibid.* (emphasis added). Like its synonym "regarding," the word "concerning" used "in a legal **\*12** context generally has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Patel v. Garland*, 596 U.S. 328, 339 (2022) (citations omitted). The Secretary does not dispute that, if his investigations constitute covered activities, the records PILF seeks "concern[]"--or relate to--the "implementation" of those activities. 52 U.S.C. 20507(i)(1); *see, e.g.*, Sec'y Br. 36 (arguing only that his efforts were not covered because Section 8(i) applies solely to NVRA-mandated removal programs).

In any event, the NVRA applies its disclosure requirement to "*all*" the "records concerning the implementation of" list-maintenance programs. 52 U.S.C. 20507(i)(1) (emphasis added). "All," like the similar word "any," gives a provision "an expansive meaning," covering implementation-related records "of whatever kind." *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (citation omitted); *accord Arcos Sanchez v. Attorney Gen. of U.S.*, 997 F.3d 113, 120 & n.4 (3d Cir. 2021). "[T]he statute's use of the term 'all records' relating to [a State's] 'implementation of' the program or activity" indicates that Section 8(i) "encompasses a broad range of disclosable documents." *Public Int. Legal Found.*, 996 F.3d at 266. This includes all records concerning the removal of noncitizens from the voter rolls.

**\*13** Finally, Section 8(i) only excludes two types of records from its reach: those that "relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered." 52 U.S.C. 20507(i)(1). The records that PILF requests do not implicate either of these exceptions, and this Court should not manufacture a third. *See American C.R. Union*, 872 F.3d at 182-183 (refusing to "amend" the text of Section 8 "by reading" wording "into its text" that "Congress obviously chose not to" include). "Congress explicitly enumerate[d] certain exceptions" to Section 8(i)'s disclosure mandate; the Secretary cannot invent an "additional," "implied" exception for records related to removal of noncitizens. *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 772 n.10 (3d Cir. 2018) (citation omitted).

The only appeals court to address similar issues has read Section 8(i)'s text the same way. In *Project Vote*, the Fourth Circuit stated that "the plain language of Section 8(i)(1) does not allow us to treat its disclosure requirement as limited to voter removal records," and held that "completed voter registration applications are clearly" covered. 682 F.3d at 335. Following the same "statutory analysis," the Fourth Circuit later held that a State's "efforts . . . to identify noncitizen registrants" and remove them from the rolls "qualify as a 'program' or 'activity' to ensure an accurate list of eligible voters," and that records related to those efforts therefore "fall within the scope of the NVRA's disclosure provision." **\*14** *Public Int. Legal Found.*, 996 F.3d at 266 (quoting 52 U.S.C. 20507(i)(1)). In that case, the Fourth Circuit required the North Carolina State Board of Elections to release documents to PILF that were nearly identical to the information that PILF seeks here: the identities of individuals investigated as potential noncitizen registrants. *Id.* at 260, 262. Though the court agreed that North Carolina could redact particularly sensitive information, it held that the State's privacy concerns "do[] not render the requested documents affiliated with potential noncitizens immune from disclosure under the plain language of the NVRA." *Id.* at 267; *see* pp. 28-29, *infra* (discussing redaction). Nor are such records immune here.

2. Statutory context further shows that Section 8(i) covers records related to finding and removing noncitizen registrants. Congress specified throughout Section 8 when a particular NVRA provision applies only to certain types of removal programs or only to removals of those deemed ineligible for particular reasons. For instance, Section 8(c), titled "[v]oter removal programs," 52 U.S.C. 20507(c), sets time limits for completing "any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. 20507(c)(2)(A). This language refers to routinized list-maintenance processes, as compared to one-off removals. Section 8(a)(4) is even more explicit, requiring States to implement a "general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of **\*15** eligible voters by reason of" voters' death or change of address. 52 U.S.C. 20507(a)(4). Section 8(i) contains no such limiting language--a presumptively intentional difference. *See Riccio v. Sentry Credit, Inc.*, 954 F.3d 582, 587-588 (3d Cir. 2020) (en banc).

3. To the extent any "perceived ambiguity" remains, statutory purpose "resolv [es]" it. *United States v. Smukler*, 991 F.3d 472, 483 (3d Cir. 2021) (citations and internal quotation marks omitted). The NVRA's text enumerates the legislation's four core purposes: increasing eligible voter registration, enhancing voter participation, protecting electoral integrity, and maintaining accurate and current voter registration rolls. 52 U.S.C. 20501(b). Disclosure of records related to States' investigation of and removal of suspected noncitizen registrants would advance all four purposes.

Whether "voter registration rolls" are "accurate and current," 52 U.S.C. 20501(b)(4), can only be determined by examining records related to *all* the bases on which a State removes registrants. At the same time, public inspection of records related to removals--whatever the reason for them--ensures that States are engaging in uniform and nondiscriminatory list-maintenance practices. *See* 52 U.S.C. 20507(b)(1). Identifying errors in States' voter registration systems promotes a smoother registration process, which is vital to "enhanc[ing]" voter "participation," while also "protect[ing] the integrity of the electoral process" by **\*16** ensuring that ineligible individuals are excluded from the rolls. *See* 52 U.S.C. 20501(b)(2)-(3). Plus inspection of all registration and list-maintenance records helps to uncover systemic problems in a jurisdiction, so voters or organizations can remedy registration or list-maintenance issues and re-register improperly removed voters before future elections. *See, e.g.*, *Project Vote*, 682 F.3d at 333; *see also* 52 U.S.C. 20501(b)(1)-(2). Public disclosure of the records of the Secretary's investigation thus advances the NVRA's central purposes.

**B. The Secretary's restrictive view of Section 8(i) conflicts with Section 8(i)'s text, context, and purpose.**

The Secretary's alternative reading of Section 8(i) misreads its text and would remove from its reach many records vital to fulfilling the NVRA's purposes. Section 8(i) is not limited to records related to the NVRA's mandatory voter-removal programs. Nor does Section 8(i) exempt records of those who canceled their registrations in response to the Commonwealth's investigation.

**1. Section 8(i) applies beyond records related to Section 8(a)(4) removal programs.**

a. The Secretary principally contends (Br. 25-32) that Section 8(i) only applies to the mandatory, systematic programs that Section 8(a)(4) requires States to undertake to remove voters ineligible due to death or change of residence. *See* 52 U.S.C. 20507(a)(4). Section 8(i) does not apply here, the Secretary says (Br. **\*17** 31-32), because the NVRA does not similarly require States to remove noncitizens from the rolls.

But Section 8(i)'s text cannot be read to tether disclosure to Section 8(a)(4) programs alone. "If Congress had wanted the provision to have that effect, it could have said so in words far simpler than those that it wrote." *Biden v. Texas*, 142 S. Ct. 2528, 2539 (2022). Congress knows how to cross-reference statutory provisions. It could have limited disclosure to records of "the list-maintenance programs described in subsection (a)(4)." Indeed, Congress did just this in Section 8(c), laying out how "[a] State may meet the requirement of subsection (a)(4)." 52 U.S.C. 20507(c)(1); *see also* 52 U.S.C. 20507(c)(2)(B) (expressly referencing other provisions of Section 8 by stating that a prior subparagraph "shall not be construed to preclude" removing names from voter lists "on a basis described in paragraph (3)(A) or (B) or (4)(A) of subsection (a)"). Or Congress could have employed language like that used in Subsection (a)(4) itself, limiting Section 8(i) to records concerning efforts to remove people from the voter rolls due to "death" or "change in" their "residence." 52 U.S.C. 20507(a)(4). Congress even could have drafted language like that used in other provisions of Section 8 that similarly limit themselves to particular list-maintenance processes. *E.g.*, 52 U.S.C. 20507(c)(2), (d) and (f).

**\*18** Instead, Section 8(i) uses general language, applying to *all* records concerning implementation of programs "conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. 20507(i)(1). "Where Congress used specific language in one part of a statute but different language in another, we presume different meanings were intended." *Doe v. Mercy Cath. Med. Ctr.*, 850 F.3d 545, 554 (3d Cir. 2017). Far from suggesting that Section 8(i) applies only to the same "program" required by Section 8(a)(4) (*contra* Sec'y Br. 31), Congress's drafting choices indicate that different provisions of Section 8 apply to different subsets of registration or list-maintenance "programs."

Section 8(i) also reaches "activities," 52 U.S.C. 20507(i)(1), a word that "suggests great breadth," *Johnson v. City of Saline,* 151 F.3d 564, 570 (6th Cir. 1998). Yet in the Secretary's telling (Br. 31-32), Section 8(i) does not even apply to "programs" beyond the removal programs Section 8(a)(4) mandates, much less to more individualized "activities." For instance, it would exclude records of removals made "at the request of the registrant," or (when state law allows) because of "criminal conviction or mental incapacity," even though Section 8(a)(3) of the NVRA expressly authorizes States to engage in these efforts. 52 U.S.C. 20507(a)(3). The Secretary's reading of Section 8(i) would thereby render the words "and activities" superfluous--violating the "cardinal principle of statutory **\*19** construction that we must give effect, if possible, to every clause and word of a statute." *Khan,* 979 F.3d at 199 (citation omitted).

b. Moreover, the Secretary's interpretation would cut out of the statute all records related to voter registration programs and activities, even though "the unambiguous text of Section 8," *American C.R. Union,* 872 F.3d at 181, as well as the NVRA's purposes confirm that Section 8(i) covers such records.

i. Voter registration programs and activities, like list-maintenance activities, are "conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. 20507(i)(1). After all, "voter lists are not 'accurate' or 'current' if eligible voters have been improperly denied registration or if ineligible persons have been added to the rolls." *Project Vote,* 682 F.3d at 335. Reviewing voter registration applications and updating voter registration lists accordingly ensures that the voter rolls as a whole remain correct and up-to-date. Congress acknowledged as much in the NVRA itself. It instituted several new mandatory voter registration methods, 52 U.S.C. 20504-20506, and required voter registration forms to ask for the information (but only the information) needed to enable officials to "assess the eligibility of the applicant," 52 U.S.C. 20504(c)(2)(B)(ii) and (c)(2)(C), 20508(b)(1)-(2). And Congress further emphasized these purposes in passing HAVA: It required all States to develop statewide electronic voter databases, and mandated that election officials "verify **\*20** the accuracy" of applicants' information and enter voters' information into the statewide list "on an expedited basis," so that States would always have an accurate and up-to-date list. 52 U.S.C. 21083(a)(1)(A)(vi) and (a)(5)(B)(i). Records concerning these activities, then, fall within Section 8(i).

The Secretary's reading of Section 8(i) also fails to take account of the provision's two express exceptions, those for information concerning declinations to register and the agency of registration. 52 U.S.C. 20507(i)(1). Both exemptions relate to initial voter registration activities, indicating that Section 8(i) otherwise applies to registration-related records. Under the Secretary's list-maintenance-only reading, by contrast, records related to declinations to register and the agency of registration "would have *already* been impliedly exempt from [disclosure], rendering superfluous [Section 8(i)]'s express exemptions for them." *Mercy Cath. Med. Ctr.,* 850 F.3d at 554.

ii. Context, too, indicates that Section 8(i) applies to voter registration activities, not just to systematic voter removal programs. Start with the relevant statutory titles, which "are 'permissible indicators of meaning.' " *United States v. Bryant,* 996 F.3d 1243, 1258 (11th Cir.) (citation omitted), *cert. denied,* 142 S. Ct. 583 (2021). Section 8(i) is titled "[p]ublic disclosure of voter *registration* activities," 52 U.S.C. 20507(i) (emphasis added), and falls within a section titled "[r]equirements with respect to administration of voter *registration,*" **\*21** 52 U.S.C. 20507 (emphasis added). "These statutory labels reinforce the conclusion that Section 8(i)(1) governs voter registration records." *Project Vote,* 682 F.3d at 337. When Congress sought to reference only efforts to remove voters from the rolls, it titled those provisions accordingly. *Compare, e.g.,* 52 U.S.C. 20507(c) ( "Voter removal programs") and 52 U.S.C. 20507(d) ("Removal of names from voting rolls"), *with* 52 U.S.C. 20507(b) ("Confirmation of voter registration").

Congress made this distinction equally clear in the text of the provisions themselves. For instance, Section 8(a)(4) speaks of efforts "to *remove* the names of ineligible voters from the official lists of eligible voters" for particular reasons. 52 U.S.C. 20507(a)(4) (emphasis added). But Section 8(a) also includes provisions that regulate "the administration of voter registration." 52 U.S.C. 20507(a); *see* 52 U.S.C. 20507(a)(1) and (a)(5)(A) (mandating measures to "inform applicants" of "voter eligibility requirements" and "ensure that any eligible applicant is registered to vote"). And in some provisions, Congress addressed

registration and list-maintenance efforts at once. Section 8(b), for instance, does this by setting standards for "[a]ny State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office." 52 U.S.C. 20507(b). This language, like Section 8(i)'s, applies across-the-board to activities designed to "ensur[e] the accuracy and currency of official lists of eligible voters." **22** 52 U.S.C. 20507(i)(1). Such activities include both registering voters and removing voters, whatever the reason. *See* Project Vote, 682 F.3d at 335.

iii. The Secretary's crabbed interpretation of Section 8(i) also would frustrate Congress's purposes in enacting the NVRA, leaving States' voter-registration activities entirely immune from the public scrutiny that Congress drafted Section 8(i) to provide. Public inspection of registration-related records can help ensure that States are properly evaluating applications, rejecting applicants only for legitimate reasons, processing eligible applications in a timely fashion, and engaging in uniform and nondiscriminatory registration practices. *See, e.g.*, 52 U.S.C. 20504(e); 52 U.S.C. 20506(d); 52 U.S.C. 20507(a)(1) and (b)(1). The Secretary's reading would prevent the public from monitoring whether States are meeting any of these NVRA-mandated standards. This despite Congress's intent--expressed in the NVRA's text--to ensure that States "increase the number of eligible citizens who register to vote" and "implement [the law] in a manner that enhances the participation of eligible citizens." 52 U.S.C. 20501(b)(1)-(2).

c. The Secretary also suggests (Br. 35-36) that a broader reading of Section 8(i) would be nonsensical, because it would give the public greater access to records than the Attorney General under the NVRA. This is wrong on three levels. First, the provisions that the Secretary mistakenly cites as providing the Attorney **23** General with disclosure rights "under the NVRA" (*id*. at 35) actually were passed as part of the Civil Rights Act of 1960. *See* Pub. L. No. 86-449, Tit. III, §§ 301, 303-304, 74 Stat. 88 (52 U.S.C. 20701, 20703-20704). The Attorney General has the same disclosure, use, and dissemination rights under the NVRA as any other member of the "public." 52 U.S.C. 20507(i)(1).

