JONATHAN ROSENBERG*
jrosenberg@omm.com
O'MELVENY & MYERS LLP
1301 Avenue of the Americas, 17th Fl.
New York, NY 10019
Telephone:  +1 212 326 2000
Facsimile:   +1 212 326 2061

NOAH B. BOKAT-LINDELL*
nbokat-lindell@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC  20006-4061
Telephone:  +1 202 383 5300
Facsimile:   +1 202 383 5414

AARON HENSON (SB#300696)
ahenson@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, 19th Fl.
Los Angeles, CA 90071-2811
Telephone:  +1 213 430 6000
Facsimile:   +1 213 430 6407

Attorneys for *Amici Curiae*
FORMER EMPLOYEES OF THE
U.S. DEPARTMENT OF JUSTICE

**Pro hac vice* application pending
*(additional counsel on following page)*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SHIRLEY WEBER, in her official capacity as Secretary of State of the State of California, and the STATE OF CALIFORNIA,<br><br>Defendants. | Case No. 2:25-cv-09149-DOC-ADS<br><br>**BRIEF OF *AMICI CURIAE* FORMER EMPLOYEES OF THE U.S. DEPARTMENT OF JUSTICE**<br><br>Date: Monday, Dec. 8, 2025<br>Time: 8:30 a.m.<br>Courtroom: 10A<br>Trial Date: None Set<br>Action Filed: Sept. 25, 2025<br>Judge: Hon. David O. Carter |

L. NICOLE ALLAN (SB#323506)
nallan@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Fl.
San Francisco, CA 94111-3823
Telephone:  +1 415 984 8700
Facsimile:   +1 415 984 8701

Attorneys for *Amici Curiae*
FORMER EMPLOYEES OF THE
U.S. DEPARTMENT OF JUSTICE
(*continued*)

# TABLE OF CONTENTS

**Page**

I.  INTEREST OF AMICI ................................................................ 1

II.  SUMMARY OF ARGUMENT ...................................................... 1

III.  ARGUMENT ............................................................................. 3

    A.  Courts Consistently Have Adopted the United States' Previous Position That The NVRA's Disclosure Provisions Are Robust But Do Not Authorize Requestors To Seek Sensitive Voter Data From State Officials ................................................................. 3

    B.  The 1960 Civil Rights Act Does Not Justify The Department of Justice's Requests in this Case ...................................................... 9

        1.  DOJ's Justification For Seeking Full Voter Files From California Is Inadequate Under the Civil Rights Act ................ 9

            a.  DOJ has provided no adequate "basis" for needing records from California, as the Civil Rights Act requires ........................................................................ 11

            b.  DOJ cannot seek voter records for the purposes of creating a national voter roll and identifying noncitizens ................................................................... 14

        2.  The Civil Rights Division Has Previously Used The Civil Rights Act To Seek Targeted Information Based On Reasonable Law-Enforcement Concerns ............................... 19

    C.  HAVA Does Not Create Independent Disclosure Rights .................. 24

IV.  CONCLUSION ........................................................................ 25

APPENDIX A ................................................................................ 1a

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015) ........................................................................ 25

*Collins v. Yellen*,
  594 U.S. 220 (2021) ........................................................................ 25

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019) .................................................................... 14, 16

*E.E.O.C. v. Children's Hosp. Med. Ctr. of N. Cal.*,
  719 F.2d 1426 (9th Cir. 1983) ........................................................ 11

*E.E.O.C. v. Lockheed Martin Corp., Aero & Naval Sys.*,
  116 F.3d 110 (4th Cir. 1997) .......................................................... 12

*Greater Birmingham Ministries v. Sec'y of State of Ala.*,
  105 F.4th 1324 (11th Cir. 2024) ....................................................... 6

*Ill. Conservative Union v. Illinois*,
  2021 WL 2206159 (N.D. Ill. June 1, 2021) ....................................... 6

*In re Coleman*,
  208 F. Supp. 199 (S.D. Miss. 1962) ............................................... 11

*In re USAA Data Sec. Litig.*,
  621 F. Supp. 3d 454 (S.D.N.Y. 2022) ............................................... 8

*Kennedy v. Bruce*,
  298 F.2d 860 (5th Cir. 1962) ..................................................... 19, 20

*Kennedy v. Lynd*,
  306 F.2d 222 (5th Cir. 1962) ..................................................*passim*

*Matter of Evans*,
  69 F.4th 1101 (9th Cir. 2023) ......................................................... 10

*McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*,
  606 U.S. 146 (2025) ........................................................................ 13

*Mi Familia Vota v. Fontes*,
  719 F. Supp. 3d 929 (D. Ariz. 2024) ............................................... 23

*Niz-Chavez v. Garland*,
  593 U.S. 155 (2021) ........................................................................ 16

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Project Vote, Inc. v. Kemp*,
  208 F. Supp. 3d 1320 (N.D. Ga. 2016) ..................................................6, 7, 8, 10

*Project Vote/Voting for Am., Inc. v. Long*,
  682 F.3d 331 (4th Cir. 2012) ..................................................1, 3, 6, 8

*Pub. Int. Legal Found. v. Benson*,
  136 F.4th 613 (6th Cir. 2025).........................................................13, 14

*Pub. Int. Legal Found. v. Boockvar*,
  431 F. Supp. 3d 553 (M.D. Pa. 2019) ...................................................6

*Pub. Int. Legal Found., Inc. v. Bellows*,
  92 F.4th 36 (1st Cir. 2024) ..........................................................3, 6, 7, 8

*Pub. Int. Legal Found., Inc. v. Dahlstrom*,
  673 F. Supp. 3d 1004 (D. Alaska 2023) ...................................................6

*Pub. Int. Legal Found., Inc. v. Knapp*,
  749 F. Supp. 3d 563 (D.S.C. 2024) ...................................................6

*Pub. Int. Legal Found., Inc. v. Matthews*,
  589 F. Supp. 3d 932 (C.D. Ill. 2022)...................................................6, 8

*Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*,
  996 F.3d 257 (4th Cir. 2021) ..........................................................3, 6, 7, 8

*Sullivan v. Summers*,
  769 F. Supp. 3d 455 (D. Md. 2025) ...................................................6

*True the Vote v. Hosemann*,
  43 F. Supp. 3d 693 (S.D. Miss. 2014)...................................................6, 8, 10

*United States v. Powell*,
  379 U.S. 48 (1964) .......................................................11, 12, 13, 17

*Veasey v. Perry*,
  71 F. Supp. 3d 627 (S.D. Tex. 2014)...................................................23

*Voter Reference Found., LLC v. Torrez*,
  2025 WL 3280300 (10th Cir. Nov. 25, 2025)...................................................6, 8

**Statutes**

5 U.S.C. § 552...................................................4

5 U.S.C. § 552a...................................................4

iii

# TABLE OF AUTHORITIES
### (continued)

Page(s)

5 U.S.C. § 552a(e) ............................................................................................... 18

18 U.S.C. § 2721(a)(1) ........................................................................................... 8

18 U.S.C. § 2721(b)(1) ......................................................................................... 18

52 U.S.C. § 10101(a)(2)(B) ................................................................................. 23

52 U.S.C. § 20507(a)(4) ....................................................................... 13, 14, 17

52 U.S.C. § 20507(c)(2) ....................................................................................... 21

52 U.S.C. § 20507(i) ............................................................................................... 4

52 U.S.C. § 20507(i)(1) ............................................................................. 5, 9, 10

52 U.S.C. § 20510(a) ...................................................................................... 4, 17

52 U.S.C. § 20510(b) ............................................................................................. 3

52 U.S.C. § 20701 ................................................................................................... 9

52 U.S.C. § 20703 ...................................................................................... *passim*

52 U.S.C. § 20704 ......................................................................................... 10, 24

52 U.S.C. § 20705 ......................................................................................... 10, 12

52 U.S.C. §§ 20901-21145 ................................................................................. 24

52 U.S.C. § 21083(a)(1)(A) ................................................................................ 17

52 U.S.C. § 21083(a)(2)(A) ................................................................................ 25

52 U.S.C. § 21083(a)(4) ....................................................................... 13, 14, 17, 25

52 U.S.C. § 21085 ................................................................................................. 14

52 U.S.C. § 21111 ......................................................................................... 17, 25

52 U.S.C. § 21142(a) ........................................................................................... 25

52 U.S.C. § 21142(b) ........................................................................................... 25

**Regulations**

28 C.F.R. § 0.20(C) ............................................................................................... 4

**Rules**

Fed. R. Civ. P. 34 ................................................................................................. 23