Second, the public's rights under the NVRA are not uniformly broader than the Attorney General's under the Civil Rights Act. While the latter does limit the Attorney General's ability to disseminate the records it requires States to disclose, *see* 52 U.S.C. 20704, it also mandates disclosure of records that "relat[e] to" voter "registration" or "other act[s] requisite to voting" but that would fall outside Section 8(i)'s reach or within one of Section 8(i)'s exceptions, 52 U.S.C. 20701.

And third, to the extent that the NVRA authorizes broader dissemination rights than did the Civil Rights Act of 1960, that distinction merely shows that different Congresses balanced differently in each statute the benefits of transparency and the costs of reduced privacy. When Congress passed the NVRA, it had more than three decades of experience with the benefits and drawbacks of the Civil Rights Act's disclosure provision--and in between it had enacted numerous other sunshine laws of varying scopes, like the Freedom of Information Act and the Federal Advisory Committee Act. With that knowledge, Congress debated the extent to which it would restrict disclosure under Section 8(i), *see* **24** S. Rep. No. 6, 103d Cong., 1st Sess. 40 (1993), and settled on just the two narrow categorical exceptions that it listed in Section 8(i)(1), *see* 52 U.S.C. 20507(i)(1).

d. Finally, the Secretary points (Br. 29 n.7) to a 1994 FEC guidance document. This document discusses Section 8(i)(2)'s express examples of disclosable records; it then says that States might also wish to retain "for the same period of time all records of removals from the voter registration list," but "[a]s a matter of prudence, . . . not as a requirement of the Act." National Clearinghouse on Election Admin., Fed. Election Comm'n, *Implementing the National Voter Registration Act of 1993: Requirements, Issues, Approaches, and Examples* 7-1 (Jan. 1, 1994), https://perma.cc/Z5UL-LPBY.

This statement cannot sustain the Secretary's interpretation of Section 8(i). For one thing, the FEC never had general authority to administer or interpret the NVRA, and the FEC's limited rulemaking authority never extended to the NVRA's public disclosure provision. *See* Pub. L. No. 103-31, § 9(a), 107 Stat. 87 (as amended 52 U.S.C. 20508(a)); *contra* Sec'y Br. 42. Hence, as the guidance document itself notes, the FEC "d[id] *not* have legal authority either to interpret the Act or to determine whether this or that procedure meets [its] requirements"; its suggestions were "offered without force of law, regulation, or advisory opinion." National Clearinghouse on Elec. Admin. at P-1; *see* United States v. Mead Corp., 533 U.S. 218, 231-232 (2001). And the FEC

has had no role at all under the **\*25** NVRA for over two decades: HAVA transferred the FEC's functions and powers under the NVRA to the Election Assistance Commission in 2002. *See* Pub. L. No. 107-252, § 802, 116 Stat. 1726 (52 U.S.C. 20508(a)).

For another, the statement's placement after discussion of Section 8(i)(2) suggests that the FEC may have believed that *only* those records specified in Section 8(i)(2) must be retained and disclosed. Section 8(i), however, is not limited to Section 8(i) (2)'s examples. Section 8(i)(2) states that "[t]he records maintained pursuant to paragraph (1) shall *include*" the enumerated records. 52 U.S.C. 20507(i)(2) (emphasis added). The word "include[]" "makes clear that the examples enumerated in the text are intended to be illustrative, not exhaustive." *Marmon Coal Co. v. Director, Off. of Workers' Comp. Programs*, 726 F.3d 387, 393 (3d Cir. 2013) (citation omitted). Section 8(i)(2), then, does not exclude other records; it merely "describes" certain "set[s] of records that must be" created and "maintained." *Project Vote*, 682 F.3d at 337. Tellingly, not even the Secretary reads Section 8(i) as narrowly as the FEC apparently did.

In the end, however, the document gives no rationale for the statement upon which the Secretary relies. And it is the statute's clear language that ultimately controls. *See Port Hamilton Refin. & Transp., LLLP v. United States EPA*, 75 F.4th 166, 172 (3d Cir. 2023); *Mercy Cath. Med. Ctr. v. Thompson*, 380 F.3d 142, 152 (3d Cir. 2004).

### **\*26  2. Section 8(i) requires release of records related to those who responded to Pennsylvania's inquiries by canceling their registrations.**

The Secretary also asserts (Br. 38) that he need not disclose the names and addresses of those who requested to cancel their registrations because they fall within Section 8(i)'s exception for records related to "declinations to register." However, that statutory exemption does not apply here. The phrase "declination to register," 52 U.S.C. 20507(i)(1), refers to someone who is offered the opportunity to register under the NVRA's registration provisions but declines, rather than someone who is already on the voter rolls and then asks to be taken off.

Start with the contemporary "ordinary meaning" of the statutory term. *Al-Hasani*, 81 F.4th at 296. A "declination" means "a formal refusal: nonacceptance." *Webster's Third New International Dictionary* 586. A declination to register, then, means a refusal of an offer to register to vote. Those who request to be removed from the rolls after already registering are not refusing, or deciding not to accept, an offer to register.

The rest of the NVRA buttresses this understanding of the declination exception. Each of the NVRA's voter registration provisions requires voter registration forms to state that "if an applicant declines to register to vote, the fact that the applicant has declined to register will remain confidential and will be used only for voter registration purposes." 52 U.S.C. 20504(c)(2)(D)(ii); *accord* **\*27** 52 U.S.C. 20506(a)(7) and 20508(b)(4)(ii); *see also* 52 U.S.C. 20505(a) (requiring States to use mail registration forms meeting requirements of 52 U.S.C. 20508(b)). Section 7, which governs registration at designated agencies, even uses the same phrase as Section 8(i): "a declination to register." 52 U.S.C. 20506(a)(6)(B)(iii) and (a)(7). [2] "Generally, 'a statutory phrase must have a fixed meaning across a statute.' " *Garrett v. Murphy*, 17 F.4th 419, 431 (3d Cir. 2021) (citation omitted). Like the NVRA's registration provisions, then, Section 8(i)'s reference to "a declination to register" denotes an applicant's decision not to register in the first place. 52 U.S.C. 20507(i)(1); *see also* H.R. Rep. No. 9, 103d Cong., 1st Sess. 19 (1993) (explaining ties between declination exception and NVRA's registration provisions).

---

[2]    Congress ensured that declinations to register will generate records that would be subject to Section 8(i)'s disclosure mandate but for Section 8(i)(1)'s express exemption. Congress required that all applications or renewal forms for public assistance contain a voter registration form along with a form with "boxes for the applicant to check to indicate whether the applicant would like to register or declines to register to vote." 52 U.S.C. 20506(a)(6)(A) and (B)(iii). Likewise, it required States to include voter registration forms--which voters could decline to complete--as part of all driver's license applications. 52 U.S.C. 20504(c)(1).

Other NVRA provisions separately address the removal of registrants, including at their own request. Section 8(a) provides that "the name of a registrant may not be removed from the official list of eligible voters except," among other things, "at the request of the registrant." 52 U.S.C. 20507(a)(3)(A). Section **28** 8(c)(2) then requires systematic removal efforts to end 90 days before an election, but exempts removals "on a basis described in paragraph (3)(A) . . . of subsection (a)"--in other words, registrants' requests to be removed. 52 U.S.C. 20507(c)(2)(B)(i). The records of those canceling their registrations in response to Pennsylvania's investigation thus relate to those sorts of *removal requests*, not to *declinations to register*. The Secretary cannot use an inapplicable exception to shield from disclosure the names and addresses of those requesting to cancel their registration.

### C. States may redact certain information before disclosing Section 8(i) records.

Aside from the two categories of records that its text expressly excludes, Section 8(i) does not allow States to fully withhold records that fall within its reach. *See* 52 U.S.C. 20507(i)(1).

However, as the United States has noted in prior cases, the NVRA does not prohibit the *redaction* of highly sensitive information within those records, or information whose disclosure would violate other federal laws. *See, e.g.*, U.S. Br. as Amicus Curiae at 27-28, *Public Int. Legal Found. v. Bellows*, No. 23-1361 (1st Cir. July 25, 2023), https://perma.cc/ML4S-5V4S; U.S. Br. as Amicus Curiae at 24-26, *Project Vote*, 682 F.3d 331 (No. 11-1809), https://perma.cc/HSM3-U964; *see also Public Int. Legal Found., Inc.*, 996 F.3d at 259 (remanding to district court to allow for redaction of (1) "sensitive information vulnerable to abuse"-- **29** including "the identities and personal information of" those subject to criminal investigations and "those who later were determined to be United States citizens" after being investigated for noncitizenship--and (2) information protected by the DPPA or other applicable statutes). Nor does it allow requestors to disseminate disclosed information with the purpose or effect of harming voters--activity that voter-intimidation and tort laws separately prohibit. *See* U.S. Br. as Amicus Curiae at 28-30, *Bellows*, *supra* (No. 23-1361). PILF is right to acknowledge (Br. 57, 59-60) these limits on disclosure rights but wrong to claim (Br. 56) that disclosures of personally identifiable information are "imaginary threats." [3]

---

[3]    The United States takes no position on what information can or must be redacted from the documents that Section 8(i) requires to be disclosed in this case.

### *30  CONCLUSION

This Court should affirm on the issue addressed herein.

Respectfully submitted,

KRISTEN CLARKE

Assistant Attorney General

*s/ Noah B. Bokat-Lindell*

TOVAH R. CALDERON

NOAH B. BOKAT-LINDELL

Attorneys

Department of Justice

**PUBLIC INTEREST LEGAL FOUNDATION,..., 2023 WL 7486212...**

Civil Rights Division

Appellate Section

Ben Franklin Station

P.O. Box 14403

Washington, D.C. 20044-4403

(202) 598-0243

---

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit B

**2023 WL 4882397 (C.A.1) (Appellate Brief)**

United States Court of Appeals, First Circuit.

PUBLIC INTEREST LEGAL FOUNDATION, Plaintiff-Appellee,

v.

Shenna BELLOWS, in her official capacity as the Secretary of State for the State of Maine, Defendant-Appellant.

No. 23-1361.

July 25, 2023.

On Appeal from the United States District Court

for the District of Maine

Brief for the United States as Amicus Curiae in Support of Plaintiff-
Appellee Urging Certification or Affirmance on the Issues Addressed Herein

Kristen Clarke, Assistant Attorney General, Tovah R. Calderon, Noah B. Bokat-Lindell, Attorneys Department of Justice Civil Rights Division Appellate Section, Ben Franklin Station, P.O. Box 14403, Washington, D.C. 20044-4403, (202) 598-0243.

## *i  TABLE OF CONTENTS

| | |
|---|---|
| INTEREST OF THE UNITED STATES ..................................................................... | 1 |
| STATEMENT OF THE ISSUES ............................................................................. | 2 |
| STATEMENT OF THE CASE ............................................................................... | 2 |
| *1. Statutory Background* ................................................................................ | 2 |
| *2. The Present Controversy* ............................................................................. | 4 |
| SUMMARY OF ARGUMENT ............................................................................... | 6 |
| ARGUMENT | |
| I THE NVRA REQUIRES THE SECRETARY TO DISCLOSE THE VOTER FILE ............... | 7 |
| *A. Section 8(i) Covers States' Voter Lists* .......................................................... | 7 |
| *B. The Secretary's Attempts To Limit 8(i)'s Scope Fail* ........................................ | 14 |
| II THIS COURT SHOULD CERTIFY THE QUESTION OF EXCEPTION J'S SCOPE TO THE MAINE SUPREME JUDICIAL COURT ....................................................................... | 18 |
| III IF THE DISTRICT COURT CORRECTLY INTERPRETED THE USE AND DISSEMINATION BANS, THE NVRA PARTIALLY PREEMPTS THEM ............................ | 21 |
| *A. As Interpreted By The District Court, The Use And Dissemination Bans Pose Obstacles To Fulfilling The NVRA's Purposes And Therefore Are Preempted To The Extent Of The Conflict* ................................ | 21 |
| *ii B. NVRA Preemption Does Not Prohibit Redaction Of Sensitive Voter Information Or Enforcement Of Other Laws Prohibiting The Misuse Of Personal Data* ........................................ | 27 |
| CONCLUSION ................................................................................................. | 30 |
| CERTIFICATE OF COMPLIANCE | |
| CERTIFICATE OF SERVICE | |

## *iii  TABLE OF AUTHORITES

**CASES:**

| | |
|---|---|
| *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43 (1997) ............................ | 19-20 |
| *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) ............... | 22, 27 |
| *Arizona v. Thompson*, 281 F.3d 248 (D.C. Cir. 2002) ................................ | 15 |
| *Baker v. Smith & Wesson, Inc.*, 40 F.4th 43 (1st Cir. 2022) ....................... | 16 |
| *Biden v. Texas*, 142 S. Ct. 2528 (2022) ................................................. | 15 |
| *Boos v. Barry*, 485 U.S. 312 (1988) ...................................................... | 19 |
| *Brown v. Crown Equip. Corp.*, 501 F.3d 75 (1st Cir. 2007), certified question answered, 960 A.2d 1188 (Me. 2008) ......................................... | 21 |
| *Colón-Marrero v. Vélez*, 813 F.3d 1 (1st Cir. 2016) ................................. | 7, 11 |