Fed. R. Civ. P. 45 ................................................................................................. 23

**TABLE OF AUTHORITIES**
(continued)

Page(s)

Fed. R. Civ. P. 81(a)(5).............................................................................. 12

**Other Authorities**

Confidential Memorandum of Understanding, U.S. Dep't of Just. (Dec. 1, 2025), https://www.brennancenter.org/media/14806/download/ 2025-12-01-doj-mou-to-colorado.pdf?ilnine=1 .................................... 17

Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sept. 9, 2025).................................. 15

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. Times (Nov. 16, 2025), https://www.nytimes.com/interactive/2025/11/16/ magazine/trump-justice-department-staff-attorneys.html ............................................. 16

H.R. Rep. No. 86-956 (1959) .......................................................... 20

Jonathan Shorman, *DOJ Is Sharing State Voter Roll Lists With Homeland Security*, Stateline (Sept. 12, 2025), https://perma.cc/C6RQ-6ATP ........................................................... 15

Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NPR (Dec. 10, 2025), https://www.npr.org/2025/12/10/nx-s1-5588384/save-voting-data-us-citizens ................................................................................ 16

*Memorandum of Understanding*, U.S. Dep't of Just. (May 13, 2008), https://www.justice.gov/crt/case-document/file/1444746/ dl?inline ................ 22

*Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (last updated Dec. 19, 2025), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information.................................. 15

U.S. Dep't of Just., Justice Manual, https://www.justice.gov/jm/justice-manual.................................... 5, 18

I.    **INTEREST OF AMICI**[1]

*Amici curiae* are all former attorneys who worked on voting enforcement in the Civil Rights Division of the U.S. Department of Justice (DOJ). *Amici*'s experience is widespread and varied. Some worked at DOJ decades ago; others worked there until earlier this year. Some were line attorneys; others were managers who reviewed their work. Most worked in the Division's Voting Section, directly enforcing federal voting rights law; others worked alongside them as Appellate Section attorneys or political appointees. Many *amici* have made, reviewed, and approved information requests to States and localities under the National Voter Registration Act (NVRA) and Title III of the Civil Rights Act of 1960, or have litigated under those statutes and the Help America Vote Act (HAVA) on behalf of the United States. *Amici* file this brief to explain that, even though DOJ retains significant authority to investigate potential violations of federal election law, DOJ's request to California for its full unredacted voter file is inconsistent with prior DOJ practice and cannot be justified by any of the authorities it has invoked.

A full list of *amici* can be found in Appendix A.

II.   **SUMMARY OF ARGUMENT**

Section 8(i) of the NVRA and Title III of the Civil Rights Act of 1960 are vital tools that help the Attorney General determine whether to file voting lawsuits, obtain evidence for those lawsuits, and identify "both error and fraud in the preparation and maintenance of voter rolls." *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012). Although "[w]ide scope must be accorded the Attorney General in the facilities for adequate investigation," *Kennedy*

---

[1] Though they are not members of this Court's bar and have not submitted *pro hac vice* motions, and so do not appear in the signature block of this brief, counsel would like to thank Xander Nabavi-Noori, Alexander Ely, and Kelsey A. Miller, all of O'Melveny & Myers LLP, who were also integral parts of the team drafting this brief.

*v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962), that scope is not unlimited.  And here, DOJ has overstepped its bounds by requesting "all fields" of the registration list for every voter in California—including registration method, participation history, party affiliation, partial Social Security Numbers (SSNs), and driver's license numbers—without a sufficient basis and in furtherance of an improper purpose.

A.  Both DOJ and the federal courts have interpreted Section 8(i) of the NVRA to allow for broad public disclosure of registration and voting-related records.  But DOJ has also consistently taken the position, and courts have consistently agreed, that Section 8(i) must be read in conjunction with other federal privacy statutes and court-recognized privacy exemptions.  Sensitive data about individual voters—including, as relevant here, partial SSNs and driver's license numbers—can thus be redacted or withheld without running afoul of Section 8(i).

B.  Title III of the 1960 Civil Rights Act is a government investigative tool, rather than a public disclosure provision, and may be used to request sensitive voter data when needed.  The statute, however, requires DOJ to provide "a statement of the basis and the purpose" for its information requests.  52 U.S.C. § 20703.  DOJ has not provided any basis at all for thinking that California might be violating federal statutes, much less a basis that would justify requesting sensitive voter data about all California voters.  And while DOJ has provided a purpose for its requests—enforcing the NVRA—that purpose appears to be a stalking horse for its true purpose: to create a national voter roll and enable the federal government to conduct its own list maintenance to discover whether noncitizens or undocumented immigrants are registered to vote.  Various news reports, as well as statements from DOJ employees and Administration officials, confirm that this is how DOJ plans to use the data it seeks.  That purpose cannot justify the requests for sensitive data here.  The NVRA and HAVA place *States*—not the federal government—in charge of developing and maintaining voter registration lists.  DOJ's sweeping request, made without adequate investigative rationale, is a radical departure from the sorts

2

of targeted, justified requests that *amici* and others in the Voting Section have previously made under Title III.

C.  Finally, DOJ brings a claim under HAVA, but HAVA contains no disclosure provision or other investigative authority of its own that could form the basis for a legal claim.

## III.  ARGUMENT

### A.  Courts Consistently Have Adopted the United States' Previous Position That The NVRA's Disclosure Provisions Are Robust But Do Not Authorize Requestors To Seek Sensitive Voter Data From State Officials

The NVRA does not require States to hand over sensitive voter information to DOJ.  Congress enacted the NVRA to combat "discriminatory and unfair registration laws." *Project Vote/Voting for Am.*, 682 F.3d at 334; *see also Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 264 (4th Cir. 2021). The statute requires States to follow various voter registration and list-maintenance procedures meant to help "'increase the number of eligible citizens who register to vote in elections for Federal office;' 'enhance[ ] the participation of eligible citizens as voters in elections for Federal office;' 'protect the integrity of the electoral process;' and 'ensure that accurate and current voter registration rolls are maintained.'" *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 41 (1st Cir. 2024) (quoting 52 U.S.C. § 20501(b)(1)-(4)).

The NVRA contains a public-disclosure provision that is designed to "assist the identification of both error and fraud in the preparation and maintenance of voter rolls," and thus to help monitor and enforce compliance with the NVRA's other provisions. *Project Vote/Voting for Am.*, 682 F.3d at 339; *see* 52 U.S.C. § 20510(b) (creating private right of action for NVRA enforcement).  Section 8(i) sets forth the NVRA's recordkeeping and disclosure requirements: except for two types of documents not relevant here, "[e]ach State shall maintain for at least 2

years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). When it comes to disclosing certain sensitive personal data, however, federal privacy laws like the Freedom of Information Act, 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a, as well as other court-recognized privacy concerns, impose crucial limits.