*Del Grosso v. Surface Transp. Bd.*, 898 F.3d 139 (1st Cir. 2018) .............. 16
*Felder v. Casey*, 487 U.S. 131 (1988) .......................................................... 23
*Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016) ............................................ 22
*Franchini v. Investor's Bus. Daily, Inc.*, 981 F.3d 1 (1st Cir. 2020) ............ 20
*Goncalves Pontes v. Barr*, 938 F.3d 1 (1st Cir. 2019) .................................. 18
*Johnson v. City of Saline*, 151 F.3d 564 (6th Cir. 1998) ............................... 15
*Maine Forest Prods. Council v. Cormier*, 51 F.4th 1 (1st Cir. 2022) ......... 21-22, 24-25
*Medicaid & Medicare Advantage Prod. Ass'n of P.R., Inc. v. Emanuelli
Hernandez*, 58 F.4th 5 (1st Cir. 2023) ........................................................... 23, 28
  ***iv*** *Mount Vernon Fire Ins. Co. v. VisionAid, Inc.*, 875 F.3d 716 (1st Cir.
2017) ................................................................................................................ 19
*NCTA - The Internet & Television Ass'n v. Frey*, 7 F.4th 1 (1st Cir. 2021) .. 19
*Patel v. Garland*, 142 S. Ct. 1614 (2022) ..................................................... 10
*Penobscot Nation v. Frey*, 3 F.4th 484 (1st Cir. 2021) (en banc) cert.
denied, 142 S. Ct. 1668 and 142 S. Ct. 1669 (2022) ...................................... 13
*Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012) .... *passim*
*Public Int. Legal Found., Inc. v. North Carolina State Bd. of Elections*,
996 F.3d 257 (4th Cir. 2021) ........................................................................... 11, 28
*United States v. Councilman*, 418 F.3d 67 (1st Cir. 2005) (en banc) ......... 11
*United States v. Dion*, 37 F.4th 31 (1st Cir.), cert. denied, 143 S. Ct. 387
(2022) ............................................................................................................... 10-11, 16
*United States v. Mead Corp.*, 533 U.S. 218 (2001) ..................................... 17-18
*United States v. Saemisch*, 70 F.4th 1 (1st Cir. 2023) ................................. 12
**STATUTES:**
Help America Vote Act
52 U.S.C. 21083 ............................................................................................... 8
52 U.S.C. 21083(a)(1)(A) ................................................................................ 3, 10
52 U.S.C. 21083(a)(2)(B) ................................................................................ 9
52 U.S.C. 21083(a)(4) ...................................................................................... 4, 9
52 U.S.C. 21083(a)(5)(B) ................................................................................ 4, 10
Pub. L. No. 107-252, 116 Stat. 1666 (2002) ................................................... 3, 17
National Voter Registration Act
52 U.S.C. 20501(a) ........................................................................................... 2-3
52 U.S.C. 20501(b) ........................................................................................... 13, 23
  ***v*** 52 U.S.C. 20501(b)(4) ............................................................................ 13
52 U.S.C. 20504(c)(2) ...................................................................................... 9-10
52 U.S.C. 20504(e) ........................................................................................... 13
52 U.S.C. 20504-20506 .................................................................................... 8-9
52 U.S.C. 20506(d) ........................................................................................... 13
52 U.S.C. 20507 ............................................................................................... 3
52 U.S.C. 20507(a) ........................................................................................... 8, 12
52 U.S.C. 20507(a)(1) ...................................................................................... 12-13
52 U.S.C. 20507(a)(4) ...................................................................................... 9, 12, 15-16
52 U.S.C. 20507(a)(5)(A) ................................................................................ 12
52 U.S.C. 20507(b) ........................................................................................... 8, 28
52 U.S.C. 20507(b)(1) ...................................................................................... 12-13
52 U.S.C. 20507(c) ........................................................................................... 8
52 U.S.C. 20507(c)(2) ...................................................................................... 12, 15
52 U.S.C. 20507(d) ........................................................................................... 8, 15
52 U.S.C. 20507(f) ........................................................................................... 8, 15
52 U.S.C. 20507(g) ........................................................................................... 8
52 U.S.C. 20507(i) ........................................................................................... *passim*
52 U.S.C. 20507(i)(1) ...................................................................................... *passim*
52 U.S.C. 20507(i)(2) ...................................................................................... 16
52 U.S.C. 20508(a) ........................................................................................... 17
52 U.S.C. 20508(b)(1) ...................................................................................... 9-10
52 U.S.C. 20508(b)(2) ...................................................................................... 9-10
52 U.S.C. 20510(a) ........................................................................................... 1

52 U.S.C. 20510(b) ................................................................... 23
52 U.S.C. 20510(b)(1) .............................................................. 26
52 U.S.C. 20511(1) ................................................................... 29
Pub. L. No. 103-31, 107 Stat. 77 (1993) .................................. 2, 17
5 U.S.C. 552(b)(6) .................................................................... 25
5 U.S.C. 552a(b) ....................................................................... 25
18 U.S.C. 594 ........................................................................... 29
52 U.S.C. 10307(b) ................................................................... 29
52 U.S.C. 10308(d) ................................................................... 29
**\*vi** 52 U.S.C. 20703 .......................................................... 25
52 U.S.C. 20704 ....................................................................... 25
Me. Stat. Tit. 21-A, § 128 (2023) ............................................. 8
Me. Stat. Tit. 21-A, § 161 (2023) ............................................. 8
Me. Stat. Tit. 21-A, § 162-A (2023) ......................................... 8
Me. Stat. Tit. 21-A, § 196-A(1)(J) (2023) ................................ *passim*
Me. Stat. Tit. 21-A, § 232 (2023) ............................................. 8
Me. Stat. Tit. 21-A, § 233 (2023) ............................................. 8
**RULE:**
Me. R. App. P. 25(a) ................................................................. 20
**LEGISLATIVE HISTORY:**
S. Rep. No. 6, 103rd Cong., 1st Sess. (1993) ........................... 16, 23-24
*Voter Registration: Hearing Held Before the Subcomm. on Elections of* .......... 24
*the H. Comm. on Admin.*, 103rd Cong., 1st Sess. (1993) ..........................
**MISCELLANEOUS:**
National Clearinghouse on Elec. Admin., Fed. Elec. Comm'n, ........... 17
*Implementing the National Voter Registration Act of 1993: Requirements,*
*Issues, Approaches, and Examples* (Jan. 1, 1994), https://perma.cc/Z5UL-
LPBY ........................................................................................
Theodore Z. Wyman, *Litigation of Voter Intimidation Law,* 174 Am. Jur. ........ 29
Trials 385 (May 2023) ...............................................................
**\*vii** *Webster's Third New International Dictionary* (1993) ................. 8

## \*1  INTEREST OF THE UNITED STATES

This case raises important issues regarding Section 8(i) of the National Voter Registration Act (NVRA), 52 U.S.C. 20507(i). The Attorney General is charged with enforcing the NVRA. 52 U.S.C. 20510(a). Accordingly, the United States has an interest in ensuring that Section 8(i) is correctly construed and given its proper preemptive scope. The United States files this brief under Federal Rule of Appellate Procedure 29(a).

## \*2  STATEMENT OF THE ISSUES

The United States addresses the following issues:

1. Whether Section 8(i) requires disclosure of Maine's voter registration database.

2. Whether the Court should certify to the Maine Supreme Judicial Court the question of how to interpret Maine's statutory restrictions on using and disseminating voter data.

3. If the Court declines to certify, whether Section 8(i) preempts Maine's use and dissemination restrictions to the extent they interfere with the NVRA's purposes.

4. Whether the NVRA leaves States and individuals free to protect voter privacy by redacting sensitive information from released voter records or enforcing other laws prohibiting misuse of personal information. [1]

1    The United States takes no position on any issue not addressed herein.

## STATEMENT OF THE CASE

### *1. Statutory Background*

a. In 1993, Congress passed the NVRA, Pub. L. No. 103-31, 107 Stat. 77 (52 U.S.C. 20501-20511). Congress found that governments have a "duty" to promote the "fundamental right" to vote, and that "discriminatory and unfair registration laws and procedures" can damage federal voter participation and **\*3** "disproportionately harm" participation "by various groups, including racial minorities." 52 U.S.C. 20501(a).

Section 8 of the NVRA, titled "[r]equirements with respect to administration of voter registration," establishes uniform procedures to increase voter registration in federal elections while maintaining accurate voter rolls. See 52 U.S.C. 20507. This case concerns Section 8(i), titled "[p]ublic disclosure of voter registration activities." 52 U.S.C. 20507(i). Section 8(i) provides, in relevant part:

> Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

52 U.S.C. 20507(i)(1).

b. In 2002, Congress enacted the Help America Vote Act (HAVA), Pub. L. No. 107-252, 116 Stat. 1666 (52 U.S.C. 20901-21145). HAVA required each State to create "a single, uniform, official, centralized, interactive computerized statewide voter registration list," which "shall serve as the single system for storing and managing the official list of registered voters throughout the State." 52 U.S.C. 21083(a)(1)(A) and (a)(1)(A)(i). Upon receiving registration applications, election officials must "electronically enter[]" the information "into the computerized list on an expedited basis." 52 U.S.C. 21083(a)(1)(A)(vi). States must take specified **\*4** steps to ensure that officials can "verify the accuracy of the information provided on applications for voter registration," and must "ensure that voter registration records in the State are accurate and are updated regularly." 52 U.S.C. 21083(a)(4) and (a)(5)(B)(i).

### *2. The Present Controversy*

a. As HAVA requires, Maine maintains its voter-roll information in a single database. Doc. 87, at 4. [2] Plaintiff Public Interest Legal Foundation (PILF), a nonprofit "that 'seeks to promote the integrity of elections nationwide,' " sent Maine Secretary of State Shenna Bellows (the Secretary) a request in October 2019 for "an electronic copy of Maine's 'statewide voter registration list.' " Doc. 87, at 3, 5 (citations omitted). A state law restricting access to the State's voter list prohibited the Secretary from releasing this data. Doc. 87, at 5. PILF sued the Secretary under the NVRA. Doc. 87, at 5.

2    "Doc. __, at __" refers to the docket entry and page number of documents filed in the district court, No. 1:20-cv-61 (D. Me.). "Sec'y Br." and "PILF Br." refer respectively to the Secretary's and PILF's opening briefs on appeal.

b. In June 2021, Maine added a new Exception J to its confidentiality law. Doc. 87, at 5. Exception J allows anyone "evaluating the State's compliance with its voter list maintenance obligations" to "purchase" a subset of information--the Voter File--from the statewide database. Me. Stat. Tit. 21-A, § 196-A(1)(J) (2023). However, those obtaining the Voter File must comply with two privacy **5** restrictions. First, the Use Ban states that they may not "use the voter information or any part of the information for any purpose that is not directly related to evaluating the State's compliance with its voter list maintenance obligations." *Id.* § 196-A(1)(J)(1). Second, the Dissemination Ban states that they may not cause "any part of the voter information that identifies, or that could be used with other information to identify, a specific voter, including but not limited to a voter's name, residence address or street address, to be made accessible by the general public on the Internet or through other means." *Id.* § 196-A(1)(J)(2).

c. After Maine enacted Exception J, PILF amended its complaint. Doc. 55. The Secretary moved to dismiss. Doc. 58. The district court denied the motion in relevant part, holding that Section 8(i) required the State to disclose the Voter File and that PILF plausibly alleged its preemption claims. Doc. 61, at 9-12.

Both sides later moved for summary judgment (Docs. 74, 80), and the court granted PILF's motion (Docs. 87, 88). It first refused the Secretary's request to reconsider its holding that Section 8(i) mandates the Voter File's disclosure. Doc. 87, at 7 & n.10, 10-11. It then found that the plain language of Maine's Exception J would forbid PILF from (1) using the Voter File "to evaluate *another* State's compliance with its voter list maintenance obligations," (2) "enforc[ing] the NVRA" against other States, and (3) "publicly releasing the Voter File's data." Doc. 87, at 11-12 & nn.17-18. Finally, the court held that Exception J poses a **6** sufficient obstacle to the accomplishment of the NVRA's purposes to warrant preemption. Doc. 87, at 12-13. It issued a declaratory judgment. Doc. 87, at 17.

d. The Secretary timely appealed. Doc. 89.

## SUMMARY OF ARGUMENT

The district court correctly held that Section 8(i) requires the Secretary to disclose the Voter File. Statutory text, context, and purpose establish that Section 8(i) covers records concerning both voter registration and list-maintenance activities, including voter registration lists such as the Voter File. The Secretary's reliance on select provisions of Section 8 and statements from the Federal Election Commission (FEC) do not support her contrary argument.

Before resolving the subsequent preemption question, this Court should certify the question of Exception J's scope to the Maine Supreme Judicial Court. The parties hotly debate the Use Ban's breadth, and questions remain about the Dissemination Ban's scope. Maine's highest court alone can issue binding interpretations of state law, and it may provide narrowing constructions that obviate some or all of the preemption issues in this case.

Should this Court decline to certify, then the NVRA would partially preempt both the Use and Dissemination Bans as the district court interpreted them. The NVRA preempts any condition on Section 8(i)'s disclosure right--including restrictions on using and disseminating voter data--when it would interfere with **7** the statute's purposes. For similar reasons, Section 8(i) can be viewed as creating implied federal rights to use or disseminate the records it requires to be disclosed, when needed to fulfill the NVRA's purposes. As interpreted by the district court, Maine's broad bans pose obstacles to fulfilling the NVRA's purposes and are preempted as to applications that conflict with those purposes.

However, Maine retains many options to protect voters' privacy, which the NVRA does not preempt or hinder. For instance, States may redact certain particularly sensitive information before disclosing voters' records. Likewise, they may prohibit use or dissemination of voter data that does not further the NVRA's purposes. And the NVRA leaves intact many state and federal laws designed to prevent voter intimidation or other abuses.

## ARGUMENT

## I

## THE NVRA REQUIRES THE SECRETARY TO DISCLOSE THE VOTER FILE

### *A. Section 8(i) Covers States' Voter Lists*

The district court correctly held that Section 8(i) applies to voter registration databases like the Voter File. The NVRA's language, structure, and purpose support this reading.

1. The "starting point in discerning the meaning of a statute is the provision itself." *Colón-Marrero v. Vélez*, 813 F.3d 1, 11 (1st Cir. 2016). Section 8(i)  **\*8**  requires disclosure of "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. 20507(i)(1). Maine's Voter File, which records the results of all the State's registration and list-maintenance activities, falls squarely within this language. To see why, take each piece of the statutory text step by step.

First, both Maine's registration and list-maintenance efforts plainly constitute "programs" or "activities." 52 U.S.C. 20507(i)(1). A "program" is "a plan of procedure" or "schedule or system under which action may be taken toward a desired goal," while an "activity" is a "natural or normal function or operation." *Webster's Third New International Dictionary* 22, 1812 (1993). Maine's efforts meet either definition. Both federal and state law require Maine to make ongoing, continuous efforts to verify applicants' eligibility to vote, register eligible voters in its central voter registration system, revise its voter registration records, and remove ineligible voters from its voter rolls. See 52 U.S.C. 20504-20506, 20507(a)-(g), 21083; Me. Stat. Tit. 21-A, §§ 128, 161, 162-A, 232, 233 (2023). Each of these processes "is a 'program' because it is" a plan of procedure "carried out in the service of a specified end--maintenance of voter rolls." *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 335 (4th Cir. 2012) (*Project*  **\*9**  *Vote*). And each "is an 'activity' because it is a particular task and deed of [Maine] election employees," a normal operation for which they are responsible. *Ibid.*

Next, these registration, maintenance, and removal activities are "conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. 20507(i)(1). Maine's after-the-fact list-maintenance activities plainly ensure that the voter rolls remain both current and accurate as voters move, die, changes their names, or affiliate with new political parties. See also 52 U.S.C. 20507(a)(4) and (b)-(g), 21083(a)(2)(B) and (a)(4) (requiring States, under both the NVRA and HAVA, to conduct continuous list maintenance activities while imposing safeguards to prevent improper removals). But registration processes also serve this purpose, as "voter lists are not 'accurate' or 'current' if eligible voters have been improperly denied registration or if ineligible persons have been added to the rolls." *Project Vote*, 682 F.3d at 335.