DOJ is charged with enforcing the NVRA, including Section 8(i). *See* 52 U.S.C. § 20510(a). The Attorney General is also, of course, a member of the "public" entitled to inspect records under Section 8(i). 52 U.S.C. § 20507(i). The United States thus has a dual interest in both enforcing the underlying statute and enabling the broader public to monitor States' compliance with the NVRA. As a result, DOJ's Civil Rights Division has filed numerous amicus briefs in NVRA disclosure cases in the federal courts of appeals that lay out its interpretation of Section 8(i). *See* Br. for the U.S. as Amicus Curiae, *Pub. Int. Legal Found. v. Sec'y Commonw. of Pa.*, 136 F.4th 456 (3d Cir. 2025) (Nos. 23-1590 & 23-1591) (Dkt. No. 96, at 5), https://www.justice.gov/crt/media/1324146/dl ("*Pa.* Br."); Br. for U.S. as Amicus Curiae, *Pub. Int. Legal Found. v. Bellows*, 92 F.4th 36, 41 (1st Cir. 2024) (No. 23-1361) (Dkt. No. 96, at 19), https://www.justice.gov/crt/media/1307451/dl ("*Bellows* Br."); Br. for U.S. as Amicus Curiae, *Greater Birmingham Ministries v. Sec'y of State of Ala.*, 105 F.4th 1324 (11th Cir. 2024) (No. 22-13708), https://www.justice.gov/crt/case-document/file/1575631/dl ("*GBM* Br."); Br. for U.S. as Amicus Curiae, *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 334 (4th Cir. 2012) (No. 11-1809) (Dkt. No. 96, at 33), https://www.justice.gov/sites/default/files/crt/legacy/2011/10/19/projectvotebr.pdf ("*Project Vote* Br."). Those amicus briefs require the Solicitor General's authorization and represent the official position of the United States. *See* 28 C.F.R. § 0.20(C); U.S. Dep't of Just.,

4

Justice Manual §§ 2-3.210(C), 8-2.170(D), https://www.justice.gov/jm/justice-manual.

Given the "broad[] language" of Section 8(i), as well as the surrounding statutory "context" and the disclosure provision's importance to fulfilling the NVRA's "purpose[s]," DOJ has consistently advised federal appellate courts that Section 8(i) provides for public access to "a broad range of disclosable documents." *Pa.* Br. 9, 12; *Bellows* Br. 6, 11; *GBM* Br. 5, 8; *see Project Vote* Br. 11. But the public is not entitled to access sensitive personal data. DOJ's request for (most of) California's statewide voter file therefore complies with both past DOJ and court interpretations of Section 8(i)—subject to redaction limits noted below.

Most relevant to this case, DOJ has previously taken the position "that Section 8(i) applies to voter registration databases"—*i.e.*, their voter rolls. *Bellows* Br. 7. A State's voter "registration and list-maintenance efforts plainly constitute 'programs' or 'activities,'" and those efforts plainly are "conducted for the purpose of ensuring" that the "official lists of eligible voters" are both accurate and up-to-date. *Id.* at 8-9 (quoting 52 U.S.C. § 20507(i)(1)). Because the voter data in a State's database "reflect[] the results of [the State's] registration and list-maintenance activities," they "'concern'—or relate[] to—the 'implementation' of those activities." *Id.* at 10. For similar reasons, DOJ has interpreted Section 8(i) as mandating disclosure of various other voting-related records. *See Project Vote* Br. 12-24 (voter-registration applications); *GBM* Br. 6-19 (lists of voters denied registration or removed from rolls due to felony convictions); *Pa.* Br. 9-28 (records about State's efforts to find and remove from rolls noncitizens registered to vote). DOJ has also argued that Section 8(i) preempts state-law limits on access, use, and dissemination of voter data to the extent they "prohibit uses or disseminations of disclosed information that would further the NVRA's purposes." *Bellows* Br. 21.

Courts uniformly have agreed with DOJ's interpretations. In *Bellows*, for example, the First Circuit ruled that Section 8(i) requires disclosure of a State's

5

voter roll, 92 F.4th at 49,[2] and preempts various state-law access, use, and dissemination restrictions on voter data, *id.* at 56.[3]  In *Project Vote/Voting for America*, the Fourth Circuit held that Section 8(i) requires disclosure of completed voter registration applications.  682 F.3d at 336-37.  And in *Greater Birmingham Ministries*, the Eleventh Circuit held that Section 8(i) requires disclosure of the identities of those denied registration or removed from the voter rolls due to felony convictions.  105 F.4th 1324, 1331-32 (11th Cir. 2024).  Courts have also agreed that records related to finding and removing noncitizens from the voter rolls must be disclosed under the NVRA.  *See N.C. State Bd. of Elections*, 996 F.3d at 266; *Pub. Int. Legal Found. v. Boockvar*, 431 F. Supp. 3d 553, 561 (M.D. Pa. 2019); *cf. Pub. Int. Legal Found., Inc. v. Dahlstrom*, 673 F. Supp. 3d 1004, 1011 (D. Alaska 2023) ("data concerning deceased and potentially deceased voters").

> At the same time, however, DOJ has just as consistently advised courts that Section 8(i) does *not* require States to release to the public certain sensitive personal voter data contained within the broader voter files.  In *Bellows*, for example, DOJ clarified that the statute did not prohibit States "from redacting 'uniquely sensitive information' like voters' [SSNs]," or "an even broader set of personal information in certain sensitive circumstances—for instance, the names and personal

---

[2] Many other courts have also so ruled.  *See Voter Reference Found., LLC v. Torrez*, 2025 WL 3280300, at *2 n.2, *10-14 (10th Cir. Nov. 25, 2025); *Sullivan v. Summers*, 769 F. Supp. 3d 455, 463 (D. Md. 2025); *Pub. Int. Legal Found., Inc. v. Knapp*, 749 F. Supp. 3d 563, 570 (D.S.C. 2024); *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 941 (C.D. Ill. 2022); *Ill. Conservative Union v. Illinois*, 2021 WL 2206159, at *5 (N.D. Ill. June 1, 2021); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 723 (S.D. Miss. 2014); *see also Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1341 (N.D. Ga. 2016) (holding that various data derived from statewide voter database must be disclosed).

[3] *See also Voter Reference Found.*, 2025 WL 3280300, at *10; *Sullivan*, 769 F. Supp. 3d at 463; *Knapp*, 749 F. Supp. 3d at 572; *Matthews*, 589 F. Supp. 3d at 943; *Boockvar*, 431 F. Supp. 3d at 564; *Ill. Conservative Union*, 2021 WL 2206159, at *7.

information of people subjected to criminal investigation (but later exonerated) on suspicion of being illegally registered to vote." *Bellows* Br. 27-28.  In *Project Vote/Voting for America*, DOJ similarly noted that records required to be disclosed under Section 8(i) could "be redacted to address legitimate privacy concerns"—for example, concerns about revealing felony convictions and mental incapacity. *Project Vote* Br. 24 (capitalization omitted).  As in *Bellows*, DOJ noted that "[n]othing in the NVRA requires disclosure of an applicant's SSN." *Id.* at 24 n.5. And in *Secretary of the Commonwealth of Pennsylvania*, DOJ reiterated that "the NVRA does not prohibit the *redaction* of highly sensitive information within [disclosed] records, or information whose disclosure would violate other federal laws." *Pa.* Br. 28.