Meeting these goals is not a mere byproduct of the registration process (contra Sec'y Br. 33); application review and database input processes have no other purpose but to ensure that the voter rolls as a whole remain correct and up-todate. Congress acknowledged as much in the NVRA itself: It instituted several new mandatory voter registration methods, 52 U.S.C. 20504-20506, and required voter registration forms to ask for the information (but only the information) needed to enable officials to "assess the eligibility of the applicant,"  **\*10**  52 U.S.C. 20504(c)(2)(B)(ii), 20504(c)(2)(C), and 20508(b)(1)-(2). And Congress further emphasized these purposes in passing HAVA: It required all States to develop statewide electronic voter databases, and mandated that election officials "verify the accuracy" of applicants' information and enter voters' information into the statewide list "on an expedited basis," so that States would always have an accurate and up-to-date list. 52 U.S.C. 21083(a)(1)(A)(vi) and (a)(5)(B)(i).

Moreover, the information in the Voter File constitutes "records concerning the implementation of" Maine's registration and list-maintenance programs. 52 U.S.C. 20507(i)(1). Section 8(i) extends not just to records "*of*" the implementation of programs or activities, but rather to all records "concerning" implementation. *Ibid.* (emphasis added). Like its synonym "regarding," the word "concerning" used "in a legal context generally has a broadening effect, ensuring that the scope of a provision covers not

only its subject but also matters relating to that subject." *Patel v. Garland*, 142 S. Ct. 1614, 1622 (2022) (citation omitted). The Voter File reflects the results of Maine's registration and list-maintenance activities, and therefore "concern [s]"--or relates to--the "implementation" of those activities. *Project Vote*, 682 F.3d at 335. Moreover, the NVRA applies its disclosure requirement to "*all*" such "records." 52 U.S.C. 20507(i)(1) (emphasis added). "All," like the similar word "any," gives a provision "an expansive meaning," covering implementation-related records "of whatever kind." **11** *United States v. Dion*, 37 F.4th 31, 35 (1st Cir.), cert. denied, 143 S. Ct. 387 (2022). "[T]he statute's use of the term 'all records' relating to [a State's] 'implementation' of the program or activity" indicates that Section 8(i) "encompasses a broad range of disclosable documents." *Public Int. Legal Found., Inc. v. North Carolina State Bd. of Elections*, 996 F.3d 257, 266 (4th Cir. 2021). This includes the Voter File.

Finally, the Voter File is not among the two sets of records excluded from Section 8(i)'s reach: those that "relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered." 52 U.S.C. 20507(i)(1). As "Congress explicitly enumerate [d] certain exceptions" to Section 8(i), the Secretary cannot invent any "additional," "implied" exceptions for registration databases. *United States v. Councilman*, 418 F.3d 67, 75 (1st Cir. 2005) (en banc) (citation omitted). That Congress needed to exclude two types of records, both of which relate to voter registration, also confirms that Section 8(i) otherwise reaches registration records.

2. A "contextual review" further shows that Section 8(i) requires disclosure of the Voter File. *Colón-Marrero*, 813 F.3d at 12. Section 8(i) is captioned "Public disclosure of voter *registration* activities," 52 U.S.C. 20507(i) (emphasis added), and falls within a section titled "[r]equirements with respect to administration of voter *registration*," 52 U.S.C. 20507 (emphasis added). "These statutory labels reinforce the conclusion that Section 8(i)(1) governs voter **12** registration records," *Project Vote*, 682 F.3d at 337, including records of who is registered.

Congress also specified throughout Section 8 when its provisions applied solely to list maintenace. For instance, Section 8(c), titled "[v]oter removal programs," sets time limits for completing "any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. 20507(c)(2)(A). This language refers only to largescale list-maintenance programs. Section 8(a)(4) is even more explicit, requiring States to implement a "general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of" voters' death or change of address. 52 U.S.C. 20507(a)(4). Section 8(i) contains no such language--a presumptively intentional difference. See *United States v. Saemisch*, 70 F.4th 1, 10 (1st Cir. 2023).

By contrast, Section 8(a)--like Section 8(i)--regulates registration as well as list-maintenance activities. 52 U.S.C. 20507(a); see 52 U.S.C. 20507(a)(1) and (a)(5)(A) (mandating measures to "inform applicants" of "voter eligibility requirements" and "ensure that any eligible applicant is registered to vote"). And in Section 8(b), Congress set standards for "[a]ny State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office." **13** 52 U.S.C. 20507(b)(1). This language, like Section 8(i)'s, applies across-the-board to activities designed to "ensur [e] the accuracy and currency of official lists of eligible voters." 52 U.S.C. 20507(i)(1). Such activities include adding eligible applicants to the lists and leaving off ineligible applicants.

3. To the extent any textual "ambiguity" remains, statutory purpose can "resolve" it. *Penobscot Nation v. Frey*, 3 F.4th 484, 498 (1st Cir. 2021) (en banc), cert. denied, 142 S. Ct. 1668 and 142 S. Ct. 1669 (2022). Disclosure of the Voter File plainly would advance all of the NVRA's purposes: increasing eligible voter registration, enhancing voter participation, protecting electoral integrity, and maintaining accurate and current voter registration rolls. See 52 U.S.C. 20501(b). Whether "voter registration rolls" are "accurate and current," 52 U.S.C. 20501(b)(4), cannot be determined without actually examining them. Public inspection of the information included in the Voter File, both alone and combined with other records, can help ensure that States are properly evaluating applications, rejecting applicants only for legitimate reasons, processing eligible applications in a timely fashion, and engaging in uniform and nondiscriminatory registration and list-maintenance practices. See, *e.g.*, 52 U.S.C. 20504(e); 52 U.S.C. 20506(d); 52 U.S.C. 20507(a)(1) and (b)(1). Inspection of such records also may help uncover systemic problems in a jurisdiction, so voters or organizations can remedy registration and list-maintenance issues before future elections. See, *e.g.*, **14** *Project Vote*, 682 F.3d at 333. Public disclosure of the Voter File thus advances the NVRA's central purposes.

### B. The Secretary's Attempts To Limit 8(i)'s Scope Fail

1. The Secretary responds (Br. 27, 33) that Section 8(i) applies only to list maintenance programs--and even then, only to records that directly "describe" or "document" these programs (Br. 30). As discussed above, however, neither text, context, nor purpose supports this distinction between voter-registration and list-maintenance activities, or so strictly limits the records covered. In any event, the two categories cannot be so neatly separated. As the Secretary herself acknowledges (Br. 12), some of the data in the Voter File-- like voter participation history, or updates to voters' addresses--"is not derived from" voters' initial registration forms, but rather from later list-maintenance. The Voter File therefore is a record concerning the implementation of both registration *and* list-maintenance activities.

2. The Secretary at times goes further and claims (Br. 27, 29-31, 33-34, 43-44) that Section 8(i) does not even apply to States' ongoing, "day-to-day" list-maintenance processes. Rather, she asserts (Br. 27), Section 8(i) reaches only the purposeful, periodic list-maintenance programs "authorized and regulated by the remainder of § 8."

**\*15** But Section 8(i)'s text cannot be read to tether disclosure to those programs alone. "If Congress had wanted the provision to have that effect, it could have said so in words far simpler than those that it wrote." *Biden v. Texas*, 142 S. Ct. 2528, 2539 (2022). It could have limited disclosure to records of "list-maintenance programs described in this section." Or it could have employed language like that in other provisions of Section 8, which limit themselves to the removal of names or other particular list-maintenance processes. *E.g.*, 52 U.S.C. 20507(a)(4), (c)(2), (d) and (f). But Section 8(i) uses general language, applying to *all* records concerning implementation of programs "conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. 20507(i)(1). Section 8(i) also reaches "activities," *ibid.*, a word that "suggests great breadth," *Johnson v. City of Saline*, 151 F.3d 564, 570 (6th Cir. 1998), and plainly covers "administrative functions" like "the maintenance of databases," *Arizona v. Thompson*, 281 F.3d 248, 257 (D.C. Cir. 2002).

3. Lastly, the Secretary asserts (Br. 38-41) that Congress did not have the Voter File in mind when it crafted Section 8(i). She notes (Br. 39), for instance, that some provisions in Section 8 mention voter lists, but that Section 8(i) does not specify that such lists are disclosable. Congress, however, chose to draft a general provision that covers "all" records concerning implementation of relevant programs or activities. "This commodious phrasing leaves no doubt that Congress **\*16** did not intend to exclude particular kinds of [records] simply because they were left unmentioned." *Dion*, 37 F.4th at 36.

The Secretary also relies (Br. 40-41) on Section 8(i)(2). This paragraph specifies that States must maintain certain records about confirmation-of-address mailings sent as part of Section 8(a)(4) programs, but it does not mention voter registration databases (or any other records). 52 U.S.C. 20507(i)(2). The Secretary asserts (Br. 40-41) that Section 8(i)(2) implicitly limits the personal voter data that Section 8(i)(1) renders disclosable to the data in the enumerated records.

Section 8(i)(2), however, is not limited to its examples. It states that "[t]he records maintained pursuant to paragraph (1) shall *include*" the enumerated records. 52 U.S.C. 20507(i)(2) (emphasis added). And "the word 'include' indicates the list is illustrative rather than comprehensive." *Del Grosso v. Surface Transp. Bd.*, 898 F.3d 139, 142 (1st Cir. 2018). Indeed, Congress debated the extent to which it would restrict disclosure under Section 8(i), see S. Rep. No. 6, 103rd Cong., 1st Sess. 40 (1993) (Senate Report), and settled on the two narrow categorical exceptions that it listed in Section 8(i)(1), see 52 U.S.C. 20507(i)(1). Limiting Section 8(i)'s coverage of voter data only to the enumerated examples in Section 8(i)(2) "would render" these express exclusions in Section 8(i)(1) "superfluous." *Baker v. Smith & Wesson, Inc.*, 40 F.4th 43, 49 (1st Cir. 2022). **\*17** Section 8(i)(2) does not exclude other records; it merely "describes" certain "set[s] of records that must be" created and "maintained." *Project Vote*, 682 F.3d at 337.

The Secretary then points to a 1994 FEC guidance document. Br. 42-44. This document discusses Section 8(i)(2)'s express examples of disclosable records; it then says that States might also wish to retain "for the same period of time all records of removals from the voter registration list," but "[a]s a matter of prudence, * * * not as a requirement of the Act." National

Clearinghouse on Elec. Admin., Fed. Elec. Comm'n, *Implementing the National Voter Registration Act of 1993: Requirements, Issues, Approaches, and Examples* 7-1 (Jan. 1, 1994), https://perma.cc/Z5UL-LPBY.

This statement cannot sustain the Secretary's interpretation of Section 8(i). For one thing, the FEC's rulemaking authority never extended to the NVRA's public disclosure provision. See Pub. L. No. 103-31, § 9(a), 107 Stat. 87 (as amended 52 U.S.C. 20508(a)); contra Sec'y Br. 42. [3] Hence, as the guidance document itself notes, the FEC "d[id] *not* have legal authority either to interpret the Act or to determine whether this or that procedure meets [its] requirements"; its suggestions were "offered without force of law, regulation, or advisory opinion." National Clearinghouse on Elec. Admin. at P-1; see **\*18** *United States v. Mead Corp.*, 533 U.S. 218, 231-232 (2001). For another, the statement's placement after discussion of Section 8(i)(2) suggests that the FEC may have believed that *only* those records specified in Section 8(i)(2) must be retained and disclosed--a reading that, as just discussed, would run afoul of the statutory text. However, the document gives no rationale for the statement upon which the Secretary relies. And it is the statute's clear language that ultimately controls. See *Goncalves Pontes v. Barr*, 938 F.3d 1, 3 (1st Cir. 2019).

[3]    HAVA transferred the FEC's functions and powers under the NVRA to the Election Assistance Commission. See Pub. L. No. 107-252, § 802, 116 Stat. 1726 (52 U.S.C. 20508(a)).

## II

## THIS COURT SHOULD CERTIFY THE QUESTION OF EXCEPTION J'S SCOPE TO THE MAINE SUPREME JUDICIAL COURT

Whether the NVRA preempts Exception J depends on what Exception J actually restricts. The district court determined that Maine's Use Ban would prohibit using Voter File data either to help analyze other States' NVRA compliance or to enforce the NVRA against other States, and that the Dissemination Ban would prohibit requestors from publicly releasing Voter File data. Doc. 87, at 11-12 & nn.17-18. PILF has gone further, arguing that the Use Ban would prohibit it even from using Voter File data to enforce the NVRA against Maine. Doc. 84, at 5-6. The Secretary does not dispute (Br. 46) the district court's characterization of the Dissemination Ban, but she argues (Br. 58-61) that the Use Ban would not prohibit PILF from enforcing the NVRA or analyzing other States' NVRA compliance.

**\*19**  This state-law interpretive dispute is best resolved by Maine's highest court. While "federal courts have the power" and "the duty" "to adopt narrowing constructions of *federal* legislation," they "are without power to adopt a narrowing construction of a *state* statute unless such a construction is reasonable and readily apparent." *Boos v. Barry*, 485 U.S. 312, 330-331 (1988) (emphases added). Bedrock federalism principles animate this distinction. For one thing, "the federal tribunal risks friction-generating error when it endeavors to construe a novel state Act not yet reviewed by the State's highest court." *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 79 (1997). For another, any federal interpretation could well prove ephemeral, "because federal courts cannot make their state-law interpretations binding on state courts." *Mount Vernon Fire Ins. Co. v. VisionAid, Inc.*, 875 F.3d 716, 728 (1st Cir. 2017). For this same reason, "Supreme Court precedent warns against accepting as authoritative an Attorney General's interpretation of state law when the Attorney General does not bind the state courts or local law enforcement authorities, as is the case in Maine." *NCTA -- The Internet & Television Ass'n v. Frey*, 7 F.4th 1, 19 n.13 (1st Cir. 2021) (internal citation and quotation marks omitted).