Courts have agreed with DOJ here, too.  They have made clear that "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in" otherwise-disclosable voter rolls. *Bellows*, 92 F.4th at 56.  While "the NVRA's disclosure provision is broad and does not contain an explicit exemption from disclosure for sensitive information subject to potential abuse," it "must be read in conjunction with the various statutes enacted by Congress to protect the privacy of individuals and confidential information held by certain governmental agencies." *N.C. State Bd. of Elections*, 996 F.3d at 264.  For example, the Freedom of Information Act and the Privacy Act of 1974 both evince a congressional concern for individual privacy that would be undermined if States were required to publicly disclose unredacted, highly sensitive personal information contained in the voter registration file. *See Kemp*, 208 F. Supp. 3d at 1344.  The Federal Rules of Civil Procedure likewise carve out an exception to the "general presumption that judicial records are public documents, . . . allowing redaction of [SSNs], an individual's birth year, a minor's full name, and financial account and taxpayer-identification numbers." *Id.* at 1344-45.  The Fourth Circuit has even noted that "condition[ing] voting on public release of a voter's Social Security

number" could "create[] an intolerable burden on that right as protected by the First and Fourteenth Amendments." *Project Vote/Voting for Am.*, 682 F.3d at 339. Courts have thus read the NVRA to permit States to redact registrants' SSNs and birthdates, *Voter Reference Found.*, 2025 WL 3280300, at *9 n.14; *Project Vote/Voting for Am.*, 682 F.3d at 339; *True the Vote*, 43 F. Supp. 3d at 739; phone numbers and email addresses, *Voter Reference Found.*, 2025 WL 3280300, at *9 n.14; *Kemp*, 208 F. Supp. 3d at 1345; *Matthews*, 589 F. Supp. 3d at 944; and any confidential information regarding those under or previously under criminal investigation, *Bellows*, 92 F.4th at 56; *N.C. State Bd. of Elections*, 996 F.3d at 266-68.

Yet in this case, the United States is demanding from California data that DOJ itself has repeatedly persuaded courts can be withheld from requestors under the NVRA. DOJ's letters to California insist upon receiving "all fields contained within" the State's statewide voter registration list, Dkt. No. 1 ¶ 34A, and specify that this includes voters' "state driver's license number, and the last four digits of their Social Security number," Dkt. No. 1 ¶ 38. SSNs are the paradigmatic example of sensitive personal information, and conditioning voter registration on a statutory mandate of "public release of a voter's [SSN] creates an intolerable burden on that right as protected by the First and Fourteenth Amendments." *Project Vote/Voting for Am.*, 682 F.3d at 339. Likewise, public disclosure of "drivers' license numbers, in addition to other personal information" provided in voter registration files, "can provide an opening for fraud, including applying for credit cards or loans or opening bank accounts." *In re USAA Data Sec. Litig.*, 621 F. Supp. 3d 454, 466-67 (S.D.N.Y. 2022); *see also* 18 U.S.C. § 2721(a)(1) (prohibiting state "department[s] of motor vehicles" from disclosing driver's license numbers except in delineated circumstances).[4] DOJ's information requests to California thus both exceed what

---

[4] Because Section 8(i) authorizes "public inspection" without differentiation among members of the public, 52 U.S.C. § 20507(i)(1), any records to which courts rule

court decisions have authorized and contradict its own consistent past position.

### B. The 1960 Civil Rights Act Does Not Justify The Department of Justice's Requests in this Case

Title III of the Civil Rights Act of 1960 gave election officials a new duty to preserve, and granted DOJ a new power to request, certain election-related documents.  It gives DOJ broad investigative authority to seek at least some of the information at issue in this case—but subject to important guardrails.  Under Title III, "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for" federal office "are voted for, all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election."  52 U.S.C. § 20701.  DOJ may then seek "inspection, reproduction, and copying" of "[a]ny record or paper required by section 20701 of this title to be retained and preserved."  52 U.S.C. § 20703.  But the government must have, and provide its targets with, both a "purpose" for conducting an inquiry and a "basis" for thinking there may be a legal violation to which the requested records would be relevant.  *Id.*

DOJ has failed to meet that basic standard here: it (i) fails to provide a "basis" for suspecting that California is not fulfilling its NVRA and HAVA obligations, and (ii) appears to be obscuring its true "purpose" in seeking not only California's voter rolls, but the rolls of every State in the country.  When DOJ has used the 1960 Civil Rights Act, it has rarely sought a State's entire voter database, and it certainly has not done so to enable a fishing expedition.

### 1. DOJ's Justification For Seeking Full Voter Files From California Is Inadequate Under the Civil Rights Act

Unlike Section 8(i) of the NVRA, which acts as a public-disclosure

---

DOJ can have access pursuant to this provision must likewise be made available to any other requestor.

provision, Title III of the 1960 Civil Rights Act is a record-retention and governmental investigative tool.  *See Lynd*, 306 F.2d at 225 (noting that "Title III provides 'an effective means whereby preliminary investigations of registration practices can be made'").  DOJ may use the 1960 Civil Rights Act to seek information that cannot be disclosed under the NVRA.  But at the same time, Title III's statutory framework establishes restrictions on DOJ's ability to obtain and disseminate this material.  *First*, DOJ must make a "demand in writing" for the requested records.  52 U.S.C. § 20703.  That demand "shall contain a statement of the basis and the purpose" for seeking the information.  *Id.  Second*, in contrast to the NVRA's "public" disclosure right, 52 U.S.C. § 20507(i)(1), DOJ must not "disclose any record or paper produced" pursuant to Title III, except to Congress or other agencies, or in court proceedings, 52 U.S.C. § 20704.[5]  *Third*, the statute grants courts "jurisdiction *by appropriate process* to compel the production" of records.  52 U.S.C. § 20705 (emphasis added).  DOJ is bound by these restrictions and processes whenever it seeks voting records under the 1960 Civil Rights Act.

This case directly implicates the written demand requirement.  Under Title III, any demand for records "shall contain a statement of *the basis and the purpose* therefor." 52 U.S.C. § 20703 (emphasis added).  Like any statute, this provision must be construed "so that no part is rendered superfluous."  *Matter of Evans*, 69 F.4th 1101, 1108 (9th Cir. 2023), *cert. denied sub nom. McCallister v. Evans*, 144 S. Ct. 1004 (2024).  Thus, the purpose and basis must be read as independent requirements.  The *purpose* of a records request is the rationale for the investigation—*e.g.*, determining whether a State is complying with the NVRA or the Voting Rights Act.  The *basis* is the statement indicating why DOJ believes, or what evidence suggests, that it should investigate this particular State or locality, or

---

[5] This distinction is yet another reason why neither DOJ nor any other member of the public may request the sort of sensitive voter data under the NVRA that DOJ may request under the 1960 Civil Rights Act.  *See, e.g., Kemp*, 208 F. Supp. 3d at 1344; *True the Vote*, 43 F. Supp. 3d at 734-35.

what other suspected violation the records are needed to investigate.  Combined, the basis-and-purpose requirement makes explicit what is implicitly true for many other coercive, investigative information requests: the agency seeking information must have both a legitimate *purpose* within its enforcement ambit for pursuing an investigation and a sufficient *basis* for suspecting a potential violation to which the requested records would be relevant.  *See United States v. Powell*, 379 U.S. 48, 58 (1964) (noting an administrative summons must have a proper purpose "reflecting on the good faith of the particular investigation"); *see also E.E.O.C. v. Children's Hosp. Med. Ctr. of N. Cal.*, 719 F.2d 1426 (9th Cir. 1983) (requiring that administrative subpoenas be based in statutory authority and satisfy procedural requirements), *overruled on other grounds as recognized in Prudential Ins. Co. of Am. v. Lai*, 42 F.3d 1299, 1303 (9th Cir. 1994).

DOJ's investigative actions in the early years of Title III confirm the difference between these two necessary procedural elements, both of which were provided in its requests under Section 20703.  In *Lynd*, 306 F.2d at 229 n.6, for instance, DOJ said that its purpose in requesting records was "to ascertain whether or not violations of Federal law in regard to registration and voting"—*i.e.*, the Civil Rights Act of 1957—"have occurred."  And it stated that the basis for the request was "information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction."  *Id.*  DOJ made similar statements of basis and purpose in *In re Coleman*, 208 F. Supp. 199, 199-200 (S.D. Miss. 1962), *aff'd sub nom.*, *Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963).