Here, both parties put forward plausible interpretations of Exception J, and no Maine court has yet passed on the statute's meaning. Indeed, the Use and Dissemination Bans are even more ambiguous than the parties' disagreements **\*20** illustrate. Perhaps because Maine enacted it in response to PILF's lawsuit, Exception J mentions only "list maintenance." Me. Stat. Tit. 21-A, § 196-A(1)(J) and (1)(J)(1) (2023). It thus appears to forbid requestors from using Voter File data to help register voters, even though increasing registration is a key purpose of the NVRA. Meanwhile, the Dissemination Ban does not define what constitutes making data "accessible by the general public." *Id.* § 196-A(1)(J)(2). Would it include engaging in a "door-to-door

canvassing effort to confirm the accuracy of" duplicated or error-ridden voter records (Doc. 84, at 6), or contacting voters to tell them they had been removed from the rolls?

"Speculation by a federal court about the meaning of a state statute in the absence of prior state court adjudication is particularly gratuitous when ... the state courts stand willing to address questions of state law on certification from a federal court." *Arizonans for Off. Eng.*, 520 U.S. at 79 (citation omitted). Certification is appropriate here. This Court "may certify a question to the [Maine Supreme Judicial Court acting as the] Maine Law Court where there are 'questions of [Maine] law ... that may be determinative of the cause and ... there is no clear controlling precedent in the decisions of the Supreme Judicial Court.' " *Franchini v. Investor's Bus. Daily, Inc.*, 981 F.3d 1, 10 (1st Cir. 2020) (second alteration in original) (quoting Me. R. App. P. 25(a)). The Court may certify *sua sponte*, even if "[n]o request for certification was made" by the parties "in the district court or in **\*21** this court." *Brown v. Crown Equip. Corp.*, 501 F.3d 75, 77 (1st Cir. 2007), certified question answered, 960 A.2d 1188 (Me. 2008). A binding, limiting construction of state law could eliminate the preemption dispute over the Use Ban and at least narrow the dispute over the Dissemination Ban, helping to avoid unnecessary constitutional rulings.


                                              III

         IF THE DISTRICT COURT CORRECTLY INTERPRETED THE USE AND
         DISSEMINATION BANS, THE NVRA PARTIALLY PREEMPTS THEM

         *A. As Interpreted By The District Court, The Use And Dissemination Bans Pose Obstacles To*
         *Fulfilling The NVRA's Purposes And Therefore Are Preempted To The Extent Of The Conflict*

Should the Court decline to certify, or should the Maine Supreme Judicial Court broadly interpret Exception J's restrictions, then the preemption issue will persist. Assuming the district court correctly read the Use Ban, and based on the parties' agreed reading of the Dissemination Ban, the district court's preemption analysis is largely correct. See Doc. 87, at 12-13. Both bans have applications that conflict with Section 8(i) as read in light of the NVRA's purposes, and the NVRA preempts them as to those applications, including in this case. But preemption extends only to applications of Exception J that prohibit uses or disseminations of disclosed information that would further the NVRA's purposes.

As the NVRA lacks an express preemption provision, "the parties have focused their arguments solely on * * * 'obstacle preemption.' " **\*22** *Maine Forest Prods. Council v. Cormier*, 51 F.4th 1, 6 (1st Cir. 2022). Obstacle preemption occurs when "the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Ibid.* (citation omitted).

Certain standards designed to limit preemption do not apply to statutes enacted under the Elections Clause. That Clause "invests the States with responsibility for the mechanics of congressional elections, but" grants Congress "paramount" authority to override States' choices. *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013) (citations omitted). In short, the Elections Clause itself confers preemptive power. *Id.* at 14. This means that the presumption against preemption used in Supremacy Clause cases does not apply to "Elections Clause legislation" like the NVRA. *Id.* at 15. Nor need courts search for evidence of congressional intent to preempt contrary state laws. See *id.* at 14. And in Elections Clause cases, courts "do not finely parse the federal statute for gaps or silences into which state regulation might fit," as doing so "could fundamentally alter the structure and effect of" the federal statute. *Fish v. Kobach*, 840 F.3d 710, 729 (10th Cir. 2016).

1. The central preemption inquiry is whether the NVRA "confers a right on private actors (either explicitly or implicitly) that conflicts with [Exception J's] restrictions." *Maine Forest Prods. Council*, 51 F.4th at 8. "[I]n determining the **\*23** preemptive scope of a congressional enactment, [courts] rely on the plain language of the statute and its legislative history." *Medicaid & Medicare Advantage Prod. Ass'n of P.R., Inc. v. Emanuelli Hernandez*, 58 F.4th 5, 11 (1st Cir. 2023) (citation omitted). Here, both indicate that Congress intended to authorize disclosure, dissemination, and use of records in aid of the NVRA's purposes.

a. Section 8(i) requires States to "make" covered records "available for public inspection and, where available, photocopying." 52 U.S.C. 20507(i)(1). This language plainly contemplates uniform disclosure. It gives every member of the public a right to view and copy the same information upon request--a right they may enforce through litigation. 52 U.S.C. 20510(b). States may not "condition[] that right * * * upon compliance with a rule" that "is inconsistent in both purpose and effect with the remedial objectives of the federal" statute. *Felder v. Casey*, 487 U.S. 131, 153 (1988).

Congress enacted the NVRA to "provide uniform national voter registration procedures for Federal elections." Senate Report 3. By doing so, Congress stated in the NVRA's text, it aimed both to expand voter registration and to protect the integrity of the electoral process. See 52 U.S.C. 20501(b). Because it often is necessary to use or disseminate disclosed data to fulfill these twin purposes, States may not condition Section 8(i)'s disclosure right on compliance with overbroad use or dissemination restrictions. See *Felder*, 487 U.S. at 153. For similar reasons,  **\*24**  one also may view Section 8(i)'s disclosure right as carrying with it additional "implicit federal right[s]," *Maine Forest Prods. Council*, 51 F.4th at 10, to use and disseminate the disclosed information as needed to fulfill the NVRA's purposes.

Disclosure is necessary to determine whether those who are eligible to vote have been registered and remain on the rolls, but voter data must then be used and circulated to the broader public if voter registration is ever to be increased as a result. See *Voter Registration: Hearing Held Before the Subcomm. on Elections of the H. Comm. on Admin.*, 103rd Cong., 1st Sess. 111 (1993) (statement of Edward A. Hailes, Counsel, Wash. Bur., NAACP) (praising inclusion of Section 8(i) in draft NVRA because "[t]hese records could be used to identify and assist voters ensnared in a state of voting rights uncertainty").

Similarly, "[i]t is self-evident that disclosure will assist the identification of both error and fraud in the preparation and maintenance of voter rolls." *Project Vote*, 682 F.3d at 339. But to analyze and advocate for improvements to list maintenance practices, it often will be necessary to *use* voters' data and to *disseminate* it to election officials or others.

Congress recognized, too, that "an effective national voter registration program must also include private civil enforcement," which "can encourage action to assure that a reasonable effort is undertaken to achieve [the registration program's] objectives in all States." Senate Report 21. Such civil enforcement  **\*25**  efforts also will often require using--and may require publicly revealing--certain personal voter data.

b. Pointing to the Freedom of Information Act (FOIA), the Privacy Act, and the Civil Rights Act of 1960, the Secretary counters (Br. 35-36, 56-57) that Congress has implemented a general federal policy of protecting privacy. But each of these statutes imposes its own unique set of restrictions on disclosure, use, and dissemination--restrictions that Section 8(i) does not share. See 5 U.S.C. 552(b)(6) (FOIA) (creating general disclosure exemption for personal privacy but imposing no post-disclosure restrictions); 5 U.S.C. 552a(b) (Privacy Act) (limiting disclosure only to certain recipients or to recipients promising to use information for specified purposes); 52 U.S.C. 20703 and 20704 (Civil Rights Act) (restricting disclosure to Attorney General and strictly limiting further dissemination). Far from indicating a blanket federal policy of privacy protection, the distinctions between each of these laws shows that Congress balances anew in each disclosure statute the benefits of public knowledge with the costs of reduced privacy.

2. Having demonstrated the private disclosure right that Section 8(i) affords, along with the use and dissemination rights that flow with it, "the conflict with [Exception J] becomes starkly apparent." *Maine Forest Prods. Council*, 51 F.4th at 10. The Use Ban, as the district court interpreted it, would prohibit using Voter File data to examine other States' compliance with the NVRA. Doc. 87, at 11.  **\*26**  The Use Ban also may outlaw using Voter File data for voter registration activities. See p. 20, *supra*. Such uses of data are needed to fulfill the NVRA's purposes, and Section 8(i) protects them. Likewise, the district court determined that the Use Ban would prohibit using the Voter File as evidence to help enforce the NVRA against another State. Doc. 87, at 12 n.18. Not only would this improperly condition Section 8(i)'s core disclosure right and conflict with Section 8(i)'s implicit right to use disclosed data; it also would interfere with the NVRA's private right of action for anyone "aggrieved," regardless of "the State involved." 52 U.S.C. 20510(b)(1).

The Dissemination Ban, too, conflicts with the NVRA. Section 8(i) requires records to be "ma[d]e available for public inspection." 52 U.S.C. 20507(i)(1). Dissemination restrictions thus burden the rights both of requestors and of the broader public entitled to view this information. Public interest groups and others often use lists of names and addresses in a public way to help enforce the NVRA's purposes, whether to re-register erroneously removed voters or to force States to improve their list-maintenance processes. But the Dissemination Ban prohibits making public any information that even could be combined with *other* information to identify voters. Me. Stat. Tit. 21-A, § 196-A(1)(J)(2) (2023). Exception J would thus prohibit a requestor, for instance, from creating a website with a list of "inactive" voters and encouraging voters to check if they are **\*27** on the list so they can avoid removal from the rolls. This broad ban on publicizing disclosed information "is 'inconsistent with' the NVRA's mandate" as applied to circumstances in which public dissemination would serve the NVRA's purposes. *Arizona*, 570 U.S. at 15 (citation omitted).

Maine still can enforce Exception J when it would not interfere with the NVRA's express purposes. And Maine could pass a narrower, better-defined set of use and dissemination limits. But as interpreted by the district court, the NVRA partially preempts the current bans.

### B. NVRA Preemption Does Not Prohibit Redaction Of Sensitive Voter Information Or Enforcement Of Other Laws Prohibiting The Misuse Of Personal Data

While Maine's privacy concerns do not justify an unduly restrictive reading of Section 8(i)'s text and purposes, those concerns are substantial. It is important, therefore, to emphasize the limits on Section 8(i)'s preemptive scope. The line between permissible and impermissible conditions on disclosure can be complex and fact-dependent; what follows are merely illustrative examples of acceptable restrictions.

First, the NVRA does not prohibit States from redacting "uniquely sensitive information" like voters' Social Security Numbers before disclosing records. *Project Vote*, 682 F.3d at 339. Nor does it prohibit redacting an even broader set of personal information in certain sensitive circumstances--for instance, the names **\*28** and personal information of people subjected to criminal investigation (but later exonerated) on suspicion of being illegally registered to vote. See *Public Int. Legal Found.*, 996 F.3d at 267.

Second, Section 8(i) does not preempt state-law use restrictions as to uses that would not further the NVRA's purposes. For instance, as the Secretary notes (Br. 45), many States prohibit using information from voter registration lists for commercial purposes. Such prohibitions do not "frustrate[]" the NVRA's "operation within its chosen field" and so would not be preempted. *Emanuelli Hernandez*, 58 F.4th at 11 (citation omitted).

Third, similarly, the NVRA does not preempt bans on disseminating personal data whose public broadcasting is not necessary to achieve the NVRA's purposes. For example, States may need to disclose voters' years of birth, parties of registration, or voting history so requestors can determine whether States are complying with the NVRA's list-maintenance and non-discrimination requirements. See 52 U.S.C. 20507(b). But, outside the contexts of directly assessing and litigating NVRA compliance, state publication bans would be less likely to impede the statute's purposes.

Finally, the NVRA does not authorize requestors to disseminate disclosed information for a purpose or in a manner that harms voters. Most prominently, the NVRA's disclosure provision does not revoke or preempt federal or state laws **\*29** against voter intimidation. Contra Sec'y Br. 57. Both the NVRA and federal criminal law authorize prosecutions for willfully intimidating, threatening, or coercing people for registering to vote or voting. 18 U.S.C. 594; 52 U.S.C. 20511(1). The Voting Rights Act also authorizes civil suits to prevent or remedy acts with the effect of intimidating voters. See 52 U.S.C. 10307(b) and 10308(d). And nearly all States, including Maine, impose their own restrictions on voter intimidation, threats, or coercion. See Theodore Z. Wyman, *Litigation of Voter Intimidation Law* § 8, 174 Am. Jur. Trials 385 (May 2023). Additionally, the NVRA does not preempt state laws prohibiting libel or other dangerous uses of voters' information.

PUBLIC INTEREST LEGAL FOUNDATION,..., 2023 WL 4882397...

Below, PILF agreed with several such limits on NVRA preemption. Noting Maine's concerns about publicizing "ethnic and language minorities[']" personal information, voter intimidation, and "misuse by 'scammers, hackers, commercial interests, or foreign governments,' " PILF stated that it "does not allege an intention to engage in these activities nor that they were intended by Congress, much less that they would further the NVRA's objectives." Doc. 84, at 3 (citations omitted). It has made similar concessions on appeal. PILF Br. 50-51, 52. PILF was right to acknowledge these limits on preemption but wrong to claim (PILF Br. 50) that disclosures of personally identifiable information are "imaginary monsters." See **\*30** Sec'y Br. 14-15, 49-51. This Court also should emphasize limits on preemption--plus the others discussed above--to avoid abuse of sensitive voter data.

## CONCLUSION

This Court should certify to the Maine Supreme Judicial Court, or else affirm on the issues addressed herein.

Respectfully submitted,

KRISTEN CLARKE

Assistant Attorney General

*s/ Noah B. Bokat-Lindell*

TOVAH R. CALDERON

NOAH B. BOKAT-LINDELL

Attorneys Department of Justice Civil Rights Division Appellate Section

Ben Franklin Station

P.O. Box 14403

Washington, D.C. 20044-4403

(202) 598-0243

---

**End of Document**                                   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

Exhibit C

**2011 WL 4947283 (C.A.4) (Appellate Brief)**

United States Court of Appeals, Fourth Circuit.