DOJ cannot seek California's full, unredacted voter file here, when it has satisfied neither Title III's "basis" nor its "purpose" requirement.

> a.  *DOJ has provided no adequate "basis" for needing records from California, as the Civil Rights Act requires*

DOJ has not provided an adequate basis for the broad requests it has made in

11

this case.  Although Title III does not impose a high standard for the basis of a demand for records, the provision is not so deferential as to allow DOJ to engage in fishing expeditions.  *See E.E.O.C. v. Lockheed Martin Corp., Aero & Naval Sys.*, 116 F.3d 110, 113 (4th Cir. 1997) ("[A]n agency's 'broad access to information relevant to inquiries' is not without limits.").  Rather, the statutory requirement that the Attorney General articulate in writing the "basis" for a Title III demand means that DOJ must know of specific, articulable facts suggesting that a violation of federal law may have occurred.  *See, e.g.*, *Lynd*, 306 F.2d at 229 n.6.

To be sure, early cases—decided in the midst of a concerted effort to frustrate federal investigations of racial discrimination in voter registration in the Jim Crow South—opined that "the factual foundation for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose' contained in the written demand, § [20703], is not open to judicial review or ascertainment." *Lynd*, 306 F.2d at 226.[6]  That assertion in *Lynd* must be considered in the context of what was a particularized investigation into racial discrimination in 1961 Forrest County, Mississippi, and in four rural parishes in northwest Louisiana, and not a dragnet of unprecedented national scope.  But even so, the Supreme Court has since held that notice requirements similar to those in Title III create judicially reviewable standards.  *See Powell*, 379 U.S. at 53, 58 (holding that statute requiring Treasury Secretary to "notif[y] the taxpayer in writing that an additional inspection is necessary" allows courts to "inquire into the underlying reasons for the

---

[6] This determination was based in part on the idea that the "process to compel the production of record[s]," 52 U.S.C. § 20705, should be treated as merely "a summary proceeding" not subject to regular rules of procedure, *Lynd*, 306 F.2d at 226.  Title III's text, however, requires "*appropriate* process," 52 U.S.C. § 20705 (emphasis added), and courts must ensure that their process is not being abused, *Powell*, 379 U.S. at 58.  The Federal Rules of Civil Procedure also expressly apply to proceedings seeking "production of documents" in the analogous context of a subpoena issued under any federal statute, unless the statute clearly states otherwise. Fed. R. Civ. P. 81(a)(5).  The statutory text and case law confirm that Title III proceedings are likewise subject to traditional procedural rules.

12

examination" because "a court may not permit its process to be abused").  The Court also has long applied a strong presumption in favor of judicial review of the government's actions, and the Administrative Procedure Act "itself articulates the default principle that parties in enforcement proceedings can challenge an agency's interpretation of a statute."  *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 156 (2025).

Here, DOJ has provided no basis at all for demanding sensitive data about every California voter, much less a basis that would indicate that California possibly violated federal law.  DOJ's supposed *purpose* is "to assist in [its] determination of whether California's list maintenance program complies with the NVRA."  Dkt. No. 87-7, at 2; *but see infra* Part III.B.1.b.  But DOJ has provided no *basis* for thinking that California might be violating the NVRA.  DOJ's initial letter simply "request[ed] information regarding the state's procedures for complying with" the NVRA's list-maintenance provisions and asked for "all fields" in California's statewide voter registration list.  Dkt. No. 87-3, at 1.  (It also initially requested the information pursuant to Section 8(i) of the NVRA, not the Civil Rights Act.  *Id.*)  DOJ's follow-up letter "reaffirmed" that it was trying to determine whether California was complying with the NVRA, but it erroneously treated this statement as satisfying the entirety of Title III's basis-and-purpose requirement, despite the lack of any stated *basis* for the investigation.  Dkt. No. 87-7, at 2.

And requiring that basis is especially important given the questionable fit between DOJ's demand and its ostensible purpose.  The statutes DOJ invokes only require States to conduct a "general program" of list maintenance that makes a "reasonable effort" to remove ineligible voters from the rolls.  52 U.S.C. § 20507(a)(4); 52 U.S.C. § 21083(a)(4)(A) (requiring a "system of file maintenance").  They also require only a "reasonable effort" to remove deceased or relocated voters.  *Id.*  "[T]he attempt need not be perfect, or even optimal, so long as it remains within the bounds of rationality."  *Pub. Int. Legal Found. v. Benson*,

13

136 F.4th 613, 625 (6th Cir. 2025), *petition for cert. filed*, No. 25-437 (U.S. Oct. 7, 2025). A snapshot of a State's voter file at one point in time is unlikely to convey whether a State is engaging in that reasonable effort through a continuing program. *See, e.g.*, *id.* (rejecting identification of "27,000 'potentially deceased' voters on Michigan's registration rolls" as evidence of an NVRA violation). Indeed, HAVA provides that "[t]he specific choices on the methods of complying with [the list maintenance mandate] shall be left to the discretion of the State." 52 U.S.C. § 21085. And the potential for government misuse of the information sought— including partial SSNs and driver's license numbers—outweighs any reason yet provided for needing that information to investigate an ostensible HAVA or NVRA violation. DOJ therefore cannot derive from the NVRA's and HAVA's mandates a "basis" for seeking California's full, unredacted voter files. 52 U.S.C. § 20703.

> b.     *DOJ cannot seek voter records for the purposes of creating a national voter roll and identifying noncitizens*

DOJ fails the purpose prong of Title III's basis-and-purpose requirement because (1) the true purpose is not articulated in the request for records and (2) the true purpose exceeds DOJ's enforcement authority under the cited statutes.

Although courts' "review" of an information request's purpose is deferential, courts "are 'not required to exhibit a naiveté from which ordinary citizens are free.'" *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). News reports and the Administration's public statements have revealed that DOJ's true purpose in seeking these voter files is not what DOJ stated in its information requests—*i.e.*, to monitor California's compliance with the NVRA's and HAVA's list-maintenance requirements. Rather, that proffered purpose has been shown to be a pretext for other, undeclared aims, which appear to include creating DOJ's *own* national voter database and then sharing that information with the Department of Homeland Security (DHS) as part of a broader effort to discover what DOJ thinks are undocumented immigrants who are unlawfully voting.

14

DOJ is currently "compiling the largest set of national voter roll data it has ever collected" in an attempt "to prove long-running, unsubstantiated claims that droves of undocumented immigrants have voted illegally." Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sept. 9, 2025), https://perma.cc/9PM4-2A6R. As part of that scheme, DOJ plans to create a "central, federal database of voter information," and then compare that "voter data to a different database, maintained by the Department of Homeland Security, to see how many registered voters on the state lists match up with noncitizens listed by immigration agents." *Id.* To accomplish this, DOJ has sent requests for voter-roll data to at least 40 States and so far has sued 21 of them along with the District of Columbia. *See Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (last updated Dec. 19, 2025), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information.

DHS has largely confirmed these reports, issuing a statement to media outlets explaining that the Administration's plan to have DOJ and DHS share voter roll information is essential to "scrub aliens from voter rolls," and that DHS's "collaboration" with DOJ will "prevent illegal aliens" from voting. Jonathan Shorman, *DOJ Is Sharing State Voter Roll Lists With Homeland Security*, Stateline (Sept. 12, 2025), https://perma.cc/C6RQ-6ATP. As DHS put it, "[e]lections exist for the American people to choose their leaders, not illegal aliens." *Id.* For its part, DOJ admitted in a separate statement that state voter rolls were in fact "being screened for ineligible voter entries." *Id.* Assistant Attorney General for Civil Rights Harmeet Dhillon has also stated that the federal government has "checked 47.5 million voter records"—apparently through SAVE, a system with known accuracy issues—and that there are "several thousand noncitizens who are enrolled to vote in federal elections." Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NPR (Dec. 10, 2025),

15

https://www.npr.org/2025/12/10/nx-s1-5588384/save-voting-data-us-citizens.