PROJECT VOTE/VOTING FOR AMERICA, INC., Plaintiff-Appellee,

v.

Elisa LONG, in her Official Capacity as General Registrar of Norfolk, Virginia; Donald
Palmer, in his Official Capacity as Secretary, State Board of Elections, Defendants-Appellants.

No. 11-1809.

October 18, 2011.

On Appeal from the United States District Court for the Eastern District of Virginia

**Brief for the United States as amicus Curiae Supporting Plaintiff-Appellee and Urging Affirmance**

Thomas E. Perez, Assistant Attorney General, Diana K. Flynn, Erin H. Flynn, Attorneys, U.S. Department of Justice, Civil Rights Division, Appellate Section, Ben Franklin Station, P.O. Box 14403, Washington, D.C. 20044-4403, (202) 514-5361.

**\*i TABLE OF CONTENTS**

INTEREST OF THE UNITED STATES ............................................................................... 1
ISSUE PRESENTED ........................................................................................................... 2
STATEMENT ...................................................................................................................... 2
SUMMARY OF ARGUMENT ........................................................................................... 11
ARGUMENT
SECTION 24.2-444 OF THE VIRGINIA CODE VIOLATES THE NVRA ...................... 12
A. Virginia's Prohibition On The Public Disclosure Of Voter Registration Applications Conflicts With The Language, Structure, And Purpose Of The NVRA ........................................................................... 12
1. Principles Of Statutory Interpretation ........................................................................... 12
2. The District Court Properly Interpreted The Public Disclosure Provision ................... 13
3. The State's Counterarguments Should Be Rejected ...................................................... 21
B. Voter Registration Records Can Be Redacted To Address Legitimate Privacy Concerns ........................... 24
C. The MOVE Act And HA VA Do Not Limit The Disclosure Of Voter Registration Applications ................. 26
CONCLUSION ................................................................................................................... 30
CERTIFICATE OF COMPLIANCE
CERTIFICATE OF SERVICE

**\*ii TABLE OF AUTHORITIES**

Barnhart v. Peabody Coal Co., 537 U.S. 149 (2003) ................................... 16
Crespo v. Holder, 631 F.3d 130 (4th Cir. 2011) ........................................... 12, 15
Greidinger v. Davis, 988 F.2d 1344 (4th Cir. 1993) ...................................... 24
Healthkeepers, Inc. v. Richmond Ambulance Auth., 642 F.3d 466 (4th Cir. 2011) ....................................................................... 17
Helvering v. Stockholms Enskilda Bank, 293 U.S. 84 (1934) ....................... 17
National Coal. for Students with Disabilities Educ. & Legal Def. Fund v. Allen, 152 F.3d 283 (4th Cir. 1998) ............................................................... 12-13, 15
National Fed'n of the Blind v. FTC, 420 F.3d 331 (4th Cir. 2005), cert. denied, 547 U.S. 1128 (2006) ........................................................................ 22
Project Vote/Voting for Am., Inc. v. Long, 752 F. Supp. 2d 697 (E.D. Va. 2010) ................................................................................................................ passim
Project Vote/Voting for Am., Inc. v. Long, No. 10cv75, 2011 WL 2963032 (E.D. Va. July 20, 2011) ................................................................................. 10
Rivera v. Long, No. 070274 (Va. Feb. 8, 2008) ............................................. 24
Robinson v. Shell Oil Co., 519 U.S. 337 (1997) ........................................... 12

*United States v. Ide,* 624 F.3d 666 (4th Cir. 2010), cert. denied, 131 S. Ct. 2962 (2011) ........................................................... 12

*Walters v. Metropolitan Educ. Enter., Inc.,* 519 U.S. 202 (1997) ................... 15

*Wheeler v. Newport News Shipbuilding & Dry Dock Co.,* 637 F.3d 280, pet. for cert. pending No. 11-107 (filed July 21, 2011) ........................................ 13

**\*iii** *Young v. Fordice,* 520 U.S. 273 (1997) .............................................. 3

CONSTITUTION AND STATUTES:

U.S. Const. Art. I, § 4, Cl. 1 ................................................................... 2

Help America Vote Act of 2002 (HAVA), 42 U.S.C. 15301 *et seq* ............... 10, 26

42 U.S.C. 15482 ..................................................................................... 26

42 U.S.C. 15482(a) ............................................................................. 26-27

42 U.S.C. 15482(a)(5) ........................................................................... 27

42 U.S.C. 15545(a)(4) ........................................................................... 28

National Voter Registration Act of 1993 (NVRA), 42 U.S.C. 1973gg *et seq* . .... 1

42 U.S.C. 1973gg(a) ............................................................................... 3

42 U.S.C. 1973gg(b) ............................................................................ 1-3

42 U.S.C. 1973gg-2(a) .................................................................... 3, 17, 25

42 U.S.C. 1973gg-3(a)(2) ....................................................................... 19

42 U.S.C. 1973gg-3(c)(2)(D)(ii)-(iii) ....................................................... 16

42 U.S.C. 1973gg-3(e) ........................................................................... 19

42 U.S.C. 1973gg-4(b) ........................................................................... 20

42 U.S.C. 1973gg-5(a)(7) ....................................................................... 16

42 U.S.C. 1973gg-5(d) ........................................................................... 19

42 U.S.C. 1973gg-6(a)(1)-(6) .................................................................. 17

42 U.S.C. 1973gg-6(a)(1) .................................................................... 3, 19

42 U.S.C. 1973gg-6(a)(2) .................................................................... 4, 19

42 U.S.C. 1973gg-6(a)(3) ......................................................................... 4

42 U.S.C. 1973gg-6(a)(4) ......................................................................... 4

42 U.S.C. 1973gg-6(b) ........................................................................... 18

42 U.S.C. 1973gg-6(b)(1) ....................................................................... 19

42 U.S.C. 1973gg-6(b)(2) ......................................................................... 4

42 U.S.C. 1973gg-6(c)-(f) ........................................................................ 4

42 U.S.C. 1973gg-6(d)(2) .................................................................... 5, 22

42 U.S.C. 1973gg-6(i) ................................................................ 2, 5, 17-18

42 U.S.C. 1973gg-6(i)(1) ..................................................................... 8, 15

42 U.S.C. 1973gg-6(i)(2) ....................................................................... 22

42 U.S.C. 1973gg-7(a)(3) ....................................................................... 20

42 U.S.C. 1973gg-7(b)(4)(D)(ii)-(iii) ....................................................... 16

42 U.S.C. 1973gg-9(a) ............................................................................. 2

**\*iv** 42 U.S.C. 1973gg-9(b) ............................................................. 7

Privacy Act of 1974, 5 U.S.C. 552a note ............................................... 24, 26

Military and Overseas Voter Empowerment (MOVE) Act, Pub. L. No. 111-84, 123 Stat. 2195, which amended the Uniformed and Overseas Citizens Absentee Voting Act, 42 U.S.C. 1973ff *et seq* ............................... 10, 26

42 U.S.C. 1973ff-1(a)(6) ......................................................................... 28

42 U.S.C. 1973ff-1(a)(7) ......................................................................... 28

42 U.S.C. 1973ff-1(e)(6)(A) .................................................................... 28

42 U.S.C. 1973ff-1(e)(6)(B) .................................................................... 28

42 U.S.C. 1973ff-1(f)(3) ......................................................................... 28

5 U.S.C. 552(b) ..................................................................................... 26

5 U.S.C. 552(b)(6) ................................................................................. 25

Md. Code Ann., Elec. Law § 3-505 *et seq.* (West 2011) ................................ 6

Md. Code Ann., State Gov't § 10-611 *et seq.* (West 2011) ............................. 6

N.C. Gen. Stat. § 132-6 (West 201 1) ......................................................... 6

N.C. Gen. Stat. § 163-82.10 (West 2010) .................................................... 6

S.C. Code Ann. § 7-5-410 (2010) .............................................................. 6

S.C. Code Ann. § 30-4-30 (2010) .............................................................. 6

Va. Code Ann. § 24.2-444 (West 2011) ....................................................... 6

Va. Code Ann. § 24.2-444(A) (West 2011) ..................................................... 23, 28-29
Va. Code Ann. § 24.2-444(B) (West 2011) ..................................................... 22-23
W. Va. Code Ann. § 3-2-30 (West 2011) ......................................................... 6
*v 59 Fed. Reg. 32,313-32,314 (June 23, 1994) ......................................... 24
LEGISLATIVE HISTORY:
S. Rep. No. 6, 103d Cong., 1st Sess. 18 (1993) ............................................. 22
MISCELLANEOUS:
National Mail Voter Registration Form, available at, http://www.eac.gov/           25
voter resources/register to vote.aspx (last visited Oct. 12, 2011) ...................

## *1  INTEREST OF THE UNITED STATES

Congress enacted the National Voter Registration Act of 1993 (NVRA), 42 U.S.C. 1973gg *et seq.,* to increase the number of eligible citizens who register to vote in federal elections, enhance the participation of eligible citizens as voters in federal elections, protect the integrity of the electoral process, and ensure that accurate and current voter registration rolls are maintained. See **\*2** 42 U.S.C. 2-1973gg(b). The Attorney General is charged with enforcement of the NVRA. See 42 U.S.C. 1973gg-9(a).

This case presents an issue of statutory interpretation - namely, whether Section 8(i) of the NVRA, 42 U.S.C. 1973gg-6(i), requires States to make voter registration applications publicly available and thus preempts state law prohibiting the release of such information. A holding that the NVRA does not require States to disclose voter registration applications would hinder election oversight by making it more difficult to ascertain whether States are fulfilling their obligations under the NVRA. In view of the limited enforcement resources of the United States, public disclosure of voter registration applications furthers the NVRA's goal of increased eligible voter registration and participation.

The United States has a significant interest in how this Court interprets the NVRA and files this brief pursuant to Federal Rule of Appellate Procedure 29(a).

ISSUE PRESENTED

Whether Virginia's prohibition on the public disclosure of voter registration applications violates Section 8(i) of the NVRA, 42 U.S.C. 1973gg-6(i).

STATEMENT

1. The NVRA was enacted pursuant to Congress's Elections Clause authority and, by its terms, governs only federal elections. See 42 U.S.C.

1973gg(b); U.S. Const. Art. I, § 4, Cl. 1. The Act flowed from Congressional **\*3** findings that the right to vote is a fundamental right, the exercise of which federal, state, and local governments have a duty to promote, and that discriminatory and unfair registration laws and procedures can have a damaging effect on federal voter participation and disproportionately harm voter participation by various groups, including racial minorities. See 42 U.S.C. 1973gg(a). The purposes of the NVRA are to establish procedures that increase federal voter registration and enhance voter participation by eligible citizens, to protect the integrity of the electoral process, and to ensure States maintain accurate and current voter registration lists. See 42 U.S.C. 1973gg(b).

Under the NVRA, States must provide three methods of voter registration: (1) registration as part of a driver's license application; (2) mail registration using the form prescribed initially by the Federal Election Commission (and now by the Election Assistance Commission); and (3) registration through state-designated voter registration agencies. See 42 U.S.C. 1973gg-2(a); *Young v. Fordice,* 520 U.S. 273, 275 (1997). These voter registration methods must be provided "notwithstanding any other Federal or State law, [and] in addition to any other method of voter registration provided for under State law." 42 U.S.C. 1973gg-2(a). For all three types of registration, States must ensure that "any eligible applicant is registered to vote," 42 U.S.C. 1973gg-6(a)

(1), and must "send notice to **\*4** each applicant of the disposition of [his or her voter registration] application," 42 U.S.C. 1973gg-6(a)(2).

In addition to registering eligible voters and notifying applicants of the disposition of their applications, the NVRA requires States to conduct a general program to promote the accuracy and currency of their official voter registration lists while simultaneously protecting against improper voter removal. See 42 U.S.C. 1973gg-6(a)(3)-(4). Under the NVRA, a voter may not be removed from a State's official list of eligible voters unless the voter requests his or her removal, is ineligible to vote by reason of criminal conviction or mental incapacity as provided by state law, dies, or has become ineligible due to a change of address confirmed in accordance with the NVRA. See 42 U.S.C. 1973gg-6(a)(3)-(4); 42 U.S.C. 1973gg-6(c)-(f). A State may not remove an individual from its official lists simply because that person has failed to vote. See 42 U.S.C. 1973gg-6(b)(2).

The NVRA also requires public disclosure of voter registration activities. The Act states as follows:
(1) Each state shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, *all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters,* except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

(2) The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in **\*5** subsection (d)(2) of this section are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

42.S.C. 1973gg-6(i) (Public Disclosure Provision) (emphasis added). The notices referred to in paragraph (2) concern a State's ability to remove registered voters from its official lists on the basis of a suspected change in address. See 42 U.S.C. 1973gg-6(d) (2).

2. Section 24.2-444 of the Virginia Code governs the State's disclosure of voter registration records. The statute provides as follows:
A. Registration records shall be kept and preserved by the general registrar * * *. The State Board shall provide to each general registrar * * * lists of registered voters for inspection and lists of persons registering pursuant to [absentee voter registration] and [overseas voter registration]. The lists shall contain the name, address, year of birth, gender and all election districts applicable to each registered voter. The lists shall be opened to public inspection at the office of the general registrar when the office is open for business. * * * The State Board shall provide to each general registrar lists of persons denied registration for public inspection * * *

B. The general registrars * * * shall make available for public inspection and copying * * * all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of the registration records pursuant to §§ 24.2-427 [registration cancellation by voter or for persons known to be deceased or disqualified to vote], 24.2-428 [suspected change of address and inactive status] and 24.2-428.1 [other procedures for assigning inactive status], including lists of the names and addresses of all persons to whom notices are sent, and information concerning whether each person has responded to the notice as of the date that inspection of the records is made.