An attorney in the Housing Section of the Civil Rights Division, who was "detailed to work in the Voting Section enforcing the [NVRA]" and participated in making the requests for States' voter rolls, has also explained DOJ's true purpose to the *New York Times*:

> Leadership said they had a DOGE person who could go through all the data and compare it to the Department of Homeland Security data and Social Security data.  The idea was, We want to identify undocumented immigrants that have registered to vote.  There was no pre-existing evidence this is a problem.  I had a concern that the data would be used not for purging voter rolls of people who aren't eligible to vote but for broader immigration enforcement.

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. Times (Nov. 16, 2025), https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-department-staff-attorneys.html.

DOJ's use of the Civil Rights Act for these purposes—*i.e.*, to create and maintain its own voter list and then use that list to substantiate its claims of widespread voter fraud by noncitizens—is improper twice over.

First, it is not the "purpose" that DOJ set forth in its "statement" to California.  52 U.S.C. § 20703.  "If men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them."  *Niz-Chavez v. Garland*, 593 U.S. 155, 172 (2021).  An agency's action thus cannot be sustained when there is "a significant mismatch between the decision [an agency] made and the rationale [it] provided."  *Dep't of Com.*, 588 U.S. at 783.  This principle is especially important in the context of a proceeding to enforce administrative process, since it would be an abuse of the court's *own* process to invoke it when there are doubts about "the good faith of the particular investigation."  *Powell*, 379 U.S. at 58.

Second, even if DOJ had been truthful about its purpose for seeking voter

data, that purpose would have been improper, as the very statutes that DOJ invokes establish that the *States*, not the federal government, are in charge of maintaining voter rolls.  The NVRA provides that "each *State* shall . . . conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters."  52 U.S.C. § 20507(a)(4) (emphasis added).  HAVA is likewise clear that *States* are required to define, maintain, and administer voter rolls.  For example, HAVA requires "each State" to "implement" "a single, uniform, official, centralized, interactive computerized statewide voter registration list *defined, maintained, and administered at the State level*."  52 U.S.C. § 21083(a)(1)(A) (emphasis added).  It is this "list" that serves "as the official voter registration list for the conduct of all elections for Federal office in the State."  *Id.*  HAVA similarly requires each State to provide for a "[m]inimum standard for accuracy of State voter registration records."  52 U.S.C. § 21083(a)(4).  While DOJ has authority to enforce these provisions, 52 U.S.C. §§ 20510(a), 21111, it does *not* have authority to conduct list maintenance itself and then force States to remove certain voters from their rolls.  Yet that is precisely what a Memorandum of Understanding that DOJ recently offered to Colorado proposed to do.  *See* Confidential Memorandum of Understanding 5, U.S. Dep't of Just. (Dec. 1, 2025), https://www.brennancenter.org/media/14806/download/2025-12-01-doj-mou-to-colorado.pdf?ilnine=1.

Simply put, there is nothing in the Civil Rights Act, the NVRA, or HAVA that authorizes the federal government to use highly sensitive, personal data in state voter rolls to conduct a nationwide search for individual registrants that it suspects may not be eligible to vote.  If an Administration were to have legitimate concerns about non-citizens unlawfully registering and voting, the appropriate divisions of DOJ can (and must) use the DOJ's legitimate authorities to investigate—it cannot misuse Title III to do so.

The lawful and appropriate steps to review States' treatment of noncitizens in

17

their registration systems are straightforward. Assuming its review is consistent with federal statutes like the Privacy Act,[7] DOJ may first obtain and examine the non-sensitive information that States are required to disclose to the public under the NVRA. If review of that non-sensitive information were to lead to legitimate suspicion that any particular individual is unlawfully registered in violation of criminal registration and voter fraud provisions, then the Criminal Division—not the Voting Section of the Civil Rights Division—can conduct further, targeted investigations. *See* U.S. Dep't of Justice, Justice Manual §§ 9-85.100, 9-85.210 (granting Criminal Division supervisory jurisdiction over cases involving "election crimes," including voter registration fraud).

As part of its additional investigation, the Criminal Division can seek suspected individuals' driver's license numbers, SSNs, and other information from state DMVs under the law enforcement exception to the federal Driver Privacy Protection Act. *See* 18 U.S.C. § 2721(b)(1). And if state privacy law provides suspected individuals with additional protections beyond the Driver Privacy Protection Act, the Criminal Division can seek those individuals' voluntary disclosure and, failing that, issue grand jury subpoenas. *See* U.S. Dep't of Justice, Justice Manual § 9-85.210 (describing "investigative step[s]" for election-related crimes as including "interviewing witnesses, issuing grand jury subpoenas, executing search warrants, or conducting surveillance"). But what DOJ cannot do is what it tries to do here: misuse the records provisions of the Civil Rights Act and NVRA to conduct fishing expeditions for highly sensitive personal information from every voter in a State while offering a pretextual investigative purpose.

---

[7] The Privacy Act requires certain procedural steps before the government can lawfully collect information on individuals indexed to each individual's identity, 5 U.S.C. § 552a(e), including having to publish a notice in the Federal Register before developing a new system of records, *id.* § 552a(e)(4).

2.    **The Civil Rights Division Has Previously Used The Civil Rights Act To Seek Targeted Information Based On Reasonable Law-Enforcement Concerns**

DOJ's demand for California's full voter roll is also out of step with the way the Civil Rights Division historically has used Title III's records-inspection authority: as a focused investigative tool tethered to concrete, articulable concerns about unlawful registration or voting laws or practices.

The earliest Title III cases from the 1960s arose against a backdrop of blatant, widely documented racial exclusion from voter registration.  *See Lynd*, 301 F.2d at 818-19 (describing the government's clear showing of voting rights discrimination against Black voters).  Those decisions reflect two relevant features of Title III practice.

First, DOJ's demands were directed at "records and papers" connected to the mechanics of registration and voting—materials that would allow federal investigators to evaluate whether discriminatory administration was occurring. They were not generalized requests for personal identifiers untethered to a defined investigative need.  For example, in *Kennedy v. Bruce*, 298 F.2d 860, 861 (5th Cir. 1962), DOJ sought inspection of "all records and papers . . . relating to any application, registration, payment of poll tax, or other act requisite to voting" for federal elections, and provided both a basis (*i.e.*, it believed that "distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction") and a purpose (*i.e.*, "to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred").

Second, those cases underscore that Title III's inspection mechanism was conceived as an investigative instrument keyed to identifiable concerns about discriminatory voting practices in discrete locations, not a free-standing entitlement to assemble broad voter data sets to try to find a "problem" in the first place.  In

19

*Bruce*, the Fifth Circuit noted that the record reflected extraordinary racial disparities in access to registration in Wilcox County, Alabama, that made an inspection plainly appropriate.  298 F.2d at 863-64.  And in *Lynd*, the Fifth Circuit emphasized with respect to five southern counties that a Title III application is intended to "enable the Attorney General to determine whether . . . suit[s] . . . should be instituted" and "to enable him to obtain evidence for use in such [suits] if and when filed."  306 F.2d at 228.  These requests fulfilled Title III's principal purpose: serving as a "necessary supplement" to, and helping to "implement federal enforcement" of, the 1957 Civil Rights Act's prohibitions against racial discrimination in voting.  H.R. Rep. No. 86-956, at 26 (1959).  It is unthinkable that the Department of Justice in 1960 could instead have invoked the authority of the new Civil Rights Act to demand millions of voter registration cards held by the thousands of voter registration authorities across the country, to assemble a central federal voter file.