**\*6** C. No list provided by the State Board * * * nor any record made available for public inspection * * * shall contain any of the following information: (i) an individual's social security number, or any part thereof; (ii) the residence address of an individual who has furnished a post office box in lieu of his residence address as authorized by [state law]; (iii) the declination by an individual to register to vote and related records; (iv) the identity of a voter registration agency through which a particular voter is registered; or (v) the day and month of birth of an individual. *No voter registration records other than the lists provided by the State Board under subsection A and the records made available under subsection B shall be open to public inspection.*

Va. Code Ann. § 24.2-444 (West 2011) (emphasis added). Accordingly, state law prohibits the public inspection of voter registration applications, including rejected applications and related records. [1]

[1]   Virginia is the only State in the jurisdiction of the Fourth Circuit that bars access to voter registration applications. Maryland, North Carolina, South Carolina, and West Virginia each make these applications available for public inspection, albeit subject to certain privacy restrictions. See, *e.g.,* Md. Code Ann., Elec. Law § 3-505 (West 2011) (voter registration records); Md. Code Ann., State Gov't § 10-611 *et seq.* (West 2011) (public records); N.C. Gen. Stat. Ann. § 132-6 (West 2010) (public records); N.C. Gen. Stat. Ann. § 163-82.10 (West 2010) (voter registration records); S.C. Code Ann. § 30-4-30 (2010) (public records); S.C. Code Ann. § 7-5-410 (2010) (voter registration records); W. Va. Code Ann. § 3-2-30 (West 2011) (voter registration records).

3. In May 2009, plaintiff Project Vote/Voting for America, Inc. (Project Vote) sought access from the Norfolk General Registrar to the "voter registration applications of any individual who timely submitted an application [in 2008] who was not registered to vote in time for the November 4, 2008 general election, and also other documents, such as documents identifying the reasons the applications **\*7** were rejected." J.A. 18-19. [2] Project Vote requested the records under the Public Disclosure Provision, based on its belief that the Norfolk General Registrar had incorrectly rejected the applications of students at Norfolk State University (NSU), a historically African-American public university in Norfolk, Virginia. J.A. 18-19.

[2]   "J.A." refers to the page numbers within the Joint Appendix filed with this Court on September 12, 2011.

After its request was denied under state law, Project Vote provided the requisite notice of violation to the State in accordance with Section 11(b) of the NVRA, 42 U.S.C. 1973gg-9(b), and filed the complaint in this case. J.A. 12-23. Project Vote sought a declaration that the State was in violation of the NVRA and that Section 24.2-444 was preempted. J.A. 22. It also sought an injunction prohibiting the State from denying it access to the requested records. J.A. 13, 22.

4. On March 26, 2010, the State filed a motion to dismiss. J.A. 26-28. In addition to arguing that Project Vote lacked standing, the State asserted two merits-based arguments: (1) the Public Disclosure Provision relates only to voter removal programs; and (2) Virginia law does not conflict with, and is not preempted by, the NVRA because (a) the Public Disclosure Provision does not grant access to voter registration applications and (b) Virginia allows the public to inspect records concerning the maintenance of voter registration lists. J.A. 34-48.

**\*8**  -On October 29, 2010, the district court denied the State's motion. See *Project Vote/Voting for Am., Inc. v. Long,* 752 F. Supp. 2d 697 (E.D. Va. 2010). After finding standing, the court considered two questions: (1) "what constitutes a program or activity conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters"; and (2) "whether ** voter registration applications[ ] concern the implementation of such a program or activity." *Id.* at 705.

The court first looked to the statute's plain meaning and, relying on dictionary definitions, determined that "a program or activity covered by the Public Disclosure Provision is one conducted to ensure that the state is keeping a 'most recent' and errorless account of which persons are qualified or entitled to vote within the state." *Project Vote,* 752 F. Supp. 2d at 706. It next stated that "[t]he process of evaluating voter registration applications * * * is a central part of 'ensuring the accuracy and currency of the official lists of eligible voters.' " *Ibid.* (quoting 42 U.S.C. 1973gg-6(i)(1)). The court found that where a State incorrectly denies an application, its official lists are "inaccurate and obsolete." *Ibid.*

The court further found that the exceptions to the Public Disclosure Provision, *i.e.,* preventing disclosure of records related to a declination to register to vote or the identity of a voter registration agency through which any particular voter is registered, supported its conclusion that the provision applied to voter **\*9** registration procedures. See *Project Vote,* 752 F. Supp. 2d at

706-707. The court noted that if it interpreted the provision to apply only to voter removal programs, the statutory exceptions would be rendered superfluous. See *id.* at 707.

Finally, the court considered the meaning of the phrase "records concerning the implementation of." Again relying on dictionary definitions, the court concluded that the Public Disclosure Provision governs "records which relate to carrying out" registration procedures and removal programs. See *Project Vote,* 752 F. Supp. 2d at 707. It explained that voter registration applications are "the means by which an individual provides the information necessary for the Commonwealth to determine his eligibility to vote * * * [and], perhaps more than other records, are relevant to carrying out voter registration procedures." *Ibid.* It also noted that Congress used broad language in requiring disclosure of "all records" not specifically excepted. *Id.* at 708. The court rejected the State's argument that Section 1973gg-6(i)(2) limited the records subject to disclosure. See *id.* at 708 n. 17.

The court then determined that the specific context in which the Public Disclosure Provision appeared - and the broader context of the statute as a whole - supported its conclusion that the State was required to make voter registration applications available to the public. See *Project Vote,* 752 F. Supp. 2d at 708-709. It also examined the NVRA's purposes and concluded that its interpretation of the **\*10** Public Disclosure Provision was congruent with increasing voter registration, enhancing voter participation, protecting the integrity of the electoral process, and ensuring the accuracy and currency of voter registration rolls. See *id.* at 710. The court did find, however, that disclosing a registrant's social security number (SSN) would undermine federal voter registration and participation. See *id.* at 711.

5. On January 31, 2011, Project Vote moved for summary judgment. J.A. 292-294. In response, the State renewed the arguments it made in its motion to dismiss and further submitted that disclosing original applications was inconsistent with the State's obligations under the Help America Vote Act of 2002 (HAVA), 42 U.S.C. 15301 *et seq.,* and the Military and Overseas Voter Empowerment (MOVE) Act, Pub. L. No. 111-84, 123 Stat. 2195, which amended the Uniformed and Overseas Citizens Absentee Voting Act, 42 U.S.C. 1973ff *et seq.* J.A. 309-313.

On July 20, 2011, the district court granted summary judgment to Project Vote. See *Project Vote/Voting for Am., Inc. v. Long,* No. 10cv75, 2011 WL 2963032 (E.D. Va. July 20, 2011). The court explained that it did not have to harmonize the NVRA with the MOVE Act or HAVA, neither of which concerned the security or privacy of voter registration applications. See *id.* at \*3. The court then incorporated the reasoning set forth in its prior decision and held that insofar as state law prohibits the disclosure of redacted voter registration applications, it is preempted by the NVRA. See *id.* at \*4. The State timely appealed. J.A. 440-442.

**\*11**  SUMMARY OF ARGUMENT

The district court correctly interpreted the NVRA to require public access to voter registration applications. The plain meaning of the Public Disclosure Provision, the specific context in which it appears in the NVRA, and the use of the terms "programs" and "activities" elsewhere in the statute all support the court's conclusion. Public disclosure of voter registration applications also promotes the NVRA's express purposes, *i.e.,* increased voter registration and participation by eligible voters, electoral integrity, and the maintenance of current and accurate voter registration lists.

Privacy concerns do not counsel against public inspection of voter registration applications. Nothing in the NVRA requires an applicant to disclose his or her social security number in order to register to vote. Similarly, the federal mail registration form does not request specific information regarding an applicant's record of felony convictions or mental incapacity. Where a State requires an applicant's social security number or other sensitive information for voter registration purposes, that information may be redacted prior to disclosure of any records requested under federal law. Finally, the security and privacy protections contained in the MOVE Act and HAVA neither govern nor conflict with the public disclosure of voter registration applications under the NVRA.

**\*12  ARGUMENT**

## SECTION 24.2-444 OF THE VIRGINIA CODE VIOLATES THE NVRA

*A. Virginia's Prohibition On The Public Disclosure Of Voter Registration*
*Applications Conflicts With The Language, Structure, And Purpose Of The NVRA*

### 1. *Principles Of Statutory Interpretation*

In resolving issues of statutory interpretation, courts look to the statutory language and, if it is plain, apply it according to its terms. See *Crespo v. Holder,* 631 F.3d 130, 133 (4th Cir. 2011). To determine whether a statute's language is plain, a court considers "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *National Coal. for Students with Disabilities Educ. & Legal Def. Fund v. Allen,* 152 F.3d 283, 289 (4th Cir. 1998) (quoting *Robinson v. Shell Oil Co.,* 519 U.S. 337, 341 (1997)).

Under a plain meaning analysis, a court gives statutory terms their "ordinary, contemporary, common meaning." *Crespo,* 631 F.3d at 133 (internal quotation marks and citation omitted). A court must consider all the words used and not review phrases in isolation. See *United States v. Ide,* 624 F.3d 666, 668 (4th Cir. 2010), cert. denied, 131 S. Ct. 2962 (2011). "The context in which a term is used often determines how broadly or narrowly a term is to be defined." *National Coal. for Students with Disabilities,* 152 F.3d at 290. When Congress uses broad **\*13**  language, the court may not disregard it. See *ibid.* If the statutory text lends itself to more than one reasonable interpretation, the court must find "that interpretation which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and the general purposes that Congress manifested." *Wheeler v. Newport News Shipbuilding & Dry Dock Co.,* 637 F.3d 280, 284 (4th Cir. 2011), pet. for cert. pending No. 11-107 (filed July 21, 2011).

### 2. *The District Court Properly Interpreted The Public Disclosure Provision*

The language, structure, and purpose of the NVRA support the conclusion that the Public Disclosure Provision applies to voter registration applications.

a. In analyzing the Public Disclosure Provision, the district court correctly focused its inquiry on the meaning of the phrase "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." The court looked to the dictionary definitions of the terms used and concluded that "a program or activity covered by the Public Disclosure Provision is one conducted to ensure that the state is keeping a 'most recent' and errorless account of which persons are qualified or entitled to vote within the state." *Project Vote/Voting for Am., Inc.* v. *Long,* 752 F. Supp. 2d 697, 706 (E.D. Va. 2010).

Evaluating voter registration applications and registering eligible applicants to vote are important means through which States ensure accurate and current voter **\*14**  registration lists. While voter removal programs allow States to maintain updated lists and protect against voter fraud, those programs do not alone assure accurate and current voter registration lists. Rather, official lists are accurate and current only insofar as States properly register eligible voters and timely add them to their lists. Thus, the district court correctly concluded that voter registration activities as well as voter removal programs are important to ensuring accurate and current eligible voter lists.

Having determined that voter registration and voter removal both qualify as "programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," the district court then analyzed whether voter registration applications are "records concerning the implementation of" voter registration activities. See *Project Vote,* 752 F. Supp. 2d at 706-707 (citation omitted). The court properly looked to the ordinary, common meaning of "records concerning

the implementation of," and concluded that it pertained to "records which relate to carrying out" the covered programs and activities. *Id.* at 707.

Voter registration applications are the primary means through which a State determines an individual's eligibility to vote. Moreover, because a State can neither register an individual to vote nor conduct any voter removal programs with respect to that individual without receipt and processing of an original voter registration application, all voter administration procedures ultimately depend on **\*15** the initial evaluation of, and the accurate and timely processing of, voter registration applications. Voter registration applications thus relate to the carrying out of voter registration activities; they are subject to disclosure under the NVRA because they fall within the ordinary, common meaning of "records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters."

That States must make voter registration applications publicly available is all the more apparent given the statutory requirement that States disclose "all" records not specifically excepted. See 42 U.S.C. 1973gg-6(i)(1). As this Court stated in *National Coalition for Students with Disabilities,* "the use of the word 'all' [as a modifier] * * * suggests an expansive meaning because 'all' is a term of great breadth." 152 F.3d at 290. Moreover, as the district court correctly found, both statutory exceptions to disclosure, *i.e.,* declinations to register to vote and the identity of the voter registration agency through which a particular voter is registered, relate only to voter registration activities. If a court were to interpret the Public Disclosure Provision to apply exclusively to voter removal programs, the statutory exceptions would be rendered superfluous. See *Walters v. Metropolitan Educ. Enter., Inc.,* 519 U.S. 202, 209 (1997) ("Statutes must be interpreted, if possible, to give each word some operative effect."); *Crespo,* 631 F.3d at 135.

 **\*16** Inaddition, under the maxim of *expressio unius est exclusio alterius,* the inclusion of specific exceptions to the operation of a statute is an indication that the statute should apply in all instances of the sort not specifically excepted. As the Supreme Court explained in *Barnhart v. Peabody Coal Co.,* the maxim applies "when the items expressed are members of an associated group or series, justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence." 537 U.S. 149, 168 (2003) (internal quotation marks omitted).

Congress likely would have included applications to register to vote alongside declinations to register to vote and the identity of an applicant's voter registration agency had it wanted to exempt voter registration applications from disclosure. Thus, a court can infer that the Public Disclosure Provision applies to voter registration applications. This conclusion is supported by NVRA provisions stating that all three types of voter registration methods must be accompanied by written statements that a declination to register to vote and the office through which an application is submitted will remain confidential. See 42 U.S.C. 1973gg-3(c)(2)(D)(ii)-(iii); 42 U.S.C. 1973gg-5(a)(7); 42 U.S.C. 1973gg-7(b)(4)(ii)-(iii). These provisions do not evince any Congressional intent to withhold voter registration applications from public inspection.

b. The broader statutory context of the Public Disclosure Provision also supports public inspection of voter registration applications. It is well-settled that **\*17** "identical words used in different parts of the same [statute] are intended to have the same meaning." *Healthkeepers, Inc. v. Richmond Ambulance Auth.,* 642 F.3d 466, 472 (4th Cir. 2011) (quoting *Helvering v. Stockholms Enskilda Bank,* 293 U.S. 84, 87 (1934)). A court can infer that the term "programs and activities" in the Public Disclosure Provision applies to both voter registration and voter removal based on how "programs" or "activities" is used elsewhere in the NVRA.

As an initial matter, Section 1973gg-6(i)'s title, "Public disclosure of voter registration activities," implies that the provision concerns more than voter removal programs. Under the NVRA, "registration" encompasses four methods of submitting a voter registration application: simultaneous to a driver's license application; by mail; through a state-designated voter registration agency; and pursuant to state law. See 42 U.S.C. 1973gg-2(a). Mandatory state activities attendant to federal voter registration include: ensuring that eligible applicants are registered to vote in a timely fashion; notifying applicants of the disposition of their applications; providing that a registrant's name cannot be removed from the official list of eligible voters except under certain circumstances; conducting a general program to remove the names of ineligible voters; informing applicants of voter

eligibility requirements and penalties for false registration; and ensuring that the identity of an applicant's voter registration agency, if any, remains confidential. See 42 U.S.C. 1973gg-6(a)(1)-(6). Given the NVRA's expansive use of **\*18** "registration" as well as the numerous obligations imposed on States with respect to the administration of voter registration under Section 1973gg-6(a), there is no basis for reading "[p]ublic disclosure of voter registration activities" under Section 1973gg-6(i) to cover only voter removal records.