Modern practice reinforces the same point.  When the Civil Rights Division has invoked Title III more recently, it has typically done so to obtain discrete categories of records narrowly keyed to a specific, articulated enforcement concern.  Several examples illustrate how the Civil Rights Division has traditionally wielded its investigative authority, including under the Civil Rights Act:

- When necessary to investigate potential violations of Section 2 of the Voting Rights Act, the Voting Section may send Title III requests to specific jurisdictions under investigation based on definite, articulable discriminatory practices, seeking, for example, a voter registration list to conduct racial bloc voting analysis of elections held within the jurisdiction.  DOJ has not needed, and has not made, Title III requests for SSNs or driver's license numbers to conduct any such analyses.

- In 2021, the United States challenged several provisions of Georgia's new omnibus voting law, SB202, as having been adopted with a discriminatory purpose.  *See* Compl. ¶ 161, *United States v. Georgia*, No. 1:21-cv-2575 (June 25,

20

2021), Dkt. No. 1.  Counties with records relevant to the case were not parties to the lawsuit, and the district court froze discovery while deciding the defendants' motions to dismiss.  *See* Min. Order of Aug. 6, 2021, *Georgia*, *supra*.  DOJ therefore used its authority under the 1960 Civil Rights Act to request county records that were relevant to the allegations that DOJ had already made in its lawsuit: (1) the Numbered Lists of Provisional Voters from each polling place in a county—paper lists of provisional voters, with voters' names and their reasons for casting a provisional ballot—which were relevant to DOJ's challenge to SB202's "prohibition on counting most out-of-precinct provisional ballots," Compl. ¶ 161(g); and (2) Drop Box Ballot Transfer Forms—paper records of how many ballots a county picked up from each mail-in ballot drop box on each day—which were relevant to DOJ's challenge to SB202's "cutback in the number of drop boxes permitted" and limitations on their dates and times of use, *see id.* ¶ 161(e). *See, e.g.*, Decl. of Dr. Barry C. Burden, 35, 51, *In re Georgia Senate Bill 202*, No. 1:21-mi-55555 (May 30, 2023), Dkt. No. 566-42.

• In 2024, DOJ sued Alabama for systematically removing several thousand people from its voter rolls within 90 days of a federal election, which would violate the NVRA's Quiet-Period Provision, 52 U.S.C. § 20507(c)(2).  *See* Compl. ¶¶ 2-4, *United States v. Alabama*, No. 2:24-cv-1329 (N.D. Ala. Sept. 27, 2024), Dkt. No. 1.  DOJ sent a letter to state election officials explaining that DOJ had "reviewed reports" (which it cited) suggesting that the State was implementing within 90 days of the November 5, 2024 federal election a "program" to identify and remove registrants identified as noncitizens, in violation of the Quiet-Period Provision.  Letter, *Alabama*, *supra*, Dkt. No. 11-7, at 2.  DOJ then requested a defined set of materials keyed to that asserted concern, including (i) a list of the voters removed under the State's new processes; (ii) a list of any additional voters sent notices of intent to cancel on similar grounds; and (iii) a "complete description" of the methodology used, including contacts with or requests to

federal agencies.  Letter, *Alabama*, *supra*, at 2-3.  The letter did not explicitly invoke Title III.  *Id.*  But in later conversations, DOJ did "assert[]" that authority, and the State "produced" the requested records "in compliance with Title III of the Civil Rights Act of 1960."  Letter, *Alabama*, *supra*, Dkt. No. 11-9, at 1.  DOJ did not request SSN or driver's license data, but the State did provide it for those registrants who were ensnared in its program.

• In 2024, DOJ and private plaintiffs also sued Virginia for substantially the same reasons as in DOJ's suit against Alabama.  *See* Compl. ¶¶ 2-4, *United States v. Virginia*, No. 1:24-cv-1807 (E.D. Va. Oct. 11, 2024), Dkt. No. 1.  As part of the Virginia suit, DOJ sent a Title III request for certain discrete data from Loudoun County, which the County provided.  *See* Declarations of Judy Brown, *Virginia Coal. for Immigrant Rts. v. Beals*, No. 1:24-cv-1778 (E.D. Va. Oct. 23, 2024), Dkt. Nos. 100-3, 100-4, 100-5, 100-6.  DOJ also sent a letter to State election officials in Virginia identifying the same concerns as in Alabama and requesting similar materials.  Letter, *Virginia*, *supra*, Dkt. No. 9-17, at 1.  As in Alabama, this letter did not directly invoke Title III.  *Id.*  Virginia did not turn over the records in response to DOJ's request, but provided them as part of expedited discovery in litigation.  *See* Order, *Va. Coal. for Immigrant Rts.*, *supra*, Dkt. No. 72.

Thus, in the rare instances when DOJ has requested or received sensitive information like SSNs and driver's license numbers, it was because this information was vital to investigating or proving a potential legal violation in a particular jurisdiction, and there was an articulable reason to believe that a violation might have occurred.  DOJ does not usually request such data under Title III.[8]

---

[8] In 2006 and 2008, DOJ sent Title III requests to Georgia and Texas, seeking the States' voter files with SSNs and/or driver's licenses to ensure compliance with the NVRA.  *See* Compl. ¶¶ 9-10, *United States v. Georgia*, No. 1:06-cv-02442 (N.D. Ga. Oct. 12, 2006), Dkt. No. 1; *Memorandum of Understanding*, U.S. Dep't of Just. (May 13, 2008), https://www.justice.gov/crt/case-document/file/1444746/dl?inline.  DOJ and Georgia agreed to a consent order approved by the court shortly after DOJ filed a complaint.  *See* Consent Judgment and Decree, *Georgia*, *supra*,

22

To the extent DOJ has need of sensitive voter data, it has instead tended to obtain it through traditional civil litigation tools.  *See, e.g.*, Fed. R. Civ. P. 34 (authorizing discovery of documents); Fed. R. Civ. P. 45 (authorizing issuance of subpoenas to nonparties).  For instance, DOJ may need a State's entire voter file (including SSNs and driver's license numbers) to analyze whether a voter ID law violates the Voting Rights Act, because having this information allows DOJ to compare the voter file to other state and federal databases to determine (i) how many people registered in a State do not have driver's licenses or the other forms of ID allowed under the voter ID law and (ii) whether there are significant racial disparities in possession of those IDs.  Likewise, it may need such information to determine whether a required field on a voter-registration form is "not material in determining whether" an applicant "is qualified under State law to vote" and so violates the Civil Rights Act of 1964.  52 U.S.C. § 10101(a)(2)(B).

The United States has typically gotten such information in discovery.  *See, e.g.*, *Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 962 (D. Ariz. 2024) (noting that United States' expert witness—to help show that state requirement for place of birth on voter registration forms is not material to determining registrants' qualifications—"determined that of the nearly 4.7 million active and inactive voter records in Arizona, only 2,734 records cannot be uniquely identified based on the voter's name and date of birth"), *aff'd in part, vacated in part, remanded*, 129 F.4th 691 (9th Cir. 2025); *Veasey v. Perry*, 71 F. Supp. 3d 627, 659 (S.D. Tex. 2014) (noting that United States' expert witness determined which voters and of what race lacked IDs covered by Texas's photo ID law "by comparing individual [state] voter records with databases" of U.S. passports, citizenship certificates, and military IDs), *aff'd in part, vacated in part sub nom. Veasey v. Abbott*, 796 F.3d 487 (5th Cir. 2015), *aff'd in part, vacated in part, rev'd in part*, 830 F.3d 216 (5th Cir. 2016) (en

---

Dkt. No. 4.  DOJ and Texas entered into a memorandum of understanding, obviating any litigation.  *Memorandum of Understanding*, *supra*.

banc). And crucially, it has done so under strict court supervision and pursuant to the terms of detailed protective orders that prescribe procedures for exchanging, handling, storing, protecting, and deleting this sensitive data. *See, e.g.*, Protective Order, *Mi Familia Vota*, *supra*, Dkt. No. 353. Title III does not offer these kinds of safeguards. *See* 52 U.S.C. § 20704.