Moreover, Section 1973gg-6(b), entitled "Confirmation of voter registration," provides that "[a]ny State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll * * * shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act" and shall not result in the removal of a registrant's name by reason of that person's failure to vote. 42 U.S.C. 1973gg-6(b). Given the title of Section 1973gg-6(b) and its placement directly after the list of mandatory activities attendant to federal voter registration, Section 1973gg-6(b) can be understood only as "program [s] or activit[ies]" undertaken to ensure that a registrant properly is included on voter registration rolls both upon initial registration (*e.g.,* a procedure that detects false registration) and in subsequent election cycles (*e.g.,* a voter removal program). Thus, just as in the Public Disclosure Provision, Congress used the term "program or activity" in Section 1973gg-6(b) to cover both the inclusion of an eligible voter on official lists and the use of removal programs to ensure the continued eligibility of persons on those lists.

**\*19** c. Disclosing voter registration applications also advances the statutory purposes of increasing eligible voter registration, enhancing voter participation, protecting electoral integrity, and maintaining current and accurate voter registration rolls.

While the State argues it suffices under the NVRA to allow public inspection of voter registration lists and official records concerning voter removal programs, the accuracy and currency of official lists can only be determined by comparing the information set forth in those lists with the information submitted during the registration process. Public inspection of original applications ensures that States are properly evaluating applications, rejecting applicants only for legitimate reasons, processing eligible applications in a timely fashion, and notifying applicants of the disposition of their applications. See, *e.g.,* 42 U.S.C. 1973gg-3(e); 42 U.S.C. 1973gg-5(d); 42 U.S.C. 1973gg-6(a)(l)-(2). Broad inspection of original applications also helps ensure that a State's registration activities and removal programs are uniform, nondiscriminatory, and in compliance with the Voting Rights Act. See 42 U.S.C. 1973gg-6(b)(1) (protecting against selective confirmation and purging procedures). Public inspection also ensures that election officials are processing updated information in a timely manner, thereby avoiding later confusion at the polls. See 42 U.S.C. 1973gg-3(a)(2) (updating prior registration information).

**\*20** Importantly, public disclosure of voter registration applications helps uncover systemic problems in any given jurisdiction. Broad inspection of voter registration records allows the public to identify the basis for numerous rejected applications and remedy registration issues in advance of future elections. [3] This is especially important for voter registration drives, which Congress envisioned under the NVRA. See 42 U.S.C. 1973gg-4(b). Similarly, public inspection of original records may help bring systemic problems to the attention of the Election Assistance Commission, which assesses the impact of the NVRA and formulates recommendations for improvements in procedures, forms, and other matters affected by the Act. See 42 U.S.C. 1973gg-7(a)(3). Public disclosure of voter registration applications thus advances one of the central purposes of the NVRA, **\*21** *i.e.,* making the registration process accessible to as many eligible voters as possible.

---

[3]    The importance of understanding the basis for an application's denial is readily apparent in this case. In its brief, the State asserts that the applications at issue were rejected because NSU falls within two voting precincts; the State thus needed students' dormitory addresses, not the general school address, for voter administration purposes. See Appellant's Br. 9-10. The State further explains that many of the notices it sent to rejected applicants were returned as undeliverable. See Appellant's Br. 10. On election day, the State provided provisional ballots to those students whose names did not appear on the poll books. See Appellant's Br. 10. The Electoral Board later voted to count all ballots cast by otherwise qualified students who provided their residence address on their provisional ballot forms, if the address was located within the precinct where the provisional ballot was cast. See Appellant's Br. 10. Thus, otherwise qualified voters who

cast a provisional ballot at the wrong precinct did not have their votes counted. If the public and private organizations were aware of this address issue through their inspection of rejected applications and related records, they could easily rectify this recurring basis for denial, thereby increasing eligible voter registration and participation.

### 3. The State's Counterarguments Should Be Rejected

As explained above, the language, structure, and purpose of the NVRA support the conclusion that the Public Disclosure Provision covers voter registration applications.

The State argues that because information contained in rejected applications has never appeared on official voter registration lists, those records do not concern list maintenance. See Appellant's Br. 12-13. The Public Disclosure Provision, however, covers not only compiled registration lists, but all records concerning "programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." The maintenance of current and accurate eligible voter lists necessarily encompasses the State's evaluation of voter registration applications and its compilation of updated registration lists. Rejecting ineligible applicants and requesting further information from applicants who submit incomplete applications are activities that ensure the accuracy of voter registration lists. Rejected applications relate to these activities. Thus, the State's argument fails.

The State also argues that paragraph (2) of the Public Disclosure Provision limits the records a State must make available for public inspection. See **\*22** Appellant's Br. 15-16. The NVRA mandates that a State's publicly available records include "lists of the names and addresses of all persons to whom notices described in [Section 1973gg-6(d)(2)] are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made." 42 U.S.C. 1973gg-6(i)(2).

The State misinterprets the Public Disclosure Provision in arguing that paragraph (2) limits disclosure to only those documents concerning notice and confirmation of a suspected change in address. Rather, paragraph (2) merely allows for ease of oversight on an issue that was particularly troublesome to Congress - *i.e.,* the improper removal of registrants from official lists - by mandating that States create a list they might not otherwise generate. See S. Rep. No. 6, 103d Cong., 1st Sess. 18 (1993). The statutory language that records "shall include" the enumerated lists in paragraph (2) is not exhaustive; it merely requires States to maintain these lists, among other records, for a period of at least two years. See *National Fed'n of the Blind v. FTC,* 420 F.3d 331, 338 (4th Cir. 2005) (explaining that "shall include" did not act as words of limitation), cert. denied, 547 U.S. 1128 (2006). [4]

---

[4]   The State's disclosure provision, which parrots the Public Disclosure Provision, further undermines the State's argument. In addition to disclosing the lists required under paragraph (2), the State discloses records created pursuant to Virginia Code §§ 24.2-427, 24.2-428, and 24.2-428.1. See Va. Code Ann. § 24.2-(continued...) 444(B). The State also compiles and discloses lists of persons denied registration. See Va. Code Ann. § 24.2-444(A). Thus, while the state legislature limited public disclosure of election records to official registration lists and voter removal records, it likely did not interpret the Public Disclosure Provision as restricted to the enumerated lists in paragraph (2).

**\*23**  The State likewise argues that the district court erred in concluding that the NVRA's specific exceptions to public disclosure apply to voter registration generally and not merely to voter registration agencies. See Appellant's Br. 13-14. As discussed above, the NVRA's confidentiality provisions for declinations to register to vote and the site of an application's submission apply to all three methods of voter registration. See p. 16, *supra.* Moreover, regardless of how a declination to register to vote is manifested, it relates to voter registration efforts, not voter removal.

Exempting declinations to register to vote is consistent with the oversight function of the Public Disclosure Provision and the conclusion that the provision applies to voter registration applications. The State's actions with respect to ensuring current and accurate voter registration lists are relevant only insofar as a particular individual seeks to register, or is registered, to vote. The public interest in the integrity of official lists does not extend either to a personal decision not to register to vote or to

a declination to register on the basis of voter ineligibility. As for the second statutory exception, Congress determined that disclosing the identity **\*24** of the agency through which an individual voter submits a registration application hinders voter registration efforts, thus undermining a central purpose of the NVRA. Congress included two statutory exceptions to public disclosure; neither concerns voter registration applications.

### B. Voter Registration Records Can Be Redacted To Address Legitimate Privacy Concerns

The State also argues that public disclosure of voter registration applications will chill voter registration because the state form reflects information about felony convictions and mental incapacity. See Appellant's Br. 22. The State's arguments should be rejected. [5]

[5] The State has abandoned its argument below that requiring an applicant's SSN on the state form counsels against public disclosure. Both this Court and the Virginia Supreme Court have held that voter registration applications with redacted SSNs are subject to disclosure. See *Greidinger v. Davis,* 988 F.2d 1344, 1353-1354 (4th Cir. 1993) (holding that the right to vote was substantially burdened only insofar as the State publicly released SSNs); *Rivera v. Long,* No. 070274, slip op. 3 (Va. Feb. 8, 2008) (unpublished) (J.A. 78-81) (holding that predecessor statute to Section 24.2-444 required public disclosure of redacted applications).

Nothing in the NVRA requires disclosure of an applicant's SSN to register to vote. Indeed, when the Federal Election Commission first developed the mail voter registration form, it noted that not all States required SSNs for voter registration purposes and that, because of variations in state practices, it would refer applicants to state-specific instructions for providing an identification number. See 59 Fed. Reg. 32,313-32,314 (June 23, 1994). In light of the Privacy Act of 1974, 5 U.S.C. 552a note, Congress would have anticipated that if existing state practices required a SSN for voter registration purposes, that SSN would be redacted prior to the release of any records requested under the NVRA.

**\*25** As an initial matter, the information the State seeks to withhold is largely available to the public. More importantly, however, an eligible applicant can register to vote in federal elections without disclosing such information. Under the NVRA, States must accept the federal mail voter registration form, see 42 U.S.C. 1973gg-2(a), which contains no specific information about an applicant's felony convictions or mental incapacity. Rather, the federal form merely requires the applicant to affirm that he or she is a United States citizen, meets the eligibility requirements of his or her state (*e.g.,* the applicant has not been declared mentally incompetent and has not been convicted of a felony or has had his or her civil rights restored), subscribes to any oath required, and has provided truthful information under penalty of perjury. See National Mail Voter Registration Form, available at, http://www.eac.gov/voter resources/register to vote.aspx (last visited Oct. 12, 2011). Thus, an applicant who previously was declared mentally incompetent or lost his or her voting rights because of a felony conviction can use the federal form to register to vote if he or she currently is eligible to vote and has privacy concerns with respect to use of the state form.

In addition, if the State believes that its voter registration form raises privacy concerns, it can revise that form to remove specific requests for sensitive personal information. Likewise, redaction of highly sensitive information may be warranted in certain circumstances. See 5 U.S.C. 552a note. Cf. 5 U.S.C. 552(b)(6) (federal **\*26** agency files subject to disclosure may be redacted if disclosure "would constitute a clearly unwarranted invasion of personal privacy"); 5 U.S.C. 552(b) ("Any reasonably segregable portion of a record shall be provided * * * after deletion of the portions which are exempt."). The complete withholding of original voter registration applications, however, conflicts with the NVRA.

### C. The MOVE Act And HA VA Do Not Limit The Disclosure Of Voter Registration Applications

The State also argues that the district court's interpretation of the Public Disclosure Provision conflicts with privacy protections in the Help America Vote Act of 2002 (HAVA), 42 U.S.C. 15301 *et seq.,* and the Military and Overseas Voter Empowerment (MOVE) Act, Pub. L. No. 111-84, 123 Stat. 2195, which amended the Uniformed and Overseas Citizens Absentee Voting Act, 42 U.S.C. 1973ff *et seq.* See Appellant's Br. 20-21. The State's arguments should be rejected.

The State argues that Congress could not have intended disclosure of voter registration applications under the NVRA when much of the same personal information is protected under HAVA. As relevant here, HAVA established provisional voting and voting information requirements. See 42 U.S.C. 15482. Under HAVA, voters may cast a provisional ballot where they do not appear on a jurisdiction's official voter registration lists but declare that they are registered voters in that jurisdiction and eligible to vote in a federal election. See **27** 42 U.S.C. -15482(a). States must provide written notice to each voter who casts a provisional ballot that the voter may use the State's free access system (*e.g.,* a toll-free number or Internet website) to determine whether his or her vote was counted, and, if not, why. See 42 U.S.C. 15482(a)(5). HAVA requires States to establish procedures "to protect the security, confidentiality, and integrity of personal information collected, stored, or otherwise used by the free access system." 42 U.S.C. 15482(a). It also restricts "[a]ccess to information about an individual provisional ballot * * * to the individual who cast the ballot." 42 U.S.C. 15482(a).

The privacy protections afforded under HAVA concern only the information collected, stored, or otherwise used by the free access system, which is accessible to individual voters to determine whether their votes were counted and, if not, why. HAVA does not conflict with the NVRA, which concerns only pre-election voter registration activities and voter removal programs, not any particular voter's ballot activity. Moreover, HAVA specifically provides that "nothing in [HAVA] may be construed to authorize or require conduct prohibited under [the NVRA], or to supersede, restrict, or limit the application of [the NVRA]." 42 U.S.C. 15545(a)(4).

The same flaws extend to the State's argument under the MOVE Act. The MOVE Act requires States to ensure the security of procedures established for the transmission of voter registration and absentee ballot applications to uniformed **28** services voters and overseas voters. See 42 U.S.C. 1973ff-1(a)(6) and (e)(6)(A). It also requires States to protect the privacy of the identity and personal data of voters who request or are sent voter registration and absentee ballot applications under the Act. See 42 U.S.C. 1973ff-1(e)(6)(B). These protections exist "throughout the process of making such request or being sent such application." 42 U.S.C. 1973ff-1(e)(6)(B). Similar security and privacy protections exist for the transmission of blank absentee ballots to these voters. See 42 U.S.C. 1973ff-1(a)(7) and (f)(3).

Just as with HAVA and its protections for provisional voting, the privacy protections afforded under the MOVE Act do not govern the *submission* of a voter registration application and, thus, the decision to be placed on an official list of registered voters. Rather, much like declinations to register to vote or the identity of an agency through which a voter is registered, requests for voter registration and absentee ballot applications are not public. Once submitted, however, voter registration applications are subject to disclosure under the NVRA, thereby allowing for public oversight of a State's eligibility determinations and list compilation.

The State's privacy concerns are undermined by state law, which releases lists of persons registered as absentee or overseas voters. See Va. Code Ann. § 24.2-444(A). These lists contain "the name, address, year of birth, gender and all election districts applicable to each registered voter." Va. Code Ann. § 24.2 **29** 444(A). Because the State also makes lists of all denied applicants available for public inspection, see Va. Code Ann. § 24.2-444(A), it is only the actual voter registration applications and the basis for their denial that are withheld from the public. Accordingly, this Court should reject the State's arguments that public access to voter registration applications injects otherwise personal information into the public sphere.

## *30 CONCLUSION

The judgment of the district court should be affirmed.

---

**End of Document**                                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.