Against this backdrop, DOJ's approach in this litigation stands out for both overbreadth and lack of justification. DOJ rejected an offer to allow inspection of the statewide voter registration list with sensitive fields redacted. Instead, it demanded an unredacted electronic copy, asserting simply that the data was needed to determine "whether California's list maintenance program complies with the NVRA." Dkt. No. 87-3, at 1; Dkt. No. 87-7, at 2. DOJ also demanded copies of "all original and completed voter registration applications" from a multi-year period, which likewise would include voters' driver's license numbers or partial SSNs. Dkt. No. 87-7, at 2. DOJ's requests expressly insisted that the statewide file must include "all fields"—including driver's license numbers and the last four digits of SSNs—and that the requested registration applications be provided in "unredacted" format. Dkt. No. 87-3, at 1; Dkt. No. 87-7, at 2. DOJ did not seek this information to further any *purpose* for which DOJ traditionally might need this sensitive voter data. Nor did DOJ offer the kind of articulated enforcement *basis* that must accompany such requests.

### C.     HAVA Does Not Create Independent Disclosure Rights

Finally, DOJ cannot rely on HAVA as an independent basis for its information requests. Unlike the Civil Rights Act and the NVRA, Congress chose not to include a provision in HAVA creating subpoena authority or requiring disclosure. *See generally* 52 U.S.C. §§ 20901-21145. This makes sense, as HAVA's list-maintenance requirements build on the NVRA's, *see* 52 U.S.C. § 21083(a)(2)(A) and (4), and the NVRA already includes a public-disclosure provision. HAVA requires recipients of grants made under the statute to maintain

24

financial records only for the purpose of allowing audits by the "office making a

grant or other payment" under the statute. 52 U.S.C. § 21142(a)-(b). The inclusion

of this audit provision further indicates that Congress did not silently provide for

other records-access or subpoena power in HAVA. *See Collins v. Yellen*, 594 U.S.

220, 248 (2021); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 328

(2015). DOJ appears to recognize this fact: while it asks the Court to declare that

California is *violating* the Civil Rights Act and the NVRA, it asks only for a

declaration that California's failure to hand over everything DOJ wants "prevents

the Attorney General from enforcing HAVA's list maintenance requirements."

Dkt. No. 1, Prayer for Relief ¶ 3. But HAVA grants DOJ authority to seek

remedies only for actual violations of the statute's "uniform and nondiscriminatory

election technology and administration requirements." 52 U.S.C. § 21111. Thus,

while DOJ can make proper information requests under the Civil Rights Act or the

NVRA for the purpose of ensuring compliance with HAVA, HAVA itself provides

no separate disclosure right. Nor does HAVA authorize DOJ to collect and comb

through highly sensitive personal data from state voter rolls in search of registrants

it suspects are not eligible to vote.

## IV.   **CONCLUSION**

For the reasons discussed above, the Court should grant Defendants' motion

to dismiss.

Dated: December 22, 2025

**O'MELVENY & MYERS LLP**
JONATHAN ROSENBERG*
NOAH B. BOKAT-LINDELL*
AARON HENSON (SB#300696)
L. NICOLE ALLAN (SB#323506)

By: /s/ Jonathan Rosenberg
    Jonathan Rosenberg

By: /s/ Noah B. Bokat-Lindell
    Noah B. Bokat-Lindell

By: /s/ Aaron Henson
    Aaron Henson

Attorneys for *Amici Curiae*
FORMER EMPLOYEES OF THE
U.S. DEPARTMENT OF JUSTICE

*\*Pro hac vice* application pending

## **APPENDIX A**

### *Alphabetic List of Amici Curiae*[*]

**Anna Baldwin**

U.S. Department of Justice (2010-2025): *Trial Attorney*, Voting Section (2010-2015); *Trial Attorney/Senior Trial Attorney*, Appellate Section (2015-2025)

**David Becker**

U.S. Department of Justice (1998-2005): *Trial Attorney*, Voting Section (1998-2005)

**Gregory Friel**

U.S. Department of Justice (1989-2022): *Attorney*, Appellate Section (1992-2006); *Special Litigation Counsel*, Appellate Section (2006-2011); *Senior Counsel*, Office of the Assistant Attorney General (2011); *Deputy Assistant Attorney General* (2012-2022)

**Bradley Heard**

U.S. Department of Justice (2010-2022): *Trial Attorney*, Voting Section (2010-2022)

**Brian Heffernan**

U.S. Department of Justice (1978-2011): *Trial Attorney*, Voting Section (2000-2009); *Special Litigation Counsel*, Voting Section (2009-2011)

**Robert Kengle**

U.S. Department of Justice (1984-2005): *Trial Attorney*, Voting Section (1984-1996); *Special Counsel*, Voting Section (1996-1999); *Deputy Chief*, Voting Section (1999-2005)

**Timothy Lambert**

U.S. Department of Justice (2001-2004): *Trial Attorney*, Voting Section (2001-2004)

**Justin Levitt**

U.S. Department of Justice (2015-2017): *Deputy Assistant Attorney General*, Civil Rights Division (2015-2017)

**Steven Mulroy**

U.S. Department of Justice (1991-2000): *Trial Attorney*, Voting Section (1991-1995)

---

[*] *Amici* submit this brief in their personal capacities. *Amici*'s institutional affiliations are for identification purposes only.

1a

1
2

**Dana Paikowsky**
U.S. Department of Justice (2021-2025): *Trial Attorney*, Voting Section (2021-2023)

3
4
5

**Stephen B. Pershing**
U.S. Department of Justice (1996-2005): *Trial Attorney*, Voting Section (1996-2005)

6
7
8

**John Powers**
U.S. Department of Justice (2007-2015, 2021-2024): *Civil Rights Analyst & Senior Civil Rights Analyst*, Voting Section (2007-2015); *Counsel*, Office of the Assistant Attorney General (2021-2024)

9
10

**Joseph Rich**
U.S. Department of Justice (1968-2005): *Trial Attorney*, Southern Section (1968); *Chief*, Voting Section (1999-2005)

11
12

**Elizabeth Ryan**
U.S. Department of Justice (2012-2025): *Trial Attorney*, Voting Section (2012-2025)

13
14

**Bryan Sells**
U.S. Department of Justice (2010-2015): *Special Litigation Counsel*, Voting Section (2010-2015)

15
16
17

**Avner Shapiro**
U.S. Department of Justice (2000-2007, 2013-2016): *Trial Attorney*, Voting Section (2000-2007, 2013-2016)

18
19

**Thomas Sheran**
U.S. Department of Justice (1971-1977): *Trial Attorney*, Voting & Public Accommodations Section (1971-1977)

20
21
22
23
24
25
26
27
28

BRIEF OF *AMICI CURIAE* FORMER EMPLOYEES OF THE U.S. DEPARTMENT OF JUSTICE

# CERTIFICATE OF COMPLIANCE

The undersigned counsel of record for *amici curiae* Former Employees of the U.S. Department of Justice certifies that this brief contains 25 pages, which:

_____ complies with the word limit of L.R. 11-6.1.

___X___ complies with the page limit set by Section 6 under "Judge's Procedures" on this Court's courtroom website, https://apps.cacd.uscourts.gov/Jps/honorable-david-o-carter.

Dated: December 22, 2025                     **O'MELVENY & MYERS LLP**
                                             AARON HENSON

                                             By:/s/ Aaron Henson
                                                  Aaron Henson

                                             Attorney for *Amici Curiae*
                                             FORMER EMPLOYEES OF THE
                                             U.S. DEPARTMENT OF JUSTICE